# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WOMEN, INFANTS, AND ) <br> CHILDREN GROCERS ASSOCIATION, ) <br> ) <br> NUTRITIONAL FOOD DISTRIBUTORS, INC., ) <br> ) <br> COUNTY FOOD SERVICES, INC., and ) <br> ) <br> DILLARD FOODS, INC., ) <br> ) <br>           Plaintiffs, ) <br>      v. ) <br> ) <br> FOOD AND NUTRITION SERVICE, ) <br> ) <br>           Defendant. ) | Civil Action No. _____ |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, TEMPORARY RESTRAINING ORDER AND COUNSEL'S CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 65.1

Plaintiffs National Women, Infants, and Children Grocers Association ("NWGA"), Nutritional Food Distributors, Inc ("Nutritional Food Distributors"), County Food Services, Inc. ("County Food Services"), and Dillard Foods, Inc. ("Dillard Foods") respectfully move for a preliminary injunction or, in the alternative, a temporary restraining order. Plaintiffs seek a preliminary injunction to enjoin Defendant Food and Nutrition Service ("FNS"), an agency of the U.S. Department of Agriculture ("USDA"), from implementing an interim final rule published in the Federal Register for November 29, 2005. Unless enjoined by this Court, the interim final rule will go into effect on December 29, 2005, and cause irreparable harm to NWGA, Nutritional Food Distributors, County Foods Services, and Dillard Foods, Inc., and other NWGA members.

The interim final rule addresses the vendor cost containment provisions of Section 203 of the Child Nutrition and WIC Reauthorization Act of 2004, Pub. L. No. 108-625 ("Reauthorization

Act"). In purportedly promulgating that rule, Defendant failed to comply with the Regulatory Flexibility Act, the Child Nutrition Act, the Reauthorization Act, the notice-and-comment rulemaking provisions of the Administrative Procedure Act, and (in the alternative) USDA's policy of utilizing notice-and-comment rulemaking even when not required by law.

The legal and factual bases for this motion are described more fully in an accompanying memorandum and the Declarations of EAnn Robinson, J.C. Halbert, and Michael Dillard.

For these reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction, enjoining Defendant from implementing the interim final rule on December 29, 2005. In the alternative, Plaintiffs respectfully request that this Court enter a temporary restraining order that maintains the status quo until this matter can be heard.

Pursuant to LCvR 65.1(a), the undersigned counsel for Plaintiffs (Mr. Olsson) certifies that on December 16, 2005, at approximately 11:00 a.m. EST, he contacted counsel for Defendant (Thomas V. Conway, Esq., Associate General Counsel, U.S. Department of Agriculture) and informed him about Plaintiffs' plan to file this lawsuit and this motion for a preliminary injunction or, in the alternative, a temporary restraining order. Contemporaneous with the filing of this lawsuit and this motion, copies of all pleadings have been provided to counsel for Defendant by electronic mail and hand delivery.

This motion is accompanied by two proposed orders, one granting a preliminary injunction and one granting a temporary restraining order.

Contemporaneous with the filing of this motion, Plaintiffs are filing a separate motion requesting an expedited briefing schedule, so that this motion can be briefed, argued, and decided before the effective date of the interim final rule.

December 16, 2005

Respectfully submitted,

Philip C. Olsson, D.C. Bar No. 172163
Arthur Y. Tsien, D.C. Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 Sixteenth Street, N.W.
Suite 400
Washington, D.C.  20036
202/789-1212
202/234-3537 (FAX)

Attorneys for National Women, Infants, and
Children Grocers Association, Nutritional
Food Distributors, Inc., County Foods
Services, Inc., and Dillard Foods, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL WOMEN, INFANTS, AND CHILDREN GROCERS ASSOCIATION, | ) ) ) | |
| NUTRITIONAL FOOD DISTRIBUTORS, INC., | ) ) | |
| COUNTY FOOD SERVICES, INC., and | ) ) | |
| DILLARD FOODS, INC., | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| FOOD AND NUTRITION SERVICE, | ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR TEMPORARY RESTRAINING ORDER**

Plaintiffs National Women, Infants, and Children Grocers Association ("NWGA"), Nutritional Food Distributors, Inc. ("Nutritional Food Distributors"), County Food Services, Inc. ("County Food Services"), and Dillard Foods, Inc., ("Dillard Foods") (collectively "Plaintiffs") respectfully submit this memorandum in support of their motion for a preliminary injunction or, in the alternative, for a temporary restraining order ("TRO").

## I.    INTRODUCTION

This case involves a challenge to an interim final rule ("Rule") issued by defendant Food and Nutrition Service ("FNS"), an agency of the U.S. Department of Agriculture ("USDA"), on November 29, 2005. 70 Fed. Reg. 71,708.  The Rule implements provisions of the Special Supplemental Nutrition Program for Women,

Infants, and Children ("WIC Program") which were included in section 203 of the Child Nutrition and WIC Reauthorization Act of 2004 ("Reauthorization Act"), enacted and signed into law on June 30, 2004. Incredibly, FNS waited over seventeen months, then published an interim final rule effective in 30 days, and established a twelve-month period for accepting comments. The Rule will drive down reimbursements to unsustainable levels for a discrete segment of food retailers, those that only sell to participants in the WIC Program. The Rule refers to these vendors as "above-50-percent vendors." NWGA represents these vendors, referred to herein as "WIC-only stores" in keeping with industry terminology.

Plaintiff NWGA, on behalf of its members, and Nutritional Food Distributors, County Food Services, and Dillard Foods, all NWGA members, respectfully request that this Court enjoin FNS from implementing the Rule and direct the agency to promulgate a rule that complies with the Administrative Procedure Act and the Regulatory Flexibility Act. NWGA's members will be irreparably injured if FNS is permitted to implement this flawed Rule; indeed, as a result of the Rule, County Food Services and Dillard Foods will both close their stores by January 1, 2006, must fire their employees, and must cease sales to the thousands of nutritionally at risk women and children who regularly shop in their WIC-only stores. Nutritional Food Distributors will close its doors within 60 days as well. NWGA believes that within 60 days, virtually all WIC-only stores will close.

These severe repercussions flow from a legally deficient Rule. The Rule is unlawful because it is contrary to the underlying statute and contrary to Congressional intent. Further, FNS failed to conduct an analysis consistent with the requirements of the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et. seq.* Had FNS adhered to the

2

requirements of the RFA, it would have been able to implement a rule that is consistent with Congressional intent and does not have such irreparably injurious impact on Plaintiffs and other NWGA members. Last, FNS violated the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2). FNS ignored the notice-and-comment rulemaking requirements of the APA, 5 U.S.C. § 553(b); in the alternative, FNS failed to comply with the longstanding policy of USDA that utilizes public comment even when not required by law.

Therefore, Plaintiffs seek a preliminary injunction enjoining FNS from implementing the Rule. If this Court deems it appropriate, Plaintiffs request that their motion be considered as a motion for a TRO, to maintain the status quo until Plaintiffs' motion for preliminary injunction can be heard and decided.

## II.    **BACKGROUND**

### A.    **THE WIC PROGRAM**[1]

This case involves new regulations that limit the participation of certain retailers in the WIC Program, a nutrition assistance program authorized by section 17 of the Child Nutrition Act of 1966. 42 U.S.C. § 1786. The WIC Program provides healthcare, immunization screening, nutrition education, and supplemental foods to pregnant, postpartum, and breastfeeding women, infants, and young children at nutritional risk. Eligibility is determined on the basis of nutritional risk and federal income guidelines.

---

[1]    The facts regarding the WIC Program are supported by the Declaration of EAnn Robinson, President of NWGA and Vice President and General Manager of Nutritional Food Distsributors ("Robinson Decl."), the Declaration of J.C. Halbert, President of County Food Services ("Halbert Decl."), and the Declaration of Michael A. Dillard, President of Dillard Foods ("Dillard Decl.").

The income guidelines are relatively generous, providing eligibility up to 185% of the poverty income level.[2]

The WIC Program is a large, nationwide program, with an annual budget for fiscal year (FY) 2006 of approximately $7 billion. Of this amount, $5.2 billion is appropriated by the U.S. Congress (Pub. L. No. 109-97, 119 Stat. 2144), and nearly $2 billion is expected to be provided to the program through statutorily mandated rebates from infant formula manufacturers. In FY 2005, the last full year for which statistics are available, the WIC Program served approximately 8 million participants, which includes approximately 1.9 million women, 2.1 million infants, and 4 million children ages five and under.[3] Surprisingly, nearly half of all infants born in the United States each year are WIC beneficiaries.[4]

The authority to administer the program on the federal level has been delegated to FNS, which is required to "provide assistance to State and local agencies and evaluate all levels of Program operations to ensure that the goals of the Program are achieved in the most effective and efficient manner possible." 7 C.F.R. § 246.3(a). State agencies are responsible for implementing the program within their States which includes but is not limited to, the following tasks: (1) authorizing the participation of retail food stores ("authorized vendors"); (2) creating a vendor agreement that governs the contractual

---

[2]     *See, e.g.*, 42 U.S.C. § 1786(a). *See also* WIC Benefits and Services, available at http://www.fns.usda.gov/wic/benefitsandservices/;
http://www.fns.usda.gov/wic/howtoapply/eligibilityrequirements.htm; WIC Nutrition Program Facts, available at http://www.fns.usda.gov/wic/WIC-Fact-Sheet.pdf.
[3]     *See* WIC Program Participation and Costs, available at
http://www.fns.usda.gov/pd/wisummary.htm; WIC Program Monthly Data, available at
www.fns.usda.gov/pd/WIC_Monthly.htm.
[4]     *See*    Frequently    Asked    Questions    About    WIC,    available    at
www.fns.usda.gov/wic/FAQs/FAQ.HTM#4.

relationship between the State and each authorized vendor; (3) establishing price limitations for paying authorized vendors; (4) training authorized vendors; and (5) monitoring compliance. 7 C.F.R. §§ 246.3(b) and 246.12.

Among other services, WIC Program participants receive supplemental foods (a "food package") at no cost. Typically, pregnant women enroll in the WIC Program by signing up for a pre-natal health check-up at a local health clinic. The mother then will receive a voucher document for each member of the family who is a WIC participant. The monthly WIC voucher for each individual is an English-language list of food items to which that person is entitled. A typical food package for a child or pregnant woman might include a voucher that can be exchanged for specific brands and quantities of fluid milk, eggs, cereal, juice, and dry beans. *See* 7 C.F.R. § 246.10(c). A new mother with an infant and a three-year-old would receive three separate vouchers each month, one for herself and one for each of her children.[5]

Referring to her English-language voucher lists for each eligible member of her family, the WIC mother must search out the WIC-approved foods at an authorized retailer (in the proper package size specified in each voucher) and then exchange her vouchers for these food items at checkout. At a typical "box store" or supermarket, the WIC mother will take her WIC selections to the check-out counter, where they will be processed separately from her other purchases. The store clerk must correct any mistaken selections at the check-out counter while other customers in line are waiting their turn to checkout. Robinson Decl. at ¶ 12. This process can be daunting for the WIC Program participant, particularly those who have low literacy skills and/or speak little or no

---

[5]    *See, e.g.*, Benefits and Services: WIC Food Package, available at http://www.fns.usda.gov/wic/benefitsandservices/foodpkg.htm. *See also* Robinson Decl. at ¶ 9.

English. time consuming in the typical busy store, and irritating to the clerk and the other waiting customers.   Robinson Decl. at ¶¶ 12-15; Halbert Decl. at ¶¶ 8-10; Dillard Decl. at ¶¶ 9-11.   *See also* Assessment of WIC Cost Containment Practices Final Report, Economic     Research     Service,     USDA     (Feb.     2003)     at     131-134 (www.ers.usda.gov/publications/efan03004).

The difficulty of negotiating the voucher lists and the awkwardness of this retail store experience for the WIC mother is well documented and a persistent concern for WIC recipients.  As the Government Accounting Office reported in 1998:

> [T]he stigma some women associate with WIC—how their participation in the program makes them appear to their friends and co-workers—is another significant factor limiting participation, according to about 57 percent of the local agency directors. Another aspect of the perceived stigma associated with WIC participation is related to the so-called "grocery store experience." The use of WIC vouchers to purchase food in grocery stores can cause confusion and delays for both the participant-shopper and the store clerk at the check-out counter. For example, Texas requires its WIC participants to buy the cheapest brand of milk, evaporated milk, and cheese available in the store. Texas also requires participants to buy the lowest-cost 46-ounce fluid or 12-ounce frozen fruit juices from an approved list of types (orange, grapefruit, orange/grapefruit, purple grape, pineapple, orange/pineapple, and apple) and/or specific brands. In comparing the cost of WIC-approved items, participants must also consider such things as weekly store specials and cost per ounce in order to purchase the lowest-priced items. While these restrictions may lower the dollar amount that the State pays for WIC foods, it may also make food selections more confusing for participants. According to Texas WIC officials, participants and cashiers often have difficulty determining which products have the lowest price. Consequently, a delay in the check-out process may result in unwanted attention for the WIC participant

Testimony of Robert A. Robinson, Director, Food and Agriculture Issues, General Accounting Office, Before the U.S. Senate Committee on Agriculture, Nutrition, and

Forestry, Food Assistance -- Information on Selected Aspects of WIC (March 17, 1998) at p. 5.[6]

To address the barriers that arise for the WIC participant in a typical retail setting, WIC-only stores have arisen to provide a more dignified shopping experience. WIC-only stores are described below.

## B.    THE PLAINTIFFS – WIC-ONLY STORES AND THEIR TRADE ASSOCIATION

### 1.    WIC-only Stores[7]

The barrier of all-English voucher lists and the awkwardness of the typical retail checkout experience for WIC participants has led to the emergence of WIC-only stores. In these stores, every WIC-approved food (in the proper packaging size) is carried in stock, and only WIC-eligible items are carried. Some of the stores are set up with aisles like small grocery stores, except that all of the foods in the store are WIC-approved. Others will be set up like pharmacies, where the WIC mother presents her voucher(s) to a clerk behind the counter, and the clerk will fill the entire order enumerated on the WIC mother's voucher(s). Because the food selection process at the WIC-only store is much easier for a WIC mother than the selection process at larger mainline retailers, WIC-only stores have proven popular wherever they have opened. *See*, Robinson Decl. at ¶¶ 15-17; Dillard Decl. at ¶¶ 6, 8-11; Halbert Decl. at ¶¶ 8-12.

Additionally, the complexity of the WIC Program and the English language voucher lists is a barrier to non-English-speaking WIC participants and those with low English literacy skills. WIC-only stores frequently hire current and former WIC

---

[6]    Available at http://www.gao.gov/archive/1998/rc98128t.pdf.

[7]    *See generally* Robinson Decl. at ¶¶ 29-40; Halbert Decl. at ¶¶ 5-14; Dillard Decl. at ¶¶ 4-12.

participants (Halbert Decl. at ¶ 9; Robinson Decl. at ¶ 17 and 23). WIC-only store employees are frequently fluent in Spanish. Robinson Decl. at ¶ 17; Dillard Decl. at ¶ 9; Halbert Decl. at ¶¶ 5,9. They have also had to respond to less-conventional communication challenges. For instance, at Dillard Foods, the store employees have learned to communicate with their deaf customers. Dillard Decl. at ¶ 9. At County Food Services, these Arkansas stores have learned enough Marshallese to be able to communicate with their customers from the Marshall Islands. Halbert Decl. at 9. The WIC-only store clerks are knowledgeable about the WIC Program and, importantly, sympathetic to providing a dignified shopping experience for their customers. Dillard Decl. at ¶ 10.

WIC-only stores also are more likely than traditional vendors to fully redeem a recipient's food benefits. This is because traditional vendors often do not stock the right package sizes and/or brands of approved foods or because WIC recipients are otherwise not able to fill the full food package to which the recipient is entitled. Assuring that their customers obtain the full allotment of foods allowed in a voucher is one of the critical services WIC-only stores provide. Robinson Decl. at ¶ 15; Dillard Decl. at ¶ 6, 9.

Finally, WIC-only stores are purposefully located to be convenient for WIC recipients. It is common for WIC-only stores to be located in close proximity to local WIC clinics which certify WIC participants; in ethnic neighborhoods, where the language and translation services offered by WIC-only stores are particularly well received; and near major military bases, where many young service families have incomes within the program edibility guidelines. Robinson Decl. at ¶ 19 and 33; Dillard Decl. at ¶ 4.

Because WIC-only stores are small businesses that provide special services and offer only a small, targeted product line, their prices and costs of doing business generally have been higher than those of large "box stores" and supermarkets. Wholesale product acquisition costs for WIC-eligible products are higher for a WIC-only store than they are for a typical "box store" or supermarket, whose volume purchasing commands large discounts. *See generally*, Dillard Decl. at ¶ 12; Halbert Decl. at ¶ 13; Robinson Decl. at ¶ 24. Prices charged by WIC-only stores are probably, on average, about 8 to 15 percent higher than prices at high-volume "box stores."

### 2.    Plaintiffs

Plaintiff NWGA is a District of Columbia corporation with its principal place of business in Norman, Oklahoma. Robinson Decl. at ¶ 1. NWGA is a small, voluntary, not-for-profit trade association whose primary purpose is to represent WIC-only stores. NWGA and most of its members meet the Small Business Administration ("SBA") definition of a "small business."[8] According to FNS, WIC-only stores account for approximately 2.5 percent of all WIC-authorized stores in 2004. 70 Fed. Reg. at 71,725.

Plaintiff Nutritional Food Distributors has its corporate office in Norman, Oklahoma. Robinson Decl. at ¶ 29. The company operates five WIC-only stores in Oklahoma. *Id.* at ¶ 31.

---

[8]    *See* Small Business Size Standards Matched to North American Industry Classification System, available at http://www.sba.gov/size/sizetable2002-old.html. The SBA sets income levels of $6.5 million in annual revenue for business professional associations (NWGA). NWGA estimates its annual revenue for 2005 will be less than $6.5 million. Robinson Decl. at ¶ 4. The SBA sets income levels of $25 million for supermarkets and grocery stores and $6.5 million in annual revenue for specialty grocery stores. Under either standard, Plaintiffs Dillard Foods, County Foods Services, and Nutritional Food Distributors all meet the SBA definition of a small business entity. *See*, Dillard Decl. at ¶ 7; Halbert Decl. at ¶ 7; Robinson Decl. at ¶ 36, respectively. NWGA believes that a vast majority of its members have annual revenues of less than $6.5 million annually and that almost all of its members have annual revenues of less than $25 million annually. Robinson Decl. at ¶ 5.

Plaintiff County Food Services has its corporate office in Rogers, Arkansas. Halbert Decl. at ¶ 2. The company operates five WIC-only stores in the state of Arkansas. Id. at ¶ 5.

Plaintiff Dillard Foods has its corporate office in Hot Springs, Arkansas. Dillard Decl. at ¶ 2. The company operates four WIC-only stores in the state of Arkansas. Id. at ¶ 4.

## C.    THE REAUTHORIZATION ACT

On June 30, 2004, the President signed into law the Child Nutrition and WIC Reauthorization Act of 2004, Pub. L. No. 108-265 ("Reauthorization Act"). This law reauthorized the WIC Program through 2009, and made a number of substantive changes to the underlying statute.

Section 203(e)(10) of the Reauthorization Act mandated new vendor cost containment requirements that require State administering agencies to: (1) establish a "vendor peer group system" and (2) establish competitive price criteria and allowable reimbursement levels for each vendor peer group. 42 U.S.C. § 1786(h)(11)(A)(i). A "vendor peer group system" is the system by which State agencies categorize WIC-authorized vendors into groups of similar vendors for the purpose of determining reimbursement levels (*e.g.*, Wal-Mart with Target Greatland; corner store with corner store). *See new* 7 C.F.R. § 246.2 (definition of "vendor peer group system"), 70 Fed. Reg. at 71,722.

WIC-only stores are singled out for special treatment in achieving additional program cost containment.[9] However, the Reauthorization Act states that it is not

---

[9]    The legislation refers to "above 50 percent vendors." In reality, all of the members of this category are WIC-only stores.

intended to "compel a State agency to achieve lower food costs if program participants redeem supplemental food vouchers" at WIC-only stores rather than other retail vendors. 42 U.S.C. § 1786(h)(11)(A)(i). The goal is to ensure that vendor reimbursement levels "do not result in average payments per voucher to [WIC-only stores] that are higher than average payments per voucher to comparable vendors" that are not WIC-only stores. Id. § 1786(h)(11)(E) (emphasis added).

The legislative history of the Reauthorization Act outlined Congress' expectations for how FNS was to achieve the objectives of the vendor cost containment provision. The history is clear that FNS was to develop objective and readily discernable criteria to implement the provision and that WIC-only stores were always to be compared fairly to comparable stores. *See, e.g.,* 150 Cong. Rec. E1328 (2004) (statement of Rep. Bohener).

The Reauthorization Act included two implementation clauses that relate to the vendor cost containment provision. First, FNS "may promulgate interim final regulations. . . ." *Id.* § 501(b)(2) (emphasis added); *see* 42 U.S.C.A. § 1758 note. Second, FNS "*shall* promulgate final regulations" not later than two years after the date of enactment – by June 30, 2006. *Id.* § 502(b)(2) (emphasis added); *see* 42 U.S.C.A. § 1758 note.

Further, the Reauthorization Act directed FNS and the State agencies to comply with the vendor cost containment provision on or before December 30, 2005. 42 U.S.C. § 1786(h)(11)(G).

## D.    THE RULE

On November 29, 2005, 17 months after enactment of the Reauthorization Act, only 30 days before the Congressional deadline for compliance, and without prior notice

and comment, FNS published an interim final rule to take effect on December 29, 2005.[10] The Rule purports to implement the new vendor cost containment requirements. 70 Fed. Reg. 71,708.

The Rule will require WIC-only stores to maintain pricing at or below the average prices charged by all stores in the State. In each State, a few large "box stores" and national chains typically will account for most of the below-average prices charged, and the above-average prices will be charged by a large number of smaller WIC-authorized retailers. The Rule will require WIC-only stores to charge lower prices than their competition — the large number of smaller, similarly situated WIC-authorized retailers that are traditional vendors and not WIC-only stores. The latter category will comprise the vast majority of WIC-authorized vendors in the State; these vendors will not be subject to the cost containment provisions of the Rule.

As noted, the cost containment provision of the Reauthorization Act directs that its provisions not "be construed to compel a State agency to achieve lower food costs if program participants redeem supplemental vouchers at [WIC-only stores] rather than at [traditional WIC-authorized vendors that are not WIC-only stores.]" 42 U.S.C. § 1786(h)(11)(A)(i). The Reauthorization Act provides: "The State agency shall establish a vendor peer group system" for the purpose of cost comparisons and containment. Specifically, it requires states to limit prices of WIC-only stores so that prices at WIC-only stores "do not result in average payments per voucher that are higher than average payments per voucher to comparable vendors other than [WIC-only stores]." 42 U.S.C. § 1786(h)(10)(E).

---

[10]    The Rule requires state agencies to implement the provisions contained therein by December 30, 2005. 70 Fed. Reg. 71,708.

The Rule incorporates the statutorily mandated vendor peer group system and the specific test for limiting per voucher payments of WIC-only stores. However, it makes a nullity of that requirement by adopting an additional per voucher test for which the Reauthorization Act does not provide, by limiting WIC-only store prices to the average of costs of all vouchers redeemed by traditional retailers. Thus, the Rule renders irrelevant the Reauthorization Act's express requirement for a comparison to prices of comparable stores. The Rule limits reimbursements for WIC-only stores to a level lower than the average for vouchers redeemed by all vendors. *See New* 7 C.F.R. § 246.12(g)(4)(vi), 70 Fed. Reg. at 71,724.

State administering agencies are required to implement the provisions of the Rule no later than December 30, 2005. Simultaneously with publication of the Rule, FNS authorized comments to be submitted until November 29, 2006, a comment period of 12 months. 70 Fed. Reg. 71,708. Yet, the Reauthorization Act directs that FNS "shall" promulgate final regulations within 2 years of enactment, by June 30, 2006. Reauthorization Act § 502(b)(2); *see* 42 U.S.C.A. § 1758 note. Apparently, FNS has no intention of complying with the statutory deadline for a final rule.

FNS addressed the Regulatory Flexibility Act (RFA) in the preamble: "FNS does not believe this rule will have a significant impact on a sufficient number of small entities" to trigger the RFA. 70 Fed. Reg. at 71,709. Yet, FNS also stated:

> [T]he rule may have a significant economic impact on a small number of vendors that have been authorized to participate in the WIC Program. These vendors tend to be smaller grocery stores that serve WIC participants exclusively or predominantly, have a large volume of WIC transactions, and are not subject to the retail market forces that keep food prices at competitive levels. ... Only those vendors that are able to meet competitive pricing requirements will be able to continue participating in the program.

> Currently FNS estimates that between three and four percent of the approximately 45,000 authorized vendors will need to make changes in the prices that they offer the WIC Program in order to be deemed competitive.

Id. Thus, FNS concluded that it did not need to evaluate the impact of the Rule on what it estimated to be 1,350 to 1,800 (three or four percent of 45,000) WIC-only stores because, in the agency's view, this is not a substantial number of small entities, but rather "a small number of vendors." Id.

## III.    ARGUMENT

This Court weighs four factors in deciding whether to grant a preliminary injunction or a TRO:  (1) whether there is a substantial likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction or TRO is not granted; (3) whether the injunction or TRO will substantially injure other interested parties; and, (4) whether the public interest would be furthered by the injunction or TRO. *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).  These factors interrelate on a sliding scale and must be balanced against each other. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).  However, a court may accept a showing that the movant has a "substantial case on the merits" instead of the probability of success on the merits that is ordinarily required, when "the other three factors strongly favor interim relief." *WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). *See also Serono Labs.*, 158 F.3d at 1318, *quoting CityFed Financial*, 58 F.3d at 746.

Here, all four factors weigh heavily in favor of a preliminary injunction.

## A.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A TRO

Injunctive relief rests foremost upon a demonstration of irreparable injury. *See*, e.g., *City Fed Fin. Corp.* 58 F.3d at 747 (*quoting Sampson v. Murray*, 415 U.S. 61, 88, (1974)).   The irreparable harm to plaintiffs Nutritional Food Distributors, County Food Services, Dillard Foods, and other NWGA members flowing from the Rule is discussed in the accompanying Declarations of Ms. Robinson, Mr. Halbert, and Mr. Dillard.

Mr. Halbert states:

> The State of Arkansas has informed County Food Services, Inc. that the new cost containment rule will require the state to recoup any payments made to County Food Services, Inc. in excess of the average payments per food instrument in Arkansas. … Continued operation at these payment levels would mean substantial, immediate loses for County Food Services, Inc. So, we have informed our employees, customers, and leasors that County Food Services, Inc. will be forced out of business on December 30, 2005."

Halbert Decl. at ¶¶ 16-17.   Mr. Halbert, his wife, and their employees will be unemployed as of January 1, 2006.  Additionally, the business will incur additional losses as it cancels it leases.  Id. at ¶ 18-19.

Mr. Dillard states:

> Among other things, FNS is requiring that the State of Arkansas Department of Health, with which Dillard Foods, Inc. has its vendor agreement, must be able to demonstrate that it has a system in place to ensure that Dillard Foods, Inc. is not receiving average payments for its sale of WIC foods that are higher than average payments of other vendors, such as traditional, full service grocery stores and retailers like Wal-Mart.  The State of Arkansas is required to be able to make this demonstration no later than December 30, 2005.

> By incorrectly requiring a comparison of voucher payments of Dillard Foods, Inc. to all WIC vendors, as opposed to comparable small business vendors, the State agency will

be forced to lower its reimbursement to Dillard Foods, Inc. to levels significantly below the levels paid to comparable vendors. *The lower reimbursement levels will make it impossible for us to cover our operating costs and sustain the stores. This means Dillard Foods, Inc. will be forced to cease operations as of December 30, 2005.* We are currently depleting our inventory and have notified our employees that we plan for December 30,2005 to be our last day to be open for business and any of our stores. During the month of January, we will be engaged in business closure procedures and wrap up activities.

As a result of closing our stores in the State of Arkansas, my wife and I will lose our jobs, and we will have to terminate all eight of our employees, effective December 30, 2005.

Dillard Decl. at ¶¶ 13-15 (emphasis supplied).  Additionally, Mr. Dillard's business will incur costs on terminated leases and other business costs to close down Dillard Foods.

Ms. Robinson, attesting to the injury to Nutritional Food Distributors, states:

*If this Rule is allowed to go into effect, the small business we have built over that last 14 years will be forced to close within 60 days.* The primary reason I would take that long to close down would be to provide better layoff notice to our staff. We also have additional expenses associated with this closing. We would have to terminate store leases, probably incurring penalties and costs of $24,700. We would also have about $200,000 in inventory we would have to liquidate. Any employee reimbursements made under our cafeteria plan that are higher than deposits by the employees would have to be paid by the company when the plan is dissolved. Additionally, we would all lose our health insurance coverage because the company is not covered by COBRA. Even if it were, the premiums would be prohibitive.

Robinson Decl. at ¶ 40 (emphasis supplied).

Ms. Robinson, in her capacity as President of NWGA offers the following bleak forecast for the WIC-only industry: "[B]ased on my personal knowledge of the business

16

and the numerous telephone conferences with WIC-only store operators from around the country since the Rule was published, I conservatively estimate that the Rule will force 90% of all WIC-only stores to close within 60 days of implementation." Robinson Decl. at ¶ 27.

