UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————

)
NATIONAL WOMEN, INFANTS AND )
CHILDREN GROCERS ASSOCIATION, <u>et</u>. <u>al</u>. )
)
Plaintiffs, )
)
v. )
)
)
FOOD AND NUTRITION SERVICE, )
)
Defendant. )

———————————————————————

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING
ORDER

Case No. 1:05-cv-02432-EGS

Judge Emmet G. Sullivan

## <u>INTRODUCTION</u>

An interim rule issued by the Food and Nutrition Service ("FNS"), a division of the United

States Department of Agriculture ("USDA"), and effective on December 29, 2005, imposes

statutorily-required cost-containment measures on state agencies that receive grants under the

Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"). Under WIC,

state agencies provide vouchers to qualified women and children, who then may redeem those

vouchers for specific food items from authorized vendors; vendors may then seek reimbursement

from the state. When passing the Child Nutrition and WIC Reauthorization Act of 2004, Pub. L.

108-265, Title II, 118 Stat. 771 (June 30, 2004) ("WIC Reauthorization Act"), Congress determined

that the costs of WIC were being driven up by certain vendors for whom WIC sales constituted a

majority of their business and who sought reimbursement at above-market rates. Accordingly,

Congress imposed new cost-containment measures especially to constrain the program costs

incurred by authorization of these "above-fifty-percent" or "WIC-only" vendors, and authorized the

FNS to issue guidance for state implementation of these measures.

1

Plaintiffs are some of the WIC-only vendors targeted by the statute; they allege that the interim rule's cost-containment provisions are inconsistent with requirements of the WIC Reauthorization Act, the Regulatory Flexibility Act ("RFA"), the Administrative Procedure Act ("APA"), and the policies of the USDA. Accordingly, plaintiffs seek a temporary restraining order ("TRO") to enjoin the agency from implementing the rule.

Plaintiffs cannot meet the heavy burden imposed on parties seeking such relief. First, plaintiffs cannot demonstrate any likelihood of irreparable harm caused by timely implementation of these rules. The harms alleged in plaintiffs' declarations are largely self-imposed, based on self-serving, speculative, and unsubstantiated conjecture about the implications of the interim rule. Furthermore, regardless of the effectiveness of the interim rule, state agencies are required to implement the statutory provisions on December 30, 2005, meaning that the alleged harms to plaintiff may occur regardless of this Court's decision. Under these circumstances, it would be premature to enjoin the national implementation of a program based on an unknown and unquantified future impact on plaintiffs' businesses.

Second, plaintiffs cannot demonstrate a strong likelihood of success on the merits because the plain language of the WIC Reauthorization Act mandates the measures adopted in the interim rule and because the FNS did not violate any procedural requirements in promulgating the interim regulation. First, the RFA does not apply, but the FNS nonetheless complied with its requirements. Second, notice and comment rulemaking is not required under these circumstances because the APA does not require such procedures for grants and benefits and because good cause existed to depart from the agency's preference for notice and comment rulemaking.

2

Finally, the interests of third parties and of the general public tip sharply in favor of the agency. The statute and the new regulations are intended to preserve the financial integrity of WIC and stretch federal dollars to benefit the largest number of eligible women and children, who are best served by timely implementation of cost-containment measures. If those dollars are doled out to the high-cost WIC-only vendors that Congress believes are habitually overcharging the government, fewer needy women and children can benefit from the program.

## STATUTORY AND REGULATORY BACKGROUND

### The Child Nutrition Act

In light of the fact that "substantial numbers of pregnant, postpartum, and breastfeeding women, infants, and young children from families with inadequate income are at special risk with respect to their physical and mental health by reason of inadequate nutrition or health care," Congress enacted the Child Nutrition Act of 1966, Pub. L. No. 89-642 (codified at 42 U.S.C. § 1786). As part of this initiative, WIC provides grants to state agencies to "provide[] nutrition services and tailored food packages to lower-income pregnant, breast-feeding, and postpartum women, and infants and children who are judged to be at nutritional risk." S. Rep. 108-279, at 2, 2004 U.S.C.C.A.N. 668, 669 (June 7, 2004). WIC is not an entitlement program; Congress does not set aside funds to allow every eligible individual to participate in the program. Rather, it is a Federal grant program for which Congress annually authorizes a specific amount of funds. See 42 U.S.C. § 1786(a), (g).

The Child Nutrition Act authorizes the Secretary of Agriculture to administer WIC, see 42 U.S.C. § 1786, and the Secretary has delegated that power to the FNS, 7 C.F.R. § 246.3(a). In this capacity, the FNS "provide[s] assistance to State and local agencies and evaluate[s] all levels of

3

Program operations to ensure that the goals of the Program are achieved in the most effective and efficient manner possible." Id. State agencies are nonetheless responsible for the daily administration of WIC benefits, pursuant to a plan approved by the FNS. Id. §§ 246.3(b), (c).

Among the benefits provided by WIC are food packages that provide participants with nutritionally appropriate foods. See 7 C.F.R. § 246.10. One means by which state agencies may choose to deliver these food packages is a "retail delivery system," through which the women and children are provided with "food instruments" that they may redeem at authorized vendors for approved supplemental foods. Id. § 246.12. The state agency must ensure that authorized vendors charge competitive prices and establish price limitations. Id.

**The WIC Reauthorization Act**

In 2004, Congress found that this system had inadvertantly spawned a new breed of entrepreneur, the WIC-only vendor. According to the Senate Report accompanying the WIC Reauthorization Act,

> WIC-only stores tend to charge much higher prices for WIC food items than do regular grocery stores, resulting in significantly higher costs to the federal government and creating long-term cost-containment problems in the WIC program. Over the past few years, WIC-only stores have redeemed a growing share of WIC vouchers; in fiscal year 2002, WIC-only stores accounted for 9 percent of WIC sales nationwide. Given higher costs in and rapid growth of WIC-only stores, the Committee is concerned that the result of these trends may be significantly higher program costs and, consequently, significant barriers to WIC program access for low-income women and children.

S. Rep. 108-279, at 54, 2004 U.S.C.C.A.N. at 715. Because the WIC-only vendors serve predominately WIC customers (who pay in government vouchers and therefore are not price sensitive), there are no competitive pressures on prices, and the only pricing consideration relevant to WIC-only vendors is the amount the government can be persuaded to pay. See id. The market

4

forces that were expected to constrain the prices of vendors had no effect on WIC-only vendors, who could take advantage of government largesse to the greatest extent permitted by law and drain the program of funding that would otherwise fund benefits for additional women and children.

In order to "ensure sound stewardship of taxpayer dollars," the WIC Reauthorization Act "includes several provisions designed to ensure that the WIC program continues to rely on market forces to contain food costs and that WIC-only stores do not charge higher prices than other stores, leading to waste of federal funds." S. Rep. 108-279, at 55, 2004 U.S.C.C.A.N. at 716. The legislative history states that these provisions are designed to ensure "cost neutrality" S. Rep. 108-279, at 56-57.

In a provision affecting all authorized vendors, the Act requires state agencies to "establish a vendor peer group system" and to "establish competitive price criteria and allowable reimbursement levels for each vendor peer group." See 42 U.S.C. § 1786(h)(11)(A)(i). In these vendor peer group systems, state agencies compare vendors to similarly situated vendors to ensure that their pricing is competitive. However, the same statutory section specifically requires that WIC-only vendors be distinguished from regular vendors.[1] Id. § 1786(h)(11)(A)(i)(III)(aa).

