UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL WOMEN, INFANTS AND )
CHILDREN GROCERS ASSOCIATION, et. al. )
                                      )
                     Plaintiffs,      )
                                      )
        v.                            )
                                      )  Case No.1:05-cv-02432-EGS
                                      )
FOOD AND NUTRITION SERVICE,           )
                                      )
                     Defendant.       )

### DECLARATION OF RONALD VOGEL

1) My name is Ronald Vogel. I am Associate Deputy Administrator for Special Nutrition Programs for the Food and Nutrition Service (FNS) of the United States Department of Agriculture (USDA). I have held this position for the past thirteen years. In this position I have operational responsibility for the National School Breakfast and Lunch Programs, the Special Supplemental Nutrition Program for Women, Infants and Children (WIC), the Child and Adult Food Care Program, the Summer Food Service Program and a variety of commodity distribution programs. Prior to holding this position, I was the Director of the Supplemental Food Programs Division, which includes WIC, and Director of the Program Information Division where I was responsible for FNS' financial and program information management systems.

2) On November 29, 2005, FNS published an interim regulation titled, "Special Supplemental Nutrition Program for Women, Infants and Children (WIC): Vendor Cost Containment." The Vendor Cost Containment regulation was issued pursuant to the Child Nutrition and WIC Reauthorization Act of 2004, Pub. L. 108-265 (Reauthorization Act). The interim rule incorporates into WIC Program regulations new legislative requirements that affect the selection, authorization and reimbursement of WIC retail vendors. As provided for in the statute, the regulation requires states to implement a peer group system, competitive price criteria and allowable reimbursement levels in effort to contain WIC vendor costs by fostering more competitive prices for WIC supplemental foods.

3) As mandated in the statute, the regulation has two primary cost containment principles that apply to stores that derive more than 50 percent of their annual sales revenue from the sale of WIC supplemental foods (commonly referred to as WIC-only stores) : 1) it requires State agencies that intend to authorize WIC-only stores to demonstrate to FNS that their competitive price criteria and allowable reimbursement levels do not result in higher average payments per voucher to WIC-only stores than average payments per voucher to comparable regular vendors; and 2) it requires that the established competitive price criteria and allowable reimbursement levels do not result in higher food costs if WIC vouchers are redeemed at a WIC-only store rather than at a regular vendor.

4) The interim rule implements the first principle by requiring states to implement a peer group system that will place vendors into groups based on common characteristics. Once comparable vendors have been identified, states must ensure that the average payment per voucher of WIC-only stores is not higher than the average payments per voucher to comparable regular vendors. If this were the only cost containment principle, WIC program costs would likely increase because WIC-only stores would only be compared to those in their peer groups, which may be smaller vendors with higher prices. The second principle requires an additional comparison between WIC-only stores and all regular vendors because States must ensure that they do not have higher food costs when WIC vouchers are redeemed at a WIC-only store rather than at a regular vendor. Therefore, the regulation requires States to compare the average prices charged by WIC-only stores to the average prices charged by all other stores to ensure that payments to WIC-only stores do not result in higher food costs.

5) The Reauthorization Act requires states to implement the vendor cost containment provision not later than December 30, 2005. Some currently authorized WIC-only stores in states that have elected to continue to authorize such stores may experience a reduction in payments on December 30th as states adjust the maximum allowable reimbursement levels to comply with the cost containment provisions. However, the actual impact on any individual WIC-only store is uncertain because the regulation does not require that the payments of every WIC-only store be limited to the average payment made to all other

stores. In order to effectuate the statutory mandate on cost neutrality, the average payments made to WIC-only stores would be limited to the average payments made to other stores as prescribed in the interim regulation. It is FNS' policy that currently authorized WIC-only stores in states seeking certification to authorize such stores may continue their current authorizations pending certification.

6) In light of statements in the Plaintiff's Memorandum in Support of Motion for Preliminary Injunction and supporting declarations regarding communications to named plaintiffs from officials of the Arkansas State WIC agency, FNS has contacted those officials to clarify the policies described in paragraph 5. The Arkansas State agency has been directed to communicate the correct policy to the named plaintiffs and all other WIC-only stores in the state. FNS is also clarifying these policies with all other state WIC agencies.

7) Excessive payments to WIC-only stores are injurious to achievement of Program objectives. The Program's mission is to safeguard the health of low-income women, infants, and children up to age 5 who are at nutritional risk by providing nutritious foods to supplement diets, information on healthy eating, and referrals to health care. If the number of WIC-only stores continues to grow, without effective cost containment measures in place, Program services will have to be reduced. Since WIC is not an entitlement program, it must operate on a finite annual appropriation. In the past, the program operated for many years with

4

insufficient funds to provide benefits to all eligible applicants and waiting lists had to be created. Without effective cost containment measures it is entirely possible that we would need to turn away eligible applicants because of insufficient funding.

8) We believe that about 2.5 percent of the approximately 45,000 authorized WIC vendors are WIC-only stores. For several reasons, as explained in the Preamble to the interim rule, we do not believe the regulation will have a significant economic impact on a substantial number of stores. First, since the interim regulation merely reflects the statutory mandate, the economic impact on affected stores is the result of Congressional action rather than the interim rule. Second, individual WIC-only stores may receive payments that are higher than the average for regular stores so long as the average for all WIC-only stores does not exceed the average prices for regular stores. This will undoubtedly result in downward price adjustments for many WIC-only stores because they have traditionally charged higher prices than regular stores which are subject to normal competitive market forces. The extent of this price impact for each individual WIC-only store is unknown at this time. Again, this impact would result from the action of Congress and the decision of the individual state rather than from the interim rule. Finally, the overall economic impact on WIC-only stores cannot be fully assessed until it is known how many states elect to authorize WIC-only stores.

9) As required by the statute, FNS issued guidance on, among other things, vendor cost containment. The guidance was distributed to all state agencies in July 2005. In response to comments received from state agencies, FNS made changes to the guidance. The guidance, which did not carry the force of law, did state that state agencies could not pay WIC-only stores more than the statewide average payment per food voucher for regular vendors until the state had their cost containment system certified by FNS. However, this statement was not included and is not a requirement in the interim rule. The statute also authorized FNS to issue an interim regulation and stipulated an 18-month deadline for implementation of the cost containment provisions. As such, FNS issued an interim regulation in order to assure that the implementation deadline was met. Further, the potential cost savings stemming from the implementation of the rule is conservatively estimated at $75 million annually. By issuing an interim rule, the Program would begin to realize these cost savings at the earliest date possible.

I declare under penalty of perjury that the foregoing is true and correct. Further, I certify that I am qualified and authorized to file this Declaration.

Ronald Vogel
Associate Deputy Administrator
Special Nutrition Programs
Food and Nutrition Service
United States Department of Agriculture