**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL WOMEN, INFANTS, AND )<br>CHILDREN GROCERS ASSOCIATION, )<br>NUTRITIONAL FOOD DISTRIBUTORS, INC., )<br>COUNTY FOOD SERVICES, INC., and )<br>DILLARD FOODS, INC., )<br>)<br>        Plaintiffs, )<br>      v. )<br>)<br>FOOD AND NUTRITION SERVICE, )<br>)<br>        Defendant. )<br>_____) | Civil Action No. 05-2432 (EGS) |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER**

      Plaintiffs respectfully submit this reply memorandum in support of their motion

for a temporary restraining order.

I.    **BACKGROUND**

      1.    FNS asserts that Congress does not appropriate enough funds to serve

every eligible recipient and the Rule's speculative savings will allow the program "to

serve additional participants" and prevent it from having "to turn away eligible applicants

because of insufficient funding." Vogel Decl. ¶ 7 and FNS Br. at 3, 7, 33-34. This is

rhetorical hyperbole. FNS knows full well that "it is currently estimated that we [FNS

and State agencies] have achieved full coverage of eligible infants" and overall "the

program is estimated to serve about 93 percent" of eligible recipients. *See*

www.fns.usda.gov/wic/FAQs/FAQ.HTM#4. This level of participation of eligible

recipients is unheard of in nutrition programs administered by FNS. By way of example,

the Food Stamp Program, an entitlement program that also relies on retail food delivery, serves just over half of all eligible recipients.

2.      FNS relies heavily on a Senate report (S. Rep. No. 108-279) to help justify its position that the Reauthorization Act requires that WIC-only store prices be compared to the average of all traditional authorized vendors. *See, e.g.*, FNS Br. at 4, 5, 6. This reliance is misplaced. The bill described in S. Rep. No. 108-279 was the Senate version of reauthorization legislation (S. 2507) and was a precursor to the Reauthorization Act. The cost containment provisions of the Reauthorization Act are significantly different from the provisions of the version of S. 2507 described in S. Rep. No. 108-279. Accordingly, that report cannot be relied upon as supportive legislative history.

3.      FNS implies that WIC-only stores have been manipulating State agencies when it claims that payments to these stores are dependent upon "the amount the government can be persuaded to pay." FNS Br. at 4. States have always had clear authority to establish reimbursement rates for their authorized vendors and are required to do so. 7 C.F.R. § 246.12(f)(3)(i). As such, payments to WIC-only stores are dictated by established State policy, not what the stores "persuade" State agencies to pay.

4.      FNS offers the Vogel Declaration to elucidate the Rule. A rule, however, should be able to stand on its own unaided by additional evidentiary support. "[C]ourts have traditionally looked with hostility upon explanations of agency officials submitted in affidavit form during the course of litigation. These 'post hoc rationalizations' are typically found to be an inadequate basis for review." *Rodway v. USDA*, 514 F.2d 809, 816 (D.C. Cir. 1975), *citing Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971); *Burlington Truck Lines v. United States*, 371 U.S. 156, 168-169 (1962).

Thus, to the extent that the Vogel Declaration offers any support for the Rule, it should be disregarded by this Court.

II.    **IRREPARABLE HARM TO PLAINTIFFS**

1.    FNS asserts that Plaintiffs' injuries are not sufficiently certain or severe. FNS Br. at 12.  FNS errs.  The injury of Plaintiffs that will be caused by the Rule will be great, actual, certain, and imminent.

The Rule will cause Plaintiffs to operate at a substantial loss, including an estimated $20,200 per month loss at Dillard Foods.  *See generally* Supplemental Dillard Declaration (attached).  The magnitude of the injury will be so great as to compel them to close their businesses at approximately the date of implementation of the Rule.  *See generally* Supp. Dillard Decl.; Supplemental Robinson Declaration (attached). Moreover, the magnitude of the injury is so great that the President of NWGA, the national trade association representing WIC-only stores, has conservatively estimated that 90% of all WIC-only stores will be forced out of business within 60 days of implementation of the Rule.  Robinson Decl. ¶ 40.

The severe adverse effect of the Rule is actual.  Based solely on the looming implementation of the Rule, Plaintiff Dillard Foods has initiated business close-down procedures.  FNS has conceded that under the Rule payments to WIC-only stores will be significantly less than payments to comparable stores.  It should be no surprise that Plaintiffs, and WIC-only store operators generally, have concluded that the Rule will force them into operational losses for as long as they remain in business.  A significant reduction in the payments to WIC-only stores is contemplated by FNS, which

3

"conservatively" estimates that 1% of total WIC Program costs will be saved by imposing reductions on a mere 2% to 3% of all WIC vendors.

The adverse effect of the Rule is certain. FNS asserts that the adverse effect of the Rule may be averted by States making payments to Plaintiffs that are *above* the average payment to all non-WIC-only stores. FNS concedes that to do so under the Rule, a State must compensate for such a deviation from the payment limitation standard required by the Rule by making compensating payments to other WIC-only stores in the State that are *lower* than the payment standard. That is absurd. Plaintiff Nutritional Food Distributors operates five of the six WIC-only stores in Oklahoma. There is no potential for the State to cut payments to the only other WIC-only store sufficiently to allow higher payments to the stores operated by Nutritional Food Distributors. Moreover, with the Rule estimated to force closure of 90% of all WIC-only stores within 60 days, there are no meaningful prospects for long term survival of any WIC-only store that receives payments that are lower than the payment limitation.