FNS does not dispute the serious consequences of its Rule to Plaintiffs' WIC-only stores: "the rule may have a significant economic impact on a small number of vendors that have been authorized to participate in the WIC Program. ... Only those vendors that are able to meet competitive pricing requirements will be able to continue participating in the program." 70 Fed. Reg. at 71,709.

The financial consequences of the Rule are not compensable. Plaintiffs and NWGA's other members have no cause of action against FNS that would compensate for these injuries. Furthermore, these losses go beyond mere lost profits – these businesses cannot continue as going concerns and must close their doors to their established WIC customers. Where, as here, the financial harm to the moving party threatens its very existence, such that it will not survive as an ongoing business concern absent court intervention, the irreparable injury necessary to support issuance of an injunction is demonstrated. *Bristol-Myers Squibb v. Shalala*, 923 F. Supp. 212, 220 (D.D.C. 1996); *Holiday Tours*, 559 F.2d at 843 n.2; *Wisconsin Gas Co. v. Federal Energy Regulatory Com'n*, 758 F.2d 669, 674 (D.C. Cir. 1985).

**B.    OTHER PERSONS WILL BE SUBSTANTIALLY INJURED IN THE ABSENCE OF A PRELIMINARY INJUNCTION**

WIC-only stores accounted for approximately 2.5 percent of all WIC-authorized vendors in 2004, while comprising nearly 12 percent of total WIC redemptions. 70 Fed. Reg. at 71,725. These stores serve thousands of customers every day who will be injured

if the FNS Rule proceeds on December 30, 2005. Eliminating this important and familiar store for the WIC mother-purchaser is a serious matter.

Plaintiffs' customers are saying that they would abandon the Program rather than seek to redeem their vouchers at a traditional retailer. Dillard Decl. at ¶ 10. These WIC customers are willing to make separate trips to two grocery stores – to both a WIC-only store and to a traditional grocery store or retailer – because of the service and support that WIC-only stores provide. Halbert Decl. at ¶ 12; Robinson Decl. at ¶ 20. As stated in these declarations, the WIC voucher program can be very intimidating, and redeeming WIC vouchers can be awkward at a conventional "box store" or supermarket, with the result that mothers will simply not use the WIC vouchers if they cannot redeem them at WIC-only stores. See generally, Dillard Decl. at ¶ 10; Robinson Decl. at ¶ 28. These women and their children are at nutritional risk; yet, these mothers would rather bear the costs out of pocket, or do without entirely, than try to redeem their benefits at a conventional grocery store or retailer.

## C.    THE ISSUANCE OF A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST

The public interest also favors entry of a preliminary injunction enjoining implementation of the Rule. Certainly, there is a public interest served in forcing FNS to comply with the Reauthorization Act, to analyze in a meaningful and searching way the impact of the Rule upon small businesses as the RFA requires, and to comply with the APA.

Failure to stay the implementation of the Rule will have significant adverse effects on 1,350 to 1,800 small WIC-only retailers and the hundreds of thousands of WIC participants whom they serve. The WIC-only stores will almost certainly have to close

18

their doors because they will not be able to meet the "as low as Wal-Mart pricing" which will be required by the Rule, even though that result is not required by the Reauthorization Act. Hundreds of thousands of their customers will unfortunately stop using the nutrition benefits which the WIC Program provides for them and their children for a variety of reasons, ranging from language barriers to the social stigma of holding up friends and neighbors in a grocery store checkout line while the cashier verifies multiple voucher documents. See Dillard Decl. at ¶ 15; Halbert Decl. at ¶ 20. See also, Testimony of Robert A. Robinson, Director, Food and Agriculture Issues, General Accounting Office, before the U.S. Senate Committee on Agriculture, Nutrition, and Forestry, Food Assistance – Information on Selected Aspects of WIC (March 17, 1998) at pg. 5; Assessment of WIC Cost Containment Practices Final Report, Economic Research Service, USDA (Feb. 2003) at pgs. 131-134.[11]

Conversely, projected savings from the proposed cost controls will amount to only approximately one percent of total program costs. It is certainly in the public interest for the government to absorb this small incremental cost for the several months necessary to bring its implementing regulations into compliance with the Reauthorization Act and to provide both WIC-only retailers and WIC participants with the procedural due process guaranteed by the APA and RFA.

* * *

The savings FNS estimates with the Rule are anticipated to be marginal. In contrast, the damages to WIC-only stores and the WIC families they serve are enormous, irreparable and not compensable. WIC-only stores, like the Plaintiffs here, will have to

---

[11]    See www.ers.usda.gov/publications/efan03004.

cease operations entirely and a vulnerable, nutritionally at risk population will lose, almost overnight, an important purchasing option.

The balance of harms tips decidedly in favor of the Plaintiffs. Plaintiffs' very strong showing on the factors of irreparable harm, public interest, and injury to non-parties all favor granting interim relief.

**D.    THERE IS A SUBSTANTIAL LIKELIHOOD THAT PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS**

As demonstrated below, Plantiffs are likely to succeed on the merits because FNS's Rule is legally deficient. The Rule is inconsistent with the Reauthorization Act and Congressional intent. Further, FNS violated the RFA by failing to conduct the required Regulatory Flexibility Analysis. Had FNS adhered to the requirements of the RFA it would have been able to implement a rule that is consistent with Congressional intent and does not have such an irreparable adverse impact on NWGA, Nutritional Food Distributors, County Food Services, and Dillard Foods. FNS also failed to follow statutory requirements and USDA policy to utilize notice-and-comment procedures.

**1.    The Rule Violates The Vendor Cost Containment Provisions Of The Amended Act And Is Not Authorized By The Underlying Statute**

In reviewing an agency regulation, this Court is guided by the standard of Chevron USA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984):

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

Here, the Rule cannot stand under the <u>Chevron</u> "step one" test.

The vendor cost-containment provisions of the Reauthorization Act require that each State "establish a vendor peer group system." 42 U.S.C. § 1786(h)(11)(A)(i)(I). Each State is then to "establish competitive price criteria and allowable reimbursement levels for each vendor peer group...." Id. § 1786(h)(11)(A)(i)(II). The statute then provides that for vendors "for which more than 50 percent of the annual revenue of the vendor from the sale of food items consists of revenue from the sale of supplemental foods that are obtained with food instruments," the State shall establish "competitive price criteria and allowable reimbursement levels [which] do not result in average payments per voucher to vendors... that are higher than average payments per voucher to <u>comparable vendors</u> other than" vendors that are not WIC-only stores.      Id. § 1786(h)(11)(D)(ii)(E) (emphasis supplied). Since these comparisons are to be made in the context of the State's vendor peer group system, Congress intended that the price criteria and reimbursement levels for WIC-only stores should be compared to peer groups of traditional food stores "using the same criteria as are used to distinguish between traditional vendor peer groups," which generally are based on store size and location. *See* 150 Cong. Rec. E1328 (2004) (statement of Rep. Bohener).

The Rule provides for the voucher payment test between comparable stores, as mandated by the Reauthorization Act.  However, it also requires an additional voucher payment test that renders the mandated test irrelevant.  Specifically,  the Rule mandates that State agencies compare voucher payments to WIC-only stores with voucher payments to <u>all other WIC-authorized vendors</u>:

> [C]ompare the average cost of each type of food instrument
> redeemed by [WIC-only stores] against the average cost of
> the same type of food instrument redeemed by regular
> vendors.

*New* 7 C.F.R. § 246.12(g)(4)(i)(D), 70 Fed. Reg. at 71,723. This high hurdle test in the FNS rule is contrary to the plain language of the Reauthorization Act and must be set aside by this Court under <u>Chevron</u> "step one."

Even if the statutory language were ambiguous (and it is not), FNS's rule cannot stand. Under <u>Chevron</u> "step two," this Court owes FNS's interpretation deference only if that interpretation leads to reasonable results. <u>Chevron</u>, 467 U.S. at 844. When judged by this standard, the Rule again fails. The Rule's non-statutory voucher payment comparison renders irrelevant the statutory test and makes a charade of the entire vendor peer group comparison system as it applies to WIC-only stores. This point is clearly recognized in December 16, 2005 correspondence from the Arkansas Department of Health and Human Services to WIC vendors, which reports on discussions with FNS regarding implementation of the Rule. The letter concludes that the means "to enforce the new maximum reimbursement levels" on WIC-only stores is, "On all food instruments with a 'Not Valid Until' date on or after January 1, 2006, a purchase amount at or below the average amount paid to regular vendors must be used." See Declaration of JC Halbert. Thus, the Rule creates a system where WIC-only stores are required to meet prices below the average of payments to comparable vendors and competitive with the very largest "box stores" and supermarkets. This forced comparison is not reasonable. Because the Rule is not a reasonable interpretation of the peer group and comparability provisions of the Reauthorization Act, it cannot stand.

Moreover, the voucher-to-voucher comparison employed by the Rule fails to account for fundamental differences in vouchers redeemed at WIC-only stores and traditional vendors. As explained in plaintiff's declarations, a primary appeal of WIC-only stores to customers is service provided to assist the customer in obtaining the full amount of food authorized for purchase with the family's vouchers. Declaration of EAnn Robinson. Traditional vendors do not offer this service. As a result, vouchers redeemed at WIC-only stores tend to reflect the cost of the full amount of food prescribed by the program, while vouchers redeemed at traditional vendors tend to reflect the cost of less than the full amount of food prescribed by the program. Such a comparison undermines the prescribed food benefit package that the WIC Program is intended to deliver. This "apples and oranges" comparison of voucher payments is not a reasonable interpretation of the peer group and comparability provisions of the Reauthorization Act.

For these reasons, Plaintiffs are likely to prevail on the merits.

### 2. FNS Violated The RFA In Failing To Conduct An Analysis That The Act Requires

The RFA, 5 U.S.C. § 601 *et seq.*, arose from complaints by small businesses that they were being bankrupted by federal regulations promulgated without regard to small business needs. In response to those concerns, Congress passed the RFA in 1980. The RFA requires agencies proposing rules to assess the potential economic impact on small businesses, small not-for-profit organizations, or small governmental entities. When promulgating a rule, the federal agency is required to prepare an RFA Analysis that includes a "description of the steps the agency has taken to minimize the significant economic impact on small entities" and an explanation of why other significant alternatives were rejected by the agency. 5 U.S.C. § 604(a)(5). Moreover, the RFA

requires that an agency "evaluate the potential adverse economic effects of and less harmful alternatives to its actions *before* taking them." *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1286 (D.C. Cir. 2005) (emphasis added).

For "any rule subject" to the RFA,[12] "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610." 5 U.S.C. § 611(a)(1) (*quoted in National Ass'n of Home Builders*, 417 F.3d at 1284.[13] FNS's cursory RFA analysis is woefully inadequate and violates the RFA's requirements. Most fundamentally, FNS developed and implemented the Rule without examining its potential economic impacts on small businesses, such as NWGA's members, and failed to evaluate what alternatives would be less burdensome to small businesses.

FNS violated its RFA obligations in several significant ways. As a threshold matter, the cursory statement that the agency does not "believe" the Rule will have a

---

[12]    The interim final rule is, unquestionably, a "rule" where FNS was required under 5 U.S.C. § 553 to publish a notice of proposed rulemaking, thereby triggering the required RFA analysis. 5 U.S.C. §§ 603 and 604. FNS identified the interim final rule as a "rule" in the *Federal Register*. 70 Fed. Reg. 71,708. The interim final rule is, indeed, an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). It has the binding effect of law, and FNS has made clear that it expects State agencies to comply by December 30, 2005. 70 Fed. Reg. 71,708. The fact that FNS chose to (unlawfully) dispense with a notice of proposed rulemaking prior to promulgating and enforcing the interim final rule is not determinative. *See National Ass'n of Home Builders v. Army Corps of Engineers*, 417 F.3d 1272, 1285 (D.C. Cir. 2005) ("Despite our declarations that 'only legislative rules' have the force and effect of law and a 'legislative rule' is one the agency has duly promulgated in compliance with the procedures laid down in the statute or in the Administrative Procedure Act, *we have not hesitated to consider an agency pronouncement issued without meeting required APA procedures a rule.*") (internal quotations and citations omitted) (emphasis added).

[13]    Interestingly, Congress added the RFA's judicial review provisions in 1996 because many agencies, such as FNS here, were simply paying "lip service" to its procedural protections. 142 CONG. REC. S3242, S3245 (daily ed. Mar. 29, 1996).

significant impact on a substantial number of small entities did not meet the certification

requirements of 5 U.S.C. § 605(b). The agency must make a formal certification and

provide the factual basis for this certification. 5 U.S.C. § 605(b). FNS did neither.

Second, the RFA analysis FNA did conduct was brief and contradictory, and occupied

merely two paragraphs of the preamble to the Rule. FNS stated: "FNS does not believe

this rule will have a significant economic impact on a substantial number of small

entities." 70 Fed. Reg. at 71,709. However, FNS contradicted that statement in the very

next paragraph of the preamble:

> [T]he rule may have a <u>significant economic impact on a small number of vendors</u> that have been authorized to participate in the WIC Program. These vendors tend to be smaller grocery stores that serve WIC participants exclusively or predominantly, have a large volume of WIC transactions, and are not subject to the retail market forces that keep food prices at competitive levels.... Currently FNS estimates that between three and four percent of the approximately 45,000 authorized vendors will need to make changes in the prices that they offer the WIC Program in order to be deemed competitive.

70 Fed. Reg. at 71,709 (emphasis added). Thus, by FNS's estimate, between 1,350 to

1,800 (three or four percent of 45,000) WIC-only stores simply do not constitute "a

substantial number of small entities" sufficient to trigger the protections afforded by the

RFA. This bald conclusion is at best erroneous and at worst grossly arrogant, where FNS

admits the Rule will have a significant economic impact on each of the vendors.[14]

---

[14]    FNS's cavalier disregard for these small WIC-only grocery stores is especially offensive because the RFA is precisely intended to avoid the very ills not afflicting NWGA's members. Indeed, Congress itself was sensitive to the hardship that the cost containment provisions of the Reauthorization Act might impose upon WIC-only stores and explained that the Reauthorization Act "is not intended to eliminate WIC-only stores or to force the WIC-only stores to price their products less than the larger retail stores." 150 CONG. REC. H49333 (daily ed. June 24, 2004) (Statement of Rep. Waters).

FNS's actions violate the protections afforded small businesses under the RFA. The agency did not undertake the RFA analysis required; thus, enforcement of the Rule must be deferred until FNS conducts a proper RFA analysis. 5 U.S.C. § 611(a)(4). On this ground alone, Plaintiffs are likely to succeed on the merits of their suit.

### 3.   FNS Violated The APA By Failing To Use Notice-and-Comment Procedures

FNS violated the APA in two ways: (1) it disregarded the procedural protections the APA affords and purportedly promulgated a Rule that cannot remotely be characterized as "interim"; and, in the alternative, (2) it abandoned, without explanation, longstanding agency policy to use notice-and-comment procedures even when not required by law.

### a.   FNS Failed To Follow The APA's Notice-and-Comment Rulemaking Requirements

In purporting to promulgate the Rule on an interim final basis, FNS stated in the preamble that prior notice and comment is "unnecessary" and that "good cause" exists for bypassing prior notice-and-comment procedures. The only justification FNS offers to support that assertion regarding the existence of "good cause" is the reference to section 501(b) of the Reauthorization Act, which permits, but does not require, FNS to issue an interim final rule. This permissive language in the Reauthorization Act does not exempt FNS from providing the written justification required by 5 U.S.C. 553(b)(3)(B) that notice-and-comment procedures and "impracticable, unnecessary or contrary to the public interest."

Exemptions from the prior notice-and-comment procedures are not to be lightly inferred. *American Federation of Government Employees, AFL-CIO v. Block*, 655 F.2d

1153, 1156 (D. C. Cir. 1981) (*quoting State of New Jersey, Department of Environmental Protection v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)) (exceptions to prior notice and comment are "narrowly construed and only reluctantly countermanced"). *Accord Asiana Airlines v. F.A.A.*, 134 F.3d 393, 396 (D.C. Cir. 1998); *Air Transport Ass'n of America v. Dept. of Transp.*, 900 F.2d 369, 379 (D.C. Cir. 1990), vacated for mootness 933 F.2d 1043 (D.C. Cir 1991).

While the APA recognizes that Congress may modify the requirements of prior notice and comment contained in section 553, a "[s]ubsequent statute may not be held to supersede or modify this subchapter ... except to the extent that it does so <u>expressly</u>." 5 U.S.C § 559 (emphasis added). "Exemptions from the terms of the [APA] are not lightly to be presumed in view of the statement in [§ 559] that modifications must be express." *Marcello v. Bonds*, 349 U.S. 302, 310 (1955) (*quoted in Asiana Airlines*, 134 F.3d at 397). "[T]he import of the § 559 instruction is that Congress's *intent to make a substantive change* be clear." *Asiana Airlines*, 397 F.3d at 397 (*quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Board of Governors*, 745 F.2d 677, 686 (D.C. Cir. 1984)) (emphasis in original).

Where Congress wishes to exempt an agency from prior notice-and-comment procedures, it knows how to do so. Specificity is necessary apart from the requirements of section 559 because there is no statutory definition of "interim final regulation." In *Asiana Airlines*, 134 F.3d at 397-399, the D.C. Circuit held that the following statutory language was sufficiently express to exempt the agency from section 553: "The Administrator shall publish in the Federal Register an initial fee schedule and associated collection process as an interim final rule, <u>pursuant to which public comment will be</u>

sought and a final rule issued" (emphasis added). The statutory language in *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225, 1236 n.18 (D.C. Cir. 1994) similarly was far more explicit than the language at issue here: "The Secretary shall cause to be published in the Federal Register a notice of the interim final DRG prospective payment rates...no later than September 1, 1983, and allow for a period of public comment thereon" (emphasis added). In comparison, the Reauthorization Act is not as explicit; it says nothing about notice-and-comment procedures at all. Absent the express exemption from section 553 that section 559 requires, FNS is not exempt from the APA's prior notice-and-comment requirements.

Had FNS tried, it easily could have given effect to both the prior notice-and-comment requirements of the APA as well as the Reauthorization Act's language that the agency "may" promulgate an interim final rule. Most obviously, FNS could have read the requirement of section 501(c) that it "*shall* promulgate final regulations"[15] within 2 years of enactment as modified by section 501(b), which would permit FNS, at the 2 year deadline (June 30, 2006), to issue an interim final regulation until the agency was able to complete the final rulemaking.

Reading an authorizing statute and the APA together wherever possible is the favored approach of the D.C. Circuit. In *State of New Jersey*, for example, the D.C. Circuit held that the Clean Air Act did not also preclude prior notice and comment under the APA because the EPA administrator could have reconciled the two statues if he had issued certain designations submitted to him as proposed rules. 626 F.2d at 1047. Such flexibility certainly was available to FNS. "If the admonition to construe the good-cause

---

[15]     Such final regulations would, of course, have to be issued pursuant to the notice and comment procedures of 5 U.S.C. § 553(b).

exception of section 553(b)(B) narrowly means anything, it means that we cannot condone its invocation where, as here, such a reconciliation [of two statutes] is possible." *Id.*

FNS has failed to comply with the prior notice-and-comment procedures of 5 U.S.C. § 553 that are necessary for a valid rule. The agency has not met the rigorous standards that provide very limited exceptions to the APA's prior notice-and-comment requirements.[16]

### b.    In The Alternative, FNS Failed To Follow USDA Policy On Use Of Notice-and-Comment Procedures

USDA has a longstanding written policy to solicit public comment in the rulemaking process even when it is not required to do so by law. Since 1971, all of USDA's agencies, including FNS, have been required to "give notice of proposed rule making and to invite the public to participate in rule making where not required by law." 36 Fed. Reg. 13,804 (July 24, 1971). The stated reason for this policy is that greater public participation "will outweigh any disadvantages such as increased costs or delays." *Id.*

USDA's policy provides that exemptions from notice-and-comment rulemaking will be limited strictly to "where an agency finds good cause that compliance would be

---

[16]    It is very well established in this Circuit that statutory time limits are not "emergencies" that allow an agency to forgo compliance with the APA's notice and comment procedural requirements, absent express Congressional intent (not, as discussed above, present here). *Air Transport Ass'n*, 900 F.2d at 379; *Kollett v. Harris*, 619 F.2d 134, 145 (D.C. Cir. 1980), *State of New Jersey*, 626 F.2d at 1042-43. Additionally, a comment period following issuance of an interim rule cannot cure the failure to follow section 553 given "the psychological and bureaucratic realities of *post hoc* comment rulemaking. *State of New Jersey*, 626 F.2d at 1049. A rule should be subject to notice and comment before it is "chiseled into bureaucratic stone." *American Federation*, 655 F.2d at 1157-58.

impracticable, unnecessary or contrary to the public interest [and] will be used sparingly, that is, only when there is a <u>substantial basis</u> therefor." *Id.* (emphasis added).

When an agency changes its course, it must supply a "reasoned analysis" indicating what factors brought about the change and why. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57 (1983). In accordance with that principle, when one of USDA's agencies makes a finding that compliance with the statement of policy would be "impracticable, unnecessary or contrary to the public interest," the agency is required to publish its "finding and a statement of the reasons therefore" with the rule it promulgates. 36 Fed. Reg. 13,804.

FNS failed to explain why its Rule was not promulgated in compliance with USDA's statement of policy. Rather, the agency merely explains that "prior notice and comment would be unnecessary" because the Reauthorization Act "authorizes the issuance of interim final regulations." 70 Fed. Reg. at 71,712. The fundamental basis of USDA's policy is that it will conduct notice-and-comment rulemaking even when it is exempt from doing so by law. Accordingly, FNS cannot rely upon a statutory exemption[17] from the rulemaking process as its "substantial basis" for forgoing notice-and-comment procedures. Such reasoning would render the statement of policy meaningless, for the policy is intended to require those steps even when the law exempts the agency from taking them.

When an agency promulgates a rule that fails to adhere to its own policies and procedures, and does so without providing a "reasoned analysis" (*i.e.,* a "substantial basis") for that deviation, the regulation is arbitrary and capricious. *See State Farm,* 463

---

[17]  As discussed above, Plaintiffs argue that the Reauthorization Act did not excuse FNS from publishing a notice and soliciting comments prior to issuance of a final rule.

U.S. at 49. FNS clearly failed to meet its burden. The Rule does not even mention USDA's statement of policy. Moreover, its "good cause" determination fails to provide a "substantial basis" for deviating from the statement of policy. Therefore, Plaintiffs are likely to succeed on the merits.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, this Court should enter a preliminary injunction, enjoining implementation of the Rule. In the alternative, this Court should enter a TRO to maintain the status quo, pending resolution of Plaintiffs' motion for a preliminary injunction.

Dated: December 16, 2005

Respectfully submitted,

Philip C. Olsson, Bar No. 172163
Arthur Y. Tsien, Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3537 (fax)

Attorneys for  National Women, Infants,
and Children Grocers Association,
Nutritional Food Distributors, Inc., County
Food Services, Inc., and Dillard Foods, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL WOMEN, INFANTS, AND )
CHILDREN GROCERS ASSOCIATION, )
                                   )
NUTRITIONAL FOOD DISTRIBUTORS, INC., )
                                     )
COUNTY FOOD SERVICES, INC., and )
                                     )
DILLARD FOODS, INC., )
                                     )
                Plaintiffs, )
            v. )        Civil Action No. _____
                                     )
FOOD AND NUTRITION SERVICE, )
                                     )
                Defendant. )

## DECLARATION OF EANN ROBINSON

I, EAnn Robinson, declare as follows:

        I am the President of the National Women Infants and Children Grocers Association. I am also the Vice President and General Manager of Nutritional Food Distributors, Inc. I make this declaration based upon my personal knowledge.

### National Women Infants and Children Grocers Association

        Based upon my knowledge, and in my capacity as President of the National Women Infants and Children Grocers Association ("NWGA" or "Association"), I present the following:

    1. NWGA is incorporated under the laws of the District of Columbia. Our mailing address is P.O. Box 5416, Norman, Oklahoma 73070. The Association was organized and operates exclusively for the benefit of its members to perform the functions and to carry out the general purpose of supporting the Special

1

Supplemental Nutrition Program for Women, Infants and Children (the WIC Program).

2. Our 30 members are from six states and Puerto Rico. All 30 members are "WIC-only stores." It is the practice of these stores to offer for sale every item that is eligible for purchase with WIC vouchers and no other items. With rare exceptions, all purchases are made with WIC vouchers. Most WIC-only stores do not accept cash payment.

3. Our member companies had been acting unofficially together to advocate the interests of WIC-only stores since early 2005. In September 2005, NWGA officially incorporated.

4. Since its organization, the Association has never had, and for 2005 does not anticipate having, annual revenues in excess of $6.5 million. The Association has no full time employees.

5. Almost all of our members are small businesses with annual revenues of less than $25 million. The vast majority of NWGA members have annual revenues of less than $6.5 million. Ownership of a large number of stores in our association is by minorities and women. With only rare exceptions, WIC-Only stores that are not members of NWGA are smaller operations than average NWGA members.

6. This Association was formed after our members repeatedly attempted to engage the Food and Nutrition Service (FNS) of the U.S. Department of Agriculture (USDA) in a meaningful dialogue to address the problem of overpricing by some WIC stores. As far as I have been able to determine, all such attempts were rebuffed.

7.  In particular, NWGA's members made repeated unsuccessful attempts to consult with FNS in the development of the interim final rule FNS issued on November 29, 2005 (hereafter, "the Rule").  On March 9, 2005, NWGA members met with Roberto Salazar, the FNS Administrator, in an attempt to discuss the rulemaking process.  Administrator Salazar was personally gracious, stating "the value-added concept is wonderful," and that the WIC "Program must meet the most basic needs of participants."  However, he refused our request that FNS provide an opportunity for notice and comment prior to publication of a rule for implementation.  Also, Mr. Salazar refused to discuss the substance of the Rule's development, though he invited us to make any comments that we would like for him to consider.  NWGA provided him both oral and written comments.  However, we were never given any hint of matters under consideration in development of the Rule.

8.  As members of the National WIC Association, generally an association of State WIC administrators, some NWGA members were invited to attend the Mid Atlantic Regional WIC Nutritional Conference on Vendor Management Training and WIC Vendor Provisions of Public Law 108-265, held July 19 through July 21, 2005.  This meeting was led by FNS to discuss development of the Rule.  When the NWGA members arrived at the meeting they were instructed to leave because FNS would not discuss development of the Rule with WIC-only store operators.

3

**How WIC Voucher Redemption Works For A WIC Participant**

9.  With respect to voucher redemption, the WIC Program works in this way. Pregnant and postpartum women, infants and children may be eligible to participate in the WIC Program. A WIC mother enrolls in the WIC Program at the local health clinic. At the clinic, she will receive a WIC voucher each month for each eligible member of her family. In Oklahoma, an eligible mother with an infant and a three-year-old would receive 7 or 8 separate vouchers each month, three for herself and the three year old and one or two for the infant depending upon whether the infant is being breastfed and is on cereal and juice yet. The WIC vouchers are in English. The WIC voucher describes a package of food that may be purchased with the voucher.

10. At a traditional grocery store, a WIC mother must perform several steps to redeem her family's vouchers. First, she must search out the WIC authorized food products for each type of food listed on the voucher. For example, most cereals, cheeses and juices available at the store are not authorized products. Moreover, traditional grocery stores do not offer all WIC authorized items. Therefore, some difficulty in locating authorized items may be encountered. Second, the WIC mother must assure that her selection of the WIC authorized item does not exceed the combined volume limit on her family's vouchers. Many WIC authorized products are not available in sizes that correspond with the volume limits authorized on the voucher. Especially when traditional vendors do not offer the full array of WIC authorized products, WIC mothers often have difficulty locating

4

authorized food products that make full use of the authorized volume of each food listed on the voucher.

11. For example, the food voucher that includes cereal lists the amount allowed by ounces. The Oklahoma Dept. of Health WIC Approved Food Card has color photos of the cereals allowed. There are 95 different cereal photos. Additionally, the client must determine that they have the correct size of box. For instance, in Oklahoma the 15 oz box of Cheerios is approved but not the 10 oz box. Especially for people with language or learning difficulties, this can be a bewildering process.

12. At a traditional grocery store, the WIC mother takes her WIC selections to the checkout counter, where they must be separated from her other purchase items and presented separately for payment. If the WIC mother has selected a food product that is not currently authorized (the list of authorized products changes with some frequency), or an error has been made in the volume of product selected, the checkout line is brought to a halt. The checkout cashier calls for assistance by loudspeaker, while the WIC mother endures the annoyance of the cashier and persons waiting in line.

13. Sometimes, these problems occur when the WIC mother has done everything correctly. A typical supermarket has 30,000 different SKU's or products. It should be no surprise that cashiers sometimes have difficulty remembering the application of WIC Program rules to various products. An error or misunderstanding by the cashier also brings the checkout line to a halt to the embarrassment of the WIC mother.

5

14. Many of our customers have described being humiliated at a traditional grocery store checkout. Many WIC mothers settle for less than the full volume of product authorized by the WIC voucher to avoid the humiliation of selecting a product that may not be authorized or if she is uncertain about the total volume of product her family's vouchers could purchase.