In lieu of the typical peer group comparison, this subsection imposes several cost-containment provisions related to WIC-only vendors. First, the agency must either establish (1) "separate peer groups for" WIC-only vendors, or (2) "distinct competitive price criteria and allowable reimbursement levels for [WIC-only vendors] within a peer group that contains both [WIC-only vendors] and other vendors." Id. Second, this section requires that the agency "establish

---

[1]The statute also makes clear in several places that a state agency is not required to authorize WIC-only vendors at all. See, e.g., 42 U.S.C. §§ 1786(h)(11)(A)(i)(III), (A)(ii)(I), (E). If states elect to authorize such vendors, the additional cost-containment provisions apply.

competitive price criteria and allowable reimbursement levels" that both (1) meet the same requirements imposed on regular vendors; and – independent of the use of peer groups – (2) "do not result in higher food costs if program participants redeem supplemental food vouchers at [WIC-only vendors] rather than at vendors other than [WIC-only vendors]." Id. § 1786(h)(11)(A)(i)(III)(bb). The Senate Report describes this last requirement thus: "Section 203(e)(10) . . . also requires the state agency to ensure that WIC-only stores are cost neutral to the WIC program by demonstrating that the competitive price criteria and allowable reimbursement levels established for WIC-only stores are designed so as not to result in higher food costs if program participants redeemed their WIC vouchers at WIC-only stores rather than at regular retail vendors." S. Rep. 108-279, at 55, 2004 U.S.C.C.A.N. at 716. Thus, the statute requires that the authorization of WIC-only stores be cost-neutral to the program as a whole.

Finally, a separate section of the statute contains an additional cost-containment measure applicable to WIC-only vendors. Section 1786(h)(11)(E) requires that a state agency seeking approval must "demonstrate to the Secretary . . . that the competitive price criteria and allowable reimbursement levels established under this paragraph for [WIC-only vendors] do not result in average payments per voucher to [WIC-only] vendors that are higher than than average payments per voucher to comparable vendors other than [WIC-only vendors]."

The legislative history clarifies that the net result of these statutory cost-containment provisions should be the implementation of two distinct cost-containment principles:

> Although the legislative language offers States latitude to design vendor peer groups, competitive price criteria, and maximum reimbursement levels, each State must meet two important cost-containment goals unless exempted by the Secretary. First, each State must ensure that its aggregate WIC food costs are no higher if WIC participants choose to shop at WIC-only stores than if they shop at regular competitive stores. Second, each State must ensure that

average prices, referred to as "average payments per voucher", in WIC-only stores are no higher than average prices in comparable competitive stores.

150 Cong. Rec. S7244-01, 7248 (June 23, 2004) (Statement of Sen. Harkin) (presenting the WIC Reauthorization bill to the Senate).

The statute directs that state agencies comply with these provisions no later than December 30, 2005. <u>See</u> 42 U.S.C.§ 1786(h)(11)(G).

**<u>The Interim Final Rule</u>**

In accordance with its statutory authority, <u>see</u> Pub. L. 108-265, Tit. V, § 501(b), 118 Stat. 789 (June 30, 2004) (codified at 42 U.S.C. § 1758 note), FNS promulgated an interim final rule on November 29, 2005. Interim Rule, <u>Special Supplemental Nutrition Program for Women, Infants and Children (WIC): Vendor Cost Containment</u>, 70 Fed. Reg. 71708 (Nov. 29, 2005). The preamble to the rule indicates the agency's intent "to maximize the number of eligible women, infants, and children served with available federal funding." <u>Id</u>. The rules impose flexible requirements on states, who may "design cost containment practices that would be effective in their own markets and would ensure adequate participant access." <u>Id</u>. The FNS explained that it expects to issue further regulations and guidance as State agencies gain experience with the effectiveness of vendor cost containment practices, and "[i]n the interim, . . . that the current rule will substantially accomplish the goal of the Act of containing food costs and ensuring that above-50-percent vendors do not result in higher costs to the program than regular vendors." <u>Id</u>. at 71708-09. Thus, in establishing the vendor peer groups required by the WIC Reauthorization Act, the state agencies are granted great leeway to define effective peer groups, competitive price criteria and allowable reimbursement rates. <u>See</u> 7 C.F.R. § 246.12(g)(4); 70 Fed. Reg. at 71713, 71722.

7

Under the interim rule, prior to authorizing any WIC-only vendors, a state agency must receive FNS certification of its vendor cost containment system under section 246.12(g)(4)(vi). In accordance with statutory section 1786(h)(11)(E), this regulatory section requires the state agency "to demonstrate that its competitive price criteria and allowable reimbursement levels do not result in average payments per food instrument to these [WIC-only] vendors that are higher than average payments per food instruments to <u>comparable</u> [non-WIC-only] vendors." 7 C.F.R. § 246.12(g)(4)(vi) (emphasis added); 70 Fed. Reg. at 71724. The regulation provides further guidance on exactly how to make that calculation. <u>Id</u>.; Declaration of Roger Vogel ("Vogel Decl.") (filed herewith), ¶ 4.

Section 246.12(g)(4)(i) contains additional requirements for certification of a state agency that elects to authorize WIC-only vendors. First, in accordance with statutory section 1786(h)(11)(A)(i)(III)(aa), the rule requires the state agency to distinguish between WIC-only vendors and regular vendors by establishing separate peer groups for WIC-only vendors or by establishing distinct competitive price selection and reimbursement criteria for the WIC-only vendors.[2] <u>See</u> 7 C.F.R. § 246.12(g)(4)(i)(A). Second, in order to ensure that state agencies meet the cost-neutrality requirement of statutory section 1786(h)(11)(A)(i)(III)(bb), the rule requires state agencies to "compare above-50-percent vendors' prices against the prices of [regular] vendors" in

---

[2]The status of new vendors must also be assessed within six months. 7 C.F.R. § 246.12(g)(4)(i)(B). The possibility of authorizing new WIC-only vendors is largely irrelevant for now, given language in a recent appropriations act prohibiting grants to state agencies that authorize new for-profit WIC-only vendors. <u>See</u> Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act of 2006, Pub. L. No. 109-97 § 787, 119 Stat. 2120 (November 10, 2005).

setting the competitive price criteria and reimbursement levels for WIC-only vendors.  7 C.F.R. § 246.12(g)(4)(i)(C).

Finally, pursuant to the same cost-neutrality provisions of § 1786(h)(11)(A)(i)(III)(bb), and to "ensure that the prices of above-50-percent vendors do not inflate the competitive price criteria and allowable reimbursement levels for the peer groups or result in higher total food costs," the specific regulation at issue here, 7 C.F.R. § 246.12(g)(4)(i)(D), requires that on a quarterly basis state agencies must ensure that statewide average payments per food instrument for above-50-percent vendors do not exceed the statewide average payments per food instrument for regular vendors.  To comply with this requirement, the state agency must compute statewide average payments quarterly, and if average payments per food instrument to WIC-only vendors are higher than those to regular vendors, they must then take "necessary action to ensure compliance, such as adjusting payment levels, recouping excess payments, or terminating vendor agreements with above-50-percent vendors whose prices are least competitive and that are not needed to ensure participant access."  Id.; Vogel Decl., ¶ 4.

The net result of all of these requirements is the implementation of the two separate, complementary cost-containment requirements imposed by the statute.  First, state agencies must demonstrate that their cost-containment measures do not result in higher average payments per voucher to WIC-only stores than to comparable regular vendors.  See 42 U.S.C. § 1786(h)(11)(E); 7 C.F.R. § 246.12(g)(4)(vi); Vogel Decl. ¶ 3.  Second, state agencies must demonstrate that the cost-containment measures do not result in higher food costs if WIC vouchers are redeemed at a WIC-only store rather than at a regular vendor.  See 42 U.S.C. § 1786(h)(11)(A)(i)(III)(bb); 7 C.F.R. § 246.12.(g)(4)(i)(D);  Vogel Decl. ¶¶ 3, 4.