The adverse effect of the Rule is imminent. As explained in Plaintiffs' Declarations, the Rule will force Plaintiffs to operate at a substantial loss upon implementation, on December 30, 2005. Specifically, each State will be required to recoup any payment made to WIC-only stores in excess of the average of payments made to all non-WIC-only vendors. There is no doubt that States will take this action. In a letter from Under Secretary Bost to State Health Officers, FNS stated that it will closely monitor States and "will determine if overpayments occurred and will pursue recovery of any overpayments." *See* Supp. Dillard Decl. States will want to avoid any liability to FNS and can be expected to aggressively police payments to WIC-only stores.

Therefore, Plaintiffs recognize that the Rule will require them to operate at a substantial loss, effective upon implementation.  The precise level of the payment limitation of the Rule, and therefore, the size of the operational loss, will not be known until the average per voucher payment made to non-WIC-only stores has been made and any excess recouped.  *New* 7 C.F.R. § 246.12(g)(4)(i)(D); 70 Fed. Reg. 71,727.

2.      FNS cites *Barton v. District of Columbia*, 131 F.Supp.2d 236 (D.D.C. 2001), and *Association of Flight Attendants-CWA v. PBGC*, 372 F. Supp.2d 91 (D.D.C. 2005), as support for its argument that Plaintiffs' injuries are not irreparable because they are "self-inflicted."  FNS Br. at 12-13.  Neither case is applicable to the Plaintiffs' plight here.

In *Barton*, the issue facing the movant was not, as it is here, closure of business but, rather, a potential eviction and relocation to another to another space. 131 F. Supp.2d at 247-48.  Moreover, the actual eviction had been stayed in a parallel State court proceeding and the federal district court was concerned that the movant could have avoided his lease difficulties altogether by accepting an earlier proffered long term, rather than month-to-month, lease.  *Id.*  In contrast, here Plaintiffs do not have the option of locating to another "storefront;" they never had the option of "negotiating an alternative" with FNS because the agency never published the Rule for prior comment and ignored Plaintiffs' attempts to work with the agency; and there is no parallel judicial proceeding staving off injury.

In *Association of Flight Attendants*, it was not adequately demonstrated that entry of an injunction would in any way prevent the attenuated harm that the movant alleged would occur.  The movant asserted harm to flight attendants such as leaving their current

5

jobs, relocation, and accepting new positions absent injunctive relief. 372 F. Supp.2d at 99-101. Here, Plaintiffs' injuries cannot be characterized as attenuated lifestyle choices. Rather than bleeding their businesses dry and then declaring bankruptcy, Plaintiffs are closing their businesses – a hallmark of irreparable injury in this Circuit. *Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C.Cir.1985).

Contrary to FNS's assertions (FNS Br. at 15), entry of temporary or preliminary relief would halt this injury. The Reauthorization Act's December 30, 2005, implementation date (42 U.S.C. § 1786(h)(11)(G)) is premised upon the development of a rule through a regulatory process that is also mandated by that statute.[1] The Reauthorization Act mandates that States "*shall* demonstrate to the Secretary, and the Secretary *shall* certify," that payments to WIC-only stores are not higher than payments to comparable traditional vendors. *Id*. § 1786(h)(11)(E) (emphasis added). Without an effective regulation that defines the parameters of the certification process and how States should determine comparability of stores, State compliance is impossible.[2]

III.  **THE RULE'S SUBSTANTIVE DEFICIENCIES**

1.  FNS incorrectly asserts that the Reauthorization Act requires two inconsistent cost containment principles: (1) each State must demonstrate to FNS, and FNS must certify, that the State cost containment system does not result in higher

---

[1]  It is important to note that FNS has no interest in following the regulatory process required by the Reauthorization Act. For example, FNS has ignored the mandatory issuance of a guidance document as soon as practicable, and the development, through notice and comment, of a rule no later than June 30, 2006. *See* 42 U.S.C. § 1758 note. A guidance document was never issued, and the document referred to in the Vogel Declaration at ¶ 9 was only a *draft* document. Moreover, comments FNS will use to develop a final rule are not due until November 29, 2006, nearly five months after the Reauthorization Act requires promulgation of a final rule.

[2]  The draft guidance issued by FNS in July 2005 would not serve this purpose because, as FNS admits, it "did not carry the force of law." Vogel Decl. ¶ 9.

payments to WIC-only stores than to *comparable* stores; and (2) ensuring cost neutrality by establishing competitive price criteria and reimbursement levels that utilize averages of *all* stores rather than *comparable* stores.  FNS Br. at 8, 17-19.

FNS's error lies in its tortured statutory interpretation regarding the second principle.  After describing the first principle, FNS found it necessary to preface its view of the second principle with "however."  FNS Br. at 18.  The plain language of the statute, forcefully amplified by the legislative history, makes clear that the Reauthorization Act provides for a rational, internally consistent regulatory scheme to achieve the twin goals of Congressional intent: cost containment without "driving vendors out of the program."   150 Cong. Rec. E1328 (2004) (statement of Rep. Boehner).