15. While this process is straightforward, it can be difficult for WIC mothers who have special challenges. For this reason, WIC mothers who do not speak English as a first language, or who do not read English, or who have difficulty adding the authorized volumes on her family's vouchers and comparing that total to the volume size of one or more product volumes, or who have difficulty remembering the authorized list of products, or who are not comfortable with friend's perception of them as WIC participants generally find WIC-only stores a preferable setting for redemption of their vouchers. These WIC mothers, especially, are more likely to redeem their WIC vouchers for the full volume of food that the voucher authorizes. WIC mothers who have children who tend to be particularly demanding in the grocery store setting also find the WIC voucher redemption process a challenge in a traditional grocery store.

16. These difficulties do not exist for the WIC mother in WIC-only stores. In our members' stores, every item that is eligible for purchase with the WIC voucher is typically offered for sale and no other food products are sold. In the vast majority of our members' stores, the WIC mother simply presents her vouchers to a checkout clerk who asks the mother her food choices. Then, the clerk quickly fills the purchase with the full volume of the WIC mother's choice of each WIC

6

food on the voucher. Even in WIC-only stores with grocery aisles where the WIC mother selects her food choices, the clerk assists her at checkout to assure that she has selected packages that provide the full volume of product authorized by the family's vouchers.

17. Our members generally hire current and former WIC participants from the local community to work in their stores. WIC-only store personnel generally can communicate in the same language as their WIC customers. Our members have personnel that speak various Spanish dialects, Russian, Korean, Mandarin, Japanese, and Hmong. The WIC-only store clerks are knowledgeable about the WIC Program and sympathetic to providing a dignified shopping experience for their customers.

18. Therefore, WIC-only stores are more likely than traditional vendors to fully redeem a recipient's food benefits. As a result, the average payment for a voucher redeemed at a WIC-only store is used to purchase a larger volume of food than the average payment for a voucher redeemed at a traditional grocery store.

19. WIC-only stores are often located in places that are very convenient for WIC participants. It is common for WIC-only stores to be located in close proximity to local WIC clinics; in ethnic neighborhoods, where the language services offered by WIC-only stores are especially important; and near military bases, where many young, service families have incomes within the WIC Program edibility guidelines.

20. Our Association strongly believes that we provide a vital service to our WIC clients. The fact that a large number of WIC participants choose to make an extra

stop for groceries to use their food instruments at WIC-only stores indicates the value they place on our stores.

**Harm The Interim Final Rule Will Cause NWGA Members**

21. If the interim final rule published on November 29, 2005 is implemented as written, extensive irreparable harm will be done to all of the small businesses operating WIC-only stores around the country.

22. First, on November 29, 2005, FNS required states to implement an elaborate new regulatory system by December 30, 2005. As of December 15, NWGA members are not aware of any State that has received FNS approval of its plan to implement the Rule. Even if approval of plans had already been provided, NWGA members are skeptical about the ability of States to fully implement in the holiday season two-week period ending on December 30, 2005. Repeatedly, the rule invites States to avoid the burden of establishing a regulatory system for WIC-only stores by electing to remove all WIC-only stores from the State's Program. NWGA members view the Rule's publication and implementation timetable, coupled with the Rule's threats to recover funds from any State that does not implement the Rule on time as a calculated, powerful incentive for States to remove all WIC-only stores from their programs. NWGA members are deeply concerned that in this context, at least some States are likely to conclude that the only practical means to comply with requirements of the Rule is to elect to disallow WIC-only store participation in their State's Program.

23. Second, the Rule's requirement for a comparison of average per voucher payments to WIC-only stores and all traditional vendors will force WIC-only

store prices so low that few if any WIC-only stores can survive. It forces WIC-only store prices far below the prices of comparable stores. In addition, WIC-only stores are subject to recoupment of WIC payments if it turns out that average voucher payments to all traditional vendors are below the average of voucher payments to WIC-only stores. So, untenable price cut problems are compounded by potential recoupment of past payments. If the certainty of devastating price cuts does not force WIC-only stores to close, the uncertainty regarding potential recoupment of payments surely will.

24. The Rule defeats the entire principle of limiting prices to the prices of comparable stores. Large box stores, like Wal-Mart, are not comparable to most other stores because they not only have direct-from-manufacturer buying power, they purchase in such volumes that they also receive promotional allowances and other manufacturer concessions of great value. Supermarket chains with their own wholesale supply systems cannot match the prices of the large box stores. Smaller grocers, including almost all WIC-only stores, must purchase all of their food from wholesalers, often at prices similar to the retail prices of large box stores. These fundamental differences between types of grocery stores are why the WIC Program historically has set price limitations by vendor peer groups and why the new law calls for limiting prices to comparable vendors.

25. Since large box stores account for a high volume of WIC redemptions, they tend to set the average for the payments to all traditional vendors. For example, in Oklahoma, state officials have told me that Wal-Mart alone accounts for 22% of WIC redemptions.

9

26. The Rule does not account for clear differences in the vouchers redeemed by WIC-only stores and traditional vendors. A primary reason why customers shop at WIC-only stores is the assistance they receive in fully utilizing their WIC vouchers. So, the average payment for vouchers at WIC-only stores reflects a payment for the full volume of food authorized for purchase with the WIC voucher. On the other hand, vouchers redeemed at traditional grocery stores often are not redeemed for the full amount of food authorized for purchase with the voucher. To fail to adjust for this fundamental difference makes the comparison of average voucher payments an "apples and oranges" comparison that is always stacked against the WIC-only store.

27. Therefore, based on my personal knowledge of the business and the numerous telephone conferences with WIC-only store operators from around the country since the Rule was published, I conservatively estimate that the Rule will force 90% of all WIC-only stores to close within 60 days of implementation.

28. The closure of WIC-only stores will harm the stores and their employees and business allies. In addition, many WIC participants will be adversely affected by closure of WIC-only stores. Some WIC participants are likely to drop out of the WIC Program rather than redeem their benefits in the traditional vendor setting. This Rule does not advance the public benefit of the WIC Program.

**Nutritional Food Distributors, Inc.**

Based upon my knowledge, and in my capacity as Vice President and General Manager of Nutritional Food Distributors, Inc., I present the following:

29. National Food Distributors, Inc. is a privately held corporation, incorporated under the laws of the State of Oklahoma. Our corporate office is located at 111 N. Peters, Suite 300, Norman, Oklahoma 73069. Nutritional Food Distributors, Inc. was incorporated in August of 1992 and has been in business continuously since then. We are exclusively engaged in the business of providing specialty vendor services to WIC Program participants in Oklahoma.

30. Nutritional Food Distributors, Inc. sells products authorized by the State of Oklahoma WIC Program, the Wichita Caddo Delaware Tribal WIC Program and the Citizen Potawatomi Tribal WIC Program to eligible participants.

31. Nutritional Food Distributors, Inc. currently operates five WIC specialty stores in Oklahoma City, Midwest City and Tulsa, Oklahoma. The locations are as follows:

Nutritional Foods Store #1
2220 N. Kelley, OKC 73105
Operating since 1992
One Register

Nutritional Foods Store #2
235 S.W. 25th, OKC 73109
Operating since 1997
Two Registers

Nutritional Foods Store #3
527 S. Utica, Tulsa, OK 74104
Operating since 1998
One Register

Nutritional Foods Store #4
9940 E. 21st, Tulsa, OK 74129
Operating since 1999
Two Registers

Nutritional Foods Store #5
1064 S. Douglas, Midwest City, OK 73110

11

Operating since 2002
One Register

32. The customer base for Nutritional Foods is approximately 85% Hispanic, 10% African American and 5% Caucasian. Many of our Hispanic customers speak English as a second language or not at all. Also, a large number of our customers of all races cannot read.

33. I am employed full time by Nutritional Food Distributors, Inc. In addition, our company employs 21 full time and 2 part time employees. The majority of our employees are Hispanic or African American and nearly all of us are either fluent in Spanish or speak enough Spanish to communicate with our customers in order to complete their WIC orders.

34. Our company provides our full time employees with paid health insurance, disability insurance, paid vacation, and a cafeteria plan as well as other benefits.

35. Most of our stores are located near WIC clinics. The Midwest City store is located less than two miles from Tinker Air Force Base. Many enlisted personnel and activated reservists and guard troops qualify for the WIC Program. These families especially appreciate being able to shop in an environment that is free of stigma. They can get their WIC food items from us while preserving their privacy and dignity among their neighbors and friends.

36. The number of customers served by our stores has increased every year since we opened. Sales have increased from $415,272 at the end of our first fiscal year in July of 1993 to $5,892,395 at the end of our most recent fiscal year, July 2005.

12

37. The State of Oklahoma has consistently required WIC-only store to be price competitive with Supermarkets, like Albertson's. In addition, Oklahoma has required that WIC vendors use registered wholesalers. The result of these policies is that at the present time, there are only six WIC-only stores in the State of Oklahoma. Oklahoma has one of the lowest WIC food package costs in the country. Our stores account for approximately 11% of WIC redemptions in Oklahoma.

38. Customers at our stores receive all of the food allowed on their food instruments because we assist them in determining what they are entitled to receive. Receiving the full allotment to which they are entitled under the WIC Program can be difficult for our customers, as previously explained.

39. Implementation of this rule would not advance public benefit of the WIC Program. Clients would be forced to shop in environments that vary from somewhat helpful to openly hostile. I believe a significant percentage of my WIC customers will choose to leave the Program if that happens. From conversations with my employees, I believe that generally our customers who remain in the WIC Program will seek out small grocery stores where they are more likely to receive personal assistance. Such stores are now allowed to charge prices at least as high as WIC-only stores in Oklahoma. The assumption that WIC-only store customers will choose, on average, the same stores as other WIC participants is wrong. By definition, our customers are making a special grocery store trip to find a better setting to redeem their WIC vouchers. They will continue to be

sensitive to that issue in selecting a grocery store when the WIC-only stores are gone. The cost savings attributed to the Rule are incorrect.

40. If this Rule is allowed to go into effect, the small business we have built over that last 14 years will be forced to close within 60 days. The primary reason I would take that long to close down would be to provide better layoff notice to our staff. We also have additional expenses associated with this closing. We would have to terminate store leases, probably incurring penalties and costs of $24,700. We would also have about $200,000 in inventory we would have to liquidate. Any employee reimbursements made under our cafeteria plan that are higher than deposits by the employees would have to be paid by the company when the plan is dissolved. Additionally, we would all lose our health insurance coverage because the company is not covered by COBRA. Even if it were, the premiums would be prohibitive.

Upon penalty of perjury, I declare that the foregoing statements are true to the best of my knowledge and belief.

Dated:  December 15, 2005

EAnn Robinson

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL WOMEN, INFANTS, AND )
CHILDREN GROCERS ASSOCIATION )
)
NUTRITIONAL FOOD DISTRIBUTORS, INC. )
)
COUNTY FOOD SERVICES, INC., and )
)
DILLARD FOODS, INC., )
)
Plaintiff, )
v. )   Civil Action No. _____
)
FOOD AND NUTRITION SERVICE, )
)
Defendant. )
_____ )

<u>DECLARATION OF J.C. HALBERT</u>

I, J.C. Halbert, declare as follows:

1.   I am the President of County Food Services, Inc.  I make this declaration based upon my personal knowledge.

<u>COUNTY FOOD SERVICES, INC.</u>

2.   County Food Services, Inc. is a privately held corporation incorporated under the laws of the State of Arkansas.  Our offices are located at 1112 N. Flamingo Rd., Rogers, Arkansas 72756.  County Food Services, Inc. is a successor to Solvents on Site, incorporated in May 1997.  Since October 2002, the corporation has been continuously operating as County Food Services, Inc. and engaged exclusively in the business of providing specialty vendor services to Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC Program") participants in Arkansas.

1

3.  County Food Services, Inc. sells products authorized by the WIC Program to eligible recipients. In our stores, every WIC-approved food (in the proper package size) is carried in stock, and only WIC-eligible items are carried. We assist the Program in fulfilling its purpose of providing supplemental foods and nutrition education to pregnant, postpartum, and breastfeeding women, infants, and young children at nutritional risk.

4.  County Food Services, Inc. has had one or more vendor agreements with the State of Arkansas Department of Health to provide food and services to eligible WIC Program recipients since October 2002.

5.  Pursuant to vendor agreements, County Food Services, Inc. has operated the following WIC-only stores:

Bentonville:
    513 SW 14th #7, 72712
    One-half mile from WIC Clinic
    Operating since Oct. 2002
    One Register
    Estimated Customer Demographics: 50% Hispanic; 50% Caucasian

Lowell:
    107 S. Lincoln #B, 72745
    Next door to WIC Clinic
    Operating since Oct. 2002
    One Register
    Estimated Customer Demographics: 50% Hispanic; 25% Marshallese (immigrants from
        Marshall Islands); 25% Caucasian
    Special services: Manager speaks Spanish and has basic understanding of the
        Marshallese language

Fayetteville:
    3396 N. Futrall, 72703
    One-half mile from WIC Clinic
    Operating since January 2004
    Two Registers – one for store and one for drive through
    Estimated Customer Demographics: 30% Hispanic, 50% Caucasian, 20% Asian

2

Springdale:
> 1102 S. Thompson #G, 72764
> Operating since October 2002
> One register
> Estimated Customer Demographics:  50% Hispanic, 25% Marshallese, 25% Caucasian
> Special services provided to meet the needs of customers from Marshall Islands and other
> > limited English proficiency clients

Van Buren:
> 2010 Chestnut Suite J, 72956
> One-half mile from WIC clinic, next door to large housing project
> Operating since April 2003
> Two Registers – one for store and one for drive through
> Estimated Customer Demographics:  30% Hispanic, 70% Caucasian

6.  My wife, Avis Halbert, and I are employed full time in operation of County Food Services, Inc.    In addition, County Food Services, Inc. has five full-time and two part-time employees.  Of our employees, three have worked for County Food Services, Inc. for at least two and one-half years, four have been WIC Program participants, and two are veterans.  All of our employees refer to County Food Services, Inc. as the best job that they have ever had.

7.  All of our sales are to WIC participants redeeming WIC Program vouchers.  Annual gross sales for County Food Services, Inc. have been:

| | |
|---|---|
| 2005 (estimate) | $2,052,668 |
| 2004 | $2,103,584 |
| 2003 | $1,450,045 |
| 2002 | $128,553 |

## CUSTOMER SERVICES

8.  County Food Services provides services that are highly valued by the WIC Program participants who shop at our stores.  Traditional vendors do not provide these services.  Specifically,

3

in several ways we assist WIC Program participants in filling their WIC Program food voucher correctly, fully, and in a stigma-free environment.

9. To the best of our ability, County Food Services, Inc. provides store personnel who address the language needs of our WIC customers. Two of our store employees are fluent in Spanish and one employee has a basic knowledge of the native language of the Marshall Islands. All Arkansas WIC vouchers are printed in English only, and many of our customers cannot read English or cannot read at all, so the assistance we provide is necessary for our customers to understand and fully redeem their English language WIC vouchers.

10. County Food Services, Inc. assures that WIC vouchers are correctly filled so that our customers receive the full amount of food prescribed and the full range of choices among authorized foods. Our stores offer all WIC-authorized food products and no other products. So, our customers have no difficulty selecting approved WIC items. Our customers have informed us that traditional vendors direct WIC participants to modify their purchase selections, in violation of Program requirements, to exclude relatively expensive authorized cereals or a portion of the authorized volume of a food. Thus, the vendor avoids a WIC voucher total sale price above the stated "not to exceed" limit on the voucher. In such cases, the WIC vendor is required to fill the voucher with the full volume of any authorized food package item, but charge an amount no greater than the "not to exceed" amount on the face of the voucher. County Food Services, Inc. does not engage in such questionable practices, and ensures that our customers receive the maximum amount of food to which they are entitled under their voucher.

11. County Food Services, Inc. provides useful community services information to WIC participants. In particular, we maintain community services bulletin boards providing current

4

information regarding Head Start, Medicaid, and other health and social services of possible use to WIC participants. Our store personnel are kept apprised of this health and social service information, which they discuss with store customers.

12. County Food Services, Inc. customers value these services, as is evidenced by the fact that virtually all of them purchase their non-WIC foods at other WIC-authorized vendors. Our customers could redeem their WIC vouchers at the same store where they purchase their non-WIC items, but they instead choose to make two separate shopping trips in order to shop at our stores. Our customers are more likely to fully utilize their voucher at our stores than at a traditional store.

<u>COST OF FOOD AT COUNTY FOOD SERVICES, INC.</u>

13. Due to the limited purchasing power of County Food Services, Inc., our prices are higher than the largest authorized WIC vendors in Arkansas, particularly Wal-Mart.

14. Our prices are lower than many grocery stores, especially those in rural areas.

<u>FOOD AND NUTRITION SERVICE RULE AND THE HARM TO COUNTY FOOD SERVICES, INC.</u>

15. November 29, 2005, the U.S. Department of Agriculture Food and Nutrition Service (FNS) published a new regulation, 70 Fed. Reg. 71708. Among other things, FNS is requiring that the State of Arkansas Department of Health, with which County Food Services has its vendor agreement, must be able to demonstrate that it has a system in place to ensure that "average payments per food instrument" for WIC specialty stores, such as County Food Services, Inc. stores, not exceed "average payments per food instrument for regular vendors."

16. The State of Arkansas has informed County Food Services, Inc. that the new cost containment rule will require the state to recoup any payments made to County Food Services, Inc. in excess of the average payments per food instrument in Arkansas.

17. Based on recent reports of average payments per food instrument, County Food Services, Inc. has determined that payment at the "average payment per food instrument" is significantly below the cost of operation of County Food Services, Inc. and significantly below prices allowed for many independent and smaller grocery stores, since "box stores" and other chains such as Wal-Mart have significantly lowered the average price. Continued operation at these payment levels would mean substantial, immediate loses for County Food Services, Inc. So, we have informed our employees, customers, and leasors that County Food Services, Inc. will be forced out of business on December 30, 2005.

18. As a result of closing our stores in the State of Arkansas, my wife and I and all employees of County Food Services, Inc. will be unemployed effective January 1, 2006. Two stores have lease agreements with a total of $41,700 remaining due for a combined period of 17 months. Three stores are on a month-to-month lease, but due to a lack of notice about the effect of the rule, lease payments are due in the amount of $3,300 for the month of January 2006.

19. The closing of County Food Services, Inc. will have a severely detrimental effect on our customers, as they will no longer be provided with the services they received at our stores. Based upon conversations County Food Services, Inc. employees have had with our customers, I believe that many will not fully redeem their WIC vouchers if they cannot shop at our stores, and some will simply drop out of the WIC Program altogether.

6

20. Attached is a letter dated December 16, 2005 sent by the State Agency to all WIC vendors in the State of Arkansas.   The letter discusses implementation of the cost containment rule, specifically including enforcement of the new maximum reimbursement levels under the interim final rule.

Upon penalty of perjury, I declare that the foregoing statements are true to the best of my knowledge and belief.

Dated:  December 15, 2005

J.C. Halbert

# ATTACHMENT



# Arkansas Department
# of Health and Human Services
### Division of Health
Paul K. Halverson, DrPH, Director



P.O. Box 1437, Slot H-43    Little Rock, AR 72203-1437    •    501-661-2473    •    TDD: 1-800-234-4399

December 16, 2005

Dear WIC Vendor:

We asked the USDA Food and Nutrition Service about the effective date of December 30, 2005, in the WIC Vendor Cost Containment Interim Rule. Our question was which date on the food instrument to use to enforce the new maximum reimbursement levels on above 50% vendors.

The answer we received on December 15, 2005, is that the date applies to food instruments with "Not Valid Until" dates on or after January 1, 2006. On all food instruments with a "Not Valid Until" date on or after January 1, 2006, a purchase amount at or below the average amount paid to regular vendors must be used. Please see the charts you received with the certified letter dated December13, 2005.

The "Not Valid Until" date is the first date printed by the computer or written on manual food instruments on the right side of the food instrument. The attached example has a "Not Valid Until" date of 01/02/2006 (January 2, 2006). The foods and quantities on this food instrument can be found on food instrument number 4 in the chart of November 2005 Vendor Redemptions, 20 Most Frequent Food Instruments sent to you on December 13. The maximum reimbursement amount for above 50% vendors on this food instrument will be the amount found under "Regular Vendors" ($16.52) in the chart.

If you have questions, please call Anita Southard at (501) 661-2123 or me at (501) 661-2473.

Sincerely,

Marcell Jones, Director
Arkansas WIC Program

Enclosure

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL WOMEN, INFANTS, AND ) <br>
CHILDREN GROCERS ASSOCIATION )
                           )

NUTRITIONAL FOOD DISTRIBUTORS, INC. )
                           )

COUNTY FOOD SERVICES, INC., and )
                           )

DILLARD FOODS, INC., )
                           )

          Plaintiff, )
  v. )     Civil Action No. _____
                           )

FOOD AND NUTRITION SERVICE, )
                           )

          Defendant. )

## DECLARATION OF MICHAEL G. DILLARD

I, Michael G. Dillard, declare as follows:

1. I am the President of Dillard Foods, Inc. I make this declaration based upon my personal knowledge.

### DILLARD FOODS, INC.

2. Dillard Foods, Inc. is a privately held corporation incorporated under the laws of the State of Arkansas. Our offices are located in 103 Utley Ct., Hot Springs, Arkansas 71913. Dillard Foods, Inc. has been in business continuously since August 2002.

3. Dillard Foods, Inc is a vendor for the provision of food under the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC Program"). Dillard Foods, Inc. has had a vendor agreement with the State of Arkansas Department of Health to provide food and services to eligible WIC Program recipients since February 2002.

1

4. Pursuant to vendor agreements, Dillard Foods, Inc. operates the following WIC-only stores in the State of Arkansas:

Hot Springs:
 1419 Malvern Avenue, 71913
 Across the parking lot from WIC Clinic
 Operating since February 2002
 One Register, retail space 690 square feet
 Estimated Customer Demographics:  80% Caucasian, 20% Hispanic

Russellville:
 2301 East Main, #104, 72802
 Around the corner from WIC Clinic
 Operating since January 2004
 One Register, retail space 634 square feet
 Estimated Customer Demographics:  70% Caucasian, 30% Hispanic

Conway:
 814 North Creek, Suite A, 72032
 Across the street from WIC Clinic
 Operating since March 2003
 One Register, retail space 836 square feet
 Estimated Customer Demographics:  90% Caucasian, 10% Hispanic

Pine Bluff:
 2510 South Hazel, 71603
 1 mile from WIC Clinic
 Operating since April 2002
 One Register, retail space 918 square feet
 Estimated Customer Demographics:  95% African American, 5% Caucasian

5. My wife and I work full time in operation of Dillard Foods, Inc.  In addition, Dillard Foods, Inc. employs four full-time and four part-time employees.  All of our employees refer to Dillard Foods, Inc. as the best job they have ever had.

6. All Dillard Foods, Inc. sales are WIC-authorized foods sold to WIC participants redeeming WIC vouchers.  In our stores, every WIC-approved food (in the proper package size) is carried in stock, and only WIC-eligible items are carried.  We serve over 1,000 WIC customers

every week. We assist the Program in fulfilling its purpose of providing supplemental foods and nutrition education to pregnant, postpartum, and breastfeeding women, infants, and young children at nutritional risk.

7. Annual gross sales for Dillard Foods, Inc. have been as follows:

| | |
|---|---|
| 2005 (estimate) | $2,368,301 |
| 2004 | $2,398,000 |
| 2003 | $1,637,793 |
| 2002 | $644,661 |

## CUSTOMER SERVICE

8. Virtually all customers of Dillard Foods, Inc. make their non-WIC food purchases at WIC-authorized traditional vendors. Our customers could redeem their WIC vouchers at the same store where they purchase their non-WIC items, but they instead choose to make two separate shopping trips in order to shop at our stores.

9. We compete with traditional vendors by providing services invaluable to WIC participants. These services are not provided by traditional vendors. Specifically, our personnel assist customers in properly and fully utilizing their WIC vouchers. Our clientele include Spanish language customers, deaf customers, and elderly customers shopping on behalf of pregnant and post-partum grandchildren. Some customers speak and read very little English, so it is essential that our staff provide them with personal service so they can understand and fully redeem their English language WIC vouchers. Especially, these services are provided to assist customers in obtaining the full amount of WIC-authorized food, particularly cereal and juice, allowed per voucher. Our stores

3

offer all WIC-authorized food products and no other products. So, our customers have no difficulty selecting approved WIC items. Often, customers proceed to checkout with less than the allowed amount of cereal or juice. Store personnel advise those customers that they are entitled to more of the product and advise them what size will provide them the full amount allowed. This service is greatly appreciated by our customers, who are more likely to fully utilize their voucher at our store than at a traditional store.

10. Our customers are provided a stigma free environment. They are never embarrassed for participating in the WIC Program or at checkout for having difficulty in fully and properly utilizing their WIC vouchers. Several of our customers have informed us that they would not stay in the WIC Program if they had to redeem their vouchers at traditional stores.

11. Many of our customers have been referred to our store by checkout clerks at traditional grocery stores.

12. As a result of the limited purchasing power of Dillard Foods, Inc. the prices at which we must sell products are higher than that of larger retail stores, such as Wal-Mart.

<u>THE FOOD AND NUTRITION SERVICE RULE</u>

<u>AND THE HARM TO DILLARD FOODS, INC.</u>

13. November 29, 2005, the U.S. Department of Agriculture Food and Nutrition Service (FNS) published a new regulation, 70 Fed. Reg. 71708. Among other things, FNS is requiring that the State of Arkansas Department of Health, with which Dillard Foods, Inc. has its vendor agreement, must be able to demonstrate that it has a system in place to ensure that Dillard Foods, Inc. is not receiving average payments for its sale of WIC foods that are higher than average payments of other vendors, such as traditional, full service grocery stores and retailers like Wal-

4

Mart. The State of Arkansas is required to be able to make this demonstration no later than December 30, 2005.

14. By incorrectly requiring a comparison of voucher payments of Dillard Foods, Inc. to all WIC vendors, as opposed to comparable small business vendors, the State agency will be forced to lower its reimbursement to Dillard Foods, Inc. to levels significantly below the levels paid to comparable vendors. The lower reimbursement levels will make it impossible for us to cover our operating costs and sustain the stores. This means Dillard Foods, Inc. will be forced to cease operations as of December 30, 2005. We are currently depleting our inventory and have notified our employees that we plan for December 30,2005, to be our last day to be open for business and any of our stores. During the month of January, we will be engaged in business closure procedures and wrap up activities.

15. As a result of closing our stores in the State of Arkansas, my wife and I will lose our jobs, and we will have to terminate all eight of our employees, effective December 30, 2005. We have three leases that extend for a combined 32 months, with payments coming close to $4,000 per month. The fourth is a land lease that if it is terminated, the land must be returned to its original state. The approximate cost for removing all structures and improvements such as plumbing and sewage, paving, parking lots, and sidewalks is $30,000. In addition, our WIC customers will no longer be provided the special services that they received at our stores, resulting in a loss of benefits to them. As a result, we expect some of them to drop out of the WIC Program.

16. Based upon conversations Dillard Foods, Inc. employees have had with our customers, we believe that many will simply not redeem their WIC vouchers if they cannot shop at our stores.

5

17. I attach a true and correct photograph of one of our store displays that shows the efforts we take to make it easy for our customers to redeem their WIC vouchers for the full package of food to which they are entitled.  I also attach true and correct copies of WIC vouchers redeemed by some of our customers on December 15, 2005.

Upon penalty of perjury, I declare that the foregoing statements are true to the best of my knowledge and belief.