As noted above, by the terms of the WIC Reauthorization Act, these provisions must be implemented by state agencies on December 30, 2005. See 42 U.S.C. § 1786(h)(11)(G); 70 Fed. Reg. at 71708. It is FNS policy that currently authorized WIC-only stores in states seeking certification to authorize such stores may continue their current authorizations pending certification, although the states are nonetheless required to achieve cost-neutrality. See Vogel Decl. ¶ 5.

## PLAINTIFFS' CLAIMS

Plaintiffs are several WIC-only vendors and have moved pursuant to Fed. R. Civ. Pr. 65(b) for a temporary restraining order to prevent implementation of the interim rule. Plaintiffs allege a "substantial likelihood" that plaintiffs may succeed on the merits of their four claims. First, they claim that the regulations are unreasonable and contrary to plain statutory language because the statute requires a comparison of WIC-only vendors only to "comparable" vendors and because the "voucher-to-voucher comparison employed by the Rule . . . undermines the prescribed food benefit package." (Pls' Mem. Supp. TRO at 20-23.) Second, plaintiffs argue that the FNS failed to assess the potential economic impact on small businesses as required by the RFA. (Pls' Mem. Supp. TRO at 23-26.) Finally, they allege that the issuance of an interim final rule without notice-and-comment rulemaking runs afoul of both the APA and stated USDA policy. (Pls' Mem. Supp. TRO at 26-31.)

In support of their motion for a TRO, the plaintiffs further allege that they and other WIC-only vendors will be irreparably harmed by the implementation of rules that compare them to regular vendors. (Pls' Mem. Supp. TRO at 14-18.) Although the declarations submitted with the motion contain no analysis of the actual effect of the rule on prices and profits, the declarations do allege that WIC-only vendors will be forced to shut their doors within two months. (EAnn Robinson Decl. ¶¶ 27, 40; J.C. Halbert Decl. ¶ 17; Michael G. Dillard Decl. ¶ 14.) Finally, they claim that the public

interest is best served by keeping their stores in business, even at higher prices.  (Pls' Mem. Supp.

TRO at 18-20.)

## ARGUMENT

### I.    STANDARDS FOR TRO

A temporary restraining order is "an extraordinary form of relief."  See Johnson v. Holway,

329 F. Supp. 2d 12, 15 (D.D.C. 2004).  Accordingly, courts have required "a clear and convincing

showing by the moving party," id., of four factors:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer
> irreparable injury if the injunction is not granted, (3) that an injunction would not
> substantially injure other interested parties, and (4) that the public interest would be
> furthered by the injunction.

Guam Indus. Services, Inc. v. Rumsfeld, 383 F.Supp.2d 112, 115 (D.D.C. 2005) (quoting Mova

Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998)).  These factors should be balanced

and examined in a "sliding scale," id. at 116, but a plaintiff must establish irreparable harm and a

likelihood of success on the merits, District 50, United Mine Workers of Am. v. International Union,

United Mine Workers of Am., 412 F.2d 165, 167 (D.C. Cir. 1969).

### II.    PLAINTIFFS WILL NOT BE IRREPARABLY HARMED BY IMPLEMENTATION OF THE RULE DURING THE 10-DAY PROTECTION AFFORDED BY A TRO

"[I]rreparable harm to the moving party is 'the basis of injunctive relief in the federal

courts'."  Almurbati v. Bush, 366 F.Supp.2d 72, 77-8 (D.D.C. 2005) (Walton, J.), citing CityFed

Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995) (quoting Sampson

v. Murray, 415 U.S. 61, 88 (1974)).  Accordingly, a plaintiff's failure to meet its burden of

establishing irreparable harm is sufficient, in itself, to deny emergency relief.  CityFed Fin. Corp.,

58 F.3d at 747.  Moreover, "[t]o obtain injunctive relief, the petitioners must show that the

11

threatened injury is not merely 'remote and speculative'." Almurbati, 366 F.Supp.2d at 78, (quoting

Milk Indus. Found. v. Glickman, 949 F.Supp. 882, 897 (D.D.C. 1996)). Thus, proving "irreparable"

injury is a considerable burden, requiring proof that the movant's injury is *certain, great and actual*

- not theoretical - and *imminent*, creating a clear and present need for extraordinary equitable relief

to prevent harm. Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985); Varicon Int'l v.

OPM, 934 F. Supp. 440, 447 (D.D.C. 1996). Economic loss, in and of itself, generally does not

constitute irreparable harm unless it is shown that the loss threatens the very survival of a movant's

business, and is certain to occur in the near future as a direct result of the threatened action.

Wisconsin Gas Co., 758 F.2d at 674; Varicon, 934 F. Supp. at 447.

The plaintiffs have fallen far short of their burden to establish that certain, great, actual and

imminent harm will result if the Court denies the "extraordinary" and "unusual" emergency

injunctive relief it requests. Role Models America, Inc. v. White, 193 F. Supp.2d 76, 80 (D.D.C.

2002). The declarations allege that as a result of actions that Arkansas will assertedly take at some

unspecified point in the future, plaintiffs will be "forced" to shut down immediately as of December

30, 2005. (EAnn Robinson Decl. ¶¶ 27, 40; J.C. Halbert Decl. ¶ 17; Michael G.Dillard Decl. ¶ 14.)

At best, such allegations describe unilateral business decisions based on unsubstantiated speculation

about the anticipated impact of undefined State agency action under the new regulation, not

irreparable injury caused by any action that defendants will take or force plaintiffs to take on that

date. In no event should the plaintiffs' self-imposed shutdown be deemed a cause for the

extraordinary remedy provided by a TRO. See Barton v. District of Columbia, 131 F. Supp. 2d 236,

247 (D.D.C. 2001) (the requirement of irreparable harm is not met "when the alleged harm is self-

inflicted") (citations omitted); see also Association of Flight Attendants-CWA v. PBGC, 372 F.

12

Supp. 2d 91, 101 (D.D.C. 2005) (economic consequences of plaintiffs' own "life choices" does not constitute irreparable harm).

The implementation of the new rule on December 30 imposes two requirements that may impact the bottom line of plaintiffs' businesses down the road, but neither provision will have any impact on the plaintiffs in the next ten days. First, some states will have been forced to adjust competitive price criteria and maximum reimbursement levels, presumably taking effect for all instruments redeemed after the effective date, in order to meet both the comparable vendor and average costs criteria.[3] But there is first no evidence that the adjustment of reimbursement rates would have so <u>immediate</u> an impact on plaintiffs' profits or operations as to require emergency injunctive relief. Even after the effective date of the interim rule, it will take time, at least a matter of weeks, presumably, for vendors to submit WIC vouchers that have been redeemed at their stores for reimbursement, and for States to process them.

Similarly, plaintiffs have not shown how the interim rule's other cost-containment requirement -- that States conduct quarterly assessments of whether the average payments per voucher to WIC-only stores exceeds the average payments to regular vendors -- could possibly have any immediate impact on their businesses. The various remedial actions that states may take in the future as a result of such an assessment (<u>i.e.</u>, recoupments of excess payments or termination of vendor agreements) also cannot justify a finding of irreparable harm before the states have even begun collecting the relevant data. FNS policy, moreover, allows authorized WIC-only vendors to continue their current authorizations pending certification by the Secretary. <u>See</u> Vogel Decl., ¶ 5.