2.     FNS claims that it is reasonable and consistent with the Reauthorization Act to require that States compare average WIC-only store redemptions with the average of all other vendors when determining if food costs are higher when a recipient chooses to shop at a WIC-only store.  FNS Br. at 20.  This is incorrect, and reads the peer grouping requirements out of the statute.

FNS notes that the Reauthorization Act requires that food costs be no higher "if program participants redeem supplemental food vouchers at [WIC-only] vendors."  *Id.* (*quoting* 42 U.S.C. § 1786(h)(11)(A)(i)(III)(bb)).  This quote is seriously misleading because it ignores the first part of this sentence of the statute, which requires that cost neutrality be achieved through the vendor peer grouping system.  To appreciate its importance, the sentence must be read as a whole, as it requires States to "establish competitive   price criteria and allowable reimbursement levels *that comply with*

*subparagraphs (B) and (C)*, respectively, *and* that do not result in higher food costs if program participants redeem supplemental food vouchers at [WIC-only] vendors." 42 U.S.C. § 1786(h)(11)(A)(i)(III)(bb) (emphasis added). Subparagraphs (B) and (C) require the use of vendor peer groups. FNS has ignored this requirement by utilizing a simple comparison of average WIC-only store redemptions with the average of all other vendors.

       3.     FNS incorrectly asserts that Section 1786(h)(11)(E), the Reauthorization Act's only prescribed comparison of average per voucher payments, is "only for the purpose of establishing that payments to WIC-only vendors are no higher on average than the average payment to ordinary vendors." FNS Br. at 18. The plain language of Section 1786(h)(11)(E) provides for a comparison to voucher payments made to *comparable* vendors, not ordinary vendors as a whole. FNS's view of the purpose of Section 1786(h)(11)(E) is without support and contrary to the plain language of the statute and its legislative history. This perspective attempts to portray this provision's statutory requirement for an average per voucher payment comparison to *comparable* stores as subservient to the FNS invention of an average per voucher payment comparison to all stores. FNS errs in overlooking that price limitations to "comparable stores" is the hallmark of the cost containment statute. "The objective is neutrality: for WIC-Only store costs to be at the same levels as *comparable* market-based vendors." 150 Cong. Rec. E1328 (2004) (Statement of Rep. Boehner) (emphasis added).

       FNS notes that Section 1786(h)(11)(A)(i)(III)(bb) "imposes no requirement that WIC-only vendors be compared solely to comparable vendors; indeed, the term 'comparable ' does not appear in the text of Section 1786(h)(11)(A)(i)(III)(bb)." FNS Br.

at 18.  Thus, FNS attempts to justify its invention of an average per voucher comparison to *all* stores that renders irrelevant the statutory average per voucher comparison to *comparable* stores. The fact that Section 1786(h)(11)(A)(i)(III)(bb) does not specifically reference comparable stores affords FNS the thinnest of reeds for hiding; it does not relieve FNS of the duty to implement the statute consistent with Congressional intent. Section 1786(h)(11)(A)(i)(III)(bb) is a general statement of cost neutrality.  It is not an independent, conflicting test intended to render meaningless the statutorily prescribed average per voucher payment comparison to comparable stores.  Unlike the statutorily prescribed comparable store average per voucher payment test of Section 1786(h)(11)(E), it does not prescribe an average per voucher payment comparison.  Instead, Section 1786(h)(11)(A)(i)(III)(bb) refers to general cost neutrality, and is written to allow for consideration of WIC participant shopping preferences, recognizing that not all WIC Program mothers are alike and inclined to regard large "box stores" as their preferred alternative.  FNS ignores the overarching framework of the cost containment law, the general test delineated at Section 1786(h)(11)(A)(i)(III)(bb), and how the general language of that provision compares with the prescriptive test of Section 1786 (h)(11)(E).

4.     The FNS interpretation of Section 1786(h)(11)(A)(i)(III)(bb) is also contrary to the clearly expressed Congressional intent.  FNS cites a statement of Senator Tom Harkin (D-IA) as support for the proposition that cost-neutrality provision does not need to be based on "comparable" stores.  FNS Br. at 17.  That is categorically incorrect. In the cited statement, Senator Harkin expressly and clearly stated his view that WIC-only store prices be contrasted with "prices in *comparable* competitive stores."  150 Cong. Rec. S7248 (emphasis added).  This statement summarizes the key element of the

Reauthorization Act that the Rule and FNS ignore – that WIC-only stores be measured against "comparable" stores, not the "average" store.

     5.    FNS asserts that it is inappropriate to use the statement of Representative John Boehner (R-OH) to support the proposition that the cost-neutrality provision does not need to be based on "comparable" stores.  FNS Br. at 18-19.[3]  FNS asserts "that speech simply refers to the requirements under § 1789(h)(11)(E) [FNS certification] that WIC-only stores be compared to comparable vendors; it does not purport to explain the operation of the second cost-containment requirement adopted in § 1786(h)(11)(A)(i)(III)(bb))."  *Id*. at 18-19.    Again, the FNS brief is categorically incorrect. Chairman Boehner stated that the Reauthorization Act:

> includes language requiring that competitive price criteria and allowable reimbursement levels will *"not result in higher food costs if program participants redeem supplemental food vouchers"* at WIC-Only stores than other vendors.  This language is a statement of the general cost neutrality objective previously explained [as requiring comparison to comparable stores].  It is not to be construed to compel a rigid cost limitation test.