Dated:  December 15, 2005

Michael Dillard

# ATTACHMENT



**YOUR RECEIPT THANK YOU CALL AGAIN**

REG   12-15-2005  04:42 PM
                    009069

611 FZ APPLE        $1.95
614 FZ GRAPE        $2.15
816 FZ PNAPL        $2.05
813 WHL GAL         $4.08
813 WHL GAL         $4.08
202 CHEDDAR         $4.05
251 EGGS            $1.45

CASH              $19.81
      7 No

---

CLINIC NO. 2602          47232330
                          4723233
919

| QTY | DESCRIPTION |
|---|---|
| 3 | 11-12 OZ FROZEN CONCENTRATED JUICE |
| 2 | GALLON FAT FREE 1% 2% OR WHOLE MILK |
| 1 | 1 LB. WIC APPROVED CHEESE |
| 1 | DOZEN WHITE EGGS, LARGE |

Pay to the order of: WIC VENDOR #
**9674**
NOT VALID UNTIL 11/28/2005
PURCHASE DATE DEC 15 2005
VOID FOR PURCHASE AFTER 12/28/2005
MUST BE DEPOSITED WITHIN 60 DAYS OF "NOT VALID UNTIL" DATE
VOID IF AMOUNT EXCEEDS 19.00
PAY EXACT PURCHASE AMOUNT 1900

ARKANSAS WIC PROGRAM
PAYABLE THROUGH FSMC AN AFFILIATE OF SECURITY STATE BANK, HOWARD LAKE, MN 55349
Arkansas WIC Program 2602-Garland Co. Hot Springs
ACCT. NO. 804009

⑈47232330⑈ ⑆091912482⑆   80 400 9⑈

---

**YOUR RECEIPT THANK YOU CALL AGAIN**

EG   12-15-2005  01:46 PM
                    009062

11 K CR F 7         $2.35
23 MIN WHTS         $5.05
16 FZ PNAPL         $2.05
16 FZ PNAPL         $2.05
13 WHL GAL          $4.08
13 WHL GAL          $4.08
01 AM SLICE         $3.95
51 EGGS             $1.45
02 RED KDN          $0.95

ASH              $26.01
      9 No

---

CLINIC NO. 2602          4726527
                          4726527

| QTY | DESCRIPTION |
|---|---|
| 28 | OUNCES WIC APPROVED CEREAL |
| 2 | 11-12 OZ FROZEN CONCENTRATED JUICE |
| 2 | GALLON FAT FREE, 1%, 2%, OR WHOLE MILK |
| 1 | 1 LB. WIC APPROVED CHEESE |
| 1 | DOZEN WHITE EGGS, LARGE |
| 1 | 1 LB BAG DRY BEANS OR PEAS |

Pay to the order of: WIC VENDOR #
**9674**
NOT VALID UNTIL 12/05/200
PURCHASE DATE DEC 15 2005
VOID FOR PURCHASE AFTER 01/04/200
MUST BE DEPOSITED WITHIN 60 DAYS OF "NOT VALID UNTIL" DATE
VOID IF AMOUNT EXCEEDS 27.00
PAY EXACT PURCHASE AMOUNT 260

ARKANSAS WIC PROGRAM
PAYABLE THROUGH FSMC AN AFFILIATE OF SECURITY STATE BANK, HOWARD LAKE, MN 55349
Arkansas WIC Program 2602-Garland Co Hot Springs
ACCT. NO. 804009

⑈47265278⑈ ⑆091912482⑆   80 400 9⑈

---

**YOUR RECEIPT THANK YOU CALL AGAIN**

REG   12-15-2005  01:49 PM
                    009063

611 FZ APPLE        $1.95
612 FZ OJ           $1.95
616 FZ PNAPL        $2.05
813 WHL GAL         $4.08
813 WHL GAL         $4.08
803 WHOLE ½         $2.12
206 COL JACK        $4.00
251 EGGS            $1.45

CASH              $21.68
      8 No

---

CLINIC NO. 2602          46966899
                          4696689
919

| QTY | DESCRIPTION |
|---|---|
| 3 | 11-12 oz Frozen Concentrated Juice |
| 2 | Gallon Fat Free, 1%, 2%, or Whole Milk |
| 1 | Half Gal Fat Free, 1%, 2%, or whole milk |
| 1 | 1 lb. WIC Approved Cheese |
| 1 | Dozen White Eggs, Large |

Pay to the order of: WIC VENDOR #
**9674**
NOT VALID UNTIL 12/05/200
PURCHASE DATE DEC 15 2005
VOID FOR PURCHASE AFTER 01/04/200
MUST BE DEPOSITED WITHIN 60 DAYS OF "NOT VALID UNTIL" DATE
VOID IF AMOUNT EXCEEDS 21.00
PAY EXACT PURCHASE AMOUNT 21.0

ARKANSAS WIC PROGRAM
PAYABLE THROUGH FSMC AN AFFILIATE OF SECURITY STATE BANK, HOWARD LAKE, MN 55349
Arkansas WIC Program 2602-Garland Co. Hot Springs
ACCT. NO. 804009

⑈46966899⑈ ⑆091912482⑆   80 400 9⑈





## ADDENDUM OF STATUTORY AND REGULATORY PROVISIONS

Statutory Provisions

1. Child Nutrition and WIC Reauthorization Act of 2004 § 203(e)(10), 42 U.S.C. § 1786(h)(11).
2. School Lunch Programs: Nutrition promotion, 42 U.S.C. § 1758 note.

Regulatory Provisions

3. Special Supplemental Nutrition Program for Women, Infants and Children (WIC): Vendor Cost Containment; Interim Rule, 70 Fed. Reg. 71708 (Nov. 29, 2005) (to be codified at 7 C.F.R. pt. 246).
4. USDA Statement of Policy, 36 Fed. Reg. 13804 (July 24, 1971).

1. Child Nutrition and WIC Reauthorization Act of 2004 § 203(e)(10), 42 U.S.C. § 1786(h)(11).

(I) infant formula wholesalers, distributors, and retailers licensed in the State in accordance with State law (including regulations); and

(II) infant formula manufacturers registered with the Food and Drug Administration that provide infant formula.

**(x) Purchase requirement**

A vendor authorized to participate in the program under this section shall only purchase infant formula from the list described in clause (ix).

*[See main volume for text of (B) to (J); (9) and (10)]*

**(11) Vendor cost containment**

**(A) Peer groups**

**(i) In general**

The State agency shall—

(I) establish a vendor peer group system;

(II) in accordance with subparagraphs (B) and (C), establish competitive price criteria and allowable reimbursement levels for each vendor peer group; and

(III) if the State agency elects to authorize any types of vendors described in subparagraph (D)(ii)(I)—

(aa) distinguish between vendors described in subparagraph (D)(ii)(I) and other vendors by establishing—

(AA) separate peer groups for vendors described in subparagraph (D)(ii)(I); or

(BB) distinct competitive price criteria and allowable reimbursement levels for vendors described in subparagraph (D)(ii)(I) within a peer group that contains both vendors described in subparagraph (D)(ii)(I) and other vendors; and

(bb) establish competitive price criteria and allowable reimbursement levels that comply with subparagraphs (B) and (C), respectively, and that do not result in higher food costs if program participants redeem supplemental food vouchers at vendors described in subparagraph (D)(ii)(I) rather than at vendors other than vendors described in subparagraph (D)(ii)(I).

Nothing in this paragraph shall be construed to compel a State agency to achieve lower food costs if program participants redeem supplemental food vouchers at vendors described in subparagraph (D)(ii)(I) rather than at vendors other than vendors described in subparagraph (D)(ii)(I).

**(ii) Exemptions**

The Secretary may exempt from the requirements of clause (i)—

(I) a State agency that elects not to authorize any types of vendors described in subparagraph (D)(ii)(I) and that demonstrates to the Secretary that—

(aa) compliance with clause (i) would be inconsistent with efficient and effective operation of the program administered by the State under this section; or

(bb) an alternative cost-containment system would be as effective as a vendor peer group system; or

(II) a State agency—

(aa) in which the sale of supplemental foods that are obtained with food instruments from vendors described in subparagraph (D)(ii)(I) constituted less than 5 percent of total sales of supplemental foods that were obtained with food instruments in the State in the year preceding a year in which the exemption is effective; and

(bb) that demonstrates to the Secretary that an alternative cost-containment system would be as effective as the vendor peer group system and would not result in higher food costs if program participants redeem supplemental food vouchers at vendors described in

subparagraph (D)(ii)(I) rather than at vendors other than vendors described in subparagraph (D)(ii)(I).

**(B) Competitive pricing**

**(i) In general**

The State agency shall establish competitive price criteria for each peer group for the selection of vendors for participation in the program that—

(I) ensure that the retail prices charged by vendor applicants for the program are competitive with the prices charged by other vendors; and

(II) consider—

(aa) the shelf prices of the vendor for all buyers; or

(bb) the prices that the vendor bid for supplemental foods, which shall not exceed the shelf prices of the vendor for all buyers.

**(ii) Participant access**

In establishing competitive price criteria, the State agency shall consider participant access by geographic area.

**(iii) Subsequent price increases**

The State agency shall establish procedures to ensure that a retail store selected for participation in the program does not, subsequent to selection, increase prices to levels that would make the store ineligible for selection to participate in the program.

**(C) Allowable reimbursement levels**

**(i) In general**

The State agency shall establish allowable reimbursement levels for supplemental foods for each vendor peer group that ensure—

(I) that payments to vendors in the vendor peer group reflect competitive retail prices; and

(II) that the State agency does not reimburse a vendor for supplemental foods at a level that would make the vendor ineligible for authorization under the criteria established under subparagraph (B).

**(ii) Price fluctuations**

The allowable reimbursement levels may include a factor to reflect fluctuations in wholesale prices.

**(iii) Participant access**

In establishing allowable reimbursement levels, the State agency shall consider participant access in a geographic area.

**(D) Exemptions**

The State agency may exempt from competitive price criteria and allowable reimbursement levels established under this paragraph—

(i) pharmacy vendors that supply only exempt infant formula or medical foods that are eligible under the program; and

(ii) vendors—

(I)(aa) for which more than 50 percent of the annual revenue of the vendor from the sale of food items consists of revenue from the sale of supplemental foods that are obtained with food instruments; or

(bb) who are new applicants likely to meet the criteria of item (aa) under criteria approved by the Secretary; and

(II) that are nonprofit.

**(E) Cost containment**

If a State agency elects to authorize any types of vendors described in subparagraph (D)(ii)(I), the State agency shall demonstrate to the Secretary, and the

Secretary shall certify, that the competitive price criteria and allowable reimbursement levels established under this paragraph for vendors described in subparagraph (D)(ii)(I) do not result in average payments per voucher to vendors described in subparagraph (D)(ii)(I) that are higher than average payments per voucher to comparable vendors other than vendors described in subparagraph (D)(ii)(I).

**(F) Limitation on private rights of action**

Nothing in this paragraph may be construed as creating a private right of action.

**(G) Implementation**

A State agency shall comply with this paragraph not later than 18 months after June 30, 2004.

**(12) Imposition of costs on retail stores**

The Secretary may not impose, or allow a State agency to impose, the costs of any equipment, system, or processing required for electronic benefit transfers on any retail store authorized to transact food instruments, as a condition for authorization or participation in the program.

**(13) Universal product codes database**

The Secretary shall—

**(A)** establish a national universal product code database for use by all State agencies in carrying out the program; and

**(B)** make available from appropriated funds such sums as are required for hosting, hardware and software configuration, and support of the database.

**(14) Incentive items**

A State agency shall not authorize or make payments to a vendor described in paragraph (11)(D)(ii)(I) that provides incentive items or other free merchandise, except food or merchandise of nominal value (as determined by the Secretary), to program participants unless the vendor provides to the State agency proof that the vendor obtained the incentive items or merchandise at no cost.

**(i) Division of funds formula; reallocation of unspent funds; use of State allocation to buy supplemental foods; use of amounts available for succeeding fiscal year**

**(1)** By the beginning of each fiscal year, the Secretary shall divide, among the State agencies, the amounts made available for food benefits under subsection (h)(1)(C) of this section on the basis of a formula determined by the Secretary.

**(2)** Each State agency's allocation, as so determined, shall constitute the State agency's authorized operational level for that year, except that the Secretary shall reallocate funds periodically if the Secretary determines that a State agency is unable to spend its allocation.

**(3)(A)** Notwithstanding paragraph (2) and subject to subparagraph (B)—

**(i)(I)** not more than 1 percent (except as provided in subparagraph (C)) of the amount of funds allocated to a State agency under this section for supplemental foods for a fiscal year may be expended by the State agency for allowable expenses incurred under this section for supplemental foods during the preceding fiscal year; and

**(II)** not more than 1 percent of the amount of funds allocated to a State agency under this section for nutrition services and administration for a fiscal year may be expended by the State agency for allowable expenses incurred under this section for supplemental foods and nutrition services and administration during the preceding fiscal year; and

**(ii)(I)** for each fiscal year, of the amounts allocated to a State agency for nutrition services and administration, an amount equal to not more than 3 percent of the amount allocated to the State agency under this section for the fiscal year may be expended by the State agency for allowable expenses incurred under this section for nutrition services and administration during the subsequent fiscal year; and

17

2.   School Lunch Programs: Nutrition promotion, 42 U.S.C. § 1758 note.

Subsec. (b)(12)(A)(iii). Pub.L. 108–265, § 107(a)(2), struck out the period at the end and inserted a semicolon. See Codifications note under this section.

Subsec. (b)(12)(A)(iv) to (vi). Pub.L. 108–265, § 107(a)(3), added cls. (iv) to (vi). See Codifications note under this section.

Subsec. (b)(12)(B). Pub.L. 108–265, § 104(d)(2)(A), struck out "paragraph (2)(C)" and inserted "this subsection" in par. (12) (as redesignated by Pub.L. 108–265, § 104(a)(1)).

Subsec. (b)(13). Pub.L. 108–265, § 104(a)(1), redesignated former par. (7) as par. (13).

Pub.L. 108–265, § 109, struck out "For each of fiscal years 2002 and 2003 and through June 30, 2004, the" and inserted "The" in par. (13) (as redesignated by Pub.L. 108–265, § 104(a)(1); see Codifications note under this section).

Subsec. (d)(1). Pub.L. 108–265, § 104(d)(2)(B), struck out "subsection (b)(2)(C) of this section" and inserted "subsection (b)(3)(G) of this section".

Subsec. (d)(2). Pub.L. 108–265, § 108(a)(2)(A), struck out "local school food authority" each place it appeared and inserted "local educational agency".

Subsec. (d)(2)(A). Pub.L. 108–265, § 108(a)(2)(B), struck out "such authority" and inserted "the local educational agency".

Subsec. (d)(2)(B). Pub.L. 108–265, § 107(b)(1), struck out "or" at the end.

Subsec. (d)(2)(C). Pub.L. 108–265, § 107(b)(2), struck out the period at the end and inserted a semicolon.

Subsec. (d)(2)(D), (E). Pub.L. 108–265, § 107(b)(3), added subpars. (D), (E).

Subsec. (f)(5). Pub.L. 108–265, § 110, struck out "September 30, 2003" and inserted "September 30, 2009".

Subsec. (h) heading. Pub.L. 108–265, § 111(1), struck out "inspections" following "safety".

Subsec. (h)(1). Pub.L. 108–265, § 111(2)(A) to (C), struck out "Except as provided in paragraph (2), a" and inserted "A"; struck out "shall, at least once" and inserted "shall—(A) at least twice"; and struck out the period at the end and inserted a semicolon.

Subsec. (h)(1)(B). Pub.L. 108–265, § 111(2)(D), added subpar. (B).

Subsec. (h)(1)(C). Pub.L. 108–265, § 111(2)(D), added subpar. (C).

Subsec. (h)(2). Pub.L. 108–265, § 111(3), rewrote par. (2), which formerly read:

"(2) Exception

"Paragraph (1) shall not apply to a school if a food safety inspection of the school is required by a State or local governmental agency responsible for food safety inspections."

Subsec. (h)(3). Pub.L. 108–265, § 111(3), added par. (3).

Subsec. (h)(4). Pub.L. 108–265, § 111(3), added par. (4).

Subsec. (h)(5). Pub.L. 108–265, § 111(3), added par. (5).

Subsec. (j)(2)(A). Pub.L. 108–265, § 112, struck out "2007" and inserted "2009".

**2003 Amendments.** Subsec. (b)(7). Pub.L. 108–134, § 1, inserted "and through March 31, 2004" after "and 2003".

**Effective and Applicability Provisions**

**2004 Acts.** Except as otherwise provided in Pub.L. 108–265, amendments made by Pub.L. 108–265 take effect on June 30, 2004; see Pub.L. 108–265, § 502(a), set out in a note under 42 U.S.C.A. § 1754.

Except as otherwise provided in Pub.L. 108–265, amendments made by Pub.L. 108–265, §§ 106, 107, 126(c), and 201 [amending subsecs. (b)(9), (12) and (d)(2) of this section] take effect on July 1, 2004; see Pub.L. 108–265, § 502(b)(1), set out in a note under 42 U.S.C.A. § 1754.

Except as otherwise provided in Pub.L. 108–265, amendments made by Pub.L. 108–265, §§ 102, 104 (other than section 104(a)(1)), 105, 111, and 126(b) [amending subsecs. (a)(2), (b)(2) to (13), (d), and (h) of this section] take effect on July 1, 2005; see Pub.L. 108–265, § 502(b)(4), set out in a note under 42 U.S.C.A. § 1754.

**Guidance and Regulations**

Pub.L. 108–265, Title V, § 501, June 30, 2004, 118 Stat. 789, provided that:

"(a) **Guidance.**—As soon as practicable after the date of enactment of this Act [June 30, 2004], the Secretary of Agriculture shall issue guidance to implement the amendments made by sections 102, 103, 104, 105, 106, 107, 111, 116, 119(c), 119(g), 120, 126(b), 126(c), 201, 203(a)(3), 203(b), 203(c)(5), 203(e)(3), 203(e)(4), 203(e)(5), 203(e)(6), 203(e)(7), 203(e)(10), and 203(h)(1) [amending this section, 7 U.S.C.A. § 2020 and 42 U.S.C.A. §§ 1396a, 1759a, 1761, 1766, 1769, 1769c, 1773, 1776, and 1786, and enacting provisions set out as notes under this section and 42 U.S.C.A. §§ 1769c and 1786].

"(b) **Interim final regulations.**—The Secretary may promulgate interim final regulations to implement the amendments described in subsection (a) [of this note].

"(c) **Regulations.**—Not later than 2 years after the date of enactment of this Act [June 30, 2004], the Secretary shall promulgate final regulations to implement the amendments described in subsection (a) [of this note]."

[Except as otherwise provided in Pub.L. 108–265, amendments made by Pub.L. 108–265 take effect on June 30, 2004; see Pub.L. 108–265, § 502(a), set out in a note under 42 U.S.C.A. § 1754.]

## CODE OF FEDERAL REGULATIONS

Child care food program, see 7 CFR § 226.1 et seq.

National school lunch program, see 7 CFR § 210.1 et seq.

## LIBRARY REFERENCES

**American Digest System**
Agriculture ⟅=2.7.
Key Number System Topic No. 23.

3. Special Supplemental Nutrition Program for Women, Infants and Children (WIC): Vendor Cost Containment; Interim Rule, 70 Fed. Reg. 71708 (Nov. 29, 2005) (to be codified at 7 C.F.R. pt. 246).



Tuesday,
November 29, 2005

Part III

# Department of Agriculture

### Food and Nutrition Service

**7 CFR Part 246**
**Special Supplemental Nutrition Program for Women, Infants and Children (WIC): Vendor Cost Containment; Interim Rule**

**DEPARTMENT OF AGRICULTURE**

**Food and Nutrition Service**

**7 CFR Part 246**

**RIN 0584–AD71**

**Special Supplemental Nutrition Program for Women, Infants and Children (WIC): Vendor Cost Containment**

**AGENCY:** Food and Nutrition Service, USDA.

**ACTION:** Interim rule.

**SUMMARY:** This interim rule amends the regulations governing the Special Supplemental Nutrition Program for Women, Infants and Children (WIC) to strengthen vendor cost containment. The rule incorporates into program regulations new legislative requirements that affect the selection, authorization, and reimbursement of retail vendors. These requirements are contained in the Child Nutrition and WIC Reauthorization Act of 2004, enacted on June 30, 2004. The rule reflects the statutory provisions that require State agencies to implement a vendor peer group system, competitive price criteria, and allowable reimbursement levels in a manner that ensures that the WIC Program pays authorized vendors competitive prices for supplemental foods. It also requires State agencies to ensure that vendors that derive more than 50 percent of their annual food sales revenue from WIC food instruments do not result in higher food costs to the program than do other vendors. The intent of these provisions is to maximize the number of eligible women, infants, and children served with available Federal funding.

**DATES:** Effective Date: This rule is effective December 29, 2005.

Implementation Date: State agencies must implement the provisions of this rule no later than December 30, 2005.

Comment Date: To be assured of consideration, comments on this interim rule must be received by the Food and Nutrition Service (FNS) on or before November 29, 2006.

**ADDRESSES:** FNS invites interested persons to submit comments on this interim rule. Comments may be submitted by any of the following methods:

• Mail: Send comments to Patricia Daniels, Director, Supplemental Food Programs Division, Food and Nutrition Service, USDA, 3101 Park Center Drive, Room 528, Alexandria, Virginia 22302, (703) 305–2746.

• Web Site: Go to *http:// www.fns.usda.gov/wic.* Follow the

online instructions for submitting comments through the link at the Supplemental Food Programs Division Web site.

• E-Mail: Send comments to *WICHQ-SFPD@fns.usda.gov.* Include Docket ID Number 0584–AD71, Vendor Cost Containment Interim Rule, in the subject line of the message.

• Federal eRulemaking Portal: Go to *http://www.regulations.gov.* Follow the online instructions for submitting comments.

All comments submitted in response to this interim rule will be included in the record and will be made available to the public. Please be advised that the substance of the comments and the identities of the individuals or entities submitting the comments will be subject to public disclosure. All written submissions will be available for public inspection at the address above during regular business hours (8:30 a.m. to 5 p.m.), Monday through Friday.

FNS also plans to make the comments publicly available by posting a copy of all comments on the FNS Web site at *http://www.fns.usda.gov/wic.*

**FOR FURTHER INFORMATION CONTACT:** Debra Whitford, Chief of the Policy and Program Development Branch, Supplemental Food Programs Division, at the address indicated above or at (703) 305–2746, during regular business hours (8:30 a.m.–5 p.m.), Monday through Friday.

**SUPPLEMENTARY INFORMATION:**

**Executive Order 12866**

This rule has been determined to be Significant and was reviewed by the Office of Management and Budget under Executive Order 12866.

**Regulatory Impact Analysis**

As required for all rules that have been designated as Significant by the Office of Management and Budget, a Regulatory Impact Analysis was developed for the WIC Vendor Cost Containment Interim Rule. A complete copy of the Impact Analysis appears in the appendix to this rule.

*Need for Action*

This action is needed to implement the vendor cost containment provisions of the Child Nutrition and WIC Reauthorization Act of 2004, Public Law 108–265. The rule requires WIC State agencies to operate vendor management systems that effectively contain food costs by ensuring that prices paid for supplemental foods are competitive. The rule also responds to data which indicate that WIC food purchases increasingly include payments to a type of vendor whose prices are not governed

by the market forces that affect most retail grocers. As a result, the prices charged by these vendors tend to be higher than those of other retail grocery stores participating in the program. To ensure that the program pays competitive prices, this rule codifies the new statutory requirements for State agencies to use in evaluating vendor applicants' prices during the vendor selection process and when paying vendors for supplemental foods following authorization.

While the Child Nutrition and WIC Reauthorization Act mandates that States establish peer groups, competitive price criteria and allowable reimbursement levels and states that these requirements must result in the outcome of paying above-50-percent vendors no more than regular vendors, the Act does not specify particular criteria for peer groups or acceptable methods of setting competitive price criteria and allowable reimbursement levels. FNS considered mandating specific means of developing peer groups, competitive price criteria and allowable reimbursement levels in order to ensure that the outcome of this legislation was achieved. However, given State agencies' responsibility to manage WIC as a discretionary grant program, the varying retail food market conditions in each State, and the wide variations in current vendor cost containment systems operated by State agencies, FNS believes that State agencies need flexibility to develop their own peer groups, competitive price criteria and allowable reimbursement levels.

Thus, the rule gives State agencies flexibility to design cost containment practices that would be effective in their own markets and would ensure adequate participant access. In addition, there is little information about the effectiveness of particular cost containment practices in the variety of markets represented by the 89 State agencies. Mandating more specific means of developing peer groups, competitive price criteria and allowable reimbursement levels could have unintended, negative consequences on participant access, food costs and administrative burden.

As State agencies gain experience and the results of their vendor cost containment practices become apparent, FNS may develop further regulations and guidance to improve WIC vendor cost containment. In the interim, FNS believes that the current rule will substantially accomplish the goal of the Act of containing food costs and ensuring that above-50-percent vendors

do not result in higher costs to the program than regular vendors.

As noted previously, FNS believes that State agencies need flexibility to develop their own peer groups, competitive price criteria and allowable reimbursement levels. Given State agencies' responsibility to manage WIC as a discretionary grant program, the varying retail food market conditions in each State, the wide variations in current vendor cost containment systems operated by State agencies, the limited amount of information about the effectiveness of particular cost containment practices in the variety of markets represented by the 89 State agencies, and the need to minimize administrative burden, this is the most appropriate approach for the interim final rule.

In order to better assess the effectiveness of specific cost containment strategies, FNS will be collecting and analyzing data from State agencies, in anticipation of issuing a final rule. This will enable the agency to analyze the effect of particular vendor peer group systems, competitive price criteria, and allowable reimbursement levels on WIC food prices, participant access, the vendor community and a range of other measures. FNS will also be collecting information on administrative burden associated with the new requirements. This will enable FNS to identify and consider a reasonable number of regulatory alternatives when considering the final rule and adopt the most cost-effective or least burdensome alternative that achieves the objectives of the rule. While we expect the final rule to be promulgated within three years, it is important that sufficient time be allowed to assess the impacts of this interim final rule before moving to alter any of its provisions.

*Benefits*

The WIC Program will benefit from the provisions of this rule by reducing unnecessary food expenditures, which increases the potential to serve more eligible women, infants, and children for the same cost. The rule should have the effect ensuring that payments to vendors, particularly vendors that derive more than 50 percent of their annual food sales revenue from WIC food instruments reflect competitive prices for WIC foods. Currently, the WIC Program pays vendors whose food sales consist primarily of WIC transactions substantially more for supplemental foods than it pays other authorized vendors. Under this rule, State agencies that choose to authorize these vendors will demonstrate that payments to them

do not exceed the competitive prices paid to other vendors. FNS conservatively estimates that implementation of the rule will result in a cost savings of approximately $75 million annually.

*Costs*

In order to comply with this rule, State agencies will need to make one-time changes in their vendor cost containment systems. Some State agencies may already be in full or partial compliance with the rule, while others may demonstrate that they meet the conditions for an exemption from the vendor peer group system requirement. Many State agencies, particularly those that choose to authorize vendors that rely predominantly on WIC food instruments for food sales revenue, will incur additional costs and administrative burden to achieve compliance with its provisions. These costs are associated with establishing or restructuring vendor peer groups, revising competitive price criteria and allowable reimbursement levels for those peer groups, collecting and monitoring vendor shelf prices for supplemental foods, and evaluating payments to vendors. Variations in State agency vendor management systems and staffing resources make it difficult to derive a cost estimate. State agencies will not receive additional funds to administer the program with these new requirements.

Some WIC vendors, particularly smaller stores that are not also authorized by the Food Stamp Program, may incur costs to compile data on their total annual food sales. State agencies will require this data in order to determine, as required by law, whether a vendor derives more than 50 percent of their total annual food sales revenue from WIC food instruments.

**Regulatory Flexibility Act**

This rule has been reviewed with regard to the requirements of the Regulatory Flexibility Act (5 U.S.C. 601–612). FNS does not believe this rule will have a significant economic impact on a substantial number of small entities. With the high degree of State flexibility allowable under this rule, small entities will be impacted differently in each State depending upon how that State chooses to meet the requirements set forth here. It is therefore not feasible to accurately estimate the rule's impact on small entities. As FNS is concerned about these impacts, we plan to collect data on the implementation of this interim final rule and the options States select in

order to better assess the impact for the final rulemaking and the Final Regulatory Flexibility Analysis and publish it for comments.

In fulfilling the intent of the Child Nutrition and WIC Reauthorization Act of 2004, the rule may have a significant economic impact on a small number of vendors that have been authorized to participate in the WIC Program. These vendors tend to be smaller grocery stores that serve WIC participants exclusively or predominantly, have a large volume of WIC transactions, and are not subject to the retail market forces that keep food prices at competitive levels. In accordance with the law, the rule requires that State agencies implement effective competitive price criteria in selecting and reimbursing vendors, including assurance that payments to vendors that derive more than 50 percent of their annual food sales revenue from WIC food instruments do not result in higher food costs to the program than other vendors. Only those vendors that are able to meet competitive pricing requirements will be able to continue participating in the program. Currently FNS estimates that between three and four percent of the approximately 45,000 authorized vendors will need to make changes in the prices that they offer the WIC Program in order to be deemed competitive.

**Public Law 104–4**

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, establishes requirements for Federal agencies to assess the effects of their regulatory actions on State, local and tribal governments and the private sector. Under section 202 of the UMRA, FNS generally must prepare a written statement, including a cost benefit analysis, for proposed and final rules with "Federal mandates" that may result in expenditures by State, local or tribal governments, in the aggregate, or the private sector, of $100 million or more in any one year. When such a statement is needed for a rule, section 205 of the UMRA generally requires FNS to identify and consider a reasonable number of regulatory alternatives and adopt the most cost-effective or least burdensome alternative that achieves the objectives of the rule.

This interim rule contains no Federal mandates (under the provisions of Title II of the UMRA) for State, local and tribal governments or the private sector of $100 million or more in any one year. Thus, the rule is not subject to the requirements of sections 202 and 205 of the UMRA.

**Executive Order 12372**

The Special Supplemental Nutrition Program for Women, Infants and Children (WIC) is listed in the Catalog of Federal Domestic Assistance under 10.557. For the reasons set forth in the final rule in 7 CFR part 3015, subpart V and related Notice (48 FR 29115), this program is included in the scope of Executive Order 12372, which requires intergovernmental consultation with State and local officials.

**Federalism Summary Impact Statement**

Executive Order 13132 requires Federal agencies to consider the impact of their regulatory actions on State and local governments. Where such actions have federalism implications, agencies are directed to provide a statement for inclusion in the preamble to the regulations describing the agency's considerations in terms of the following three categories called for under section (6)(b)(2)(B) of Executive Order 13132.

*Prior Consultation With State Officials*

State agencies have expressed concerns and shared information regarding implementation of the new vendor cost containment legislative requirements. Because the WIC Program is a State-administered, federally funded program, our regional offices have formal and informal discussions with State agencies on an ongoing basis regarding program implementation and policy issues. This arrangement allows State agencies to raise questions and provide comments that form the basis for many of the implementation detail decisions in this and other WIC Program rules. Following the enactment of Public Law 108–265, several regional offices convened meetings with State WIC staff that included discussion of the vendor cost containment provisions of this law. As a result of these meetings, FNS continues to receive State agency requests for policy guidance on the vendor cost containment requirements. These questions have helped us make the rule responsive to State agency concerns.