---

[3]Some states may not necessarily make any significant adjustments to reimbursement. The declaration of EAnn Robinson, for example, asserts that Oklahoma currently employs criteria similar to those required by the interim rule. <u>See</u> Robinson Decl., ¶ 37.

In short, nothing that will happen on December 30 can possibly justify the current breakneck speed with which plaintiffs seek to have this Court impose injunctive relief.

Furthermore, there is no reason to believe, based on the current submissions to the Court, that these cost-containment principles will result in drastic cuts in payments to particular vendors, either now, or later. Contrary to plaintiffs' mistaken understanding, the rule does not require that each individual WIC-only vendor be reimbursed at the statewide average, only that the statewide average of payments per food instrument to WIC-only vendors not exceed the statewide average of payments per food instrument to regular vendors. See 7 C.F.R. § 246.12(g)(4)(i)(D); Vogel Decl. ¶¶ 5, 6. Thus, any individual WIC-vendor might be allowed to charge above the average amount, so long as the state agency ensures cost-neutrality in the long term among all vendors.

Plaintiffs' attempted demonstration of irreparable harm also fails because the broad allegations contained in the declarations – that the interim rule will force businesses to shut down – are not supported by any specific facts or data. For example, although all of the declarations state that plaintiffs are being forced out of business, none of the declarations contain estimates of current net profits compared to expected net profits, data about the competitiveness of their current pricing schemes, or even a simple statement of the amounts in which they are currently reimbursed and the amounts in which they expect to be reimbursed.[4] See American Bioscience, Inc. v. Shalala, 142 F. Supp. 2d 1, 16 (D.D.C. 2000) (denying preliminary injunction where plaintiff warned of "looming, devastating injuries in a conclusory and conjectural fashion that [was] almost entirely devoid of

---

[4]For example, the letter from the Arkansas Department of Health and Human Services, attached to the plaintiffs' materials, states that the maximum reimbursement for an unidentified particular food instrument will be $16.25. Even assuming that Arkansas's action is appropriate under the interim rule, a conclusion that plaintiffs are free to challenge in Arkansas, the plaintiffs do not provide any current cost amounts compare against this $16.25 figure.

factual detail"), vacated on other grounds, 243 F.3d 579 (D.C. Cir. 2001). The Court should not grant the extraordinary remedy of a TRO based on such "bare allegations." Id. at 15.

Indeed, the testimony offered by plaintiffs contradicts their assertions that WIC-only vendors will be forced immediately out of business upon implementation of the rule. The declaration of EAnn Robinson attests that the plaintiffs' worst-case scenario has already been implemented by the State of Oklahoma. Ms. Robinson states that Oklahoma has already long required WIC-only vendors "to be price-competitive with [s]upermarkets, like Albertson's," Robinson Decl., ¶ 37, precisely the sort of comparison to which plaintiffs object under the intereim rule. Nonetheless, WIC-only stores not only continue to do business in Oklahoma but account for approximately 11% of WIC redemptions there. Id.

Finally, because the WIC Reauthorization Act requires state agencies to implement its cost containment measures as of December 30, regardless of the interim rule's effectiveness, no injunction issued by this Court against FNS is likely to forestall the harms that plaintiffs claim to envision. Irrespective of any order preventing the interim rule from taking effect, state agencies are obligated to implement the statutory cost-containment provisions by December 30, 2005. See 42 U.S.C. § 1786(h)(11)(G). Thus, preliminary injunctive relief would be inappropriate for the additional reason that "it is far from clear whether an injunction would have any effect" on states' implementation of the cost-containment measures they have devised. Flight Attendants, 372 F. Supp. 2d at 101.

Because plaintiffs have failed to establish that immediate relief is necessary to prevent imminent, irreparable, and certain harm, their motion for an extraordinary emergency injunction must be denied.

15

## III.    PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    THE COST CONTAINMENT MEASURES OF THE INTERIM FINAL RULE ARE CONSISTENT WITH THE PLAIN LANGUAGE AND INTENT OF THE WIC REAUTHORIZATION ACT.

#### 1.    FNS's interpretation of the WIC Reauthorization Act is entitled to Chevron Deference.

Plaintiffs' principal contention is that 7 C.F.R. § 246.12(g)(4)(i)(D), which implements § 1786(h)(11)(A)(i)(III)(bb) of the statute, is contrary to the express terms of the WIC Reauthorization Act because the rule requires a comparison of costs between WIC-only vendors and all other WIC vendors, rather than "comparable" WIC vendors. Pls' Mem. Supp. TRO at 21-22. But it is plaintiffs' arguments that ignore the plain language and intent of the statute.

When reviewing an agency's construction of a statute, courts apply the familiar two-step Chevron standard. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). "At the first step, [courts] ask whether the statute's plain terms directly address the precise question at issue." Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 125 S.Ct. 2688, 2702 (2005) (internal quotation marks omitted). Then, if the statute is ambiguous as to that precise point, courts "defer at step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make." Id. Thus, any "reasonable explanation of how an agency's interpretation serves the statute's objectives" can support a permissible construction, but an explanation that is "arbitrary, capricious, or manifestly contrary to the statute," cannot. See Northpoint Technology, Ltd. v. F.C.C., 412 F.3d 145, 151 (D.C. Cir. 2005) (internal quotation marks omitted); see also N.L.R.B. v. United Food & Commercial Workers' Union, Local 23, 484 U.S. 112, 123 (1987).

16

Under the Supreme Court's decision in <u>United States v. Mead Corp.</u>, "administrative implementation of a particular statutory provision qualifies for <u>Chevron</u> deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. 218, 226-27 (2001). In the WIC Reauthorization Act, Congress expressly delegated authority to the agency to promulgate these rules, <u>see</u> Pub. L. 108-265, Tit. V, § 501(b), 118 Stat. 789 (June 30, 2004) (codified at 42 U.S.C. § 1758 note), and the interim final rule is an exercise of that authority, <u>see</u> Preamble to Interim Rule, 70 Fed. Reg. at 71708.

### 2.    The Plain Language of the WIC Reauthorization Act Requires Implementation of Two Different Cost-Containment Principles.

The statute plainly imposes two cost-containment requirements. First, it requires that a state agency must "demonstrate to the Secretary . . . that the competitive price criteria and allowable reimbursement levels established under this paragraph for [WIC-only vendors] do not result in average payments per voucher to [WIC-only] vendors that are higher than than average payments per voucher to comparable vendors other than [WIC-only vendors]." 42 U.S.C. § 1786(h)(11)(E). Second, however, it also requires that price criteria and reimbursement levels "do not result in higher food costs if program participants redeem supplemental food vouchers at [WIC-only vendors] rather than at vendors other than [WIC-only vendors]." <u>Id</u>. § 1786(h)(11)(A)(i)(III)(bb); <u>see also</u> 150 Cong. Rec. S7244-01, S7248 (June 23, 2004) (Statement of Sen. Harkin) (presenting the WIC Reauthorization bill to the Senate).

Plaintiffs contend that in implementing the second of these requirements, § 1786(h)(11)(A)(i)(III)(bb) (through 7 C.F.R. § 246.12(g)(4)(i)(D)), FNS was authorized only to require that WIC-only vendors be compared with other comparable vendors. In support of this

position, however, plaintiffs do not cite § 1786(h)(11)(A)(i)(III)(bb), but instead cite the entirely separate cost-containment principle contained in 42 U.S.C. § 1786(h)(11)(E). Pls' Mem. Supp. TRO at 21. The language of §1786(h)(11)(E) does indeed require the comparison of WIC-only vendors to "comparable" regular vendors, but only for the purpose of establishing that payments to WIC-only vendors are no higher on average than the average payment to ordinary vendors. That requirement is met in the relevant implementing provision, 7 C.F.R. § 246.12(g)(4)(vi), which instructs the states to ensure that their "competitive price criteria and allowable reimbursement levels do not result in average payments per food instrument to these [WIC-only] vendors that are higher than average payments per food instruments to <u>comparable</u> [non-WIC-only] vendors" [emphasis added].