150 CONG. REC. E1328 (2004) (quotation in original; emphasis added).  The statutory language quoted by Chairman Boehner is not found in the FNS certification provision,

---

[3]  FNS asserts that the statement of Representative Boehner should be disregarded as an unreliable indicator of Congressional intent made by an individual Congressman that is also contrary to the plain language of the statute.  FNS Br. at 19-20.  Plaintiffs disagree. First, his statement is fully consistent with the plain language of the statute.  Second, Mr. Boehner was Chairman of the Education and Workforce Committee, the committee with jurisdiction over the Reauthorization Act.  Third, he was the House Floor Manager of the final version of the Reauthorization Act.   His statement provided to the House the explanation of the cost containment provision as substantially revised during the conference committee deliberations he chaired.   Fourth, his statement is the most definitive statement of legislative history regarding the Reauthorization Act's cost containment provisions.   Plaintiffs submit that FNS consideration of the intent of Congress, as clearly explained by the House Chairman, would have made this proceeding unnecessary.

Section 1789(h)(11)(E), as FNS maintains.  Rather, the precise language that Chairman Boehner took care to quote appears only in the cost-neutrality provision, Section 1786(h)(11)(A)(i)(III)(bb).

FNS's review of legislative history is dependent on statements that do not relate to the relevant statutory language, citations that support the opposite position, and dismissal of the definitive statement of legislative history, where the Floor Manager of the bill reported to the House on the actions of the Reauthorization Act's Conference Committee.    Thus, FNS's interpretation of Section 1786(h)(11)(A)(i)(III)(bb) is inconsistent with the plain language of the statute and frustrates Congressional intent.

IV.    **FNS'S FAILURE TO CONDUCT AN ADEQUATE REGULATORY FLEXIBILITY ACT ANALYSIS**

1.    FNS contends that it was not required to conduct an RFA analysis because it was exempt from notice and comment rulemaking requirements.  FNS Br. at 22-23. FNS's arguments regarding notice and comment rulemaking generally are refuted in Section V below.

2.    Turning to the intersection between notice and comment rulemaking and the RFA, FNS contends that it was not required to conduct an RFA analysis because the Rule relates to a grant and benefit program, and agencies are exempted from notice and comment rulemaking under section 553 of the APA when promulgating rules relating to such programs.  FNS Br. at 23.  FNS's contention is at odds with the law of this Circuit.

The D.C. Circuit recently stated that it has "not hesitated to consider an agency pronouncement issued without meeting required APA procedures a rule" for purposes of triggering the RFA.  *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1285 (D.C. Cir. 2005).  In that case, the Corps argued that the permits it

issued were not "rules" that required an RFA analysis because the Corps was not required to follow the notice and comment procedures of section 553. The D.C. Circuit rejected that argument and deemed the permits to be "rules" that required an RFA analysis because they "grant rights, impose obligations, and produce other significant effects on private interests." *Id.* at 1285 (internal quotations and citations omitted). Thus, an agency cannot justify its decision to forgo an RFA analysis by stating that it was not required to publish a general notice of proposed rulemaking under section 553.

Here, FNS's Rule squarely meets that definition of a "rule." The Rule is aimed at regulating WIC-only stores and, as demonstrated in Plaintiffs' declarations, will have significant adverse economic consequences for those small businesses. *See* Halbert Decl. at ¶ 16-17, Dillard Decl. at ¶ 13-15, Robinson Decl. at ¶ 40, Supp. Dillard Decl; Supp. Robinson Decl. As such, FNS violated the RFA by failing to conduct an RFA analysis to assess the effect of the Rule on WIC-only stores and to describe the steps FNS took to minimize the significant economic impact on WIC-only stores.

3. FNS contends that, even if an RFA analysis were required, WIC-only stores would not be within its scope because the Rule does not directly regulate WIC-only stores, and cites *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855 (D.C. Cir. 2001). FNS Br. at 25-26. That assertion is incorrect, and *Cement Kiln* actually supports Plaintiffs' position.

In *Cement Kiln*, a waste generator company challenged a regulation promulgated by the Environmental Protection Agency (EPA) that sought to establish emission standards for hazardous waste combustion (HWC) facilities. 255 F.3d at 859. The EPA had conducted an RFA analysis and had certified that the regulation would not have a

significant economic impact on a substantial number of small HWC facilities because there were only six HWC facilities that met the "small business" definition, and of those six, only two facilities would experience compliance costs greater than one percent of their annual sales. *Id.* at 868. The Plaintiff argued that the EPA should have evaluated the economic impact on hazardous waste generators. The Court rejected that argument because the RFA "turn[s] on whether particular entities are the 'targets' of a given rule," and HWC facilities were the "target" of the rule, not hazardous waste generators. *Id.* at 869.

Here, WIC-only stores are unmistakably the "targets" of FNS's Rule. *See* Vogel Decl. ¶ 3 (the Rule's two primary cost containment principles "apply to [WIC-only stores]"). Thus, applying the D. C. Circuit's reasoning, FNS was required to conduct an RFA analysis of the Rule's impact on the Rule's "target," WIC-only stores.