In addition, in October 2004, the Supplemental Food Programs Division (SFPD) convened a meeting of WIC State agency representatives, USDA headquarters and regional office staff, and an outside expert on competitive pricing systems, to obtain more information on State agencies' current vendor cost containment systems. During the meeting, participants identified salient issues that State agencies are likely to confront in implementing the new competitive pricing requirements. Following the

meeting, FNS received input from additional State agencies on their current competitive pricing policies, as well as from representatives of retail grocers.

**Nature of Concerns and the Need To Issue This Rule**

State agencies have inquired about the intent of the vendor cost containment provisions, particularly as amended by Public Law 108–265. They have asked whether these provisions require State agencies to improve the effectiveness of their competitive pricing systems, or whether they primarily address the competitiveness of prices charged by a comparatively small number of stores that derive their revenue from WIC food instruments predominantly and that generally charge higher prices than other authorized vendors. State agencies also have requested clarification of the term "comparable vendors;" guidance on how to determine a vendor's revenue from food sales; criteria for developing effective vendor peer groups and for obtaining an exemption from the vendor peer group requirement; and criteria for identifying, grouping, and setting allowable reimbursement levels for stores that are likely to derive more than 50 percent of their annual revenue from food sales from WIC transactions. Some State agencies have expressed concern over the potential cost of implementing changes to their automated systems for editing and payment of WIC food instruments. Many have indicated that the regulations should allow them maximum flexibility to define the competitive pricing approaches that best suit their individual circumstances.

*Extent to Which We Will Meet Those Concerns*

FNS has considered the impact of this interim rule on WIC State and local agencies. This rule makes changes required by law that became effective October 1, 2004. Through the rulemaking process, FNS has attempted to balance the need for State agencies to meet the new competitive pricing requirements against the administrative challenges that State agencies are likely to encounter in meeting them. These challenges include the commitment of adequate resources to configuring vendor peer groups and allowable reimbursement methodologies, ongoing monitoring of vendors' prices, and maintaining competitive pricing over time.

There is limited information available on proven competitive pricing approaches. Variations in State agency vendor populations, geography, and other characteristics also preclude the

use of a standardized approach. Therefore, this rule sets forth principles to guide State agency efforts, while allowing State agencies the flexibility to meet the legislative requirements through a variety of acceptable approaches. The inclusion of competitive pricing principles in this interim rule responds to State agency requests for criteria for developing effective peer groups and allowable reimbursement levels, so that foods can be purchased at the lowest prices consistent with maintaining adequate participant access to vendors.

**Executive Order 12988**

This rule has been reviewed under Executive Order 12988, Civil Justice Reform, and is intended to have preemptive effect with respect to any State or local laws, regulations or policies which conflict with its provisions, otherwise impede its full implementation, or result in any delay of implementation of provisions beyond the statutory implementation date established in the Child Nutrition and WIC Reauthorization Act of 2004, Public Law 108–265. Section 203(e)(10) of Public Law 108–265 amends section 17(h) of the Child Nutrition Act of 1966 by adding the new paragraph 17(h)(11) which specifies that the State agencies shall comply with the provisions of the paragraph not later than 18 months after the date of enactment. Since the amendment was enacted on June 30, 2004, State agencies must be in compliance by December 30, 2005. This rule is not intended to have retroactive effect unless as specified in the DATES paragraph of this preamble. Prior to any judicial challenge to the provisions of this rule or the application of its provisions, all applicable administrative procedures must be exhausted.

**Civil Rights Impact Analysis**

FNS has reviewed this interim rule in accordance with Departmental Regulation 4300–4, "Civil Rights Impact Analysis," to identify and address any major civil rights impacts the rule might have on minorities, women, and persons with disabilities. FNS has determined that the rule's intent and provisions will not adversely affect access to WIC services by eligible persons. All data available to FNS indicate that protected individuals have the same opportunity to participate in the WIC Program as non-protected individuals. FNS specifically prohibits State and local government agencies that administer the WIC Program from engaging in actions that discriminate based on race, color, national origin, sex, age or disability. Section 246.8 of the WIC regulations (7

CFR part 246) indicates that Department of Agriculture regulations on non-discrimination (7 CFR parts 15, 15a and 15b) and FNS instructions ensure that no person shall on the grounds of race, color, national origin, age, sex, or disability, be excluded from participation in, be denied benefits of, or be otherwise subjected to discrimination under the Program.

Discrimination in any aspect of program administration is prohibited by Department of Agriculture regulations on non-discrimination (7 CFR parts 15, 15a, and 15b), the Age Discrimination Act of 1975 (Pub. L. 94–135), the Rehabilitation Act of 1973 (Pub. L. 93–112, section 504), and title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d). Enforcement action may be brought under any applicable Federal law. Title VI complaints shall be processed in accordance with 7 CFR part 15. Where State agencies have options, and they choose to implement a particular provision, they must implement it in such a way that it complies with the § 246.8 of the WIC regulations.

**Paperwork Reduction Act**

The Paperwork Reduction Act of 1995 (44 U.S.C. Chap. 35; see 5 CFR 1320) requires that the Office of Management and Budget (OMB) approve all collections of information by a Federal agency before they can be implemented. Respondents are not required to respond to any collection of information unless it displays a current valid OMB control number. This interim rule contains new information collections that are subject to review and approval by the Office of Management and Budget. FNS is submitting for public comment the information collection burden that would result from the implementation of the provisions in this rule.

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on those who are to respond, including use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

Comments may be sent to Debra R. Whitford, Chief, Policy and Program

Development Branch, Supplemental Food Programs Division, Food and Nutrition Service, U.S. Department of Agriculture, 3101 Park Center Drive, Room 522, Alexandria, Virginia 22302. Comments may also be submitted via the FNS Web site at *http:// www.fns.usda.gov/wic*, by following the online instructions. In all cases, please label your comments as "Proposed Collection of Information: WIC Vendor Cost Containment Interim Rule." All written comments will be open for public inspection at the office of the Food and Nutrition Service during regular business hours (8:30 a.m. to 5 p.m. Monday through Friday) at 3101 Park Center Drive, Room 522, Alexandria, Virginia 22302. All responses to this notice will be summarized and included in the request for OMB approval. All comments will be a matter of public record.

*OMB Number:* 0584–0043.
*Expiration Date:* March 31, 2007.
*Type of Request:* Revision of a currently approved collection.

*Abstract:* The information collection and reporting burden associated with this interim rule meets new vendor cost containment requirements contained in the Child Nutrition and WIC Reauthorization Act of 2004, Public Law 108–265. These requirements affect the selection, authorization, and reimbursement of WIC vendors. The rule requires State agencies to report on a number of factors so that FNS can meet the goals of effectively containing food costs by ensuring that the WIC Program pays competitive prices for WIC foods and providing guidance to State agencies on best competitive pricing practices. These include new State Plan components, collection of information to identify vendors that derive more than 50 percent of their food sales revenue from WIC food instruments, and collection of vendor shelf prices for WIC foods. FNS deems this information collection and reporting burden to be necessary in order to fulfill the legislative requirements and ensure State agency compliance with the interim rule.

Section 246.4(a)(14)(xv) is a new section on vendor cost containment. It requires a State agency to include in the State Plan a description of the vendor peer group system and allowable reimbursement levels that demonstrates that the State agency is in compliance with WIC cost containment provisions. The vendor peer group description will include the criteria used to classify vendors into groups, the number and types of vendors in each peer group, identification of peer groups with vendors that derive more than 50

percent of their annual food sales revenue from WIC food instruments and comparable vendor peer groups, and the competitive price criteria and maximum reimbursement levels applicable to each peer group. The State Plan also must include the information specified in § 246.12(g)(4)(iv) of the interim rule on non-profit vendors that the State agency plans to exempt from the competitive price criteria and allowable reimbursement levels that are applicable to other vendors. State agencies seeking an exemption from the vendor peer group requirement based on the conditions stated in § 246.12(g)(4)(v) of the interim rule must submit a justification with documentation supporting their request. The justification will consist largely of a detailed description of how the State agency's alternative vendor cost containment system operates, with shelf price and/or redemption data to demonstrate that the system is as effective as a vendor peer group system. Under § 246.12(g)(4)(vi) of the rule, State agencies that authorize vendors that derive more than 50 percent of their annual food sales revenue from WIC food instruments must describe their methodology for ensuring that average payments per food instrument to such vendors do not exceed average payments per food instrument to comparable vendors in order to obtain vendor cost containment certification. To demonstrate that their competitive price criteria and allowable reimbursement levels meet regulatory requirements, State agencies will provide the following data for selected food instruments redeemed by vendors that derive more than 50 percent of their annual food sales from WIC food instruments and regular vendors: The number of food instruments redeemed; average food instrument redemption amounts and standard deviations by peer group; and the average variance in redemption amounts; the total dollar amount of WIC redemptions by peer group; and statewide weighted average redemption prices to demonstrate whether vendors that derive more than 50 percent of their annual food sales from WIC food instruments resulted in higher costs than would have occurred if participants had used other vendors. State agencies using EBT systems must make similar comparisons between the prices paid to vendors that derive more than 50 percent of their annual food sales revenue from WIC food instruments and the prices paid to comparable vendors. FNS will require annual updating of selected food

instrument redemption data.—874 hours

Section 246.12(g)(4)(i) requires a State agency to collect annual food sales data from authorized vendors and vendor applicants in order to identify the vendors that derive, or that may be expected to derive, more than 50 percent of their food sales revenue from WIC food instruments. A State agency that elects to authorize vendors that meet the above-50-percent criterion must identify these vendors annually using a methodology approved by FNS.

A State agency that chooses not to authorize such vendors must use an approved methodology to identify vendor applicants that would be expected to meet the more than 50 percent criterion if authorized.—45,178 hours.

Section 246.12(g)(4)(ii)(B) requires State agencies to collect the shelf prices for WIC-approved foods from authorized retail vendors twice annually. In meeting this requirement, a State agency may limit data collection to prices that have changed from a vendor's previous

submission. A State agency also may collect prices from a random sample of authorized vendors and/or for selected supplemental foods.—90,178 hours.

*Respondents:* WIC State agencies and vendors.

*Estimated Number of Respondents:* 89 State agencies and 45,000 vendors.

*Estimate of Burden:* Estimates of the information collection and reporting burden contained in this interim rule are detailed below.

### ESTIMATED ANNUAL REPORTING BURDEN

| Section of interim rule | Estimated number of respondents | Data collections or reports required annually | Estimated average burden hours per response | Estimated annual burden hours |
|---|---|---|---|---|
| 246.4(a)(14)(xv) | | | | |
| • Description of vendor peer group system and allowable reimbursement levels; average redemption amounts for selected food instruments. | 89 | 1 ........................ | 4 | 356 |
| • Notification of exemption of non-profit vendors ............................................. | 5 | 1 ........................ | 1 | 5 |
| • Request for exemption from vendor peer group requirement ...................... | 30 | 1—every three years. | 8 | 80 |
| • Information required for certification of vendor cost containment system and to monitor ongoing compliance with certification requirements. | 65 | 1—every three years. | 8 | 173 |
| | 65 | 1 ........................ | 4 | 260 |
| 246.12(g)(4)(i) ................................................................................................. | 89 | 1 ........................ | 2 | 178 |
| | 45,000 | 1 ........................ | 1 | 45,000 |
| 246.12(g)(4)(ii)(B) ........................................................................................... | 89 | 2 ........................ | 1 | 178 |
| | 45,000 | 2 ........................ | 1 | 90,000 |
| Burden hours due to program changes ........................................................... | ................ | ................ | ................ | 136,230 |
| Total adjustments * ......................................................................................... | ................ | ................ | ................ | 203 |
| Currently Approved WIC Reporting and Recordkeeping Burden Hours ............. | ................ | ................ | ................ | 2,817,091 |
| Total Proposed WIC Reporting and Recordkeeping Burden Hours .................... | ................ | ................ | ................ | 2,953,524 |

* Adjustments are due to an increase in the number of State agencies from 88 to 89.

FNS also plans an information collection to assess the impact of this regulation on State agencies at a later time.

**Government Paperwork Elimination Act**

FNS is committed to compliance with the Government Paperwork Elimination Act (GPEA), which requires Government agencies to provide the public the option of submitting information or transacting business electronically to the maximum extent possible. This interim rule encourages WIC State agencies to collect data from retail vendors using electronic methods.

**Good Cause Determination**

As discussed above, section 203(e)(10) of the Child Nutrition and WIC Reauthorization Act of 2004, Public Law 108–265, contained provisions that significantly impact vendor cost containment in the WIC Program, particularly the costs of vendors that derive more than 50 percent of their

food sales revenue from WIC food instruments. Section 501 of Public Law 108–265 requires that guidance to implement section 203(e)(10) of the law be issued as soon after the date of enactment as practicable, and authorizes the issuance of interim final regulations. Therefore, Under Secretary Eric M. Bost has determined, in accordance with 5 U.S.C. 553(b), that prior notice and comment would be unnecessary, and that good cause exists for making this rule effective without first publishing a proposed rule.

**Background**

Retail vendors make a major contribution to the success of the WIC Program by providing supplemental foods to program participants as an extension of their normal business practices. FNS recognizes that State agencies must balance multiple objectives when authorizing vendors, *i.e.,* they must ensure adequate participant access to supplemental foods; maintain effective program

management within available administrative resources; and pay reasonable food costs. Therefore, State agencies have broad authority to authorize only those vendors needed to best serve these objectives. Since WIC is best served if foods are purchased for the lowest prices, while maintaining reasonable access for program participants, this authority includes eliminating vulnerability to excessive food payments by applying competitive price methods during and following vendor selection, so the State agency can serve the maximum number of participants with limited funding.

Major amendments to the WIC Program regulations governing food delivery systems were last published on December 29, 2000, at 65 FR 83248. These amendments, referred to as the WIC Food Delivery Systems Rule, established mandatory vendor selection, training, and monitoring requirements to strengthen State agency vendor management systems and prevent abuse of the program. The WIC Food Delivery

Systems Rule implemented provisions of the William F. Goodling Child Nutrition Reauthorization Act of 1998, Public Law 105–336 (which amended the Child Nutrition Act of 1966, 42 U.S.C. 1786), that required State agencies to identify high-risk vendors, conduct compliance buys on high-risk vendors, and consider food prices in the selection of vendors. State agencies were required to implement the provisions of the WIC Food Delivery Systems Rule no later than October 1, 2002.

The use of a price criterion in the vendor selection process has been a critical first step in ensuring that the WIC Program pays competitive prices for supplemental foods. Appropriate application of this criterion, coupled with price limitations on the amount that the State agency will pay vendors subsequent to authorization, is essential to successful food cost containment. The WIC Food Delivery Systems Rule authorized State agencies to make price adjustments to the purchase price on food instruments submitted by the vendor for redemption to ensure compliance with the price limitations applicable to the vendor.

The Child Nutrition and WIC Reauthorization Act of 2004 (Pub. L. 108–265) amended the Child Nutrition Act of 1966 (CNA) to reinforce and strengthen the use of competitive price criteria and price limitations for vendor cost containment. It expanded the competitive pricing requirement of the WIC Food Delivery Systems Rule to address the application of competitive pricing methods to vendors that derive their revenue from food sales predominantly, if not exclusively, from WIC food instruments. The prices that such stores (often referred to as "WIC-only stores") charge for supplemental foods are generally higher than prices of other authorized retailers. Recent trends showing an annual increase in the number of WIC-only stores and in the percentage of the total WIC redemptions that they receive were a primary factor in the development of the vendor cost containment provisions of Public Law 108–265. Congress intended that the authorization of WIC-only stores should not result in higher food costs than if program participants used their food instruments in regular grocery stores.

Section 203(e)(10) of Public Law 108–265 amended section 17(h)(11) of the CNA to address the emergence of such vendors in the WIC Program because of their potential adverse impact on the future cost of the program particularly if these trends continue. The vendor cost containment provisions of this interim rule will promote sound stewardship of

taxpayer dollars; help ensure that the WIC Program continues to rely on market forces to contain food costs; and protect the program's ability to serve the greatest number of eligible women, infants, and children.

*Overview of the New Vendor Cost Containment Requirements*

In accordance with section 203(e)(10) of Public Law 108–265, this interim rule requires State agencies to implement competitive pricing systems that foster financial integrity and the most efficient use of their food funds. When State agencies craft these systems properly, they will not pay higher prices than necessary for supplemental foods. While State agencies have the discretion to determine many of the details of their competitive pricing approaches, section 203(e)(10) of Public Law 108–265 now requires them to establish a vendor peer group system, and competitive price criteria and allowable reimbursement levels for each vendor peer group. Previously, the use of peer groups in competitive pricing systems was optional under § 246.12(g)(4)(i) of the WIC regulations.

This rule also implements new legislative requirements for State agencies that choose to authorize for-profit vendors that derive more than 50 percent of their revenue from food sales from WIC food instruments. It requires State agencies to ensure that vendors that meet, and vendor applicants that are expected to meet, the more than 50 percent criterion are cost neutral to the program. (**Note:** This preamble will refer to vendors that meet or are expected to meet the more than 50 percent criterion as "above-50-percent vendors.") The first cost neutrality requirement in section 203(e)(10) of Public Law 108–265 is that payments to above-50-percent vendors may not result in higher food costs than if program participants purchased their WIC foods at regular vendors. The second cost neutrality requirement is that average payments per food instrument to above-50-percent vendors may not be higher than average payments per food instrument to comparable vendors. Comparable vendors cannot be other vendors that meet the above-50-percent criterion.

To achieve the cost neutrality requirements, section 203(e)(10) of Public Law 108–265 requires State agencies that authorize above-50-percent vendors to distinguish between these vendors and regular vendors when establishing vendor peer groups, competitive price criteria, and allowable reimbursement levels. In determining competitive prices for WIC foods and

establishing allowable reimbursement levels, State agencies would be required to compare above-50-percent vendors with regular vendors, *i.e.*, vendors that set their prices based on market forces and that compete for non-WIC customers. Since the WIC Program receives a finite amount of funding annually to serve as many participants as this funding allows, it is necessary for each State agency to implement a system that ensures foods are acquired at the most economical cost consistent with participant access needs. Clearly, reducing the costs to the program of vendors that have historically charged high prices for supplemental foods is imperative. Consistent with section 203(e)(10) of Public Law 108–265, this rule reflects the fact that State agencies have clear authority not to authorize any above-50-percent vendors.

As set forth in section 203(e)(10) of Public Law 108–265, this rule allows FNS to exempt a State agency, under certain conditions, from the requirement to establish a vendor peer group system. It would also allow State agencies to exempt from competitive price criteria and allowable reimbursement levels pharmacies that supply only exempt infant formula or medical foods under the program; non-profit vendors that derive more than 50 percent of their revenue from food sales from WIC food instruments; and non-profit vendor applicants that are likely to meet the above-50-percent criterion.

*Implementation of This Interim Rule*

Section 203(e)(10) of Public Law 108–265 requires State agencies to implement the provisions included in this interim rule by December 30, 2005. Therefore, State agencies must take all steps that are necessary, including compliance with any applicable State rulemaking or legislative requirements, in order to establish policies to comply with the requirements of this rule by December 30, 2005. To facilitate implementation of the interim rule, this preamble addresses comments and questions that State agencies have presented regarding the requirements to establish vendor peer groups, competitive price criteria, and allowable reimbursement levels. This preamble also discusses criteria for developing effective vendor peer groups and for obtaining an exemption from the vendor peer group requirement. It also clarifies the meaning of key concepts, such as "comparable vendors," and describes appropriate ways to identify above-50-percent vendors.

This preamble recognizes that applying competitive pricing techniques to contain food costs remains a

challenge for some State agencies. Recently, several State agencies have conducted formal analyses of their competitive pricing systems and, as a result, are in the process of planning or implementing changes to enhance system performance. FNS believes that State agencies will continue learning and adopting more efficient ways of containing food costs through competitive pricing systems. Therefore, this preamble offers principles to assist State agencies in assessing the performance of their competitive pricing systems as they make modifications to comply with the mandatory changes covered by this interim rule.

### Vendor Peer Group System

*General Requirement*

Section 203(e)(10)(A) of Public Law 108–265 added section 17(h)(11)(A) to the CNA to require each State agency to establish a vendor peer group system, except in certain circumstances. This interim rule incorporates the legislative requirement into § 246.12(g)(4) of the WIC regulations. A vendor peer group system is a means of classifying authorized vendors into groups based on common characteristics that affect food prices. The purpose of peer groups is to facilitate the application of competitive price criteria at vendor authorization and during the food instrument redemption process. When a vendor peer group system is properly constructed, the prices that vendors within a peer group charge for WIC foods will be more similar internally than they are to the prices charged by other peer groups; and the peer group system should account for most of the food price variations. A State agency that did not have a vendor peer group system at the time Public Law 108–265 was enacted in June 2004 must implement such a system by December 30, 2005.

Many State agencies already have a vendor peer group system. The structure and use of peer groups varies widely. Vendor peer groups are often established based on a combination of two factors—vendor size and vendor location. Vendor size may be determined through a variety of factors, such as total business volume, WIC business volume, square footage of store, number of cash registers (or point of sale devices), or type of store (e.g., supermarket, grocery store, convenience store, military commissary, nonprofit co-op, or pharmacy). Vendor location is often divided into geographic categories, such as urban, suburban, and rural, which may also include a number of subcategories within the State. Some

State agencies use three criteria in establishing peer groups.

Some State agencies use peer groups to set the competitive price range for WIC foods, assess whether a vendor applicant's prices are competitive, and to establish maximum reimbursement levels for WIC food instruments. Others use vendor peer groups to assess the competitiveness of a vendor applicant's prices, but they do not limit reimbursements based on a vendor's peer group. Instead, these State agencies apply a single statewide maximum reimbursement level for each food instrument type to all peer groups. Section 246.12(g)(4) of the interim rule, in implementing section 17(h)(11)(A)(i) of the CNA, clarifies that a State agency must establish competitive price criteria and allowable reimbursement levels that are applicable to each peer group.

Because characteristics of the retail grocery marketplace vary from State to State, this interim rule continues to allow State agencies broad latitude in establishing peer groups. To ensure that vendor peer group systems continue to be effective, § 246.12(g)(4)(ii) of this rule requires State agencies to assess their peer groupings at least every three years and to modify them as necessary. It also indicates that a State agency may change the peer group into which it places a vendor whenever it determines that such action is warranted.

*Specific Requirements*

Section 17(h)(11)(A)(III) of the CNA requires a State agency that chooses to authorize for-profit vendors that derive or are expected to derive more than 50 percent of their annual revenue from food sales from WIC food instruments to distinguish between the above-50-percent vendors and regular retail vendors for cost containment purposes. Accordingly, § 246.12(g)(4)(i) of this rule requires a State agency that chooses to authorize any above-50-percent vendors to distinguish between these vendors and regular vendors in its peer group system. In meeting this requirement, a State agency may establish separate peer groups for above-50-percent vendors or place them in peer groups with regular vendors, but establish distinct competitive price criteria and allowable reimbursement levels for the above-50-percent vendors within the peer groups. Both approaches require a State agency to compare the prices of above-50-percent vendors against the prices of regular retail vendors for vendor selection and reimbursement purposes. A State agency's vendor peer group system must meet this requirement unless the State agency chooses not to authorize any above-50-percent vendors.

In the past, State agencies that authorized a specific type of vendor known as WIC-only stores have tended to place them into separate peer groups where their prices were compared with other WIC-only stores. This practice generally has resulted in the payment of higher prices to WIC-only vendors than to regular retail vendors. In many instances, payment of higher prices to WIC-only vendors was unnecessary because other competitively-priced vendors were accessible to WIC participants. In implementing this rule, a State agency that authorizes any above-50-percent vendors would be required to determine whether it is more effective, from a cost containment perspective, to group them with regular retail vendors than by themselves, and if so, how to group them with regular vendors without inflating the peer group's prices.

Some State agencies have expressed the view that grouping above-50-percent vendors with regular vendors would increase a State agency's ability to monitor their prices; provide an incentive for such vendors to offer competitive prices; and help a State agency hold them to the same pricing standard as regular retail vendors. State agency arguments against this approach include the likelihood that the prices of above-50-percent vendors would be too high to allow them to be grouped with regular vendors. State agencies also thought that above-50-percent vendors would skew the average prices for the peer group. Section 246.12(g)(4)(i) of this interim rule states that State agencies must ensure that the prices of above-50-percent vendors do not inflate the competitive price criteria and allowable reimbursement levels applicable to each peer group.

When a State agency assigns above-50-percent vendors to a peer group with regular vendors, it must use the prices of the regular vendors within the peer group to establish the competitive price criteria and allowable reimbursement level for the above-50-percent vendors. If a State agency assigns above-50-percent vendors to separate peer groups, the State agency may not reimburse them at a higher level than that for peer groups consisting of comparable regular vendors.

In identifying vendors that are comparable to above-50-percent vendors, the State agency must consider geographic area; however, the State agency has the discretion to determine how much weight to give to geographic considerations. The State agency may interpret comparability differently for regular retail vendors than for above-50-percent vendors. For example, a State

agency might determine that geographic location and number of cash registers adequately define peer groups for regular vendors, but that it must utilize an additional criterion, such as WIC sales volume, to identify stores that are comparable to the above-50-percent vendors.

## Identifying Above-50-Percent Vendors

In order to comply with requirements of section 17(h)(11)(A)(III) of the CNA with regard to above-50-percent vendors, § 246.12(g)(4)(i) of this interim rule requires each State agency to determine on an annual basis whether any authorized vendors meet the more than 50 percent criterion and whether each new vendor applicant is expected to meet it. In making its determination, the State agency would be required to consider a vendor's annual revenue from the sale of food items. Under this rule, revenue from the sale of food items means the sum of all payments (including, cash, Food Stamp Program and WIC redemptions, and credit/debit transactions) received by the vendor for the sale of foods that can be purchased under the Food Stamp Program (FSP). Currently, there is no standard definition of "food sales" used in the retail food industry. Since approximately 85 percent of current WIC vendors are authorized by the Food Stamp Program, most vendors are familiar with the eligible food items and there would be a consistent definition of food sales between WIC and the FSP. Vendors that utilize scanning equipment during the checkout process are able to flag foods that are eligible for purchase with food stamp benefits and, thus, to capture the total sales amount.

Eligible food items include sales of foods intended for home preparation and consumption, including meat, fish, and poultry; bread and cereal products; dairy products; and fruits and vegetables. Items such as condiments and spices, coffee, tea, cocoa, and carbonated and noncarbonated drinks may be included in food sales when they are offered for sale along with the abovementioned foods. Items that cannot be purchased using food stamp benefits include, but are not limited to, hot foods and food that will be eaten in the store. This rule does not require that a vendor be authorized by the Food Stamp Program.

State agencies must use the following approach to identify above-50-percent vendors. State agencies may use additional methods, if approved by FNS.

## 1. Current Vendors

To determine whether a currently authorized vendor meets the more than 50 percent criterion, the State agency must calculate WIC redemptions as a percent of the vendor's total foods sales for the same period. If WIC redemptions are more than 50 percent of the total food sales, the vendor must be deemed to be an above-50-percent vendor. As an initial step in identifying above-50-percent vendors, the State agency should compare each vendor's WIC redemptions to FSP redemptions for the same period. If more than one WIC State agency authorizes a particular vendor, then each State agency must obtain and add the WIC redemptions for each State agency that authorizes the vendor to derive the total WIC redemptions. Most WIC vendors also have FSP authorization and, consequently, have FSP redemptions. If FSP redemptions exceed WIC redemptions, no further assessment would be required. The vendor clearly would not be an above-50-percent vendor.

For vendors whose WIC redemptions exceed their FSP redemptions, further assessment would be required. The State agency should ask these vendors to provide the total amount of revenue obtained from the sale of foods that could be purchased using food stamp benefits. The State agency should request documentation (such as tax documents or other verifiable documentation) to support the amount of food sales claimed by the vendor. After evaluating the documentation received from the vendor, the State agency must calculate WIC redemptions as a percent of total food sales and classify the vendor as meeting or not meeting the more than 50 percent criterion.

For vendors that are not authorized by the FSP, the State agency should clarify the types of foods that may be included in food sales, using the list of eligible and ineligible food items that applies to FSP retailers. The State agency should request and evaluate verifiable documentation on the store's revenue from food sales and classify the vendor as appropriate.

## 2. Vendor Applicants

As part of the vendor application process, the State agency must ask vendor applicants whether they expect to derive more than 50 percent of their annual revenue from the sale of food items from transactions involving WIC food instruments. This question applies whether or not the State agency chooses to authorize above-50-percent vendors. Vendor applicants include a new store

location for any ownership entity that currently has a WIC authorized store, as well as an entirely new vendor applicant. If the vendor applicant's answer is "yes," no further assessment would be necessary. The State agency would treat this vendor as likely to meet the more than 50 percent criterion, if the vendor were authorized.

The State agency would further assess all other vendor applicants using the following indicators to determine whether they would be expected to meet the more than 50 percent criterion if authorized. First, the State agency must calculate WIC redemptions as a percent of total food sales in existing WIC-authorized stores owned by the vendor applicant. Secondly, the State agency must calculate or request from the vendor applicant the percentage of anticipated food sales by type of payment, i.e., cash, FSP, WIC, and credit/debit card. Thirdly, the State agency must request and review inventory invoices to determine if the vendor will offer for sale on a continuous basis a variety of meats, poultry or fish; breads or cereals; vegetables or fruits; and dairy products. Fourthly, the State agency must determine whether WIC authorization is required in order for the store to open for business. To the extent possible, the State agency should validate information received from the vendor applicant against other data sources.