However, for the separate purpose of establishing that the redemption of supplemental food vouchers at WIC-only vendors rather than at ordinary vendors does not result in higher food costs to the program, § 1786(h)(11)(A)(i)(III)(bb) imposes no requirement that WIC-only vendors be compared solely to comparable vendors; indeed, the term "comparable" does not appear in the text of § 1786(h)(11)(A)(i)(III)(bb). Thus, plaintiffs' position entirely ignores the language of § 1786(11)(A)(i)(III)(bb), because there Congress explicitly requiresdcost neutrality as between WIC-only vendors and other vendors generally, exactly the comparison that FNS requires the states to make in 7 C.F.R. § 246.12(g)(4)(i)(D). Any attempt to import the word "comparable" (or the term "peer group") into § 1786(11)(A)(i)(III)(bb), so as to limit the basis of the comparison, distorts Congress's clearly expressed intent.

In support of their position, plaintiffs cite remarks by Congressman Boehner of Ohio, Pls' Mem. Supp. TRO at 22, but this speech simply refers to the requirement under § 1786(h)(11)(E) that WIC-only stores be compared to comparable vendors; it does not purport to explain the operation

of the second cost-containment requirement adopted in § 1786(h)(11)(A)(i)(III)(bb).  In any event, statements by individual congressmen are not strong evidence of congressional intention," and where, as here, there is "evidence to the contrary" (that is to say, the plain language of the statute), courts should "disregard them."  United States v. FCC, 652 F.2d 72, 85 (D.C. Cir. 1980); see also Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 644 (1981) ("Courts, of course, should be wary of relying on the remarks of a single legislator").   Hence, far from any conflict arising between the terms of the interim rule and the WIC Reauthorization Act, the cost-containment provisions of the rule are in complete accord with the plain language of the corresponding provisions of the statute.[5]

> ### 3.    The Voucher-to-Voucher Comparison Is a Reasonable Means to Ensure that  the Participation of WIC-Only Vendors Does Not Result in Higher Food Costs

The interim rule is not merely consistent with but also represents a more than reasonable construction of § 1786(h)(11)(A)(i)(III)(bb) that is fully in line with the cost-containment purposes of the statute. S. Rep. 108-279, at 55, 2004 U.S.C.C.A.N. at 716. Section 1786(h)(11)(A)(i)(III)(bb) requires that states establish competitive price criteria and allowable reimbursement levels for WIC-only vendors "that do not result in higher food costs if program participants redeem supplemental

---

[5]The plaintiffs' declarations and memorandum further imply that the interim rule requires that the maximum reimbursement rate for WIC-only vendors be the average reimbursement rate for all other vendors.  (See, e.g., Pls' Mem. Supp. TRO at 22; Halbert Decl. ¶ 16.)  However, the regulations require only that the average payment per food instrument to WIC-only vendors not exceed the average payment per voucher to regular vendors.  7 C.F.R. § 246.12(g)(4)(i)(D).  Thus, a state agency could set the maximum reimbursement rate for any individual WIC-only vendor above the statewide average so long as, overall, payments to WIC-only vendors remain at or below the statewide average for regular vendors.  Vogel Decl., ¶ 5.  (On the other hand, nothing in the statute or the regulations prevents state agencies from adopting such a regulation.  No provision of the statute sets a floor on maximum reimbursement rates to WIC-only vendors.)

food vouchers at [WIC-only vendors] rather than at [other] vendors." The statute does not speak directly to the question of how to compare "food costs" for this purpose. But considering the statutory mandate that costs be no higher "if program participants redeem supplemental food vouchers at [WIC-only] vendors," it was perfectly reasonable of FNS to prescribe, as it has effectively done in 7 C.F.R. § 246.12(g)(4)(i)(D), that states ascertain whether food costs are higher or not by comparing the average cost per voucher when "program participants redeem supplemental food vouchers at [WIC-only] stores" to the average cost per voucher when "program participants redeem supplemental food vouchers at . . . [other] vendors." See 7 C.F.R. § 246.12(g)(4)(i)(D) ("[t]o comply with this requirement, the State agency must compare the average cost of each type of food instrument redeemed by above-50-percent vendors against the average cost of the same type of food instrument redeemed by regular vendors").

In addition, while one can imagine many different levels of precision in calculating "food costs" to the program,[6] FNS also reasonably determined that comparing reimbursements per food instrument is the most efficient and realistic way to compare food costs without imposing undue administrative burdens on state agencies. Its determination is consistent with the purposes of the statute and reasonable within the meaning of Chevron.

_____

[6]Using some of the Arkansas vouchers attached to the Dillard Declaration as an example, the agency could have chosen to compare the prices of specific food categories to identical categories (thus, WIC-approved cereal to WIC-approved cereal, even if one person buys Cheerios and another Blueberry Morning) and weight various price comparisons based on total consumption. Or the agency could compare the prices of more specific categories based on the item (thus, gallons of whole milk to gallons of whole milk even though the general food category printed on the instrument is "Fat free, 1%, 2%, or whole milk"). The agency could even require brand-, amount-, and date-specific item-to-item comparison in order to maximize the accuracy of the calculation of average "food costs" (thus, one 18 oz. jar of Skippy peanut butter on January 3, 2006 to another). At some point, absolute precision becomes unworkable. Congress did not clearly prescribe the method used to calculate "food costs."

Plaintiffs' construction of the statute, on the other hand, is not only contrary to its plain language, as discussed above, but would also be contrary to its intent.  Twisting the statutory language to limit the § 1786(h)(11)(A)(i)(III)(bb) cost comparison of vouchers redeemed at WIC-only stores solely to vouchers redeemed at "comparable" stores costs would frustrate the purposes of the legislation, because "WIC-only stores would only be compared to those [ordinary vendors] in their peer groups, which may be smaller vendors with higher prices."  Vogel Decl., ¶4.  Thus, limiting the comparison in the manner suggested by plaintiffs  means that the costs imposed on the program by WIC-only vendors would likely continue to increase, id., contrary to the express purpose and requirement of the statute that authorizing WIC-only vendors to participate in the program "not result in higher food costs."  42 U.S.C. § 1786(h)(11)(A)(i)(III)(bb).

Finally, plaintiffs assert that "the voucher-to-voucher comparison employed by the Rule" is unreasonable because it "fails to account for fundamental differences in vouchers redeemed at WIC-only stores and traditional vendors," assertedly, that beneficiaries can more likely redeem the full amount of their food instruments at WIC-only stores.  Pls' Mem. Supp. TRO at 23.  Plaintiffs' declarations (see Robinson Decl. ¶ 18) offer no supporting evidence for this assertion, and Congress found, to the contrary, that WIC-only vendors cost the program more than other vendors because of their above-market prices, not necessarily because of a superior ability to redeem food instruments fully.  See S. Rep. 108-279, at 54, 2004 U.S.C.C.A.N. at 715; cf. 70 Fed. Reg. at 71708. Regardless of the reason, the statute requires that "food costs" to the WIC program be no "higher" "if program participants redeem [their] vouchers at [WIC-only] vendors," and the interim rule faithfully implements that mandate.  Plaintiffs argue, in essence, that there are good reasons why WIC-only should be permitted to impose higher costs on the program, but that is a matter they will

have to take up with Congress, rather than the agency, or this Court.  Plaintiffs' have no likelihood of succeeding on their claim that the interim rule is contrary to the WIC Reauthorization Act.