4. FNS contends that it met its obligations under the RFA because it "certified" that an RFA analysis was unnecessary since the Rule would not "have a significant economic impact on a substantial number of small entities." FNS Br. at 27, *citing* 70 Fed. Reg. at 71,709; 5 U.S.C. § 605(b).

a. FNS's statement fails on its face. In the next paragraph of the Rule's preamble, FNS conceded that "the rule may have a significant impact on a small number of vendors." 70 Fed. Reg. at 71,709.

b. FNS's attempt to characterize its RFA analysis as a "certification" pursuant to section 605(b) is without merit. To qualify as a "certification" under section 605(b), the "head of the agency" must certify that the rule will not "have a significant

economic impact on a substantial number of small entities."[4]  5 U.S.C. § 605(b).  The head of FNS did not provide an adequate certification nor did FNS conduct a thorough RFA analysis.  Rather, the preamble to the Rule only included a brief, conclusory, and erroneous statement that FNS "does not believe this rule will have a significant economic impact on a substantial number of small entities."  70 Fed. Reg. at 71,709.

This Court reviewed a similar RFA analysis in *National Ass'n of Psychiatric Health Systems v. Shalala*, 120 F. Supp.2d 33 (D.D.C. 2000).  In that case, the Secretary of Health and Human Services stated that she did not "anticipate…a substantial economic impact on most Medicare-participating hospitals."  *Id.* at 43 (internal citations omitted).  The Court found the Secretary's analysis "severely lacking" because she failed to make a "reasonable, good-faith effort to canvass major options and weight their probable effects."  *Id., quoting Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 116 (1st Cir. 1997).

Here, FNS's RFA analysis is similarly deficient.  FNS failed to acknowledge that the $75 million "cost savings" will result in a "significant economic impact" born by the 1,350 to1,800 WIC-only stores.  Without properly assessing the impact of the Rule on WIC-only stores, FNS failed to comply with its obligations under the RFA.[5]

---

[4]    FNS is well aware of how to "certify" in accordance with the RFA.  In a rule published eight days before the Rule, the FNS Administrator "certified that this rule will not have a significant economic impact on a substantial number of small entities."  70 Fed. Reg. 70,031, 70,032.

[5]    Congress itself was sensitive to the hardship that the cost containment provisions of the Reauthorization Act might impose upon WIC-only stores and explained that the Reauthorization Act "is not intended to eliminate WIC-only stores or to force the WIC-only stores to price their products less than the larger retail stores."  150 CONG. REC. H49333 (daily ed. June 24, 2004) (Statement of Rep. Waters).

5.    Finally, FNS relies on *Cement Kiln* to support its contention that it would be "difficult, if not impossible" to assess the economic harm caused to WIC-only stores by the Rule at this time and to try to do so would "convert the rulemaking process into an exercise in economic modeling." FNS Br. at 28, *quoting Cement Kiln*, 255 F.3d at 871. FNS misconstrues *Cement Kiln,* which actually supports Plaintiffs' arguments.

The *Cement Kiln* Court's statement that the RFA does not require an agency to conduct "economic modeling" was made in the context of rejecting the notion that an agency must "assess the impact on all of the nation's small businesses possibly affected by a rule." *Id.* Here, Plaintiffs are not asking for that type of far-reaching analysis. Rather, they only seek an analysis of the Rule's impact on the discrete universe of WIC-only stores. Such an analysis is consistent in all regards with *Cement Kiln.*

## V.    <u>FNS'S FAILURE TO USE NOTICE AND COMMENT RULEMAKING</u>

1.    FNS asserts that it was not obligated to issue a notice of proposed rulemaking and provide opportunity for comment because section 553 of the APA does not apply to rulemakings involving "public property, loans, grants, benefits, or contracts." FNS Br. at 23-24; 30 *quoting* 5 U.S.C. § 553(a)(2).  FNS relies upon *Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980), and *Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1084 (D.C. Cir. 1978), to assert that because the WIC Program involves grants and benefits, the Rule is exempt from notice and comment.  Keeping in mind "that the various exceptions to the notice-and-comment provisions of section 553 will be narrowly construed and only reluctantly countenanced" (*State of New Jersey Dept. of Environmental Protection v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980), these cases do not support an exemption from section 553 here.

Under the broad reading FNS asserts, it would follow that virtually any federal regulation that involves grants or benefits would be exempt from notice and comment. In fact, as *Humana* sets forth, the statutory exemption only applies where the federal grant or benefit is "clearly and directly implicated." 590 F.2d at 1082. Such is not the case here, for the Rule sets forth requirements for the States to follow in the administration of the WIC Program to WIC beneficiaries. Thus, the benefits to WIC beneficiaries are not "clearly or directly implicated."

FNS's reliance upon *Batterton*, 648 F.2d at 700, is similarly misplaced. In fact, this case underscores FNS's error in not first publishing the Rule for prior notice and comment. In *Batterton*, the D.C. Circuit concluded that regardless of whether the formula challenged in the case was exempt under section 553(a)(2), the APA's prior notice and comment requirements applied. The Department of Labor, like USDA here, "has expressly waived this exemption by its own regulation which provides: It is the policy of the Secretary of Labor that in applying the rule making provisions of the APA the exemption therein for rules relating to public property, loans, grants, benefits or contracts shall not be relied upon as a reason for not complying with the notice and public participation requirements thereof." 648 F.2d at 700.