Use of the percent of anticipated food sales by payment type provides information on WIC as a percentage of total food sales. Having a variety of foods other than supplemental foods would indicate that the vendor has or expects to have non-WIC sales. If the vendor is already operating a viable business without WIC transactions, this might indicate that the vendor will not be dependent upon WIC as a primary source of revenue. These indicators should provide the State agency with sufficient information on which to base its assessment of a vendor applicant. At its discretion, the State agency may use additional data sources and methodologies.

The State agency must maintain documentation indicating the basis for its determination as to whether a current vendor or vendor applicant meets or is expected to meet the more than 50 percent criterion. Section 246.12(g)(4)(i) of the interim rule requires the State agency to assess the accuracy of its determination within six months of authorizing the new vendor to determine whether the vendor should have been authorized, and/or to ensure that the State agency is applying the appropriate competitive price criteria

and allowable reimbursement level to the new vendor. If necessary, the State agency would terminate the vendor agreement or reassign the vendor to the appropriate peer group based on this assessment.

*Acceptable Vendor Peer Group Methodologies*

Structuring an effective vendor peer group system involves an ongoing process of monitoring the prices vendors charge for supplemental foods and adjusting the peer groups as needed for better cost containment. FNS believes State agencies should not view peer groups as permanent or fixed designations; rather, they should be prepared to modify the vendor peer group structure when needed based on price data (*i.e.*, shelf prices, bid prices, food instrument redemption data, and market surveys) and other information.

For example, a State agency that fails to distinguish between different types of vendors (*e.g.*, chain stores, large independent stores, and small neighborhood grocery stores) in a particular geographic area might be overlooking pricing variations or characteristics that are apparent when these vendors are further classified by type or size of store. While a State agency might find it easier to manage peer groups constructed solely on the basis of geographic location, creating peer groups that further differentiate between vendors could improve cost containment by allowing the State agency to replace a single high allowable reimbursement level for a geographic area with several lower allowable reimbursement levels tailored to the prices of each subgroup of vendors in the area. A State agency should consider the effectiveness of such alternative approaches in implementing a vendor peer group system.

Available information on the effective design of vendor peer groups for cost containment purposes suggests that State agencies could benefit from applying two principles to this process.

1. Peer Group Criteria

A State agency should use a sufficient number of criteria to differentiate between vendors and account for variations in price. Criteria used by one State agency may not have the same effect when used by another State agency. Available data suggest that State agencies benefit from using geographic location as a criterion in establishing peer groups, and that the use of two or more criteria is preferable to using a single criterion. Therefore, § 246.12(g)(4)(ii) of the interim rule

requires a State agency to use at least two criteria in establishing peer groups, one of which must be a measure of geographic location. Under § 246.12(g)(4)(ii), a State agency may receive FNS approval to use a single criterion to establish vendor peer groups. FNS approval will be based on a State agency's demonstration that the use of a single criterion significantly accounts for variations in prices among vendors, and that using a second criterion would not further contain food costs. The State agency's peer group criteria, including its criteria for identifying above-50-percent vendors and vendors that are comparable to above-50-percent vendors, are not subject to administrative review under § 246.18(a)(1)(iii) of the interim rule. The public has an opportunity to comment on these criteria as part of the State Plan process; thus interested parties should use this process to provide input. FNS must review and approve peer group-related criteria as part of the State Plan process.

2. Periodic Assessment of Peer Group Structure

To ensure that vendor peer groups remain effective, § 246.12(g)(4)(ii) of this interim rule requires the State agency to assess its peer groupings at least every three years and make adjustments as necessary. This process would include using statistical methods to verify the appropriateness of the peer group criteria and the methodology for establishing competitive price. The State agency is encouraged to work with its vendor advisory group in this process.

*Exemptions From Peer Group Requirements*

In accordance with section 17(h)(11)(A)(ii) of the CNA, the interim rule (§ 246.12(g)(4)(v)) establishes two conditions under which FNS may grant a State agency an exemption from the peer group requirements. The first condition applies to a State agency that elects not to authorize any above-50-percent vendors. The State agency must demonstrate to FNS that establishing a vendor peer group system would be inconsistent with efficient and effective operation of the program, or that its alternative cost containment system would be as effective as a peer group system.

The second condition for an exemption applies to a State agency that authorizes above-50-percent vendors. The WIC redemptions of above-50-percent vendors authorized by the State agency must be less than five percent of the State agency's total WIC

redemptions (dollars) in the year preceding a year in which the exemption is effective. By law, the State agency must demonstrate that its alternative vendor cost containment system would be as effective as a vendor peer group system and would not result in higher costs if program participants transact their food instruments at above-50-percent vendors rather than at regular vendors.

1. Request for Exemption

A State agency that believes it meets either of the conditions for an exemption may request from FNS an exemption from the vendor peer group system requirement. A State agency proposing an alternative cost containment system must support its request with a detailed description of the alternative cost containment system, including documentation that compares the potential costs and benefits of a peer group system with the costs and benefits of the State agency's alternative cost containment system. Justifications based solely on insufficient time or resources to implement a vendor peer group system would not be acceptable. If the State agency elects to authorize any above-50-percent vendors, the State agency's alternative cost containment system justification must include a detailed description of how the State agency will establish competitive price criteria and allowable reimbursement levels for above-50-percent vendors as compared to regular vendors. The justification must include the average payments that the State agency would make to above-50-percent vendors and to regular vendors for either the standard food packages or the most frequently issued food instrument types for women, infants, and children.

Rather than presenting an alternative cost containment system, a State agency that elects not to authorize any above-50-percent vendors may request an exemption from the vendor peer group system requirement by providing a detailed explanation of why implementation of a peer group system would be inconsistent with the efficient and effective operation of the program in the State. The State agency's explanation might address such factors as the number of WIC participants served, the degree of variability in food prices and types of vendors, the number of vendors authorized, the State agency's average food package costs, and previous experience with a vendor peer group system.

If the State agency seeks an exemption because payments to above-50-percent vendors comprise less than five percent of total WIC redemptions, the State

agency's submission to FNS must also include redemption data. The data must include the total dollar amount of all WIC redemptions and the dollar amount and percentage of WIC redemptions attributable to above-50-percent vendors in the fiscal year preceding the year for which an exemption is sought.

FNS will review the information submitted by the State agency and determine whether the State agency qualifies for an exemption. A State agency that obtains an exemption from the peer group requirement still must establish competitive pricing criteria for vendor selection and allowable reimbursement levels.

2. Term of Exemption

An exemption from the peer group requirement would remain in effect until the State agency no longer meets the conditions in § 246.12(g)(4)(v) on which the exemption was based (*e.g.*, redemptions to above-50-percent vendors comprise more than five percent of the total annual WIC redemptions); until FNS notifies the State agency that it has revoked the exemption for cause; or for three years, whichever occurs first. During the period of the exemption, the State agency must provide to FNS annually documentation that it either authorizes no above-50-percent vendors or that such vendors' redemptions continue to represent less than five percent of total WIC redemptions, depending on the terms of the exemption.

**Competitive Pricing**

*General Requirement*

The use of price criteria in vendor authorization and reauthorization is a primary mechanism in vendor cost containment. In accordance with section 17(h)(11)(B) of the CNA, § 246.12(g)(4) of this rule requires the State agency to establish competitive price criteria for each peer group for the selection of vendors for participation in the program. Competitive price criteria allow the State agency to determine whether the prices charged by a vendor applicant are competitive with prices charged by other vendors. In determining whether a vendor applicant's prices are competitive, the State agency is required to consider either the vendor's shelf prices or the prices the vendor bid for supplemental foods, which may not exceed the vendor's shelf prices.

The competitive pricing requirement in section 17(h)(11)(B) of the CNA largely restates the requirement established by section 203(l) of the Goodling Act (Pub. L. 105–336) and

implemented through the WIC Food Delivery Rule at § 246.12(g)(3)(i). WIC regulations, as amended by the WIC Food Delivery Rule, require the State agency to apply a competitive price criterion during the vendor selection process by comparing the prices a vendor applicant charges for supplemental foods to the prices charged by other vendor applicants and authorized vendors. State agencies have implemented this provision in different ways. For example, some use historical data, such as average prices of redeemed food instruments, to establish dollar limits against which they evaluate a vendor applicant's prices. Other State agencies use the prices for WIC food items submitted by a vendor applicant to calculate the amount the applicant would charge for a standard combination of WIC foods or for selected WIC food packages. They then compare this result with what other vendor applicants and currently authorized vendors in the same peer group would charge for the same foods or food packages. Some State agencies apply multiple criteria when assessing the competitiveness of a vendor applicant's prices, for example, requiring a vendor's prices to be within a certain percentage of the average food instrument redemption prices of authorized vendors in its peer group and within a certain percentage of the average retail price for individual WIC foods.

The competitive price range also varies among State agencies. State agencies that compare a vendor applicant's prices against an average redemption price for selected food instruments or against average prices for individual WIC foods have allowed the applicant's prices to exceed the peer group average by amounts ranging from 5 percent to 30 percent. In addition, State agencies differ regarding whether they consider factors such as transportation costs or current wholesale costs of WIC foods when assessing a vendor applicant's prices.

Under this interim rule State agencies retain flexibility in establishing competitive price selection criteria. FNS encourages State agencies, in implementing this rule, to re-examine the standards that they use to assess the prices of vendor applicants and currently authorized vendors to determine if they are paying competitive prices for supplemental foods. In this process, State agencies should ensure that they are paying the lowest prices for WIC foods by authorizing vendors whose prices fall at the lower end of the State agency's competitive range and that are needed to ensure participant

access to WIC foods. Section 246.12(g)(1) of the WIC regulations has been amended to clarify the cost containment emphasis in addition to authorizing an appropriate number and distribution of vendors in order to ensure participant access to supplemental foods and effective State agency management, oversight, and review of its authorized vendors. This requirement, in combination with the competitive pricing requirement, should enable the State agency to select a vendor population that is manageable both administratively and from a cost perspective.

*Specific Requirements*

In accordance with section 17(h)(11)(B) of the CNA, this interim rule requires State agencies to establish and apply appropriate competitive price criteria in keeping with several specific requirements.

1. Participant Access

Under § 246.12(g)(4) of this rule, the State agency must consider participant access by geographic area in establishing competitive price criteria. This means that the State agency may not deny authorization to a vendor that is needed to ensure participant access to supplemental foods because that vendor's prices do not meet the competitive price criteria for the vendor's peer group. The assumption is that there are no alternative vendors in the area with prices that meet the State agency's competitive price selection criteria and that, bearing in mind where participants typically shop, there is no other practical way to provide WIC foods. In such instances, FNS would encourage the State agency to negotiate with the vendor, if possible, to secure lower prices for WIC participants than the prices the vendor charges other customers. The authorization of vendors whose prices exceed the competitive price selection criteria, but that are needed for participant access, should be the exception and not the rule. The State agency has sole discretion to make participant access determinations. The validity or appropriateness of the State agency's participant access criteria and the State agency's participant access determinations are not subject to appeal (§ 246.18(a)(1)(iii)(B)).

2. Vendors that Meet the More-than-50-Percent Criterion

If a State agency chooses to authorize above-50-percent vendors, § 246.12(g)(4)(i) of the interim rule requires the State agency to establish distinct competitive price selection criteria for such vendors. To comply

with the competitive pricing requirement in section 17(h)(11)(B) of the CNA, the State agency would not necessarily have to achieve lower program costs when food instruments are transacted at above-50-percent vendors, rather than at regular retail vendors. The State agency would, however, be required to demonstrate to FNS that its competitive price criteria and allowable reimbursement levels for above-50-percent vendors do not result in average payments per food instrument that are higher than average payments per food instrument to comparable vendors that do not meet the more-than-50-percent criterion. In addition, competitive price criteria may not result in higher total food costs if participants use their food instruments at above-50-percent vendors rather than at regular vendors. This means that the total payments to above-50-percent vendors for supplemental foods may not

exceed the total amount that the State agency would have paid to regular vendors for the same types and quantities of supplemental foods.

To determine whether a State agency is meeting the requirement that above-50-percent vendors do not result in higher food costs than regular vendors, the State agency must compare the average cost per food instrument redeemed at above-50-percent vendors to the average cost per food instrument redeemed at regular vendors. The State agency must compute statewide average redemption amounts for each type of food instrument redeemed or for each distinct combination of foods on redeemed food instruments, depending on whether or not the State agency uses standardized food instrument types. The average cost per food instrument must be weighted to reflect the relative proportion of food instruments redeemed by each vendor peer group.

By using a weighted average, the State agency takes into account the frequency with which vendors redeem food instruments of varying redemption amounts. If a State agency makes more payments to vendors that offer the lowest prices for WIC foods, a weighted average will reflect this fact more than a simple average. The weighted average correlates with WIC participants' shopping patterns by giving the most weight to redemption prices of stores with the largest number of WIC transactions. The following charts display the weighted average redemption amounts for an infant formula food instrument (type ABC) redeemed by regular vendors and above-50-percent vendors.

*Chart 1:* Weighted Average Redemption Amounts for Regular Vendors

CHART 1.—WEIGHTED AVERAGE REDEMPTION AMOUNTS FOR REGULAR VENDORS

| Peer group number | Average redemption amount (dollars) FI Type ABC | Number and percent of redeemed food instruments Type ABC | | Weight |
|---|---|---|---|---|
| | | Number | % | |
| 1 | $ 81.51 | 8,461 | 0.82 | 0.008 |
| 2 | 111.56 | 54,748 | 4.99 | 0.050 |
| 3 | 113.89 | 217,684 | 21.01 | 0.210 |
| 4 | 110.93 | 758,175 | 73.18 | 0.732 |
| Total | | 1,036,088 | 100.00 | 1.000 |
| Weighted average redemption amount | | | | $113.66 |
| Simple average of all 1,036,088 redemption amounts | | | | $108.26 |

CHART 2.—WEIGHTED AVERAGE REDEMPTION AMOUNTS FOR ABOVE-50-PERCENT VENDORS

| Peer group number | Average redemption amount (dollars) FI Type ABC | Number and percent of redeemed food instruments Type ABC | | Weight |
|---|---|---|---|---|
| | | Number | % | |
| 1 | $130.68 | 43 | 0.03 | 0.000 |
| 2 | 128.94 | 513 | 0.34 | 0.003 |
| 3 | 125.09 | 10,242 | 6.82 | 0.068 |
| 4 | 127.96 | 139,314 | 92.81 | 0.928 |
| Total | | 150,112 | 100.00 | 1.000 |
| Weighted average redemption amount | | | | $128.38 |
| Simple average of all 150,112 redemption amounts | | | | $127.35 |

The weighted average redemption amounts for food instrument type ABC shown in the preceding charts were calculated using a standard statistical formula. (The formula derives the weighted average by multiplying each food instrument redemption amount by

the corresponding weight, adding these individual sums, and dividing this total by the sum of the weights used in the calculation.) In Chart 1 the weighted average redemption amount of $113.66 for food instrument ABC redeemed by regular vendors is $5.40 more than the

simple average redemption amount of $108.26. The weighted average more accurately reflects the cost of these food instruments to the State agency than does the simple average. The weighted average indicates that the State agency paid substantially more food

instruments at higher redemption prices than at lower prices. In Chart 2 the weighted average redemption amount of $128.38 for food instrument ABC redeemed by above-50-percent vendors exceeds the simple average redemption amount by $1.03. In this instance the difference between the simple average and the weighted average cost of food instrument ABC is not as large as it was for the same food instrument redeemed by regular vendors because 93 percent of the food instruments were redeemed by vendors in the same peer group. There was also less variation in the individual food instrument redemption amounts. The weighted average captures the impact of this redemption pattern.

Charts 1 and 2 show the disparity in payments for infant formula made to regular vendors and above-50-percent vendors. When State agencies implement competitive price criteria and allowable reimbursement levels as required in this interim rule, weighted average redemption amounts of food instruments redeemed by above-50-percent vendors should not exceed weighted average redemption amounts for the same food instruments redeemed by regular vendors. In general, for above-50-percent vendors to not result in higher costs to the program than regular vendors, the State agency's payments to these vendors should resemble payments to regular vendors in dollar amount and distribution among peer groups. A State agency that consistently reimburses above-50-percent vendors at or near the highest food instrument redemption amounts, while reimbursing most regular vendors at lower levels, would have difficulty meeting the cost neutrality requirement that above-50-percent vendors not result in higher costs to the program than regular vendors. If the average food instrument cost for above-50-percent vendors does not exceed the average food instrument cost for all regular vendors, then the State agency has assurance that above-50-percent vendors do not cost the program more than regular vendors. The average food instrument cost for above-50-percent vendors need not be less than that for regular vendors. The average costs may be equal or statistically equivalent.

A State agency must monitor average redemption amounts at least quarterly, and more frequently for newly-authorized above-50-percent vendors, and if necessary adjust payment levels, recoup excess payments, or take other actions to ensure compliance. Appropriate action may include terminating vendor agreements with above-50-percent vendors whose prices are least competitive, unless a vendor is

needed to ensure participant access to WIC foods. If FNS determines that a State agency has failed to meet the requirements in § 246.12(g)(4)(i)(A) to ensure that above-50-percent vendors do not result in higher costs to the program than if participants redeem their food instruments at regular vendors, FNS will establish a claim against the State agency to recover excess food funds expended and will require appropriate remedial action.

3. Maintaining Competitive Prices After Authorization

In amending section 17(h)(11) of the CNA, Public Law 108–265 retained the requirement that State agencies establish procedures to ensure that a retail store selected for participation in the WIC Program does not increase its prices subsequent to selection to levels that would make the store ineligible for selection. Section 246.12(g)(4)(iii) of the interim rule contains this legislative requirement, which also applies to State agencies under current regulations. To meet the requirement, the State agency must hold authorized vendors accountable for maintaining prices at a level consistent with the selection criteria applied to the vendors at authorization. For example, if a vendor's prices must be within a certain range of the peer group's average shelf prices in order for the vendor to be authorized, then the vendor's prices must remain within this range subsequent to authorization. By using competitive price criteria to establish allowable payment levels for redeemed food instruments, State agencies can ensure that vendors remain eligible for selection. They also avoid excessive payments for food instruments with prices that are below a statewide not-to-exceed amount, but outside of the competitive price range for the vendor's peer group. A vendor's failure to remain price competitive is cause for termination of the vendor agreement, even if actual payments to the vendor are within the not-to-exceed amount. One example of a failure to remain price competitive would occur if a vendor, or vendors, raised the price for a WIC food with no basis in wholesale price or handling costs.

Currently, State agencies use different approaches to monitor the food prices of vendors subsequent to redemption. Some are more rigorous than others, particularly in terms of whether the State agency reviews shelf prices or redemption data to assess a vendor's continued compliance with the competitive price selection criteria, and the action the State agency takes if it determines that a vendor is not meeting

the competitive price selection criteria. Some State agencies require authorized vendors to submit shelf price surveys at regular intervals during the year; others collect price data during store visits. Some State agencies collect price data on all WIC foods; others collect price data only on selected foods and/or from a subset of authorized vendors. At least one State agency monitors prices on a monthly basis to determine if vendors still meet selection criteria; others have no clearly defined protocol for assessing continued compliance with competitive price criteria. State agencies with EBT systems can monitor prices of individual WIC foods using data scanned into the system at the point of sale. State agencies vary in the extent to which they monitor wholesale price fluctuations and can anticipate and estimate the impact of these fluctuations on WIC food prices and food instrument redemption amounts.

*Acceptable Competitive Price Selection Methodologies*

State agencies are acutely aware of the staff time and other costs involved in administering their vendor cost containment system. They look for ways to streamline procedures and reduce the level of effort and paperwork required for vendor selection, without compromising the system's effectiveness. Investing careful and thoughtful effort in improving the selection of vendors based on competitive price can yield substantial cost savings. Some ways to enhance current competitive price selection approaches are outlined in this section.

1. Standards for Evaluating Vendors' Prices

Setting appropriate quantitative standards for determining whether a vendor's prices are competitive is critical. The State agency develops these standards by reviewing the prices of applicant and authorized vendors and price data from the larger retail marketplace. The standards should not be so flexible or loose that no vendor is denied authorization; rather they should influence vendor participation by allowing the State agency to differentiate between store prices. Allowing a small range of variation in prices produces a better standard than allowing a wide range of variation. State agency standards preferably should be expressed in terms of the number of standard deviations above the mean redemption amount (or other amount used for determining competitive price), rather than as a percentage, unless the percentage is linked to the standard deviation.

2. Linking Competitive Price Determinations to Participant Access Requirements

Authorizing a sufficient number of vendors in appropriate locations throughout the State is critical to competitive price selection. Although a State agency is not required to limit the number of vendors it will authorize, it has the authority to do so and should use information on the number of vendors required to ensure participant access to WIC foods when establishing competitive prices. For example, if a State agency has 100 vendor applicants, including currently authorized vendors in a particular geographic area, but only needs 80 vendors to ensure participant access, then the State agency should determine competitive prices based on the 80 stores with the lowest prices. The State agency need not authorize the twenty additional stores. However, if the State agency has the administrative resources to manage the additional vendors, it may choose to give these vendors the opportunity to submit new price lists for consideration.

Some State agencies can improve their methodologies for determining competitive price by improving their participant access criteria, including participant-to-vendor ratios. Having participant-to-vendor ratios that are too low could result in a State agency authorizing higher-priced stores for participant access reasons. If enough of these higher-priced stores are authorized in a geographic area, they will inflate the competitive price criteria used to select and reimburse vendors. Having a high participant-to-vendor ratio, that is based on a realistic assessment of the capacity of vendors to serve WIC participants, could increase competition for WIC authorization and result in more competitive prices.

When a particular vendor (or small number of vendors) that is needed to ensure participant access has prices that are higher than the State agency's competitive price criteria, the State agency should treat this vendor as an exception, and exclude the vendor's prices from its calculation of competitive price criteria in order to avoid raising the competitive range for all vendors.

3. Monitoring Shelf Prices After Authorization

At least every six months following authorization, the State agency must collect and review vendors' shelf prices. FNS believes that State agencies should not rely on redemption data alone to ensure that vendors have not, subsequent to authorization, raised their prices to a level that would exceed the competitive price selection criteria under which they were authorized. Monitoring of shelf prices should help the State agency interpret changes in average redemption amounts of food instruments. A State agency could also use shelf price data to detect partial redemptions and possible overcharging.

In monitoring prices, the State agency should observe the overall rate of increase in prices within and between peer groups, and whether any vendors have increased their prices at a higher rate than other vendors in their peer group during the monitoring period. State agencies should identify methods of collecting price data that are least burdensome, such as the use of electronic data collection via the Internet or an electronic spreadsheet; random sampling of vendors and/or WIC food items; and allowing vendors to submit only those prices that have changed or will change.

**Allowable Reimbursement Levels**

*General Requirements*

Section 17(h)(11)(C) of the CNA requires State agencies to establish allowable reimbursement levels for supplemental foods for each vendor peer group, taking into consideration participant access in a geographic area. Allowable reimbursement levels ensure that payments to vendors in the peer group reflect competitive retail prices, and that the State agency does not reimburse a vendor for supplemental foods at a level that would make the vendor ineligible for authorization under its competitive price selection criteria.

Since October 1, 2002, WIC regulations have required State agencies to establish price limitations on the amount they pay vendors. State agencies typically refer to the price limits as maximum values or not-to-exceed amounts for redeemed food instruments. State agencies currently establish these amounts in different ways. These include, but are not limited to, the use of a rolling average redemption price for each food instrument type; an average redemption price for each food instrument for a fixed period of time; the average of the highest prices charged by vendors in the peer group for a particular WIC food; the highest price charged by a vendor in the peer group for a particular food instrument type; and average prices charged by a selected group of the smallest vendors in the State increased by a designated percent. One State agency uses the prices that vendors bid for supplemental foods to establish a maximum reimbursement

amount per food instrument type. FNS believes that basing maximum reimbursement on the highest prices charged by some or all vendors in a peer group does not effectively contain costs. While this rule allows State agencies to continue using different approaches to establish allowable reimbursement levels, it directs State agencies to choose among the more effective approaches.

Because food price data available to State agencies can lag behind changes in the retail marketplace, many State agencies allow for price increases in setting allowable reimbursement limits in order to minimize the number of rejected food instruments. Under section 17(h)(11)(C)(ii) of the CNA, State agencies may continue the practice of factoring wholesale price fluctuations into the calculation of allowable reimbursement levels. Section 246.12(h)(3)(viii) of the interim rule incorporates this provision. Section 17(h)(11)(D) of the CNA also gives State agencies the option of exempting from competitive price criteria and allowable reimbursement levels pharmacies that supply only exempt infant formula and medical foods under the program and non-profit vendors that meet or are likely to meet the more than 50 percent criterion. This option is also reflected in § 246.12(g)(4)(iv) and 246.12(h)(3)(viii) of the interim rule.

Under § 246.12(g)(4)(iv) of this rule, a State agency that chooses to exempt a non-profit vendor from competitive price criteria and/or allowable reimbursement levels must have a compelling reason for doing so. The State agency must notify FNS, in writing, prior to granting this exemption. The State agency's notification must indicate the reason for the exemption (e.g., the vendor is needed to ensure participant access), the benefits to the program of exempting the non-profit vendor from the competitive price criteria and/or allowable reimbursement levels, and how the State agency will establish an appropriate reimbursement level for the non-profit vendor. State agencies are not required to notify FNS of exemptions of non-profit health and/or human service agencies or organizations that provide supplemental foods to WIC participants.

*Specific Requirement*

Section 246.12(h)(3)(viii) of this rule requires the State agency to consider participant access in a geographic area in establishing allowable reimbursement levels. A State agency must set allowable reimbursement levels that allow WIC participants to purchase all of the foods prescribed on the food

instrument from any authorized vendor. This requirement does not mean that the State agency must print a statewide maximum reimbursement level on the food instrument or set maximum reimbursement levels based on the highest supplemental food prices among authorized vendors. Rather, the requirement to consider participant access makes this a priority in establishing allowable reimbursement levels. It works in tandem with the competitive price criteria requirement to contain costs and while meeting participants' needs.

*Acceptable Approaches To Establishing and Using Allowable Reimbursement Levels*

1. Current Price Limitation Methods

Under current regulations, State agencies use food instrument redemption procedures to ensure that each vendor is not paid more than the price limitations applicable to the vendor. The following examples illustrate how State agencies should link competitive price criteria and allowable reimbursement levels. Since they describe methods currently used by State agencies, the examples do not embody all of the requirements and recommendations of this interim rule (such as using standard deviations rather than percentages to define the competitive range).

• *Scenario #1:* At authorization, a vendor's price for each WIC food item may not exceed the average shelf prices of other authorized vendors in the peer group by more than five percent. The State agency sets the maximum payment for any food instrument at five percent above the average cost of the peer group for the specific food items on the food instrument, or at five percent above the vendor's reported shelf prices, whichever is less. To allow for wholesale price fluctuations, the State agency sets food instrument not-to-exceed amounts in its redemption system at 110 percent above the average food instrument prices. It generates a monthly report that identifies all food instruments redeemed for prices between 105 and 110 percent of the peer group's average prices by food instrument type. The State agency follows up with the vendors after evaluating the information on these food instruments.

• *Scenario #2:* The State agency authorizes any qualified vendor with prices at or below the average redemption amount for selected food instruments redeemed by the peer group. The State agency's redemption system sets the maximum allowable reimbursement level for each type of WIC check and for each peer group based on a statistical formula that uses the average redemption prices of vendors in the peer group during the preceding three months, known as a rolling average. Maximum allowable reimbursement levels do not include an inflation factor. If

the price on a food instrument exceeds the maximum allowable reimbursement level, the State agency pays the vendor the maximum allowable reimbursement amount.

2. Printing Maximum Reimbursement Amounts on Food Instruments

Currently, some State agencies print maximum allowable reimbursement (or not-to-exceed) amounts on all of their food instruments; some print maximum amounts on most, but not all food instruments; others do not print maximum amounts on any food instruments. Under this rule, State agencies may continue using any of these approaches as long as printed maximum reimbursement amounts do not prohibit the State agency from applying the allowable reimbursement levels established for each peer group, which may be lower than the printed maximum. State agencies that print statewide not-to-exceed amounts on food instruments should notify vendors in the vendor agreement, vendor handbook, and training sessions, that they will be held to a peer group maximum reimbursement level that is linked to the competitive price criteria applied to the vendor at authorization.

3. Calculating Average Payments per Food Instrument

If a State agency authorizes above-50-percent vendors, it must ensure that average payments per food instrument to such vendors do not exceed average payments per food instrument to comparable vendors. When calculating average payments per food instrument, the State agency must include either all food instruments redeemed by all authorized vendors or a representative sample (constructed using appropriate sampling techniques) of the redeemed food instruments. To calculate the average payments per food instrument, a State agency should add the redemption amounts for all redeemed food instruments of the same type and divide the total by the number of food instruments of that type. If the State agency does not use pre-determined types of food instruments, it should calculate the average payment to above-50-percent vendors and regular vendors for each food item or distinct combination of foods prescribed on the food instrument. For comparison purposes, the State agency may calculate average payments per food instrument for above-50-percent vendors and comparable groups of regular vendors.