> **B.     THE AGENCY FULLY COMPLIED WITH THE REQUIREMENTS OF THE RFA**

The plaintiffs further contend that the FNS failed to follow the requirements of the Regulatory Flexibility Act ("RFA") in promulgating the interim rule.  The RFA requires agencies to consider the effect that their regulations will have on small entities, analyze effective alternatives that may minimize a rule's impact on such entities, and make their analyses available for public comment.  5 U.S.C. §§ 601-604.  The RFA was amended in 1996 by the Small Business Regulatory Enforcement Fairness Act which provided for judicial review for some of the RFA's provisions and required more detailed and substantive regulatory flexibility analyses.  See Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121.  When applicable, the RFA, as amended, requires an agency to make available for public comment an initial regulatory flexibility analysis describing a proposed rule's effect on small businesses, 5 U.S.C. § 603(a), and discussing significant alternatives that could accomplish the same objectives while reducing any significant economic impact on small businesses, id. § 603(c).  These requirements do not apply, however, where the head of the agency certifies that the regulation will not have a significant economic impact on a substantial number of small entities.  See  5 U.S.C. §  605(b); Transmission Access Policy Study Group v. Fed. Energy Regulatory Comm'n, 225 F.3d 667, 737 (D.C. Cir. 2000).

> **1.     The Regulatory Flexibility Act Does Not Apply to the Interim Rule Because the APA's Notice and Comment Provisions Exempt Grant and Benefit Programs**

The Regulatory Flexibility Act applies to agency rulemakings in three situations: (1) the agency has promulgated a "final rule" under 5 U.S.C. § 553, (2) the agency is required by "any other

law to publish a general notice of proposed rulemaking," or (3) the agency promulgates a final interpretive rule involving the internal revenue laws of the United States. 5 U.S.C. § 604(a). None of these situations is presented by the interim rule issued by FNS.

The first situation governs promulgation of a final rule under 5 U.S.C. § 553, the notice-and-comment provision of the Administrative Procedure Act. Under this provision, an agency is required to provide notice of a proposed rulemaking in the Federal Register and an opportunity to comment on the proposed rule. Lincoln v. Vigil, 508 U.S. 182, 195 (1993). However, this provision has exceptions. By its own terms, § 553 does not apply to rulemakings involving "public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2); Lincoln, 508 U.S. at 196.

The interim rule challenged in the present case involves a grant and a benefit program. FNS issued the interim rule under its authority to oversee the Special Supplemental Nutrition Program for Women, Infants and Children. 70 Fed. Reg. at 71708. This Program was created by the Child Nutrition Act of 1966, and its stated purpose is "to provide . . . supplemental foods and nutrition education through any eligible local agency that applies for participation in the program." 42 U.S.C. § 1786(a). The Program authorizes FNS to achieve this goal by assisting state agencies through the provision of "grants-in-aid" and other means. Id. § 1786(c)(1). These grants are intended to serve as a supplement to food stamp, soup kitchen, and other benefits programs. Id. § 1786(c)(1)(A), (B), (C). The interim rule challenged in the present case furthers the goals of the Special Supplemental Nutrition Program by "reducing unnecessary food expenditures, which increases the potential to serve more eligible women, infants, and children for the same cost." 70 Fed. Reg. at 71709.

Accordingly, as the interim rule involves the Special Supplemental Nutrition Program, a grant and benefits program, section 553 does not govern the promulgation of the rule. See Batterton

v. Marshall, 648 F.2d 698, 700 (D.C. Cir. 1980) ("[O]rdinarily, a methodology related to disbursement of benefits would fall outside the APA."); Humana of South Carolina, Inc. v. Califano, 590 F.2d 1070, 1084 (D.C. Cir. 1978) ("In all cases where the excepted subject matter is 'clearly and directly' involved, the congressional aim was to afford agencies procedural latitude regardless of the interest of affected parties and the public generally in contributing to formulation of the exempted rule.").

Thus, in order for the RFA to apply to the issuance of the interim rule, there must be some "other law" that requires the agency to "publish a general notice of proposed rulemaking" when issuing the interim rule. The Child Nutrition Act of 1966 is silent on the issue of whether notice and comment is required for a rule issued by the Department of Agriculture regarding the distribution of benefits under the Act. Similarly, the amendments in the Child Nutrition and WIC Reauthorization Act of 2004 has no affirmative requirement of notice and comment. In fact, section 501(b) of the Act specifically provides for the publication of "interim" rather than final regulations without mention of notice and comment. Pub. L. No. 108-265, 118 Stat. 729, codified; cf. Asiana Airlines v. FAA, 134 F.3d 393, 398 (D.C. Cir. 1998) (finding proof of clear congressional intent to avoid notice and comment procedures in statement requiring publication of interim rules).

The only general mention of notice and comment in the context of a regulation promulgated by FNS is a standing "Statement of Policy" issued by the Department of Agriculture in 1971. This statement declares the policy of all agencies of the Department to follow notice and comment requirements. 36 Fed. Reg. at 13804. The USDA has issued a statement of policy that the notice and comment requirements of the APA "will be followed by all agencies of the Department in rule making relating to public property, loans, grants, benefits, or contracts." Philadelphia Citizens in

24

Action v. Schweiker, 669 F.2d 877, 881 (3d Cir. 1982) (describing similar policy of HHS to abide by notice and comment). Although an agency's unexplained deviation from a previously articulated statement of policy may be subject to review under the APA "arbitrary and capricious" test, e.g. Union of Concerned Scientists v. Nuclear Regulatory Comm'n, 711 F.2d 370, 381, the Statement of Policy is not, in and of itself, a "law." See Pacific Gas & Electric Co. v. Fed. Power Comm'n, 506 F.2d 33, 38 (D.C. Cir. 1974) ("The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy."); see also City of Los Angeles v. McLaughlin, 865 F.2d 1084, 1087 (9th Cir. 1989) (upholding agency's waiver of statement of policy applying APA notice and comment requirements); Alcaraz v. Block, 746 F.2d 593, 611 (9th Cir. 1984) ("[R]ulemaking requirements for agencies managing benefits programs are still voluntarily imposed. . . . [I]t is only the Department's own statement of policy that applies the notice and comment provisions to rulemaking in these programs."); Philadelphia Citizens, 669 F.2d at 881 (explaining that "Congress did not require" HHS to comply with policy statement; compliance was voluntary).

In any event, as will be discussed at length below in the discussion of notice and comment, the USDA's Statement of Policy also has an exemption "for good cause." FNS's decision to issue the regulation falls within this exception. Thus, even if the policy statement could be considered a "law," the policy would not require notice and comment in the present case. Accordingly, because neither the APA nor any other law applicable to FNS requires "notice of proposed rulemaking" in the present case, the RFA does not apply to FNS's promulgation of the interim rule.