As set forth in Plaintiffs' opening brief at 29-31, even assuming for discussion purposes that the Rule does directly implicate WIC Program benefits, in its 1971 *Federal Register* notice, USDA (like the Department of Labor in *Batterton*) committed to abiding by the prior notice and comment requirements of the APA in all such rulemakings, and may not evade them here.

While citing to cases of different Circuits questioning the 1971 *Federal Register* notice (or notices similar to it) that committed USDA to compliance with section 553, FNS Br. at 24-25, FNS omits the controlling case of this Circuit, *Rodway v. USDA*, 514 F.2d 809, 813-14 (D.C. Cir. 1975). *Rodway* involved regulations that implicated a benefit program far more directly than the Rule here; in *Rodway*, members of low income households brought suit challenging the coupon allotment system USDA put in place to implement the Food Stamp Act. *Id.* at 812. USDA claimed the allotment regulations were exempt from prior notice and comment because the food stamp program was a "grant" or "benefit" program. In light of USDA's 1971 *Federal Register* notice, the D.C. Circuit disagreed:

> The food stamp program would appear to be a matter relating to public "grants" or "benefits," thereby exempting rules relating to the program from the APA.
>
> On July 24, 1971, however, as a result of a recommendation of the Administrative Conference of the United States, USDA promulgated a regulation making the procedural requirements of Section 4 of the APA applicable to all of its rule-making relating to "public property, loans, grants, benefits, or contracts." The regulation was effective immediately. 36 Fed. Reg. 13804. It is, of course, well settled that validly issued administrative regulations have the force and effect of law. *Thus the regulation fully bound the Secretary to comply thereafter with the procedural demands of the APA.*

*Rodway*, 514 F.2d at 813-14 (citations omitted) (emphasis added). The D.C. Circuit concluded that USDA had violated section 553.

More recently, and also not cited in FNS's brief, the D.C. Circuit held that USDA had violated the APA when it ignored notice and comment procedures and instead implemented by press release a payment-in-kind (PIK) program providing payments to sugar growers, processors, refiners and marketers by press release. *Sugar Cane Growers*

17

*Coop. of Fl. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002). The failure to comply with

section 553 was not, the D.C. Circuit concluded, harmless error. The D.C. Circuit

dismissed the argument that USDA might be exempt from section 553 because the PIK

program was one of "benefits" and "grants." Citing *Rodway* and the 1971 *Federal*

*Register*, the Court explained that USDA has "essentially waived that APA exemption."

*Id*. at 95 n.5. *See also Petry v. Block*, 737 F.2d 1193, 1197 n.12 (D.C. Cir. 1984).[6]

The law of this Circuit is that the 1971 policy fully binds USDA to compliance

with the procedural notice and comment demands of the APA, even when the rule itself

may be exempt under section 553(a)(2). *Rodway*, 514 F.2d at 814. USDA did not do so,

in violation of section 553.[7]

     2.     FNS further contends that both the APA and the 1971 *Federal Register*

notice allow it to dispense with prior notice and comment for "good cause." FNS Br. at

30-33. FNS errs and the authority it cites do not support finding a "good cause"

exemption here.

As discussed previously, the "good cause" exception to prior notice and comment

requirements is a narrow one. *American Federation of Government Employees, AFL-*

*CIO v. Block*, 655 F.2d 1153, 1156 (D. C. Cir. 1981); *State of New Jersey,* 626 F.2d at

---

[6]   Further, the exemptions from notice and comment FNS now claims appear to be the post-challenge arguments of litigation counsel. The preamble to the Rule references neither Section 553(a)(2) nor the 1971 *Federal Register* notice.

[7]   As discussed in Plaintiffs' opening brief at 29-31, FNS also did not explain the basis for its departure from the 1971 *Federal Register* notice, in violation of 5 U.S.C. § 706. FNS does not defend this violation in its opposition at all. FNS strives to dismiss the 1971 *Federal Register* notice as a nonbinding statement of the agency's general policy (FNS Br. at 25), an assertion at odds with *Rodway* and its progeny. Nor is FNS's argument persuasive that the 1971 *Federal Register* notice is less binding because it was voluntary. FNS Br. at 25. "Under *Rodway* . . . the fact that an agency chose to operate under the APA is irrelevant." *Petry*, 737 F.2d at 1197 n.12.

1045.  *Accord Asiana Airlines v. F.A.A.*, 134 F.3d 393, 396 (D.C. Cir. 1998).  In a cursory statement in the Rule's preamble, repeated in its brief, FNS states that it meets this "good cause" exception:

> [The Reauthorization Act] . . . authorizes the issuance of interim final regulations.  Therefore, Under Secretary Eric M. Bost has determined, in accordance with 5 U.S.C. 553(b), that prior notice and comment would be unnecessary, and that good cause exits for making this rule effective without first publishing a proposed rule.

70 Fed. Reg. at 71,712; *see* FNS Br. at 25, 30-33.

On its face, the Reauthorization Act does not state that FNS may dispense with APA procedures.  Rather, section 501 squeezes between two mandates (FNS *shall* issue a guidance and *shall* promulgate final regulations), an option:  "The Secretary *may* promulgate interim final regulations".  42 U.S.C.A. § 1758 note (emphasis supplied).  As discussed in Plaintiffs' opening brief at 27, such optional language is not sufficient because Section 559 of the APA requires that any exemptions from notice and comment procedures be express.  *Asiana Airlines*, 397 F.3d at 397, *citing Ass'n of Data Processing Serv. Orgs., Inc. v. Board of Governors*, 745 F.2d 677, 686 (D.C. Cir. 1984) and *Marcello v. Bonds*, 349 U.S. 302 (1955).