**Cost Containment Certification**

If a State agency elects to authorize any above-50-percent vendors, section

17(h)(11)(E) of the CNA requires the State agency to demonstrate to FNS that its competitive price criteria and allowable reimbursement levels do not result in average payments per food instrument to these vendors that are higher than average payments per food instrument to comparable vendors that do not meet the more than 50 percent criterion. Accordingly, § 246.12(g)(4)(vi) of the rule requires a State agency that authorizes above-50-percent vendors to submit to FNS every three years information which indicates that the State agency has an effective methodology for establishing competitive price criteria and allowable reimbursement levels. The information provided by the State agency will include data on the average payments per food instrument to above-50-percent vendors as compared to regular vendors, submitted in accordance with guidance developed by FNS.

If FNS determines, based on its review of the information provided by the State agency and any other relevant data, that the requirements of § 246.12(g)(4)(vi) have been met, FNS will certify that the State agency's competitive price criteria and allowable reimbursement levels do not result in higher average payments per food instrument for above-50-percent vendors than for other comparable vendors. If the State agency's methodology for establishing competitive price criteria and allowable reimbursement levels fails to meet the requirements in § 246.12(g)(4)(i) of the interim rule, FNS will disapprove the State agency's request to authorize above-50-percent vendors.

**Limitation on Private Rights of Action**

As required by section 17(h)(11)(F) of the CNA, the competitive pricing provisions of this interim rule do not create a private right of action. Individuals do not have the right to seek administrative or judicial redress for the standards set by the State agency with respect to vendor selection criteria and cost containment provisions. Section 246.12(g)(4)(vii) of this interim rule reflects this limitation on the private rights of action.

**State Plan**

Section 203(e)(10)(B) of Public Law 108–265 amends section 17(f) of the CNA to require a State agency to include in the State Plan a description of its vendor peer group system, competitive price criteria, and allowable reimbursement levels that demonstrates that the State agency is in compliance with the cost containment provisions in section 17(h)(11) of the CNA.

Accordingly, § 264.4 of the interim rule incorporates this requirement.

In § 246.4(a)(14)(xv) of the interim rule, the State Plan also must include information on non-profit above-50-percent vendors that the State agency has exempted from competitive price criteria and allowable reimbursement levels under § 246.12(g)(4)(iv); a justification and documentation supporting the State agency's request for an exemption from the vendor peer group requirement in § 246.12(g)(4), if applicable; and, if the State agency authorizes any above-50-percent vendors, information required by FNS to determine whether the State agency's vendor cost containment system meets the requirements in § 246.12(g)(4)(i).

**List of Subjects in 7 CFR Part 246**

Food assistance programs, Food donations, Grant programs—Social programs, Infants and children, Maternal and child health, Nutrition education, Public assistance programs, WIC, Women.

■ Accordingly, 7 CFR part 246 is amended as follows:

**PART 246—SPECIAL SUPPLEMENTAL NUTRITION PROGRAM FOR WOMEN, INFANTS AND CHILDREN**

■ 1. The authority citation for part 246 continues to read as follows:

**Authority:** 42 U.S.C. 1786.

■ 2. In § 246.2:
■ a. Add in alphabetical order the definitions of *Above-50-percent vendors, Food sales,* and *Vendor peer group system;* and
■ b. Remove the reference "§ 246.12(g)(3)" from the definition of *Vendor selection criteria* and add in its place the reference "§ 246.12(g)(3) and (g)(4)".

The additions read as follows:

**§ 246.2   Definitions.**

*Above-50-percent vendors* means vendors that derive more than 50 percent of their annual food sales revenue from WIC food instruments, and new vendor applicants expected to meet this criterion under guidelines approved by FNS.

\*      \*      \*      \*      \*

*Food sales* means sales of all Food Stamp Program eligible foods intended for home preparation and consumption, including meat, fish, and poultry; bread and cereal products; dairy products; fruits and vegetables. Food items such as condiments and spices, coffee, tea, cocoa, and carbonated and noncarbonated drinks may be included in food sales when offered for sale along with foods in the categories identified above. Food sales do not include sales of any items that cannot be purchased with food stamp benefits, such as hot foods or food that will be eaten in the store.

\*      \*      \*      \*      \*

*Vendor peer group system* means a classification of authorized vendors into groups based on common characteristics or criteria that affect food prices, for the purpose of applying appropriate competitive price criteria to vendors at authorization and limiting payments for food to competitive levels.

\*      \*      \*      \*      \*

■ 3. In § 246.4:
■ a. Remove the reference "§ 246.12(g)(3)" and from paragraph (a)(14)(ii) and add in its place the reference "§ 246.12(g)(3) and (g)(4)".
■ b. Revise the heading and the first sentence of paragraph (a)(14)(x); and
■ c. Add new paragraphs (a)(14)(xv) and (a)(14)(xvi).

The revision and additions read as follows:

**§ 246.4   State plan.**

(a) \* \* \*
(14) \* \* \*
(x) *Infant formula cost containment.* A description of any infant formula cost containment system.\* \* \*

\*      \*      \*      \*      \*

(xv) *Vendor cost containment.* A description of the State agency's vendor peer group system, competitive price criteria, and allowable reimbursement levels that demonstrates that the State agency is in compliance with the cost containment provisions in § 246.12(g)(4); information on non-profit above-50-percent vendors that the State agency has exempted from competitive price criteria and allowable reimbursement levels in § 246.12(g)(4)(iv); a justification and documentation supporting the State agency's request for an exemption from the vendor peer group requirement in § 246.12(g)(4), if applicable; and, if the State agency authorizes any above-50-percent vendors, information required by FNS to determine whether the State agency's vendor cost containment system meets the requirements in § 246.12(g)(4)(i).

(xvi) *Other cost containment systems.* A description of any other food cost containment systems (such as juice and cereal rebates and food item restrictions).

\*      \*      \*      \*      \*

■ 4. In § 246.12:
■ a. Revise paragraph (g)(1);
■ b. Remove paragraph (g)(3)(i) and redesignate paragraphs (g)(3)(ii) through (g)(3)(iv) as paragraphs (g)(3)(i) through (g)(3)(iii);
■ c. Redesignate paragraphs (g)(4) through (g)(8) as paragraphs (g)(5) through (g)(9), and add a new paragraph (g)(4); and
■ d. Add six sentences to the end of paragraph (h)(3)(viii).

The revision and additions read as follows:

**§ 246.12   Food delivery systems.**

\*      \*      \*      \*      \*

(g) \* \* \*

(1) *General.* The State agency must authorize an appropriate number and distribution of vendors in order to ensure the lowest practicable food prices consistent with adequate participant access to supplemental foods and to ensure effective State agency management, oversight, and review of its authorized vendors.

\*      \*      \*      \*      \*

(4) *Vendor selection criteria: competitive price.* The State agency must establish a vendor peer group system and distinct competitive price criteria and allowable reimbursement levels for each peer group. The State agency must use the competitive price criteria to evaluate the prices a vendor applicant charges for supplemental foods as compared to the prices charged by other vendor applicants and authorized vendors, and must authorize vendors selected from among those that offer the program the most competitive prices. The State agency must consider a vendor applicant's shelf prices or the prices it bids for supplemental foods, which may not exceed its shelf prices. In establishing competitive price criteria and allowable reimbursement levels, the State agency must consider participant access by geographic area.

(i) *Vendors that meet the above-50-percent criterion.* Vendors that derive more than 50 percent of their annual food sales revenue from WIC food instruments, and new vendor applicants expected to meet this criterion under guidelines approved by FNS, are defined as above-50-percent vendors. Each State agency annually must implement procedures approved by FNS to identify authorized vendors and vendor applicants as either above-50-percent vendors or regular vendors. The State agency must receive FNS certification of its vendor cost containment system under section 246.12(g)(4)(vi) prior to authorizing any above-50-percent vendors. The State agency that chooses to authorize any above-50-percent vendors:

(A) Must distinguish these vendors from other authorized vendors in its peer group system or its alternative cost

containment system approved by FNS by establishing separate peer groups for above-50-percent vendors or by placing above-50-percent vendors in peer groups with other vendors and establishing distinct competitive price selection criteria and allowable reimbursement levels for the above-50-percent vendors;

(B) Must reassess the status of new vendors within six months after authorization to determine whether or not the vendors are above-50-percent vendors, and must take necessary follow-up action, such as terminating vendor agreements or reassigning vendors to the appropriate peer group;

(C) Must compare above-50-percent vendors' prices against the prices of vendors that do not meet the above-50-percent criterion in determining whether the above-50-percent vendors have competitive prices and in establishing allowable reimbursement levels for such vendors; and

(D) Must ensure that the prices of above-50-percent vendors do not inflate the competitive price criteria and allowable reimbursement levels for the peer groups or result in higher total food costs if program participants transact their food instruments at above-50-percent vendors rather than at other vendors that do not meet the above-50-percent criterion. To comply with this requirement, the State agency must compare the average cost of each type of food instrument redeemed by above-50-percent vendors against the average cost of the same type of food instrument redeemed by regular vendors. The average cost per food instrument must be weighted to reflect the relative proportion of food instruments redeemed by each category of vendors in the peer group system. The State agency must compute statewide average costs per food instrument at least quarterly to monitor compliance with this requirement. If average payments per food instrument for above-50-percent vendors exceed average payments per food instrument to regular vendors, then the State agency must take necessary action to ensure compliance, such as adjusting payment levels, recouping excess payments, or terminating vendor agreements with above-50-percent vendors whose prices are least competitive and that are not needed to ensure participant access. Where EBT systems are in use, it may be more appropriate to compare prices of individual WIC food items to ensure that average payments to above-50-percent vendors do not exceed average payments for the same food item to comparable vendors. If FNS determines that a State agency has failed to ensure

that above-50-percent vendors do not result in higher costs to the program than if participants transact their food instruments at regular vendors, FNS will establish a claim against the State agency to recover excess food funds expended and will require remedial action.

(ii) *Implementing effective peer groups.* The State agency's methodology for establishing a vendor peer group system must include the following:

(A) At least two criteria for establishing peer groups, one of which must be a measure of geography, such as metropolitan or other statistical areas that form distinct labor and products markets, unless the State agency receives FNS approval to use a single criterion;

(B) Routine collection and monitoring of vendor shelf prices at least every six months following authorization; and

(C) Assessment of the effectiveness of the peer groupings and competitive price criteria at least every three years and modification, as necessary, to enhance system performance. The State agency may change a vendor's peer group whenever the State agency determines that placement in an alternate peer group is warranted.

(iii) *Subsequent price increases.* The State agency must establish procedures to ensure that a vendor selected for participation in the program does not, subsequent to selection, increase prices to levels that would make the vendor ineligible for authorization.

(iv) *Exceptions to competitive price criteria.* The State agency may except from the competitive price criteria and allowable reimbursement levels pharmacy vendors that supply only exempt infant formula and/or WIC-eligible medical foods, and non-profit vendors for which more than 50 percent of their annual revenue from food sales consists of revenue derived from WIC food instruments. A State agency that elects to exempt non-profit vendors from competitive price criteria and/or allowable reimbursements levels must notify FNS, in writing, at least 30 days prior to the effective date of the exemption. The State agency's notification must indicate the reason for the exemption, including whether the vendor is needed to ensure participant access, why other vendors that are subject to competitive price criteria and allowable reimbursement levels cannot provide the required supplemental foods, the benefits to the program of exempting the non-profit vendor from the competitive price criteria and/or allowable reimbursement levels, the criteria the State agency used to assess the competitiveness of the non-profit

vendor's prices, and how the State agency will determine the reimbursement level for the non-profit vendor. This notification requirement does not apply to State agency contracts and agreements with non-profit health and/or human service agencies or organizations.

(v) *Exemptions from the vendor peer group system requirement.* With prior written approval from FNS, a State agency may use a vendor cost containment approach other than a peer group system if it meets certain conditions. A State agency that obtains an exemption from the peer group requirement still must establish competitive pricing criteria for vendor selection and allowable reimbursement levels. An exemption from the peer group requirement would remain in effect until the State agency no longer meets the conditions on which the exemption was based, until FNS revokes the exemption, or for three years, whichever occurs first. During the period of the exemption, the State agency must provide annually to FNS documentation that it either authorizes no above-50-percent vendors, or that such vendors' redemptions continue to represent less than five percent of total WIC redemptions, depending on the terms of the exemption. The conditions for obtaining an exemption from the vendor peer group system are as follows:

(A) The State agency chooses not to authorize any vendors that derive more than 50 percent of their revenue from food sales from WIC food instruments, and the State agency demonstrates to FNS that establishing a vendor peer group system would be inconsistent with efficient and effective operation of the program, or that its alternative cost containment system would be as effective as a peer group system; or

(B) The State agency determines that food instruments redeemed by vendors that meet the above-50-percent criterion comprise less than five percent of the total WIC redemptions in the State in the fiscal year prior to a fiscal year in which the exemption is effective; and the State agency demonstrates to FNS that its alternative vendor cost containment system would be as effective as a vendor peer group system and would not result in higher costs if program participants redeem food instruments at vendors that meet the above-50-percent criterion rather than at vendors that do not meet this criterion.

(vi) *Cost containment certification.* If a State agency elects to authorize any above-50-percent vendors, the State agency must submit information, in accordance with guidance provided by

FNS, to demonstrate that its competitive price criteria and allowable reimbursement levels do not result in average payments per food instrument to these vendors that are higher than average payments per food instrument to comparable vendors that are not above-50-percent vendors. To calculate average payments per food instrument, the State agency must include either all food instruments redeemed by all authorized vendors or a representative sample of the redeemed food instruments. The State agency must add the redemption amounts for all redeemed food instruments of the same type and divide the sum by the number of food instruments of that type. If the State agency does not designate food instruments by type, it must calculate the average payment for each distinct combination of foods prescribed on the food instrument. The State agency may calculate average payments per food instrument type for groups of vendors that meet the above-50-percent criterion and comparable vendors, or the State agency may calculate average payments for each food instrument type for each vendor. State agencies with EBT systems must compare the average cost of each WIC food purchased by participants at above-50-percent vendors with the average cost of each food purchased from comparable vendors. If FNS determines, based on its review of the information provided by the State agency and any other relevant data, that the requirements in this paragraph have been met, FNS will certify that the State agency's competitive price criteria and allowable reimbursement levels established for above-50-percent vendors do not result in higher average payments per food instrument (or higher costs for each WIC food item in EBT systems). If the State agency's methodology for establishing competitive price criteria and allowable reimbursement levels fails to meet the requirement of this section regarding average food instrument payments to above-50-percent vendors, FNS will disapprove the State agency's request to authorize above-50-percent vendors. At least every three years following initial certification, the State agency must submit information which demonstrates that it continues to meet the requirements of this section relative to average payments to above-50-percent vendors. FNS may require annual updates of selected food instrument redemption data.

(vii) *Limitation on private rights of action.* The competitive pricing provisions of this paragraph do not create a private right of action based on

facts that arise from the impact or enforcement of these provisions.

\*     \*     \*     \*     \*

(h) \* \* \*

(3) \* \* \*

(viii) \* \* \* As part of the redemption procedures, the State agency must establish and apply limits on the amount of reimbursement allowed for food instruments based on a vendor's peer group and competitive price criteria. In setting allowable reimbursement levels, the State agency must consider participant access in a geographic area and may include a factor to reflect fluctuations in wholesale prices. In establishing allowable reimbursement levels for above-50-percent vendors the State agency must ensure that reimbursements do not result in higher food costs than if participants transacted their food instruments at vendors that are not above-50-percent vendors, or in higher average payments per food instrument to above-50-percent vendors than average payments to comparable vendors. The State agency may make price adjustments to the purchase price on food instruments submitted by the vendor for redemption to ensure compliance with the allowable reimbursement level applicable to the vendor. A vendor's failure to remain price competitive is cause for termination of the vendor agreement, even if actual payments to the vendor are within the maximum reimbursement amount. The State agency may exempt vendors that supply only exempt infant formula and/or WIC-eligible medical foods and non-profit above-50-percent vendors from the allowable reimbursement limits.

\*     \*     \*     \*     \*

■ 5. In § 246.18, redesignate paragraphs (a)(1)(iii)(B) through (a)(1)(iii)(G) as paragraphs (a)(1)(iii)(C) through (a)(1)(iii)(H) and add a new paragraph (a)(1)(iii)(B) to read as follows:

**§ 246.18   Administrative review of State agency actions.**

(a) \* \* \*

(1) \* \* \*

(iii) \* \* \*

(B) The validity or appropriateness of the State agency's vendor peer group criteria and the criteria used to identify vendors that are above-50-percent vendors or comparable to above-50-percent vendors;

\*     \*     \*     \*     \*

Dated: November 22, 2005.

Kate Coler,

*Deputy Under Secretary, Food, Nutrition, and Consumer Services.*

Note: This appendix will not be published in the Code of Federal Regulations.

**Appendix: Regulatory Impact Analysis**

1. *Title:* 7 CFR 246: Special Supplemental Nutrition Program for Women, Infants, and Children (WIC): Vendor Cost Containment

2. *Action:*

(a) *Nature:* Interim Rule

(b) *Need:* This rule is needed to implement the vendor cost containment provisions of the Child Nutrition and WIC Reauthorization Act of 2004, Public Law 108–265. Overall, the WIC program must ensure that program foods are acquired at the most competitive prices consistent with ensuring reasonable program participant access. This rule requires WIC State agencies to operate vendor management systems that effectively contain food costs by ensuring that prices paid for supplemental foods are competitive. The rule also responds to data which indicate that WIC food expenditures increasingly include payments to a type of vendor whose prices are not governed by the market forces that affect most retail grocers. This rule incorporates new statutory requirements for State agencies to use in evaluating vendor applicants' prices during the vendor selection process and when paying vendors for supplemental foods following authorization.

(c) *Affected Parties:* The program affected by this rule is the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). The parties affected by this regulation are the USDA's Food and Nutrition Service (FNS), State agencies that administer the WIC Program, and retail vendors that are authorized to accept WIC food instruments.

*Effects:* The following analysis describes the potential economic impact of this interim final regulation. Due to the importance of keeping food costs competitive and using program funds to serve recipients as effectively as possible, in section 501(b) of Pub. L. 108–265, Congress provided authority to implement these changes on an interim final basis. The changes in this rule are significant to the costs or overall operations to the program. The potential effects of these changes are highlighted below.

*Discussion:* Over the past five years, the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) has experienced an increase in the number of vendors whose prices are not governed by market forces, and as a result are generally higher than the prices of other authorized vendors. These stores, often referred to as "WIC-only" stores, stock only WIC food items and serve only WIC customers; thus they operate outside the commercial retail market. Because WIC is a discretionary grant program, the continued growth of WIC-only stores could drive up food costs and compromise the program's ability to respond to the nutritional needs of at-risk women and children, unless effective cost-containment

measures are instituted by State agencies. In addition, this rule is intended to cause greater focus on cost containment for WIC food from all sources with the expectation that it is likely to lead to food cost savings which can be used to serve more eligibles.

Under the WIC retail food delivery system in most states, participants receive food instruments that they use to purchase specific food items that have been prescribed for them. They generally can purchase these items at any authorized retailer, regardless of the shelf price of these foods. As a result, participants are indifferent to the prices stores charge for WIC foods. In the past this has not been a problem for program costs, since to maintain a wide customer base, commercial retail food stores need to maintain competitive prices to maintain their business with price-sensitive non-WIC customers, usually the preponderance of their customers. The emergence and growth of WIC-only stores has been problematic because these stores are not constrained by the need to maintain a wide customer base; WIC participants are their customer base. The growth of these stores, an increase from about 800 stores in 18 States in 2000 to over 1,200 stores in 20 States in 2004, appears to have increased WIC food costs. It is estimated that in 2004 WIC-only vendors represented about 2.5 percent of all WIC vendors but comprised nearly 12 percent of total WIC redemptions.[1]

While current WIC regulations have required all State agencies to use vendor authorization and reimbursement policies to control the costs paid to authorized vendors, FNS and Congress have become increasingly concerned that the WIC program cannot afford the prices charged by WIC-only stores. For example, FNS sent a letter to the State of California (the State with the most WIC-only stores) imposing a temporary moratorium on the authorization of new WIC vendors in California unless the vendors have a history of competitive prices or are needed to ensure participant access to WIC foods. In the FY 2005 appropriations act for USDA, Congress prohibited all State agencies from authorizing any new stores that derive more than 50 percent of their annual food sales revenue from WIC food instruments, unless such stores are needed for participant access.[2] Additionally, FNS sent a letter to all State Health Officers requesting them to review WIC vendor selection policies to ensure that only those vendors who offer competitive prices receive WIC authorization. In addition to concerns about WIC-only pricing, it is the intent of Congress and USDA that more competitive food pricing be achieved.

The Child Nutrition and WIC Reauthorization Act of 2004 (Pub. L. 108–265) included new legislative requirements to strengthen vendor cost containment by requiring State agencies to implement a vendor peer group system, competitive price criteria, and allowable reimbursement levels in a manner that ensures the WIC Program

pays competitive prices for supplemental foods. This rule implements the vendor cost containment provisions of this Act. The main provisions of the rule can be grouped into three categories: peer group requirements for all vendors, requirements on vendors that derive more than 50 percent of their annual food sales revenue from WIC food instruments, and exemptions from the requirements of the rule.

## Competitive Price Requirements

• For all vendors, State agencies are required to create peer groups, establish competitive price criteria for peer groups, and set allowable reimbursement levels for each peer group. Additionally, State agencies are required to collect and monitor shelf price data at least every 6 months and assess the effectiveness of peer groupings and competitive price criteria at least every three years.

• Peer groups are required to be based on at least two criteria, one of which must be geography. The second peer group criterion is not specified and is left to the discretion of the State agency to decide.

• State agencies must establish price criteria that (1) ensure prices charged by vendor applicants are competitive with prices charged by other vendors and (2) consider vendor's shelf prices or vendor's bid prices, which may not exceed shelf prices. State agencies must also consider participant access by geographic area in establishing competitive price criteria and establish procedures to ensure authorized vendors do not raise prices to levels that would make them ineligible for authorization.

• The rule requires State agencies to establish allowable reimbursement levels for each vendor peer group that ensure that payments to vendors in peer groups reflect competitive prices and ensure that no vendors receive reimbursement at a level that would make them ineligible for authorization under the competitive price requirements. State agencies may include a factor to reflect wholesale price fluctuations and consider participant access in a geographic area in establishing such levels.

## Above-50-Percent Vendors

• The rule contains additional provisions regarding vendors who derive more than 50 percent of their food sales from WIC redemptions (above-50-percent vendors). State agencies must distinguish these vendors from other vendors in the peer group system—either by using separate peer groups or by using distinct competitive price criteria and allowable reimbursement levels for above-50-percent vendors that are grouped with regular vendors.

• Moreover, State agencies must ensure that use of these vendors 1) does not result in higher food costs than if participants used regular vendors and 2) does not result in higher average payments per food instrument than if participants used comparable vendors. It interprets this requirement to mean that above-50-percent vendors must be cost neutral to the program, and that average payments to above-50-percent vendors for each type of redeemed food instrument may not exceed average payments to regular

vendors for the same type of food instruments.

## Exemptions

• Additionally, the rule allows for two types of exemptions from the requirements. State agencies can be exempt from the peer group system requirement and State agencies can exempt certain vendors from competitive price criteria and allowable reimbursement levels.

### Peer Group System Exemptions

• To be exempted from the peer group system requirement, a State agency must elect not to authorize any above-50-percent vendors and demonstrate that compliance with the peer group system requirement is inconsistent with effective operation of the program or that an alternative cost containment system would be as effective.

• Alternately, a State agency can also be exempt from the peer group system requirement if it derived less than 5 percent of its total WIC sales in the prior year from above-50-percent vendors and demonstrates that an alternative cost containment system would be as effective as a vendor peer group system and would not result in higher food costs if participants transact food instruments at above-50-percent vendors, rather than at other vendors.

### Exemptions From Competitive Price Criteria and Allowable Reimbursement Levels

• State agencies can exempt vendors from competitive price criteria and allowable reimbursement levels, if they are pharmacies that supply only exempt infant formula or medical foods, or if they are non-profit above-50-percent vendors or non-profit vendor applicants likely to meet the above-50-percent criterion.

*Costs:* This rule places new requirements on State agencies; therefore, the cost implications of this rule relate primarily to administrative burden for States agencies. These cost implications are partially dependent on the current practices of State agencies relative to the requirements of the rule. A discussion of these costs follows.

### Administrative Burden

In order to comply with this rule, State agencies will need to make changes in their vendor cost containment systems. Some State agencies may already be in full or partial compliance with the rule, while others may demonstrate that they meet the conditions for an exemption from the vendor peer group requirement. For State agencies that are not already in full compliance, there may be costs associated with forming or restructuring peer groups, establishing competitive prices and allowable reimbursement levels for those peer groups, monitoring shelf prices, and evaluating payments to above-50-percent vendors.

### Peer Groups

Under the new rule, State agencies will be required to establish peer groups that utilize at least two peer grouping criteria, one of which is geography. State agencies that already have peer groups that meet this requirement will incur no costs to comply with this provision of the regulation.

---

[1] Data on the number, location and redemptions of WIC-only stores is reported to FNS annually in The Integrity Profile (TIP).

[2] Pub. L. 108–447. Consolidated Appropriations Act, 2005.

Additionally, State agencies that already have peer groups of some type will incur fewer costs than State agencies that do not have any peer groups in place. Complete data about current practices used in all State agencies are not available, but the extent to which some State agencies use peer groups and how many will be affected by this provision can be gauged from data that 32 State agencies provided FNS in September 2004. The main findings from this data are displayed below in Table 1.

TABLE 1.—CURRENT USE OF PEER GROUPS IN 32 STATE AGENCIES, AS REPORTED TO FNS IN SEPTEMBER 2004

| | Number of State agencies |
|---|---|
| Currently uses a peer group system | 25 |
| Uses two or more criteria for peer groups | 22 |
| Geography is one of the peer group criteria | 12 |
| Peer groups are being developed | 3 |

Based on this data, it appears that as many as 77 of the 89 state agencies could incur some level of costs to develop peer groups consistent with this rule.[3]

Some of these State agencies may not have in-house resources to do the analysis necessary to group vendors into peer groups and would have to contract out. One State agency that has used an outside contractor paid about $130,000 for their peer group analysis, not including the cost of overtime in local agencies to gather the data necessary for the analysis.

*Evaluating Peer Groups*

In addition to developing peer groups, State agencies are also required to evaluate the effectiveness of these peer groups. The cost of doing so may depend on the availability and capability of staff in State agencies to evaluate the peer groups. Assuming that State agencies that currently have peer groups in place assess the effectiveness of their peer groups, evaluating peer groups will not result in any new costs. Based on the data provided above, up to 64 State agencies could incur some level of cost to conduct statistical analysis to determine whether their peer groups are having the desired and expected effect. State agencies may not have the staff capabilities, time, and resources to do this analysis and may need to work with outside contractors to complete this work.

*Establishing Competitive Price Levels and Allowable Reimbursement Levels*

Additionally, the extent that State agencies currently use peer groups to determine competitive price criteria or allowable reimbursement levels will impact their costs. While many of the State agencies that provided data to FNS had peer group systems in place, these peer groups were not always utilized in the manner required in this rule. The majority of the reporting State agencies with peer groups did not use peer groups to determine competitive price criteria or allowable reimbursement levels in the manner specified in the rule (See Table 2).

TABLE 2.—PEER GROUPS USED FOR COMPETITIVE PRICE LEVELS AND ALLOWABLE REIMBURSEMENT LEVELS AS REPORTED BY 32 STATE AGENCIES IN SEPTEMBER 2004

| | Number of State agencies |
|---|---|
| Currently has a peer group system | 25 |
| Peer group is used to set allowable reimbursement level | 14 |
| Peer group is used to determine competitive price criteria | 17 |
| Current peer group system is structured according to rule (*i.e.* one criteria is geography) | 12 |
| Peer group is used to set allowable reimbursement level | 8 |
| Peer group is used to determine competitive price criteria | 7 |

This suggests that although many of the State agencies that have peer groups may not incur significant costs to establish peer group systems, they may incur additional costs to craft the use of these peer groups in compliance with the rule. Looking more closely at the State agencies with peer groups that are structured according to the rule (two criteria, one being geography) in Table 2, it appears that even some of these State agencies will incur some costs complying with this rule.

The costs of complying will be composed of the staff time necessary to calculate the optimal competitive price level and allowable reimbursement levels for each peer group, the time required to disseminate this information to the vendors, and the time and effort required to enforce and monitor the application of these criteria. For State agencies that do not have the staff resources to assess and, if necessary, modify competitive price criteria and allowable reimbursement levels, this work will need to be contracted, which could pose a significant expense to State agencies. Any costs incurred will be higher during the start-up period, but other USDA-sponsored research suggests that the on-going administrative costs of cost-containment practices can be quite low on a per participant basis.[4]

Lastly, the stipulation that State agencies must set allowable reimbursement levels at the peer group level may cause more food instruments to be rejected for exceeding the allowable reimbursement levels. State agencies may need to develop new administrative procedures to manage these issues and may incur some administrative costs in doing so.

*Monitoring Shelf Prices*

In addition to stipulating how peer groups should be structured and utilized, the rule also specifies that State agencies must monitor shelf prices at least every six months. The cost impact of monitoring shelf prices every six months is dependent on current State monitoring practices. These practices are outlined below in Table 3.