Moreover, the RFA does not require that an agency assess the impact of a rule on all small entities that may be affected by the rule, only those directly regulated. See Cement Kiln Recycling

25

<u>Coalition v. EPA</u>, 255 F.3d 855, 869 (D.C. 2001) (holding that agency has no obligation to conduct RFA analysis on small entities indirectly harmed by a regulation, even if that regulation is "intended to affect" the entities' behavior); <u>American Trucking Assoc. v. EPA</u>, 175 F.3d 1027, 1045 (D.C. Cir. 1999) (holding that EPA's regulation requiring states to develop environmental controls directly regulates states, not potential polluters, for purposes of RFA analysis), rev'd in part on other grounds, <u>Whitman v. American Trucking Assoc.</u>, 531 U.S. 457 (2001).  In the present case, the entity regulated by the interim rule are the state agencies that establish peer groups and competitive price criteria, not WIC-only stores.  See <u>American Trucking</u>, 175 F.3d at 1045.  Thus, for this reason as well, FNS had no obligation to conduct an RFA analysis of the interim rule's impact on WIC-only vendors such as plaintiffs.

2.    **FNS Complied with the RFA by Certifying that the Interim Regulation Would Not Have a Significant Impact on a Substantial Number of Small Entities**

Although unnecessary in the present case, FNS examined whether a full RFA analysis was necessary in promulgating the interim rule.  Ultimately, the agency concluded that an RFA analysis was unnecessary because the regulation would "not have a significant economic impact on a substantial number of small entities."  70 Fed. Reg. at 71709; 5 U.S.C. § 605(b).  The plaintiffs believe that this certification fails to comply with the mandates of the RFA for two reasons: (1) FNS did not "make a formal certification" or "provide the factual basis for this certification," and (2) FNS's explanation for why no significant economic impact was expected was internally inconsistent.  (Pls. Mem. Supp. TRO at 25.)  Neither argument has merit.

FNS complied with all of the requirements in the RFA in certifying its belief that the rule would not have a significant economic impact on a substantial number of entities.  The RFA does not impose a substantive mandate on federal agencies.  See United States Cellular Corp. v. FCC, 254 F.3d 78, 88 (D.C. Cir. 2001) (describing RFA as "purely procedural" device); see also Associated Fisheries, Inc. v. Daley, 127 F.3d 104, 114 (1st Cir.1997) (holding that RFA does not command agencies to take substantive measures).  Accordingly, agencies are required only to engage in a "reasonable" and "good faith" effort to comply with the Act.  U.S. Cellular, 254 F.3d at 88.  When an agency concludes that a full RFA analysis is not necessary, it is required to certify that conclusion, publish the conclusion in the Federal Register, and include a statement providing the factual basis for the conclusion.  5 U.S.C. § 605(b).  Here, the agency stated that the rule would not have a significant economic impact on a substantial number of small entities, 70 Fed. Reg. at 71709; it published this conclusion in the Federal Register under a section of the preamble entitled

27

"Regulatory Flexibility Act," id.; and it provided a factual basis for this certification, id. These procedural steps are all that the RFA requires.

In its discussion of the Regulatory Flexibility Act, FNS explained that the interim rule "may have a significant economic impact on a small number of vendors that have been authorized to participate in the WIC program," as "[o]nly those vendors that are able to meet competitive pricing requirements will be able to continue participating in the program." Id. The plaintiffs argue that this explanation contradicts FNS's ultimate conclusion that no significant impact is anticipated. However, in order for an RFA assessment to be required, the "significant impact" must be felt by a "substantial number" of small entities, not a "small number" of authorized vendors. 5 U.S.C. § 605(b). Plaintiffs point to FNS's estimate that "between three and four percent" of the current authorized WIC vendors will "need to make changes in the prices that they offer . . . in order to be deemed competitive." Id.; see also Vogel Decl. ¶ 8. As this statement makes clear, that three-to-four percent figure includes *all* WIC-only vendors who may need to make *any* price change, no matter how minor. It is not a statement that *all* WIC-only stores will face a "significant" impact. As FNS explained (and reiterates here again), it anticipated that only a small number of WIC-only vendors would face a significant impact such as a severe decline in profits or closure of the business. 70 Fed. Reg. at 71709; see Vogel Decl. at ¶ 8.

Moreover, as FNS explains in its discussion of the Regulatory Flexibility Act in the preamble to the interim rule, it is currently infeasible to estimate precisely how many small entities will be significantly affected by the application of the interim rule. 70 Fed. Reg. at 71709. The reason for this difficulty is that the rule does not directly regulate WIC vendors, as discussed above. Instead, the rule requires state agencies to "establish a vendor peer group system and distinct competitive

price criteria and allowable reimbursement levels" in order to ensure that vendors offer the "lowest practicable food prices consistent with adequate participation access." Id. at 71722, section 246.12(g)(1), (4). With regard to the plaintiffs in the present case, the state agencies must ensure that average payments to above-50-percent vendors do not exceed "average payments for the same food item to comparable vendors." Id. at 71723, section 246.12(i)(D).

Thus, it is the state agencies who ultimately establish the competitive price plan required by the Rule and determine whether vendors are complying with the rule's requirements. Those same state agencies are responsible for establishing the peer group methodology, and they determine whether exemptions should be allowed from the requirements of the rule. Id. at 71708 ("FNS considered mandating specific means of developing peer groups, competitive price criteria and allowable reimbursement levels . . . . However, given State agencies' responsibility to manage WIC as a discretionary grant program, the varying retail food market conditions in each State, and the wide variations in current vendor cost containment systems . . . FNS believes that State agencies need flexibility to develop their own peer groups, competitive price criteria and allowable reimbursement levels.") Until the state agencies act, it is difficult, if not impossible, to define the magnitude of the harm that above-50-percent WIC vendors would suffer without "convert[ing the] rulemaking process into an exercise in economic modeling" that the RFA does not require. Cement Kiln, 255 F.3d at 869. Accordingly, a fuller RFA analysis than that FNS could practicably perform at this juncture would be unnecessary, even if the RFA applied.

C.    NEITHER THE APA NOR AGENCY POLICY REQUIRED NOTICE AND
      COMMENT PROCEDURES PRIOR TO ISSUING THE INTERIM RULE

The plaintiffs raise two arguments regarding FNS's decision not to engage in notice in comment prior to issuing the interim rule. First, the plaintiffs argue that FNS violated the notice and requirement of the APA as codified in 5 U.S.C. § 553. (Pls. Mem. Supp. TRO at 26.) Second, the plaintiffs maintain that FNS violated its own agency policy statement that requires notice and comment before the issuance of a rule. Id. However, as the discussion in the previous section demonstrates, the plaintiffs' APA claim fails as a matter of law, and good cause justifies an exemption from compliance with the agency's policy statement.

First, as previously discussed, the Special Supplemental Nutrition Program for Women, Infants and Children is a program that authorizes grants to the states in the form of voucher reimbursements in order to provide women and children in need with adequate food. Accordingly, the program is a grants program and a benefits program that is exempt from the notice and comment procedures normally mandated by the APA. 5 U.S.C. § 553(a)(2); Lincoln, 508 U.S. at 196. However, as previously mentioned, the USDA, of which FNS is a part, has issued a general policy statement explaining its intent to follow notice and comment procedures in rulemakings. 36 Fed. Reg. 13804. The question, then, is whether FNS acted arbitrarily and capriciously under this policy in choosing not to engage in notice and comment, Alcaraz, 746 F.2d at 611, and the answer is "no."

The Department's Statement of Policy does not require notice and comment in all situations. Like the APA, the Statement of Policy includes an exemption when an agency "finds for good cause that compliance would be impracticable, unnecessary or contrary to the public interest." 36 Fed. Reg. 13804. That exemption is to be used when there "is a substantial basis therefore." Id. When the agency finds that a substantial basis for the good cause exemption exists, the agency is to include

30

that exemption in writing. In the preamble to the interim rule, FNS declared that good cause exists for publishing the interim rule, given Congress's requirement that implementation guidance for state agencies be issued "as soon as practicable" and the authority it conferred on FNS to promulgate interim regulations.[7] 70 Fed. Reg. at 71712.