Two of the cases on which FNS relies, *Asiana Airlines*, 134 F.3d at 397-399, and *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225, 1236 n.18 (D.C. Cir. 1994), amply demonstrate the degree of statutory specificity necessary before the D.C. Circuit will deem an agency exempt from notice and comment procedures.  *See* Plaintiffs' opening brief at 27-28; *Asiana Airlines*, 134 F.3d at 398 ("the Administrator shall publish in the Federal Register an initial fee schedule and associated collection process as an interim final rule, pursuant to which public comment will be sought and a final rule

issued"); *Methodist Hospital*, 38 F.3d at 1236 n.18 ("The Secretary shall cause to be published in the Federal Register a notice of the interim final DRG prospective payment rates…no later than September 1, 1983, and allow for a period of public comment thereon").

FNS urges that it is reasonable to construe section 501 ("shall" issue guidance, "may" issue interim final rule, "shall" issue final rule) as "clear indication of Congressional intent" that it should dispense with notice and comment. FNS Br. at 32.[8] Apart from the fact that as discussed this "indication" is not "clear" enough to satisfy section 559, FNS seems to posit that issuance of an interim final rule necessarily means dispensing with section 553. However, interim final rules are not limited to the rare situations in which an agency has good cause to forgo issuance of a proposed rule in order to immediately respond to an emergency. *See, e.g.*, 68 Fed. Reg. 6235 (Nov. 4, 2003) (interim final rule to establish restrictions on animals to prevent spread of monkeypox in the United States). Agencies frequently publish interim final rules following a notice of proposed rulemaking and comment. *See, e.g.*, 70 Fed. Reg. 33,702 (June 9, 2005); 70 Fed. Reg. 39,021 (July 6, 2005). Nothing about the issuance of interim final rules precludes preceding them with notice and opportunity for comment.

In this light, as Plaintiffs demonstrated in their opening brief at 28-29, section 501 of the Reauthorization Act can easily be read in harmony with the APA. Such a

---

[8] FNS states at page 32 of its brief that "Congress *ordered* the Secretary of Agriculture to… issue an 'interim final rule' implementing the amendments contained within the Act" (emphasis added). Congress did no such thing. FNS's statement directly conflicts with the plain language of the statute, as the direction that FNS "may issue interim final regulations" is certainly not an "order" to do so.

construction is the favored approach of this Circuit. *State of New Jersey*, 626 F.2d at 1047.

3.    Had Congress wished to exempt FNS from both the prior notice and requirements of the APA and the 1971 *Federal Register* notice, it would have done so as it has in the past, and with the specificity that section 559 of the APA requires. Prior enactments include the following:

- Military Construction Appropriations and Emergency Hurricane Supplemental Appropriations Act, 2005 P.L. 108-324 (October 13, 2004) ("The issuance of regulations shall be made without regard to: (1) the notice and comment provisions of section 553 of title 5, United States Code; (2) The Statement of Policy of the Secretary of Agriculture effective July 24, 1971 (36 Fed. Reg. 13,804), relating to notices of proposed rulemaking and public participation in rulemaking;....").

- Farm Security and Rural Investment Act of 2002 P.L. 107-171 (May 13, 2002) ("(2) PROCEDURE.—The promulgation of the regulations and administration of this title shall be made without regard to—...(B) the Statement of Policy of the Secretary of Agriculture effective July 24, 1971 (36 Fed. Reg. 13,804), relating to notices of proposed rulemaking and public participation in rulemaking; and (C) the notice and comment provisions of section 553 of title 5, United States Code.").[9]

- An Act to Respond to the Continuing Economic Crisis Adversely Affecting American Agricultural Producers P.L. 107-25 (August 13, 2001) (Sec. 12 Regulations. (a) ...The promulgation of the regulations and administration of this Act shall be made without regard to—(1) notice and comment provisions of section 553 of title 5, United State Code; (2) the Statement of Policy of the Secretary of Agriculture effective July 24, 1971 (36 Fed. Reg. 13,804), relating to notices of proposed rulemaking and public participation in rulemaking; and....").

- An Act Making Consolidated Appropriations for the fiscal year ending September 30, 2000, and for Other Purposes P.L. 106-113 (November 29, 1999) (Appendix H-H.R. 3428 "(e) IMPLEMENTATION OF REQUIREMENT.—The implementation of the final rule, as modified by subsection (c), shall not be subject to any of the following: (1)...or the notice and comment provisions of section 553 of title 5, United States

---

[9]   This exemption appears in four separate provisions of P.L. 107-171, of which the cited section is only one.

Code…(3) the Statement of Policy of the Secretary of Agriculture effective July 24, 1971 (36 Fed. Reg. 13,804), relating to notices of proposed rulemaking and public participation in rulemaking….").

The Reauthorization Act contains no comparable language.

4.    FNS contends that the "short" implementation Congress provided justified the agency's "good cause" determination.  FNS Br. at 32.  That argument and the cases FNS cites are unavailing.