---

[3] All calculations in this document are based on 89 State agencies, but it is important to note three State agencies currently use a direct distribution or home delivery system exclusively and could be exempt from the provisions set forth in this rule.

Direct distribution and home delivery systems are also used in parts of an additional eight State agencies.

[4] U.S. Department of Agriculture, Economic Research Service, Assessment of WIC Cost-Containment Practices: Final Report, by John A. Kirlin, Nancy Cole, and Christopher Logan. ERS project representative: Phil Kaufman. E–FAN No. (03–005) 342 pp, February 2003.

TABLE 3.—SUMMARY OF STATE MONITORING OF VENDOR SHELF PRICES AS REPORTED TO FNS IN MAY 2005

[57 Agencies responding, including 5 ITOs]

| | Number of State agencies reporting | Percent of State agencies reporting (percent) |
|---|---|---|
| Frequency of Data Collection: | | |
| Only at authorization | 4 | 7.0 |
| Annually | 5 | 8.8 |
| Semiannually | 15 | 26.3 |
| Quarterly | 18 | 31.6 |
| Monthly | 5 | 8.8 |
| Other | 10 | 17.5 |

Of the 57 State agencies that provided data to FNS, about 67 percent currently monitor shelf prices at least semiannually, if not more frequently. The requirements of the new rule will likely result in no significant change from costs that they currently incur. For the remaining 33 percent of State agencies and an unknown number of those for which FNS lacks data on frequency of shelf price collection, additional monitoring costs may be incurred. It is estimated that 89 State agencies and 45,000 vendors will be affected by this provision, incurring an estimated total of 90,178 burden hours annually. The majority of these burden hours (90,000) will be borne by vendors. Applying appropriate wage rates to these burden hours result in a cost of nearly $1.4 million for vendors and about $5,500 for State agencies.[5]

*Evaluating Above-50 Percent-Vendors*

Beyond developing peer groups, State agencies will have to determine whether a vendor derives more than 50 percent of its annual food sales revenue from WIC food instruments. In order to determine whether a vendor is an above-50-percent vendor, State agencies are required to consider a vendor's

annual revenue from the food sales, defined in the rule as the sum of all payments received by the vendor for the sale of all foods that would be eligible items under the Food Stamp Program (FSP). Currently, WIC vendors are not required to report annual food sales to State agencies. It is unclear how many State agencies collect this data. State agencies that do not already collect this data will incur new costs in order to comply with this rule. Vendors also are likely to incur administrative costs to provide annual food sales data to State agencies. It is estimated that 89 State agencies and 45,000 vendors will be affected by this provision, incurring an estimated total of 45,178 burden hours to complete this task annually. Again, as above, the bulk of these costs will be incurred by vendors (45,000). Applying appropriate wage rates to these burden hours results in a cost of about $.7 million for vendors and about $5,500 for State agencies.[6]

For current vendors, once State agencies have data on the annual sales of all FSP eligible foods, they will need to calculate WIC redemptions as a percent of a vendor's total food sales for the same period. If WIC redemptions are more than 50 percent of total

food sales, the vendor is then deemed an above-50-percent vendor. The preamble of the rule states that as an initial step in this process, State agencies should compare each vendor's WIC redemptions to FSP redemptions for the same period and for those vendors whose WIC redemptions exceed their FSP redemptions, conduct further assessment using the total amount of revenue obtained from the sale of FSP eligible foods. After evaluating the total revenue obtained from the sale of FSP eligible foods, the State agency should calculate WIC redemptions as a percent of total food sales and classify the vendor as an above-50-percent vendor if appropriate.

To help States determine how many of these vendors might exist, FNS compared fiscal year 2004 WIC redemptions to annual Food Stamp (FS) redemptions as reported in the FS database (STARS). Stores in which WIC sales exceeded FS sales were identified as potentially being above-50-percent vendors. Table 4 displays how many of the over 42,000 WIC vendors that are also Food Stamp vendors appear to have WIC sales that exceed 50 percent of total annual food sales.

TABLE 4.—NUMBER OF WIC AND FS AUTHORIZED VENDORS FOR WHICH WIC SALES MAY CONSTITUTE MORE THAN 50 PERCENT OF TOTAL FOOD SALES, FY 2004

| | Number of State agencies | Percent of State agencies | Number of vendors | Percent of all vendors |
|---|---|---|---|---|
| Potential Above-50-Percent WIC Vendors | 59 | 66.3% | 5,177 | 11.5% |

Source: FNS Administrative Data. A listing of potential WIC and FS authorized above-50-percent vendors was generated by matching data reported to FNS in 2004 in The Integrity Profile (TIP) system and the FS STARS database. There are 89 State Agencies and about 45,000 WIC authorized vendors.

This analysis shows that at least 59 of the 89 WIC State agencies may have above-50-percent vendors. The total number of potential above-50-percent vendors identified through this match (5,177) is 11.5 percent of all vendors. However, while these stores may be above-50-percent vendors because they have annual WIC sales that exceed FS sales, these stores may have non-WIC and non-FS sales that are larger than their WIC

or FS sales, and so may not qualify as above-50-percent vendors upon further investigation.

In addition to these 5,177 vendors, there are about 3,000 additional WIC vendors that do not have FS authorization or that could not be matched with the FS authorization number in STARS. Most of the stores that states currently identify as WIC-only vendors fall into this category. Therefore, at least

about 1,200 of these 3,000 stores may be above-50-percent vendors.

Combining the information on potential above-50-percent vendors from FNS' match of WIC and FSP authorized stores and the self-identified WIC-only vendors provides an estimate of how many vendors potentially have WIC redemptions that are more than 50 percent of their total food sales. Currently, there are about 1,200 WIC-only vendors in 20

[5] U.S. Department of Labor, Bureau of Labor Statistics. "May 2004 National Occupational and Employment Wage Estimates" and "Employer Costs for Employee Compensation, March 2005."

[6] U.S. Department of Labor, Bureau of Labor Statistics. "May 2004 National Occupational and Employment Wage Estimates" and "Employer Costs for Employee Compensation, March 2005."

State Agencies. Together, this means that about 6,400 vendors in 64 State agencies are potentially above-50-percent vendors, since all but 5 of the 20 State agencies with WIC-only vendors had other stores that were potentially above-50-percent vendors. Consequently, between 1,200 and 8,200 vendors could be identified as having WIC redemptions that are more than 50 percent of total food sales.

State agencies must ask new vendor applicants if they expect to derive more than 50 percent of their annual revenue from the sale of food items from transactions involving WIC food instruments. If the vendor applicant responds "yes", the State agency does not need to do any further verification and should treat this vendor as an above-50-percent vendor. The preamble specifies that all other vendor applicants should be assessed to determine whether they are likely to meet the more than 50 percent criteria. To do so, State agencies should calculate WIC redemptions as a percent of total food sales in any existing WIC-authorized stores owned by the vendor applicants, calculate the percentage of anticipated food sales by type of payment, request and review inventory invoices to determine if a variety of foods will be offered for sale on a continuous basis, and determine whether WIC authorization is necessary for the store to open for business. Since we do not have data on the number of stores that apply for WIC authorization in any given year, we cannot estimate the impact of this provision of the rule.

State agencies will also have to determine how to place above-50-percent vendors in peer groups so that these vendors do not result in WIC paying more to these vendors than to comparable vendors. State agencies must develop and apply a definition of comparable vendors and may incur costs defending their application of comparable vendor criteria for the above-50-percent vendors. However, under the rule, neither the validity nor the appropriateness of the State agency's vendor peer group criteria or the criteria used to identify above-50-percent vendors and comparable vendors would be subject to appeal by a vendor.

The rule requires FNS to certify that the State agency's competitive price criteria and allowable reimbursement levels do not result in higher average payments per food instrument for above-50-percent vendors than for other comparable vendors. This certification will entail reviewing information provided by the State agency and other relevant data to determine that the requirements have been met. FNS will need to do this potentially for at least 64 of the State agencies identified above, if not all 89 State agencies, without additional resources.

In summary, most of the administrative burden/costs of this rule will be incurred at the State level. As outlined above, some State agencies will be affected less than others because they already have a peer group system that is based on the criteria specified in the rule, while others may incur significant, one-time start up costs because they will need to develop peer groups, competitive price levels, and allowable reimbursement levels for the peer groups. Some vendors will incur administrative costs to provide State agencies with total food sales information annually and to submit shelf prices semiannually. Most of these costs are difficult to determine given the current data that we have, but it is important to note that many State agencies already do this work within their existing NSA funds and the NSA allocations will not change to provide additional funds to administer the program with these new requirements.

*Benefits:* The WIC Program will benefit from the provisions of this rule by reducing unnecessary food expenditures, which increases the potential to serve more eligible women, infants, and children for the same cost. This rule should have the effect of ensuring that payments to vendors, particularly vendors that derive more than 50 percent of their annual food sales from WIC food instruments, reflect competitive prices for WIC foods.

To estimate the rule's cost savings, FNS estimated the annual difference in food instrument redemption values between WIC-only versus non-WIC-only stores. FNS reviewed redemption data from 12 State

agencies that have 97 percent of the "WIC-only" vendors. Since State agencies currently are in the process of identifying above-50-percent vendors (and thus do not have data available on such vendors), FNS relied on data on stores that stock only WIC food items and serve only WIC customers; these stores are primarily self-identified as WIC-only. State agencies provided data on their total food redemptions, WIC-only store food redemptions, the total number of vendors and number of WIC-only vendors, and the average redemption values of the five most frequently redeemed WIC food instruments in September 2004.[7]

Using these data, FNS examined the cost differential between the average redemption amounts for the five food instruments most frequently redeemed at non-WIC-only and WIC-only vendors (see column labeled "Ratio of Average Redemption Amounts of Non-WIC-Only to WIC-Only Vendors" in Table 5 below). By applying the average cost ratio for these five food instruments to all redemptions for WIC-only vendors, FNS determined what the redemptions would have been at WIC-only vendors if prices were the same as those at non-WIC-only vendors. The resulting cost savings was about $6 million monthly, $75 million annually, or about $377 million (assuming no inflation) over the course of five years for the 12 States. Table 5 summarizes this analysis.

It is also worth considering that the number of WIC-only stores had been growing rapidly before the California moratorium, the FY 2005 appropriations act, and Pub. L. 108-265. It is reasonable to project that there could be substantially more of these high-cost stores in the program absent these measures and this rule. If the number of stores continued to grow at the rate they were growing, the excess costs (and thus potential savings) could be far greater than what is estimated here. From this perspective, our cost savings estimate may be lower than what would occur if these limitations on the growth of WIC-only stores had not been imposed.

### TABLE 5.—POTENTIAL COST SAVINGS BY IMPLEMENTING RULE

[Dollars in millions]

| State | Total redemptions (Sept. 2004) | Estimated non-WIC-only redemptions (Sept. 2004) | Estimated WIC-only redemptions (Sept. 2004) | Ratio of average redemption amounts of non-WIC-only to WIC-only vendors | Total redemptions if all at non-WIC-only level | Monthly cost savings |
|---|---|---|---|---|---|---|
| 1 | $5.99 | $5.73 | $.26 | .82 | $5.94 | $.05 |
| 2 | 4.79 | 3.59 | 1.20 | .75 | 4.50 | .29 |
| 3 | 97.33 | 66.47 | 30.86 | .87 | 93.27 | 4.06 |
| 4 | 18.53 | 16.40 | 2.13 | .81 | 18.13 | .40 |
| 5 | 3.49 | 3.38 | .11 | .80 | 3.47 | .02 |
| 6 | 9.67 | 9.29 | .38 | .80 | 9.59 | .08 |
| 7 | 3.17 | 2.86 | .31 | 1.19 | 3.23 | -.06 |
| 8 | 12.56 | 11.46 | 1.10 | .67 | 12.20 | .36 |
| 9 | 4.51 | 4.14 | .37 | .78 | 4.43 | .08 |
| 10 | 43.51 | 37.49 | 6.02 | .83 | 42.52 | 1.00 |

[7] September 2004 was deemed to be a representative month because there were no significant or unusual spikes in food prices during that month.

TABLE 5.—POTENTIAL COST SAVINGS BY IMPLEMENTING RULE—Continued

[Dollars in millions]

| State | Total redemptions (Sept. 2004) | Estimated non-WIC-only redemptions (Sept. 2004) | Estimated WIC-only redemptions (Sept. 2004) | Ratio of average redemption amounts of non-WIC-only to WIC-only vendors | Total redemptions if all at non-WIC-only level | Monthly cost savings |
|---|---|---|---|---|---|---|
| 11 | 6.85 | 6.78 | .07 | .69 | 6.83 | .02 |
| 12 | 14.44 | 13.22 | 1.22 | 1.02 | 1.24 | −.03 |
| Total | $210.40 | $167.59 | $42.81 | .................. | $204.11 | $6.27 |

*Source:* States reported total redemptions to FNS and calculated non-WIC-only and WIC-only redemptions. All other figures calculated by FNS based on this and other data supplied by the States.

This analysis assumes that September 2004 is a representative month and can be used to calculate annual cost savings. It also assumes that the mix of items within each redemption and the rate of full versus partial redemptions are the same for both vendor types. However, there is some evidence that WIC-only stores require full redemption of vouchers, resulting in higher redemption values compared with other vendors. This could overstate the impact of the rule. This analysis also excludes State agencies with smaller numbers of WIC-only stores and does not account for any impact on other types of vendors. To realize some level of savings, State agencies would need to develop effective peer group systems. As noted below, there is uncertainty about the degree to which State agencies will be able to develop such systems initially, given the data collection and analysis needed.

*Uncertainty:* Because the vendor peer group provisions in the Child Nutrition and WIC Reauthorization Act of 2004 and this rule provide for some flexibility in implementation, and because there is a wide degree of variation in food prices and current vendor cost containment practices across State agencies, the impact of many of the provisions of this rule is uncertain. Uncertainties include the administrative burden State agencies will incur and the savings that can be realized nationally or in any State agency. The major uncertainties for administrative burden were discussed previously in the analysis; the following is a discussion of the uncertainties regarding program savings.

*Program Savings*

Peer Groups

Three issues introduce uncertainty regarding the impact of peer groups, as defined in the rule, on program costs. These issues center on the requirements for including geography as one of the criteria, choosing a second peer group criteria, and establishing an effective peer group. These issues are outlined below.

Peer groups must be based on two criteria, one of which is geography. A state-sponsored analysis of WIC peer group practices suggest that geography is an important criterion for defining peer groups, but the findings also suggest that the way geography is defined and applied also matters.[8] For example, study findings show that in some cases, grouping geographic entities (*i.e.*, cities and counties) by price level was more effective than relying on contiguous geographic groupings, such as administrative program areas or geographic regions. Additionally, rule of thumb definitions of geography, such as one major metropolitan area versus the rest of the State, may result in geographic peer groups that are too large and heterogeneous to be effective. Conversely, using the county as the measure of geography might result in peer groups that are too small and whose average price is influenced by the prices of a single outlying vendor.

Additionally, the measure selected for the second peer group criterion could influence the effectiveness of the peer group structure. FNS's preliminary analysis of redemption data in two large States suggests that measures of sales volume (number of registers, market share, amount of redemptions) seem to have a bigger effect on price than type of ownership (sole proprietorship, partnership, corporation), but

that no one measure of sales volume is consistently the best measure to group vendors once broken down by geography.

To examine different scenarios, FNS obtained data from two large State agencies and developed hypothetical peer groups based on geographic area, number of registers, and monthly redemption amounts for vendors. Four sets of hypothetical peer groups were developed. All four used the same geographic criterion for the first criterion. For two sets of peer groups, the second criterion was based on the number of registers. For the other two sets of peer groups, the second criterion was based on the WIC redemption amounts for the vendor. The peer groups were formed by analyzing the distribution of number of registers or amount of WIC redemptions and dividing the vendors such that the same number of vendors fell into each of the five groups. Average prices for each group were calculated and tested to ensure they were statistically different from each other. In each scenario below, the two types of peer groups are compared (number of registers versus WIC redemptions) based on the method used to calculate the groups. For scenario one, the peer groups were calculated excluding the WIC-only vendors in the State data file. For scenario two, the peer groups were calculated including all vendors in the file. Analysis on average price was calculated for all non-WIC-only vendors since WIC-only vendors are most likely to be above-50-percent vendors and as such, could be put into separate peer groups under the rule.

Tables 6 and 7 below compare the mean price for a food instrument using two different second criteria. For comparison purposes, only the range of categories is displayed here.

TABLE 6.—SCENARIO 1, MEAN PRICE OF FOOD INSTRUMENT, GROUPINGS BASED ON NON-WIC ONLY VENDORS

| 2nd Peer group criterion | Number of registers | | WIC redemption amounts | |
|---|---|---|---|---|
| Group | Number of registers | Mean price of food instrument | WIC redemption amounts | Mean price of food instrument |
| 1 | 1 to 3 | $3.5316 | Up to $3,835 | $3.5404 |

[8] State of Texas, Department of Health, Bureau of Nutrition Services, Retailer Peer Grouping Study for Competitive Pricing: Deliverable 3, Non-Commercial Vendor Recommendations. Prepared by Burger, Carroll and Associates, December 30, 2003.

**71730**    **Federal Register** / Vol. 70, No. 228 / Tuesday, November 29, 2005 / Rules and Regulations

TABLE 6.—SCENARIO 1, MEAN PRICE OF FOOD INSTRUMENT, GROUPINGS BASED ON NON-WIC ONLY VENDORS—Continued

| 2nd Peer group criterion | Number of registers | | Mean price of food instrument | WIC redemption amounts | | Mean price of food instrument |
|---|---|---|---|---|---|---|
| Group | | Number of registers | | | WIC redemption amounts | |
| 2 | 4 to 7 | | 3.5116 | $3,836 to $130,318 | | 3.5172 |
| 3 | 8 to 10 | | 3.3428 | $130,319 to $1,943,825 | | 3.3051 |
| 4 | 11 to 12 | | 3.3366 | $1,943,826 to $3,205,592 | | 3.3885 |
| 5 | 13 or more | | 3.3082 | $3,205,593 or more | | 3.2293 |

In scenario 1, all but one of the group averages are statistically equal, regardless of whether the number of registers or monthly WIC redemption amounts is used as the second peer group criterion. This result suggests that it would not matter which measure is used as the second criterion; both would have about the same outcome. But, when the same characteristics are applied to all vendors (scenario 2), the average prices in almost all of the categories are statistically different, indicating that the groupings are different from one another and may result in different outcomes. It is obviously difficult to definitively assess the effect of the peer groups when there is so much variation in how peer groups could be defined and how the vendors could be grouped.

TABLE 7.—SCENARIO 2, MEAN PRICE OF FOOD INSTRUMENT, GROUPINGS BASED ON ALL VENDORS

| 2nd Peer group criterion | Number of registers | | Mean price of food instrument | WIC redemption amounts | | Mean price of food instrument |
|---|---|---|---|---|---|---|
| Group | | Number of registers | | | WIC redemption amounts | |
| 1 | 1 to 2 | | $3.5418 | Up to $5,628 | | $3.5395 |
| 2 | 3 to 5 | | 3.5119 | $5,628 to $80,442 | | 3.5131 |
| 3 | 6 to 9 | | 3.4337 | $80,443 to $1,872,819 | | 3.3539 |
| 4 | 10 to 12 | | 3.3064 | $1,872,820 to $2,973,459 | | 3.3669 |
| 5 | 13 or more | | 3.3082 | $2,973,460 or more | | 3.2293 |

Further, the rule provides State agencies considerable flexibility and few specific requirements for constructing peer groups. The rule focuses more on the intended outcome (*i.e.*, cost neutrality of above-50-percent vendors) than on how State agencies achieve this outcome. FNS assumes that State agencies will perform sufficient analysis and will select the most effective criteria to contain vendor costs. The inability or failure of State agencies to do so could undermine or minimize the success of this rule. For example, State agencies will need to prevent peer groups from having wide price variation or non-normal distributions, or from being so large or so small that they are ineffective.

Since State agencies could choose a strategy that is effective or ineffective for their particular needs and characteristics, and since an effective strategy for one State agency may not be an effective strategy for another State agency, the impact of the vendor peer group requirement on cost savings is uncertain. If implemented effectively, the peer group requirement as specified in the rule should ensure that above-50-percent vendors do not result in higher costs to the program than regular vendors.

*Establishing Competitive Price Criteria and Allowable Reimbursement Levels*

The degree to which cost savings can be achieved also depends on the effectiveness of a state's method for assessing the prices of new vendor applicants relative to others in a peer group. Currently, many states either apply a percentage or a standard deviation measure to set a maximum competitive price criteria or a maximum reimbursement level. For example, some states may set their competitive price criteria at 5 percent above the average peer group price and others may set their competitive price criteria at 1 or 2 standard deviations above the average peer group price.

Either method could control costs effectively depending on the size of peer group, the distribution of prices within that peer group and the percentage or number of standard deviations applied. For example, a standard deviation measure might be more effective in a peer group of a given size with a relatively small distribution of prices. But, a percentage might be more effective in a peer group with a relatively large distribution. Consequently, State agencies have been given flexibility to determine their competitive price criteria.

2. *Alternatives:* This rule implements the vendor peer group provisions of the Child Nutrition and WIC Reauthorization Act of 2004, which FNS believes is an effective means of controlling WIC food costs. While this Act mandates that States establish peer groups, competitive price criteria and allowable reimbursement levels and states that these requirements must result in the outcome of paying above-50-percent vendors no more than regular vendors, the Act does not specify particular criterion for peer groups or acceptable methods of setting competitive price criteria and allowable reimbursement levels. FNS considered mandating specific means of developing peer groups, competitive price criteria and allowable reimbursement levels in order to ensure that the outcome of this legislation was achieved.

However, given States' responsibility to manage WIC as a discretionary grant program and the varying market conditions in each state, FNS believes that states need flexibility to develop their own peer groups, competitive price criteria and allowable reimbursement levels. At the October 2004 meeting that FNS convened to gain input for this rule, States indicated that they needed the ability to design cost containment practices that would be effective in their own markets and would ensure participant access. In addition, there is little information about the effectiveness of particular cost containment practices in the variety of markets represented by the 89 state agencies. Mandating more specific means of developing peer groups, competitive price criteria and allowable reimbursement levels could have unintended, negative consequences on participant access, food costs and administrative burden.

As States gain experience and the results of their vendor cost containment practices become apparent, FNS may develop further regulations and guidance to improve achievement of the WIC vendor cost containment goals of the Child Nutrition and WIC Reauthorization Act of 2004. In the interim, FNS believes that the current rule will substantially accomplish the goal of the Act of containing food costs and ensuring that above-50-percent vendors do not result

in higher costs to the program than regular vendors.

[FR Doc. 05–23365 Filed 11–28–05; 8:45 am]

**BILLING CODE 3410–30–P**

4. USDA Statement of Policy, 36 Fed. Reg. 13804 (July 24, 1971).

(1) Approve and accept options and offers to sell to, or exchange with the United States, lands or interests in lands within areas under the jurisdiction or control of the National Park Service, and to execute all necessary agreements and conveyances incident thereto.

(2) Accept deeds conveying to the United States, lands or interests in lands, within areas under the jurisdiction or control of the National Park Service.

(3) Contract for and accept bills of sale or other evidence of title to personal property related to the acquisition of lands which is authorized to be acquired for the purposes of the areas under the jurisdiction or control of the National Park Service.

(4) Approve on behalf of the National Park Service offers of settlement in condemnation cases. Approvals of offers of settlement by him will be communicated to the appropriate office of the Solicitor's Office of the Department of the Interior for such further action as may be proper.

Sec. 2. *Revocation.* This order supersedes and revokes National Park Service Delegation of Authority Order No. 64, 36 F. R. 5629.

(205 DM, as amended; 245 DM, as amended; 5 U.S.C. 22; sec. 301 of Reorganization Plan No. 3 of 1950)

Dated: July 6, 1971.

RAYMOND L. FREEMAN,
*Acting Director,*
*National Park Service.*

[FR Doc.71-10573 Filed 7-23-71; 8:51 am]

# DEPARTMENT OF AGRICULTURE

## Commodity Credit Corporation

## JUTE BAGGING AND BALE TIES USED IN WRAPPING COTTON

### Modification of Revised Specifications

The Notice of Specifications—Jute Bagging and Bale Ties Used in Wrapping Cotton (Revision 2) issued by Commodity Credit Corporation published in the FEDERAL REGISTER on May 7, 1969 (34 F.R. 7388), stated the specifications for jute bagging and bale ties for wrapping cotton tendered to Commodity Credit Corporation (hereinafter referred to as CCC) for loans beginning with the 1969 crop of cotton.

Notice is hereby given that, effective as to the 1971 and subsequent crops of cotton, the specifications contained in the notice are amended as follows:

1. In order to provide for heavier weight bale ties and buckles on gin compressed cotton, the paragraph following the center head Bale Ties and Buckles is amended to read as follows:

BALE TIES AND BUCKLES

The total weight of bale ties and buckles used to tie each bale of cotton shall be not less than 8½ pounds or more than 9½ pounds: *Provided, however,* That bale ties and buckles weighing not

less than 8½ pounds or more than 10 pounds may be used to tie a gin compressed bale (gin standard or gin universal density) having not less than eight bands.

2. In order to provide for shorter length bagging on gin compressed cotton, the first paragraph following the center head Jute Bagging is amended to read as follows:

JUTE BAGGING

All bagging must be clean, in sound condition, and of sufficient strength to adequately protect the cotton. Cotton wrapped in jute bagging to which any kind of salt or other corrosive material has been added, or which contains sisal or other hard fibers or any other material which will contaminate or adversely affect the cotton as determined by the President or Executive Vice President, CCC, will not be eligible for tender to CCC. Each one-half pattern (panel) of bagging shall be not less than 108 inches or more than 115 inches in length and must be not less than 47 inches or more than 56 inches in width: *Provided, however,* That bagging panels not less than 96 or more than 115 inches in length may be used for wrapping gin compressed bales (gin standard or gin universal density). Each pattern of bagging (two bagging panels) must weigh not less than 11¼ pounds or more than 13¾ pounds at 13.75 percent moisture content (not moisture regain): *Provided, however,* That a pattern weighing not less than 10 pounds or more than 13¾ pounds at 13.75 percent moisture content (not moisture regain) may be used for wrapping gin compressed bale if each panel of the pattern is not less than 96 inches in length.

Signed at Washington, D.C., on July 20, 1971.

KENNETH E. FRICK,
*Executive Vice President,*
*Commodity Credit Corporation.*

[FR Doc.71-10586 Filed 7-23-71; 8:52 am]

## Office of the Secretary

## AGRICULTURAL RESEARCH SERVICE

### Delegation of Functions

The assignment of functions to the Agricultural Research Service in 30 F.R. 5801, as amended in 31 F.R. 4975, 32 F.R. 7469, and 36 F.R. 7152 is hereby further amended by adding a new subparagraph (10) to paragraph b of section 115 to read as follows:

(10) Assisting the Consumer and Marketing Service (C & MS) in cooperating with the various States in performing State meat and poultry inspection activities as provided by the Federal Meat Inspection Act (21 U.S.C. 661) and the Poultry Products Inspection Act (21 U.S.C. 454).

Done at Washington, D.C., this 20th day of July 1971.

CLIFFORD M. HARDIN,
*Secretary.*

[FR Doc.71-10586 Filed 7-23-71; 8:48 am]

## PUBLIC PARTICIPATION IN RULE MAKING

### Statement of Policy

Notice is hereby given of the policy of the Department of Agriculture to give notice of proposed rule making and to invite the public to participate in rule making where not required by law.

5 U.S.C. 553 provides generally that before rules are issued by Government agencies, notice of proposed rule making must be published in the FEDERAL REGISTER, and interested persons must be given an opportunity to participate in the rule making through submission of data, views, or arguments.

The law exempts from this requirement rules relating to public property, loans, grants, benefits, or contracts.

The Administrative Conference of the United States has recommended that Government agencies provide for public participation when formulating rules relating to public property, loans, grants, benefits, or contracts as a matter of policy.

The advantages of implementing the Conference's recommendation that the public be afforded an opportunity for greater participation in the formulation of rules relating to public property, loans, grants, benefits, or contracts will outweigh any disadvantages such as increased costs or delays.

The public participation requirements prescribed by 5 U.S.C. 553 (b) and (c) will be followed by all agencies of the Department in rule making relating to public property, loans, grants, benefits, or contracts. The exemptions permitted from such requirements where an agency finds for good cause that compliance would be impracticable, unnecessary or contrary to the public interest will be used sparingly, that is, only when there is a substantial basis therefor. Where such a finding is made, the finding and a statement of the reasons therefore will be published with the rule.

*Effective date:* Upon publication in the FEDERAL REGISTER (7-24-71).

Signed at Washington, D.C., on July 20, 1971.

CLIFFORD M. HARDIN,
*Secretary of Agriculture.*

[FR Doc.71-10587 Filed 7-23-71; 8:48 am]

# DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

## Food and Drug Administration

## ATLAS CHEMICAL INDUSTRIES, INC.

## Notice of Filing of Petition for Food Additives

Pursuant to provisions of the Federal Food, Drug, and Cosmetic Act (sec. 409(b) (5), 72 Stat. 1786; 21 U.S.C. 348(b) (5)), notice is given that a petition (FAP 1B2698) has been filed by