The D.C. Circuit has identified a number of factors that support an agency's determination of good cause to forgo notice and comment. See Mid-Tex Elec. Coop. v. Fed. Energy Regulatory Comm'n, 822 F.2d 1123, 1132 (D.C. Cir. 1987). Several of these factors support FNS's good cause determination in this case. The first relevant factor is the specific timeline set by Congress in the WIC Reauthorization Act for implementation of the regulation. "[D]eviation from APA requirements has been permitted where congressional deadlines are very tight and where the statute is particularly complicated." Methodist Hospital of Sacramento v. Shalala, 38 F.3d 1225, 1236 (D.C. Cir. 1994); see also Petry v. Block, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (characterizing limited time given by Congress for adoption of regulations as "crucial factor" in good cause analysis).

Congress enacted the WIC Reauthorization Act on June 30, 2004. In the Act, Congress ordered state agencies to establish competitive price criteria and a vendor peer group system within 18 months of enactment, or December 30, 2005. Pub. L. 108-265, 118 Stat. 729, codified as amended at 42 U.S.C. § 1786(h)(11)(G). In order to prepare state agencies for this deadline,

---

[7]In FNS's good cause determination, the agency declares that its decision is made "in accordance with 5 U.S.C. 553(b)," the notice-and-comment section of the APA. It is not surprising that the agency would cite to the APA in discussing the good cause exemption, considering that the Statement of Policy applies notice and comment requirements and the corresponding good cause exemption exactly as they appear in 5 U.S.C. § 553. 36 Fed. Reg. at 13804.

Congress ordered the Secretary of Agriculture to (1) establish guidance regarding state agency compliance with the mandates of the Act "as soon as practicable," Pub. L. 108-265, section 501(a), 118 Stat. 729, and (2) issue an "interim final rule" implementing the amendments contained within the Act, id. section 501(b).  It was perfectly reasonable of FNS to construe this clear indication of Congressional intent that it should dispense with notice and comment procedures as good cause for setting aside its own policy preference in this instance.  Cf. Asiana Airlines, 134 F.3d at 398 (finding proof of congressional intent to avoid notice and comment procedures in statement requiring publication of interim rules); Methodist Hospital, 38 F.3d at 1237 (citing Congress's intent to issue interim rule followed by notice and comment as proof of good cause).

In addition to the necessity of providing regulatory guidance to the states in advance of the implementation deadline established by Congress in the WIC Reauthorization Act, the temporary nature of the interim rule is a "significant factor" in determining whether an agency's good cause determination is justified.  Tenn. Gas Pipeline Co. v. Fed. Energy Regulatory Comm'n, 969 F.2d 1141 (D.C. Cir. 1992).  Even before issuing the interim final rule on November 29, FNS issued a lengthy guidance in July 2005, received and reviewed comments from state agencies, and made changes to the guidance on the basis of those comments.  Vogel Decl ¶ 9.  In the preamble to the interim rule, FNS explains that it "will be collecting and analyzing [still further] data from State agencies, in anticipation of issuing a final rule." 70 Fed. Reg. at 71709.  These data will demonstrate how states chose to implement particular vendor peer groups and competitive price criteria.  FNS would then be in a position to "consider a reasonable number of regulatory alternatives" based on its findings.  Id.  Anticipating that comments from affected businesses would be beneficial at this point, FNS established a comment date of November 29, 2006, in advance of a final rule.  Id. at

32

71708. Thus, even though the interim rule did not include full notice and comment when it was issued, the informal comment process the agency underwent beforehand, and its intent to follow additional comment procedures in advance of the final rule supports the good cause determination.[8] See Petry, 737 F.2d at 1203 (holding that any presumption against a "late" comment period may be overcome by proof that agency has been open-minded in accepting comments regarding the interim rule); Universal Health Servs. Inc. v. Sullivan, 770 F. Supp. 704, 721 (D. D.C. 1991) (finding that "the Secretary's failure to engage in pre-promulgation notice and comment was at least partially cured by allowing the opportunity for post-promulgation comment").

Until those procedures can be completed, the public interest in avoiding almost $75 million in excess payments to non-price competitive WIC vendors, 70 Fed. Reg. at 71709; see also Vogel Decl. ¶ 9, more than justified the adoption of a "temporary measure" while the agency considers a "permanent solution." Mid-Tex, 822 F.2d at 1133.

## IV.    THE PUBLIC INTEREST IS BEST SERVED BY MAXIMIZING THE AMOUNT OF FOOD PROVIDED TO PREGNANT WOMEN AND CHILDREN

Finally, the balancing of interests favors immediate implementation of cost-containment measures. Every federal dollar spent on reimbursing WIC-only vendors at noncompetitive prices for the effective period of the TRO could be better spent buying additional food items for eligible women and children. FNS "conservatively" estimates that the interim rule as a whole will save the

---

[8] In addition, without a temporary interim rule that would allow FNS to determine how state agencies are carrying out the mandates of the Reauthorization Act, it is difficult to see how the agency could effectively set a final rule. See Nat'l Ass. of Broadcasters v. FCC, 740 F.2d 1190, 1200 (D.C. Cir. 1984) (recognizing the agency's "authority to approve services on an experimental basis in an effort to gather . . . data to be used in the completion of a regulatory framework" as long as the agency acts within its statutory obligations).

program $75 million.  (Vogel Decl ¶ 9)  Such savings allow the program "to serve additional participants" and prevents the possibility of having "to turn away eligible applicants because of insufficient funding."  (Vogel Decl. ¶ 7.)

For their part, plaintiffs plainly exaggerate the likely impact of the interim rule on WIC-only vendors.  Given the lack of support in the plaintiffs' papers for the catastrophic harm alleged, the immediate impact of the interim rule is at worst uncertain because the Court has no information about the actual reimbursement rates that will be used by state agencies and no information about what action state agencies will take on December 30, 2005, to comply with the mandates of the WIC Reauthorization Act whether or not the interim rule becomes effective.  Furthermore, even if some non-price competitive WIC-only vendors must close the end result will be that more funds will be available to provide food to more needy women, infants, and children.  It is, in the final analysis, for their benefit that Congress created the WIC program, not for vendors, and therefore the public interest as Congress itself has defined it counsels against judicial action that would frustrate rather than promote Congress' beneficial purposes.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a TRO should be denied.

Dated:   December 23, 2005                    Respectfully submitted,


                                              PETER D. KEISLER
                                              Assistant Attorney General

                                              KENNETH L. WAINSTEIN
                                              United States Attorney

/s/ *James J. Gilligan*
JAMES J. GILLIGAN
Assistant Director, Federal Programs Branch
Department of Justice
20 Mass. Ave., N.W., Room 7208
Washington, D.C.  20530
Tel: (202) 514-3358
Fax: (202) 616-8202
E-mail:

AMY E. POWELL
Attorney, Federal Programs Branch

ERIC WOMACK
Attorney, Federal Programs Branch

Attorneys for Defendants

35

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL WOMEN, INFANTS AND | ) | |
| CHILDREN GROCERS ASSOCIATION, et. al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | Case No. 1:05-cv-02432-EGS |
| | ) | |
| FOOD AND NUTRITION SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Upon plaintiffs' motion for a temporary restraining order, the materials submitted in support thereof and in opposition thereto, it is hereby ordered this ___ of December 2005 that plaintiffs' motion be denied.

_____

UNITED STATES DISTRICT JUDGE

36