"The mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute good cause for a § 553(b)(B) exception." *State of New Jersey*, 626 F.2d at 1042 (citations and quotations omitted); *Council of the Southern Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981) (an agency unwilling to provide notice or comment could "simply wait until the eve of a statutory . . . deadline, then raise up the 'good cause' banner").

Congress ordered the vendor cost containment measures to begin as of December 30, 2005.  As compared to other cases of true, short Congressional implementation deadlines (*cf. Petry*, 737 F.2d at 1195-96), the implementation provision for the Reauthorization Act allowed FNS 18 months from the date of enactment in which to conduct notice and comment rulemaking.  The cases on which FNS relies provided far shorter statutory deadlines than the 18 months FNS had here.  *See Methodist Hospital*, 38 F.3d at 1235-36 (statute enacted in April, interim final rules to be published by September 1); *Petry*, 737 F.2d at 1195-96 (regulations to be promulgated within 60 days of enactment).  A good cause exemption cannot reasonably be made out here when FNS "had a substantial period of time within which to propose regulations, the promulgation of which it knew was both necessary and forthcoming in the future." *Methodist Hospital*,

38 F.3d at 1237, *quoting American Federation*, 655 F.2d at 1158.  *See also State of New Jersey*, 626 F.2d at 1042 (holding that 180 days from enactment was sufficient time to comply with prior notice and comment procedures); *Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir. 1980)(14 months from enactment of statute to statutory deadline provided sufficient time for agency to comply with both its statutory deadline and the APA); *see also Air Transport Ass'n of America v. Dep't of Trans.*, 900 F.2d 369, 379 (D.C. Cir. 1990), *remanded*, 498 U.S. 1077 (1991), *vacated as moot*, 933 F2d 1043 (D.C. Cir. 1991) (two year window to promulgate regulations).

5.      Nor does FNS's characterization of the Rule as "temporary," FNS Br. at 32-33, ameliorate the concerns raised by lack of prior notice and comment.  The Rule cannot fairly or rationally be characterized as temporary in any respect given that the Rule's impact is being felt immediately as it will force WIC-only stores out of business in a matter of weeks; FNS is allowing 12 months for comment; and FNS does not anticipate completing the rulemaking for another 3 years, until 2008.[10]   70 Fed. Reg. at 71,709. FNS has far exceeded what is appropriate and permissible for an interim final rule.  *See American Federation*, 655 F.2d at 1157-58 (interim final rule promulgated without public procedures should be as narrow as possible to respond to the emergency at hand).

6.      Nor does the availability of a post-effective date, 12 month comment period excuse the failure to comply with the APA prior notice due to "the psychological and bureaucratic realities of *post hoc* comment rule-making." *State of New Jersey*, 626 F.2d at 1049.  *See also Kollett*, 619 F.2d at 145.  The D.C. Circuit recognizes that an agency "is not likely to be receptive to suggested changes" once it has put "its credibility

---

[10]  *See* note 1 *supra*.

on the line in the form of (final) rules" because "[p]eople tend to be more close-minded and defensive once they have made a 'final' determination." *Air Transport Ass'n*, 900 F.2d at 379, *quoting National Tour Brokers Ass'n v. U.S.,* 591 F.2d 896, 902 (D.C. Cir. 1978) (citations and quotations omitted). The agency would have to bear the burden of showing that it remains "sufficiently open-minded" in order to rebut the presumption that *post hoc* comment is not consistent with APA. *State of New Jersey*, 626 F.2d at 1050.

7.      Finally, the D.C. Circuit has emphasized the importance of prior notice and comment in circumstances such as those presented here, where the States play an important role in implementation of federal requirements. *See State of New Jersey*, 626 F.2d at 1047.

## VI.    **PLAINTIFFS' REQUESTED RELIEF**

1.      The relief that Plaintiffs seek is narrow, and is directed at only two provisions of the Rule:  7 C.F.R. § 246.12(g)(4)(i)(D) and (g)(4)(vi).  A proposed Temporary Restraining Order that references these two provisions is attached.

2.      If the Court is so inclined, Plaintiffs respectfully submit that this matter can be resolved by means of a decision on Plaintiffs' motion for preliminary injunction, without having to address a TRO.  The standards for granting a preliminary injunction or a TRO are the same.  *WMATA V. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).  From Plaintiffs' perspective, the matter is fully briefed, and the TRO hearing scheduled for December 30 will pose exactly the same legal, factual, and equitable issues that would be posed by a preliminary injunction hearing.  Resolving this matter on the basis of a decision on Plaintiffs' motion for a preliminary injunction would promote

judicial economy.  It would also permit the losing side to appeal, and to seek emergency

relief from the D.C. Circuit if it so desires.

## **CONCLUSION**

For the reasons discussed in Plaintiffs' opening memorandum and in this reply

memorandum, Plaintiffs have met the standards for the issuance of a TRO, pending a

decision by this Court on Plaintiffs' motion for a preliminary injunction.

Dated:  December 26, 2005                    Respectfully submitted,


Philip C. Olsson, Bar No. 172163
Arthur Y. Tsien, Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3537 (fax)

Attorneys for  National Women, Infants,
and Children Grocers Association,
Nutritional Food Distributors, Inc., County
Food Services, Inc., and Dillard Foods Inc.