## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WOMEN, INFANTS, AND<br>CHILDREN GROCERS ASSOCIATION,<br>NUTRITIONAL FOOD DISTRIBUTORS, INC.,<br>COUNTY FOOD SERVICES, INC., and<br>DILLARD FOODS, INC.,<br><br>          Plaintiffs,<br><br>    v.<br><br>FOOD AND NUTRITION SERVICE,<br><br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 05-2432 (EGS)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs National Women, Infants, and Children Grocers Association, Nutritional Food Distributors, Inc., County Food Services, Inc., and Dillard Foods, Inc. respectfully move for summary judgment. This motion is supported by a memorandum, the Second Supplemental Declaration of EAnn Robinson, the Second Supplemental Declaration of Michael G. Dillard, the Supplemental Declaration of J. C. Halbert, previously filed declarations, a statement of undisputed material facts pursuant to Local Civil Rule 56.1, and excerpts from the Administrative Record. A proposed order accompanies this motion.

Dated: January 17, 2006

Respectfully submitted,

Philip C. Olsson, Bar No. 172163
Arthur Y. Tsien, Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3537 (fax)

Attorneys for National Women, Infants, and
Children Grocers Association, Nutritional Food
Distributors, Inc., County Food Services, Inc., and
Dillard Foods, Inc.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL WOMEN, INFANTS, AND CHILDREN GROCERS ASSOCIATION, NUTRITIONAL FOOD DISTRIBUTORS, INC., COUNTY FOOD SERVICES, INC., and DILLARD FOODS, INC., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 05-2432 (EGS) |
| | ) | |
| FOOD AND NUTRITION SERVICE, | ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JDUGMENT

Philip C. Olsson, Bar No. 172163
Arthur Y. Tsien, Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3537 (fax)

Attorneys for  National Women, Infants, and
Children Grocers Association, Nutritional Food
Distributors, Inc., County Food Services, Inc., and
Dillard Foods, Inc.

January 17, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

I.    INTRODUCTION ...................................................................... 1

II.   BACKGROUND ......................................................................... 2

    A.    THE WIC PROGRAM ......................................................... 2

    B.    THE PLAINTIFFS – WIC-ONLY STORES AND THEIR
        TRADE ASSOCIATIONS ..................................................... 7

        1.    WIC-Only Stores – Their Services, Costs, And Prices ...... 7

        2.    Plaintiffs ................................................................... 9

    C.    THE REAUTHORIZATION ACT .......................................... 10

    D.    THE GUIDANCE .............................................................. 12

    E.    THE RULE ..................................................................... 13

    F.    LITIGATION HISTORY ..................................................... 15

III.  ARGUMENT ............................................................................ 15

    A.    STANDARDS FOR GRANTING SUMMARY JUDGMENT ........ 15

    B.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ...... 16

        1.    FNS Failed To Use Required Notice-and-Comment Rulemaking
            Procedures And Did Not Establish Good Cause For Departing
            From Those Requirements And Thus Failed To Comply
            With The Administrative Procedure Act ........................... 17

            a.    FNS's Promulgation Of The Rule Is Not Exempt From
                Section 553 Of The APA ....................................... 17

            b.    FNS Did Not Meet The "Good Cause" Exemption From
                Notice-And-Comment Procedures ........................... 19

(Page)

2.     FNS Failed To Conduct An Adequate Analysis Under The
       Regulatory Flexibility Act                                    22

3.     The Rule Is Substantively Deficient                           26

       a.    The Reauthorization Act                                 26

       b.    The Rule Is Invalid Under *Chevron* "Step One"
             Because It Is Inconsistent With The Reauthorization
             Act                                                     28

             i.    Comparison Of WIC-Only Store Prices To
                   Average Of All Retail Store Prices Renders
                   Meaningless The Peer Grouping Requirements
                   Of The Statute                                    29

             ii.   Comparison Of WIC-Only Store Voucher Costs
                   To The Average Of All Retail Store Voucher
                   Costs Renders Meaningless The Prohibition On
                   Achieving Lower Food Costs If Participants
                   Shop At WIC-Only Stores                           30

       c.    The Rule Is Invalid Under *Chevron* "Step Two" Because
             Of Its Retroactive Effects And Failure To Consider
             Participant Access                                      32

             i.    There Is No Statutory Authorization For Requiring
                   Retroactive Recoupment                            33

             ii.   The Rule Is An Unreasonable Interpretation Of The
                   Statutory Requirements To Consider Geographical
                   Factors And Participant Access                    35

C.     THIS COURT SHOULD VACATE THE ENTIRE RULE                      37

IV.    CONCLUSION                                                    39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Air Transport Association of America v. Department of Transportation*, 900 F.2d 369
(D.C. Cir. 1990) ...........................................................................................................20
*American Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001).................16, 37
*American Federation of Government Employees, AFL-CIO v. Block*, 655 F.2d 1153
(D.C. Cir. 1981) ...........................................................................................................20
*Asiana Airlines v. F.A.A.*, 134 F.3d 393 (D.C. Cir. 1998)...........................................20, 21
*Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104 (1ˢᵗ Cir. 1997)...................25
*Association of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047 (D.C. Cir. 2000)..............37
*Automotive Parts & Accessories Association v. Boyd*, 407 F.2d 330 (D.C. Cir. 1968) ....30
*Barnhart v. Walton*, 535 U.S. 212 (2002).........................................................................33
*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988)......................................34
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................16
*Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855 (D.C. Cir. 2001)........................25
*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837
(1984) ................................................................................................................... passim
*Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004)..........................................................38
*Held v. American Airlines, Inc.*, 13 F. Supp. 2d 20 (D.D.C. 1998) ..................................16
*Marcello v. Bonds*, 349 U.S. 302 (1955) ..........................................................................20
*Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225 (D.C. Cir. 1994).................21
*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance
Co.*, 463 U.S. 29 (1983) ........................................................................................19, 30
*Murphy Exploration and Production Co. v. U.S. Department of Interior*, 252 F.3d 473
(D.C. Cir. 2001) .....................................................................................................28, 32
*National Association of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272
(D.C. Cir. 2005).............................................................................................................23
*National Association of Psychiatric Health System v. Shalala*, 120 F. Supp. 2d 33
(D.D.C. 2000) ...............................................................................................................24
*National Mining Association v. U.S. Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir.
1998) .........................................................................................................................37-38
*Pacific Legal Foundation v. Department of Transportation*, 593 F.2d 1338 (D.C. Cir.
1979) .............................................................................................................................30
*Petry v. Block*, 737 F.2d 1193 (D.C. Cir. 1984) ...............................................................19
*Qi-Zhuo v. Meissner*, 70 F.3d 136 (D.C. Cir. 1995)....................................................28, 32
*Reeder v. FCC*, 865 F.2d 1298 (D.C. Cir. 1989) ..............................................................37
*Rodway v. USDA*, 514 F.2d 809 (D.C. Cir. 1975) .......................................................18, 19
*Spirit of the Sage Council v. Norton*, 294 F. Supp. 2d 67 (D.D.C. 2003) ..................16, 37
*Sprint Corp. v. FCC*, 315 F.3d 369 (D.C. Cir. 2003) .......................................................37
*State of N.J., Department of Environmental Protection v. EPA*, 626 F.2d 1038 (D.C. Cir.
1980) .............................................................................................................................20
*Sugar Cane Growers Co-op. of Florida v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002)........18
*Troy Corp. v. Browner*, 120 F.3d 277 (D.C. Cir. 1997.....................................................16

*United States v. Mead Corporation*, 533 U.S. 218 (2001) ...............................................33
*Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749 (D.C. Cir. 2001) ..................37

## FEDERAL STATUTES

5 U.S.C. § 553 ............................................................................................ passim
5 U.S.C. § 559 ........................................................................................................20
5 U.S.C. § 604(a) ...................................................................................................23
5 U.S.C. § 611(a) ...................................................................................................23
5 U.S.C. § 706 ............................................................................................. passim
42 U.S.C. § 1758 note.................................................................................. passim
42 U.S.C. § 1786 ........................................................................................... passim

## FEDERAL REGULATIONS

7 C.F.R. § 246.2 ....................................................................................................13
7 C.F.R. § 246.3 .................................................................................................3, 4
7 C.F.R. § 246.10 ....................................................................................................4
7 C.F.R. § 246.12 ......................................................................................... passim

## OTHER AUTHORITIES

FED. R. CIV. P. 56 ..................................................................................................16
142 Cong.Rec. S3242, S3245 ................................................................................23
150 Cong.Rec. E1328 ......................................................................................12, 28
150 Cong.Rec. H4932.............................................................................................24
Pub. L. No. 106-113................................................................................................22
Pub. L. No. 107-25..................................................................................................22
Pub. L. No. 107-171................................................................................................21
Pub. L. No. 108-265................................................................................................10
Pub. L. No. 108-271..................................................................................................5
Pub. L. No. 108-324................................................................................................21
Pub. L. No. 109-97....................................................................................................3
36 Fed. Reg. 13,804 (July 24, 1971).....................................................................18
70 Fed. Reg. 71,708 (Nov. 29, 2005)............................................................ passim

iv

## I.    **INTRODUCTION**

Plaintiffs National Women, Infants, and Children Grocers Association ("NWGA"), Nutritional Food Distributors, Inc. ("Nutritional Food Distributors"), County Food Services, Inc. ("County Food Services"), and Dillard Foods, Inc. ("Dillard Foods") (collectively "Plaintiffs") respectfully submit this memorandum in support of their motion for summary judgment.

This case involves a challenge to an interim final rule ("Rule") issued by defendant Food and Nutrition Service ("FNS"), an agency of the U.S. Department of Agriculture ("USDA"), on November 29, 2005. 70 Fed. Reg. 71,708.    The Rule implements provisions of the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC Program") that were included in section 203 of the Child Nutrition and WIC Reauthorization Act of 2004 ("Reauthorization Act"), enacted and signed into law on June 30, 2004.    Incredibly, FNS waited over 17 months after enactment before publishing an interim final rule effective in 30 days (and established an unusually long 12-month period for accepting comments).    The Rule will drive down reimbursements to unsustainable levels for a discrete segment of food retailers, those that sell only to participants in the WIC Program. The Rule refers to these vendors as "above-50-percent vendors."    NWGA represents these vendors, referred to herein as "WIC-only stores" in keeping with industry terminology.

In purporting to promulgate the Rule, FNS ignored the notice-and-comment rulemaking requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b). Further, FNS failed to conduct an analysis consistent with the requirements of the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq.*  Finally, the Rule is

unlawful because it is contrary to the underlying statute and contrary to Congressional intent. Had FNS provided for notice-and-comment rulemaking and adhered to the requirements of the RFA, it would have been able to promulgate a rule that is consistent with the statute and Congressional intent.

## II.    **BACKGROUND**

### A.    THE WIC PROGRAM[1]

This case involves new regulations that limit reimbursement to certain retailers in the WIC Program, a nutrition assistance program authorized by section 17 of the Child Nutrition Act of 1966, 42 U.S.C. § 1786. The WIC Program provides healthcare, immunization screening, nutrition education, and supplemental foods to pregnant, postpartum, and breastfeeding women, infants, and young children at nutritional risk. Eligibility is determined on the basis of nutritional risk and federal income guidelines. The income guidelines are relatively generous, providing eligibility up to 185% of the

---

[1]    The facts regarding the WIC Program are supported by the following declarations: (1) the Declaration of EAnn Robinson, President of NWGA and Vice President and General Manager of Nutritional Food Distributors ("Robinson Decl."), the Declaration of J.C. Halbert, President of County Food Services ("Halbert Decl."), and the Declaration of Michael A. Dillard, President of Dillard Foods ("Dillard Decl."), submitted with Plaintiffs' motion for preliminary injunction or temporary restraining order; (2) the Supplemental Declaration of EAnn Robinson ("Supp. Robinson Decl.") and the Supplemental Declaration of Michael A. Dillard ("Supp. Dillard Decl."), both filed with Plaintiffs' reply brief in support of their motion for temporary restraining order; and (3) the Second Supplemental Declaration of EAnn Robinson ("2nd Supp. Robinson Decl."), the Second Supplemental Declaration of Michael G. Dillard ("2nd Supp. Dillard Decl."), and the Supplemental Declaration of J. C. Halbert ("Supp. Halbert Decl."), filed concurrently with Plaintiffs' motion for summary judgment.

poverty income level.[2]  For instance, in the 48 contiguous states from July 1, 2005 to

June 30, 2006, a household of four persons would be eligible for the WIC Program with

annual household income up to $35,798.[3]  Nearly half of all infants born in the United

States each year are WIC beneficiaries.[4]

The WIC Program is a large, nationwide program, with an annual budget for

fiscal year ("FY") 2006 of approximately $7 billion.  Of this amount, $5.2 billion is

appropriated by the U.S. Congress (Pub. L. No. 109-97, 119 Stat. 2120, 2144), and nearly

$2 billion is expected to be provided to the program through statutorily mandated rebates

from infant formula manufacturers.  In FY 2005, the last full year for which statistics are

available, the WIC Program served approximately 8 million participants, which included

approximately 1.9 million women, 2.1 million infants, and 4 million children ages five

and under.[5]

The authority to administer the program on the federal level has been delegated to

FNS, which is required to "provide assistance to state and local agencies and evaluate all

levels of Program operations to ensure that the goals of the Program are achieved in the

most effective and efficient manner possible."  7 C.F.R. § 246.3(a).  State agencies are

---

[2]    *See also* WIC Benefits and Services, available at
http://www.fns.usda.gov/wic/benefitsandservices/;
http://www.fns.usda.gov/wic/howtoapply/ eligibilityrequirements.htm;
WIC Nutrition Program Facts, available at
http://www.fns.usda.gov/wic/WIC-Fact-Sheet.pdf.

[3]    *See* http://www.fns.usda.gov/wic/howtoapply/incomeguidelines.htm.

[4]    *See* Frequently Asked Questions About WIC, available at
www.fns.usda.gov/wic/FAQs/FAQ.HTM#4.

[5]    *See* WIC Program Participation and Costs, available at
http://www.fns.usda.gov/pd/wisummary.htm; WIC Program Monthly Data, available at
www.fns.usda.gov/pd/WIC_Monthly.htm.

responsible for implementation of the program, which includes, but is not limited to, the following tasks:  (1) authorizing the participation of retail food stores ("authorized vendors"); (2) creating a vendor agreement that governs the contractual relationship between the state and each authorized vendor; (3) establishing price limitations for paying authorized vendors; (4) training authorized vendors; and (5) monitoring compliance. 7 C.F.R. §§ 246.3(b) and 246.12.

Among other benefits, WIC Program participants receive supplemental foods (a "food package") at no cost.  Often, pregnant women enroll in the WIC Program by signing up for a pre-natal health check-up at a local health clinic.  The mother then will receive a voucher document for each member of the family who is a WIC participant. The monthly WIC voucher for each individual is an English-language list of food items to which that person is entitled.  A typical food package for a child or pregnant woman might include a voucher that can be exchanged for specific brands and quantities of fluid milk, eggs, cereal, juice, and dry beans.  *See* 7 C.F.R. § 246.10(c)(4) and (5).  A new mother with an infant and a three-year-old would receive three separate vouchers each month, one for herself and one for each of her children.[6]

Referring to her English-language voucher lists for each eligible member of her family, the WIC mother must search out the WIC-approved foods (in the proper brand and package size specified in each voucher) at an authorized vendor and then exchange her vouchers for these food items at checkout.  At a typical "box store" or supermarket, the WIC mother will take her WIC selections to the check-out counter, where they will be

---

[6]    *See generally* Benefits and Services:    WIC Food Package, available at http://www.fns.usda.gov/wic/benefitsandservices/foodpkg.htm. *See also* Robinson Decl. at ¶ 9.

processed separately from her other purchases. The store clerk must correct any mistaken selections at the check-out counter while other customers in line wait their turn. Robinson Decl. at ¶ 12. This process can be daunting for the WIC Program participant, particularly those who have low literacy skills and/or speak little or no English, time consuming in the typical busy store, and irritating to the clerk and to the other waiting customers.   Robinson Decl. at ¶¶ 11-15; Halbert Decl. at ¶¶ 8-10; Dillard Decl. at ¶¶ 9-11.[7]

The difficulty of matching food items to the voucher lists and the stigma which can accompany this retail store experience for the WIC mother is well documented in 1988 General Accounting Office[8] ("GAO") testimony and continues to be a persistent concern for WIC recipients.  As the GAO reported:

> [T]he stigma some women associate with WIC—how their participation in the program makes them appear to their friends and co-workers—is another significant factor limiting participation, according to about 57 percent of the local agency directors. Another aspect of the perceived stigma associated with WIC participation is related to the so-called "grocery store experience." The use of WIC vouchers to purchase food in grocery stores can cause confusion and delays for both the participant-shopper and the store clerk at the check-out counter. For example, Texas requires its WIC participants to buy the cheapest brand of milk, evaporated milk, and cheese available in the store. Texas also requires participants to buy the lowest-cost 46-ounce fluid or 12-ounce frozen fruit juices from an approved list of types (orange, grapefruit, orange/grapefruit, purple grape, pineapple, orange/pineapple, and apple) and/or specific brands. In comparing the cost of WIC-approved items, participants must also consider such things as weekly store specials and cost per ounce in order to

---

[7]    *See also* Assessment of WIC Cost Containment Practices Final Report, Economic Research Service, USDA (Feb. 2003) Chapter 9 (www.ers.usda.gov/publications/efan03004).

[8]    That office is now known as the Government Accountability Office. *See* GAO Human Capital Reform Act of 2004, Pub. L. No. 108-271, 118 Stat. 811 (2004).

purchase the lowest-priced items. While these restrictions may lower the dollar amount that the State pays for WIC foods, it may also make food selections more confusing for participants. According to Texas WIC officials, participants and cashiers often have difficulty determining which products have the lowest price. Consequently, a delay in the check-out process may result in unwanted attention for the WIC participant.[9]

The GAO testimony is confirmed by recent survey data from the three plaintiffs who operate WIC-only stores. On January 12 and/or 13, 2006, customers were asked to fill out a survey regarding redemption of WIC vouchers.[10] Cumulatively, these surveys demonstrate that at regular grocery stores, WIC-only store customers have been badly treated (35%), were embarrassed (36%), had difficulty getting the full amount of food allowed by the voucher (12%), and had difficulty finding the WIC-authorized food they wanted (76%). If WIC-only grocery stores were closed, less than half of the participants (34%) are confident that they would stay in the WIC Program, a substantial number say that they would drop out (20%), and the largest number simply don't know (45%). *See* 2nd Supp. Robinson Decl., 2nd Supp. Dillard Decl., and Supp. Halbert Decl.

Some survey respondents shared their experiences redeeming WIC vouchers, including the following:

- "You always gets something wrong everytimes you go into it grocery store. It never fails!! This way you get ever thing correct & don't get embaresed!"

---

[9]    Testimony of Robert A. Robinson, Director, Food and Agriculture Issues, General Accounting Office, Before the U.S. Senate Committee on Agriculture, Nutrition, and Forestry, Food Assistance -- Information on Selected Aspects of WIC (March 17, 1998) at 5, available at http://www.gao.gov/archive/1998/rc98128t.pdf.

[10]    The survey data are credible because all customers on a particular day were asked to respond to the survey, and the most of those who were asked completed the survey. While the data are credible, Plaintiffs do not offer them as definitive.

- "My son was premature & was on specialty formula that the grocery store refused to carry.  Only the WIC center made sure to stock it for us."

- "Was in the gro. store waiting in line and a man behind me said everyone wants something for nothing.  People just look at ya weird."

*See id.*

To address the barriers that arise for the WIC participant in a typical retail setting, WIC-only stores have emerged to provide a more dignified shopping experience.  WIC-only stores are described below.

**B.    THE PLAINTIFFS – WIC-ONLY STORES AND THEIR TRADE ASSOCIATION**

**1.    WIC-only Stores – Their Services, Costs, And Prices**

The barrier of all-English voucher lists and the awkwardness of the typical retail checkout experience for WIC participants has led to the emergence of WIC-only stores. In these stores, *every* WIC-approved food (in the proper packaging size) is carried in stock, and *only* WIC-approved items are carried.  Some of the stores are set up with aisles like small grocery stores, except that all of the foods in the store are WIC-approved. Others are set up like pharmacy prescription counters, where the WIC mother presents her voucher(s) to a clerk behind the counter, and the clerk fills the entire order enumerated on the WIC mother's voucher(s).  Because the food selection process at the WIC-only store is much easier for a WIC mother than the selection process at larger mainline retailers, WIC-only stores have proven popular wherever they have opened.  *See* Robinson Decl. at ¶¶ 15-17; Dillard Decl. at ¶¶ 6, 8-11; Halbert Decl. at ¶¶ 8-12.

Additionally, the complexity of the WIC Program and the English language voucher lists is a barrier to non-English-speaking WIC participants and those with low English literacy skills.  WIC-only stores frequently hire current and former WIC

participants. Halbert Decl. at ¶ 9; Robinson Decl. at ¶ 17. WIC-only store employees are frequently fluent in Spanish. Robinson Decl. at ¶¶ 17, 33; Dillard Decl. at ¶ 9; Halbert Decl. at ¶¶ 5, 9. They also have had to respond to less-conventional communication challenges, such as communicating with their deaf customers. Dillard Decl. at ¶ 9. An employee of one of the County Food Services stores in Arkansas is able to communicate with customers in the language native to the Marshall Islands. Halbert Decl. at ¶ 9. The WIC-only store clerks are knowledgeable about the WIC Program and, importantly, sympathetic to providing a dignified shopping experience for their customers. Dillard Decl. at ¶ 10. *See generally* Administrative Record ("AR") 02076.[11]

WIC-only stores also are more likely than traditional vendors to fully redeem a recipient's food benefits. 70 Fed. Reg. 71,729; AR 02076. This is because traditional vendors often do not stock the right package sizes and/or brands of approved foods or because a WIC recipient is otherwise not able to fill the full food package to which the recipient is entitled. Assuring that their customers obtain the full allotment of foods allowed in a voucher is one of the critical services WIC-only stores provide. Robinson Decl. at ¶ 15; Dillard Decl. at ¶¶ 6, 9.

Finally, WIC-only stores are purposefully located to be convenient for WIC recipients. It is common for WIC-only stores to be located in close proximity to local WIC clinics which certify WIC participants; in ethnic neighborhoods, where the language and translation services offered by WIC-only stores are particularly well received; and near major military bases, where many young service families have incomes within the program eligibility guidelines. Robinson Decl. at ¶¶ 19, 35; Dillard Decl. at ¶ 4.

---

[11]    For the Court's convenience, excerpts of the Administrative Record cited in this brief are being filed concurrently.

Because WIC-only stores are small businesses that provide special services and offer only a targeted product line, their prices and costs of doing business generally have been higher than those of large "box stores" and supermarkets. Wholesale product acquisition costs for WIC-eligible products are higher for a WIC-only store than they are for a typical "box store" or supermarket, whose volume purchasing commands large discounts, and so prices charged by WIC-only stores are on average higher than those at high volume "box stores." *See generally* Dillard Decl. at ¶ 12; Halbert Decl. at ¶ 13; Robinson Decl. at ¶ 24. However, WIC-only store prices are generally comparable to those offered by similar small stores and grocers – as the USDA's Chief Economist found, "[o]*n a peer group by peer group basis*, the average redemption by [WIC-only vendors] is probably not statistically different from that for regular vendors...." AR 01731 (emphasis added).

### 2.    Plaintiffs

Plaintiff NWGA is a District of Columbia corporation with its principal place of business in Norman, Oklahoma. Robinson Decl. at ¶ 1. NWGA is a small, voluntary, not-for-profit trade association whose primary purpose is to represent WIC-only stores. NWGA and most of its members meet the Small Business Administration ("SBA") definition of a "small business."[12]

---

[12]    *See* Small Business Size Standards Matched to North American Industry Classification System, available at http://www.sba.gov/size/sizetable2002.html. The SBA sets income levels of $6.5 million in annual revenue for business professional associations. NWGA estimates its annual revenue for 2005 will be less than $6.5 million. Robinson Decl. at ¶ 4. The SBA sets income levels of $25 million for supermarkets and grocery stores and $6.5 million in annual revenue for specialty grocery stores. Under either standard, plaintiffs Dillard Foods, County Food Services, and Nutritional Food Distributors all meet the SBA definition of a small business entity. *See* Dillard Decl. at ¶ 7; Halbert Decl. at ¶ 7; Robinson Decl. at ¶ 36, respectively. NWGA believes that a

Plaintiff Nutritional Food Distributors operates five WIC-only stores in Oklahoma. Robinson Decl. at ¶ 31. Plaintiff County Food Services operates five WIC-only stores in Arkansas. Halbert Decl. at ¶ 5. Plaintiff Dillard Foods operates four WIC-only stores in Arkansas. Dillard Decl. at ¶ 4.

C.    **THE REAUTHORIZATION ACT**

On June 30, 2004, the President signed into law the Child Nutrition and WIC Reauthorization Act of 2004, Pub. L. No. 108-265 ("Reauthorization Act"). This law reauthorized the WIC Program through 2009, and made a number of substantive changes to the underlying statute.

Section 203(e)(10) of the Reauthorization Act includes new vendor cost containment provisions that require State administering agencies to: (1) establish a "vendor peer group system" and (2) establish competitive price criteria and allowable reimbursement levels for each vendor peer group. 42 U.S.C. § 1786(h)(11)(A)(i).

These provisions address concerns that WIC-only stores had been able to avoid price competition because their prices have been "determined by the allowable reimbursement level of each voucher," AR 02076, rather than by market forces.[13] In

---

vast majority of its members have annual revenues of less than $6.5 million and that almost all of its members have annual revenues of less than $25 million. Robinson Decl. at ¶ 5.

[13]    The Administrative Record casts significant doubt that *any* significantly higher costs are in fact involved. A July 28, 2005 pre-publication review memorandum to FNS from USDA Chief Economist Keith Collins about a draft version of the Rule states that "much is made of the weighted average reimbursement to above 50 percent vendors being higher than the weighted average to so-called regular vendors. *On a peer group by peer group basis*, the average redemption by above 50 percent [vendors] is probably not statistically different from that for regular vendors...." AR 01731 (emphasis added). The Collins memorandum goes on to state that, "Also, we cannot reproduce what FNS reports as the simple and weighted averages." *Id.* This memorandum from the USDA official who should be best qualified to evaluate such things as "simple and weighted

reality, however, state agencies always have been required to "consider the prices a vendor applicant charges for supplemental foods, as compared to the prices charged by other vendor applicants and authorized vendors," and to "establish price limitations on the amount that it will pay vendors." 7 C.F.R. § 246.12(g)(3)(i) (2005 edition) (requiring states to establish competitive prices and price limitations) (*removed by* 70 Fed. Reg. at 71,722); 7 C.F.R. § 246.12(h)(3)(viii) (requiring that states ensure payments to vendors comply with established price limitations). Thus, payments to both WIC-only stores and traditional vendors always have been subject to established state pricing limitations.

Regardless, the Reauthorization Act singles out WIC-only stores for special consideration in achieving additional program cost containment.[14]  But the Reauthorization Act states that it is not intended to "compel a State agency to achieve lower food costs if program participants redeem supplemental food vouchers" at WIC-only stores rather than other retail vendors.  42 U.S.C. § 1786(h)(11)(A)(i).  The goal, which is embodied in the requirement that all State actions be certified by FNS, is to ensure that vendor reimbursement levels "do not result in average payments per voucher to [WIC-only stores] that are higher than average payments per voucher *to comparable vendors*" that are not WIC-only stores.  *Id.* § 1786(h)(11)(E) (emphasis added).

The legislative history of the Reauthorization Act outlined Congress' expectations for how FNS was to achieve the objectives of the vendor cost containment provision. The history is clear that FNS was to develop objective and readily discernable criteria to

---

averages," calls into question the figures and methods used by FNS in developing the Rule, and the record shows no subsequent attempt by FNS to address these concerns raised by USDA's Chief Economist.

[14]    The legislation refers to "above 50 percent vendors."  In reality, all of the members of this category are WIC-only stores.

implement the provision and that WIC-only stores were always to be compared fairly to comparable stores. *See, e.g.*, 150 CONG. REC. E1328 (2004) (statement of Rep. Boehner).

The Reauthorization Act included implementation clauses that relate to regulations implementing the vendor cost containment provision. First, FNS "*may* promulgate interim final regulations...." Reauthorization Act § 501(b) (emphasis added); *see* 42 U.S.C.A. § 1758 note. Second, FNS "*shall* promulgate final regulations" not later than two years after the date of enactment – by June 30, 2006. *Id.* § 502(b)(2) (emphasis added); *see* 42 U.S.C.A. § 1758 note. Further, the Reauthorization Act directed the state agencies to comply with the vendor cost containment provision on or before December 30, 2005. 42 U.S.C. § 1786(h)(11)(G).

## D.    THE GUIDANCE

The Reauthorization Act included a requirement that FNS "*shall* issue guidance" "[a]s soon as practicable" to implement the cost containment requirements. Reauthorization Act § 501(a) (emphasis added); *see* 42 U.S.C.A. § 1758 note. FNS apparently circulated a draft guidance to state agencies in July 2005, more than a year after enactment. However, FNS has not chosen to designate that draft guidance or any document relating to it as part of the Administrative Record supporting the Rule. The draft guidance was never placed on the FNS website, nor was it published in the *Federal Register*. There is no evidence in the Administrative Record that the state agencies were asked for or submitted comments on the draft guidance. To the best of Plaintiffs' knowledge, this draft guidance has not been finalized.

The Administrative Record does indicate that state agencies were upset with FNS's unwillingness to consider their input during the process. One state agency wrote to FNS:

> In the past, USDA has provided the states with the opportunity to provide input in the development of its policy guidance. With regard to the development of the draft policy guidance relating to the above 50% vendors, it does not appear that USDA is interested in obtaining the input of the states.

AR 01837.

### E.    THE RULE

On November 29, 2005, 17 months after enactment of the Reauthorization Act, only 30 days before the Congressional deadline for compliance, and without prior notice-and-comment, FNS published an interim final rule to take effect on December 29, 2005. 70 Fed. Reg. 71,708.

The Reauthorization Act provides: "The State agency shall establish a vendor peer group system" for the purpose of cost comparisons and containment. Specifically, it requires states to limit prices of WIC-only stores so that prices at WIC-only stores "do not result in average payments per voucher that are higher than average payments per voucher to *comparable* vendors other than [WIC-only stores]."[15]    42 U.S.C. § 1786(h)(11)(E) (emphasis added).  As noted, the cost containment provisions of the Reauthorization Act direct that the Act not "be construed to compel a State agency to achieve lower food costs if program participants redeem supplemental vouchers at [WIC-

---

[15]    A "vendor peer group system" is the system by which state agencies categorize WIC-authorized vendors into groups of similar vendors for the purpose of determining reimbursement levels (*e.g.*, Wal-Mart with Target Greatland; corner store with corner store).  *See new* 7 C.F.R. § 246.2 (definition of "vendor peer group system"), 70 Fed. Reg. at 71,722.

only stores] rather than at [traditional WIC-authorized vendors that are not WIC-only stores.]" 42 U.S.C. § 1786(h)(11)(A)(i).

The Rule purports to implement the new vendor cost containment requirements. The Rule will require WIC-only stores (and WIC-only stores alone) to maintain pricing at or below the average prices charged by all stores in the state. In each state, a few large "box stores" and national chains typically will account for most of the below-average prices charged, and the above-average prices will be charged by a large number of smaller WIC-authorized retailers. *See, e.g.,* Supp. Robinson Decl. ¶¶ 5-6; Supp. Dillard Decl. ¶ 8; Robinson Decl. ¶¶ 24, 25. The Rule will require WIC-only stores to charge lower prices than their competition — the large number of smaller, similarly situated WIC-authorized grocery stores that are traditional vendors and not WIC-only stores. The latter category will comprise the vast majority of WIC-authorized vendors in the state; these vendors will not be subject to the new cost containment provisions of the Rule.

State administering agencies were required by the Rule to implement its provisions no later than December 30, 2005. Simultaneously with publication of the Rule, FNS authorized comments to be submitted until November 29, 2006, 70 Fed. Reg. at 71,708, an unusually long comment period of 12 months, even though the Reauthorization Act directs that FNS "shall" promulgate final regulations within two years of enactment, that is, by June 30, 2006. Reauthorization Act § 502(b)(2); *see* 42 U.S.C.A. § 1758 note. Apparently, FNS has no intention of complying with the statutory deadline for a final rule.

According to one discussion in the preamble to the Rule, 3 to 4 percent of the 45,000 WIC-authorized stores are WIC-only stores (1,350 to 1,800 WIC-only stores). 70

Fed. Reg. at 71,709. Elsewhere in the preamble, FNS estimated that in 2004, WIC-only stores comprised 2.5 percent of all WIC vendors (1,125 WIC-only stores, based on total 45,000 WIC-authorized vendors). 70 Fed. Reg. at 71,725.[16]

FNS briefly addressed the Regulatory Flexibility Act ("RFA") in its preamble and concluded that it did not need to evaluate the impact of the Rule on WIC-only stores because, in the agency's view, the number of WIC-only stores was not a substantial number of small entities, but rather "a small number of vendors." 70 Fed. Reg. at 71,709.

## F.    LITIGATION HISTORY

Plaintiffs filed suit on December 16, 2005. Contemporaneous with the filing of the Complaint, Plaintiffs filed a motion seeking a preliminary injunction or, in the alternative, a temporary restraining order ("TRO"). The Court heard argument on Plaintiffs' motion for TRO on December 28 and 29, 2005. On December 28, 2005, the Court entered a TRO, which was further articulated and entered into the record after the hearing on December 29. The TRO restrains FNS from implementing two provisions of the Rule against Plaintiffs. By agreement of the parties, the TRO is in effect until February 9, 2005. The TRO also includes a schedule for briefing and argument on cross motions for summary judgment, with the expectation that the Court will issue its decision on or before February 9, 2005.

## III.    ARGUMENT

### A.    STANDARDS FOR GRANTING SUMMARY JUDGMENT

Summary judgment should be granted only if the moving party has shown that there is no genuine issue of material fact and that the moving party is entitled to judgment

---

[16]    *See* note 21, *infra.*

as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *Spirit of the Sage Council v. Norton,* 294 F. Supp. 2d 67, 80 (D.D.C. 2003), *vacated and remanded as moot,* 411 F.3d 225 (D.C. Cir. 2005). Likewise, when ruling on cross-motions for summary judgment, "'[t]he court must rule on each party's motion on an individual and separate basis, determining in each case whether a judgment may be entered' in accordance with Fed. R. Civ. P. 56." *Spirit of the Sage,* 294 F. Supp. 2d at 81 (citing *Held v. American Airlines, Inc.,* 13 F. Supp. 2d 20, 23 (D.D.C. 1998)).

"When reviewing agency action pursuant to the APA on motions for summary judgment, we 'review the administrative record directly...[to]...determine whether the agency has complied with the APA; specifically, whether its actions have been arbitrary or capricious, including whether it has acted consistently with its own procedures; and whether its applications of its governing law have been reasonable.'" *Spirit of the Sage,* 294 F. Supp.2d at 81 (citing *Troy Corp. v. Browner,* 120 F.3d 277, 281 (D.C. Cir. 1997) (citations omitted)). In APA review cases, "the district judge sits as an appellate tribunal. The entire case on review is a question of law." *American Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083-84 (D.C. Cir. 2001) (citations omitted).

**B.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT**

As demonstrated below, Plaintiffs are entitled to summary judgment because the Rule is procedurally and substantively defective. FNS failed to follow statutory requirements and USDA policy, both of which mandate notice-and-comment procedures. Further, FNS violated the RFA by failing to conduct an appropriate regulatory flexibility analysis. Finally, the requirements of the Rule are inconsistent with the Reauthorization Act and with Congressional intent. Had FNS adhered to the requirements of the APA

and the RFA, it would have been able to promulgate a rule that was consistent with the

Reauthorization Act and Congressional intent.

> **1. FNS Failed To Use Required Notice-and-Comment Rulemaking Procedures And Did Not Establish Good Cause For Departing From Those Requirements And Thus Failed To Comply With The Administrative Procedure Act**

FNS issued the Rule as an interim final rule effective in 30 days, and did not first

publish and solicit comment on a proposed rule prior to its effective date.  FNS violated

the notice-and-comment rulemaking requirements in section 553 of the APA.

> **a. FNS's Promulgation Of The Rule Is Not Exempt From Section 553 Of The APA**

Section 553 of the APA generally requires, among other things, that an agency

must publish a notice of proposed rulemaking stating "either the terms or substance of the

proposed rule or a description of the subjects and issues involved," and then must give

interested persons an opportunity to participate in the rulemaking and to consider the

relevant matter presented.  5 U.S.C. § 553(b)(3), (c).  Failure to comply with notice-and-

comment prior to the effective date of a rule renders the rule void for lack of proper

procedure, in violation of 5 U.S.C. § 553 and § 706.  An agency may avoid the prior

notice-and-comment requirements of section 553(b) if it "for good cause finds (and

incorporates the finding and a brief statement of reasons therefor in the rules issued) that

notice and public procedure thereon are impracticable, unnecessary, or contrary to the

public interest."  5 U.S.C. § 553(b)(B).

While 5 U.S.C. § 553(a)(2) exempts, among other things, rules that involve

matters relating to "grants, benefits, or contracts" from the APA's notice-and-comment

requirements, that exemption is not available to FNS.  In 1971 USDA committed to

abiding by the prior notice-and-comment requirements of the APA in all such rulemakings, 36 Fed. Reg. 13,804 (July 24, 1971), and may not evade them here.

The controlling law of the D.C. Circuit is *Rodway v. USDA*, 514 F.2d 809 (D.C. Cir. 1975), and its progeny. *Rodway* involved FNS regulations that implicated a benefit program far more directly than even the Rule here; in *Rodway*, members of low income households brought suit challenging the coupon allotment system USDA put in place to implement the Food Stamp Act. *Id.* at 812. USDA claimed the allotment regulations were exempt from prior notice and comment because the food stamp program was a "grant" or "benefit" program. In light of USDA's 1971 *Federal Register* notice, the D.C. Circuit disagreed:

> The food stamp program would appear to be a matter relating to public "grants" or " benefits," thereby exempting rules relating to the program from the APA.
>
> On July 24, 1971, however, as a result of a recommendation of the Administrative Conference of the United States, USDA promulgated a regulation making the procedural requirements of Section 4 of the APA applicable to all of its rule-making relating to "public property, loans, grants, benefits, or contracts." The regulation was effective immediately. 36 Fed. Reg. 13804. It is, of course, well settled that validly issued administrative regulations have the force and effect of law. *Thus the regulation fully bound the Secretary to comply thereafter with the procedural demands of the APA.*

*Rodway*, 514 F.2d at 813-14 (citations omitted) (emphasis added). The D.C. Circuit concluded that USDA had violated section 553.

More recently, the D.C. Circuit held that USDA had violated the APA when it ignored notice and comment procedures and instead implemented by press release a payment-in-kind ("PIK") program providing payments to sugar growers, processors, refiners and marketers by press release. *Sugar Cane Growers Co-op. of Fla. v. Veneman*,

289 F.3d 89, 95 (D.C. Cir. 2002). The failure to comply with section 553 was not, the D.C. Circuit concluded, harmless error. The D.C. Circuit dismissed the argument that USDA might be exempt from section 553 because the PIK program was one of "benefits" and "grants." Citing *Rodway* and the 1971 *Federal Register*, the Court explained that USDA has "essentially waived that APA exemption." *Id.* at 95 n.5. *See also Petry v. Block*, 737 F.2d 1193, 1197 n.12 (D.C. Cir. 1984).[17]

Thus, the law of this Circuit is that the 1971 *Federal Register* notice fully binds USDA to compliance with the procedural notice-and-comment demands of the APA, even when the rule itself may be exempt under section 553(a)(2). *Rodway*, 514 F.2d at 814.[18]

### b.   FNS Did Not Meet The "Good Cause" Exemption From Notice-And-Comment Procedures

As stated above, an agency may only avoid the section 553 notice-and-comment requirements if it "for good cause finds" that prior notice-and-comment is "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). In a cursory statement, FNS states that it has such "good cause" because the Reauthorization Act makes these APA procedures unnecessary:

> [Section 501 of the Reauthorization Act] requires that guidance to implement [the cost containment provisions] be issued as soon

---

[17]   Further, the exemptions from notice and comment FNS now claims appear to be the post-challenge arguments of litigation counsel. The preamble to the Rule references neither Section 553(a)(2) nor the 1971 *Federal Register* notice.

[18]   To the extent the 1971 *Federal Register* notice applies, FNS also violated the APA when it failed to explain the basis for its departure from these longstanding requirements. When an agency changes its course, it must supply a "reasoned analysis" indicating what factors brought about the change and why. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983). FNS did not do so and, in fact, did not refer to the 1971 *Federal Register* notice at all.

> after the date of enactment as practicable, and authorizes the
> issuance of interim final regulations.  Therefore, Under Secretary
> Eric M. Bost has determined, in accordance with 5 U.S.C. 553(b),
> that prior notice and comment would be unnecessary, and that
> good cause exits for making this rule effective without first
> publishing a proposed rule.

70 Fed. Reg. at 71,712.  For this claimed exemption, FNS apparently relies on the

permissive authority to issue interim final regulations which is contained in Section

501(b) of the Reauthorization Act.  The Act states:

> (b) **Interim Final Regulations.**—The Secretary *may* promulgate
> interim final regulations to implement the amendments described
> in subsection (a).

42 U.S.C.A. § 1758 note (emphasis added).  FNS errs in its conclusion that Section

501(b) exempts it from the APA's notice-and-comment requirements.

   While Congress may modify the requirements of prior notice-and-comment

contained in section 553, a "[s]ubsequent statute may not be held to supersede or modify

this subchapter…except to the extent that it does so *expressly*."  5 U.S.C § 559 (emphasis

added).  "Exemptions from the terms of the [APA] are not lightly to be presumed in view

of the statement in [section 559] that modifications must be express."  *Marcello v. Bonds*,

349 U.S. 302, 310 (1955).  *Accord American Fed'n of Gov't Employees, AFL-CIO v.

Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) (quoting *State of N.J., Dep't of Envtl. Prot.

v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)) (exceptions to prior notice-and-comment

are "narrowly construed and only reluctantly countenanced"); *Asiana Airlines v. F.A.A.*,

134 F.3d 393, 396 (D.C. Cir. 1998); *Air Transport Ass'n of America v. Dept. of Transp.*,

900 F.2d 369, 379 (D.C. Cir. 1990), *vacated as moot*, 933 F.2d 1043 (D.C. Cir 1991).

"[T]he import of the § 559 instruction is that Congress's *intent to make a substantive*

*change* be clear." *Asiana Airlines*, 397 F.3d at 397 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Board of Governors*, 745 F.2d 677, 686 (D.C. Cir. 1984) (emphasis in original)).

The Reauthorization Act does not state that FNS may dispense with APA procedures. Indeed, the Reauthorization Act says nothing about notice-and-comment procedures at all. Rather, section 501(b) provides, between two mandates (FNS "*shall*" issue a guidance (Section 501(a)) and "*shall*" promulgate final regulations (section 501(c)), an option: "The Secretary *may* promulgate interim final regulations." 42 U.S.C.A. § 1758 note (emphasis added). Such optional language is not sufficient to excuse compliance with notice-and-comment procedures because Section 559 of the APA requires that any exemptions from notice-and-comment procedures be express. *Cf.*, *Asiana Airlines*, 134 F.3d at 397-99 (statutory language expressly exempted agency from notice-and-comment requirements); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1236 n.18 (D.C. Cir. 1994) (same).

Where Congress wishes to exempt FNS from prior notice-and-comment requirements (whether arising from the APA or the 1971 *Federal Register* notice), it has done so, and with the specificity that section 559 of the APA requires. Prior enactments with express notice-and-comment exemptions for USDA include the following:

- Military Construction Appropriations and Emergency Hurricane Supplemental Appropriations Act, 2005 Pub. L. No. 108-324 (October 13, 2004) ("The issuance of regulations shall be made without regard to: (1) the notice and comment provisions of section 553 of title 5, United States Code; [and] (2) The Statement of Policy of the Secretary of Agriculture effective July 24, 1971 (36 Fed. Reg. 13,804), relating to notices of proposed rulemaking and public participation in rulemaking….").

- Farm Security and Rural Investment Act of 2002 Pub. L. No. 107-171 (May 13, 2002) ("(2) PROCEDURE.—The promulgation of the regulations

and administration of this title shall be made without regard to—...(B) the Statement of Policy of the Secretary of Agriculture effective July 24, 1971 (36 Fed. Reg. 13,804), relating to notices of proposed rulemaking and public participation in rulemaking; and (C) the notice and comment provisions of section 553 of title 5, United States Code.").[19]

- An Act to Respond to the Continuing Economic Crisis Adversely Affecting American Agricultural Producers Pub. L. No. 107-25 (August 13, 2001) (Sec. 12 Regulations. (a) ...The promulgation of the regulations and administration of this Act shall be made without regard to—(1) notice and comment provisions of section 553 of title 5, United State Code; (2) the Statement of Policy of the Secretary of Agriculture effective July 24, 1971 (36 Fed. Reg. 13,804), relating to notices of proposed rulemaking and public participation in rulemaking; and....").

- An Act Making Consolidated Appropriations for the fiscal year ending September 30, 2000, and for Other Purposes Pub. L. No. 106-113 (November 29, 1999) (Appendix H-H.R. 3428 "(e) IMPLEMENTATION OF REQUIREMENT.—The implementation of the final rule, as modified by subsection (c), shall not be subject to any of the following: (1)...or the notice and comment provisions of section 553 of title 5, United States Code...(3) the Statement of Policy of the Secretary of Agriculture effective July 24, 1971 (36 Fed. Reg. 13,804), relating to notices of proposed rulemaking and public participation in rulemaking....").

The Reauthorization Act contains no comparable language.

FNS has failed to comply with the prior notice-and-comment procedures of section 553 that are necessary for a valid rule. The agency has not met the rigorous standards that provide very limited exceptions to those requirements. The Rule is invalid and, under 5 U.S.C. § 706(2), should be declared unlawful and set aside.

**2.    FNS Failed To Conduct An Adequate Analysis Under The Regulatory Flexibility Act**

The RFA, 5 U.S.C. § 601 *et seq.*, requires agencies proposing rules to assess the potential economic impact on small businesses. When promulgating a rule, a federal agency is required to prepare an RFA analysis that includes a "description of the steps the

---

[19]    This exemption appears in four separate provisions of P.L. 107-171, of which the cited section is only one.

agency has taken to minimize the significant economic impact on small entities" and an explanation of why other significant alternatives were rejected by the agency. 5 U.S.C. § 604(a)(5). Moreover, the RFA requires that an agency "evaluate the adverse economic effects of and less harmful alternatives to its actions *before* taking them." *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1286 (D.C. Cir. 2005) (emphasis added) (citations omitted). For "any rule subject" to the RFA, "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610." 5 U.S.C. § 611(a)(1).[20]

FNS has conceded the applicability of the RFA to the Rule, by including a threshold RFA analysis that was brief, contradictory, and violative of the RFA's requirements. FNS's RFA analysis occupied merely two paragraphs of the preamble to the Rule, and began with the statement: "FNS does not believe this rule will have a significant economic impact on a substantial number of small entities." 70 Fed. Reg. at 71,709. However, FNS contradicted that conclusion in the very next paragraph of the preamble:

> [T]he rule *may have a significant economic impact on a small number of vendors* that have been authorized to participate in the WIC Program. These vendors tend to be smaller grocery stores that serve WIC participants exclusively or predominantly, have a large volume of WIC transactions, and are not subject to the retail market forces that keep food prices at competitive levels.... Only those vendors that are able to meet competitive pricing requirements will be able to continue participating in the program. Currently FNS estimates that between three and four percent of the

---

[20]     Interestingly, Congress added the RFA's judicial review provisions in 1996 because many agencies, such as FNS here, were simply paying "lip service" to its procedural protections. 142 CONG. REC. S3242, S3245 (daily ed. Mar. 29, 1996).

> approximately 45,000 authorized vendors will need to make
> changes in the prices that they offer the WIC Program in order to
> be deemed competitive.

*Id.* (emphasis added).  Thus, as noted in Section II.E, the preamble to the Rule estimates

either that between 1,350 to 1,800 WIC-only stores (3 to 4 percent of 45,000 WIC-

authorized vendors, 70 Fed. Reg. at 71,709) or that 1,125 WIC-only stores (2.5 percent of

45,000 WIC-authorized vendors, 70 Fed. Reg. at 71,725) may be impacted by the Rule,[21]

but FNS concludes that this number of entities simply does not constitute "a substantial

number of small entities" sufficient to trigger the protections afforded by the RFA.  This

conclusion is on its face erroneous and unreasonable. [22]

    This Court found a similar RFA analysis deficient in *National Ass'n of*

*Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 33 (D.D.C. 2000).  In that case, the

Secretary of Health and Human Services stated that she did not "anticipate...a substantial

economic impact on most Medicare-participating hospitals." *Id.* at 43 (internal citations

omitted).  The Court found the Secretary's analysis "severely lacking" because she failed

---

[21]    It appears that the 2.5 percent estimate (1,125 WIC-only stores) is FNS's current estimate.  *See* Declaration of Ronald Vogel at ¶ 8 (submitted with FNS's opposition to Plaintiffs' TRO motion).  The Administrative Record shows that FNS had difficulty determining the number of WIC-only stores.  At one point, FNS calculated that there could be up to 13,034 WIC-only stores.  AR 01042.  A few weeks prior to publishing the Rule, FNS estimated the number of WIC-only stores in 2004 at 1,241, and admitted "[w]e don't currently know the actual number of >50% vendors, or have a reasonable means to guesstimate what this number will be." AR 01831.

[22]    FNS's cavalier disregard for these small WIC-only grocery stores is especially offensive because the RFA is precisely intended to avoid the very ills that would afflict NWGA's members.  Indeed, Congress itself was sensitive to the hardship that the cost containment provisions of the Reauthorization Act might impose upon WIC-only stores and explained that the Reauthorization Act "is not intended to eliminate WIC-only stores or to force the WIC-only stores to price their products less than the larger retail stores." 150 CONG. REC. H4932 (daily ed. June 24, 2004) (Statement of Rep. Waters).

to make a "reasonable, good-faith effort to canvass major options and weigh their probable effects." *Id.* (quoting *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 116 (1st Cir. 1997)).

Here, FNS's RFA analysis is even more deficient. Although what constitutes a "substantial number" of small entities is not defined in the RFA, it is incumbent upon the agency to determine how many small businesses affected by the regulation may suffer a significant economic impact. *See Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001). FNS concedes both that WIC-only stores are "smaller grocery stores" and that the Rule may have a significant economic impact on some or all of the 1,125 to 1,800 WIC-only stores it admits the Rule will impact. Since FNS provides no estimate of the number of these stores that will be significantly impacted, the court can only assume they all will be significantly impacted.

FNS simply refused to conduct the analysis that logically flows from the regulatory and statistical uncertainty as to the impact of its Rule:

> With the high degree of State flexibility allowable under the rule, small entities will be impacted differently in each State depending upon how that State chooses to meet the requirements set forth here. It is therefore not feasible to accurately estimate the rule's impact on small entities.

70 Fed. Reg. at 71,709. The RFA contains no exemption for an agency's unwillingness to address its statutory duties. Interestingly, however, such uncertainty did not stymie FNS's confident assertion that the Rule will result in cost savings of $75 million per year as these same small entities reduce prices or exit the WIC Program. *Id.*

FNS does conclude that the Rule "may have a significant economic impact" on the universe of at least 1,125 smaller WIC-only retailers – not an insubstantial number of

small entities. FNS's attempts to be excused from compliance with the RFA because 1,125 "smaller grocery stores" is only a "small number of vendors" are not persuasive. Assuming that FNS's various estimates of either 1,125 or 1,350 to 1,800 WIC-only stores are correct, FNS's Rule will have a significant economic impact on an overwhelming majority of those stores. *See* Robinson Decl. at ¶ 27. In view of this admitted and demonstrated impact, FNS was required to prepare and publish a complete RFA analysis.

Without properly assessing the impact of the Rule on WIC-only stores, FNS failed to comply with its obligations under the RFA. As such, FNS's actions violate the protections afforded small businesses under the RFA.

### 3.    The Rule Is Substantively Deficient

#### a.    The Reauthorization Act

A brief review of the operative provisions of the Reauthorization Act is necessary before discussing the Rule's substantive deficiencies.

The vendor cost-containment provisions of the Reauthorization Act are express that "vendor peer groups" are required, and, importantly, that competitive price criteria and reimbursement levels be established for *each* peer group. State agencies are also to "establish a vendor peer group system." 42 U.S.C. § 1786(h)(11)(A)(i)(I). States are also to "establish competitive price criteria and allowable reimbursement levels that *comply with subparagraphs (B) and (C)*, respectively, and that do not result in higher food costs if program participants redeem supplemental food vouchers at [WIC-only] vendors." § 1786(h)(11)(A)(i)(III)(bb) (emphasis added). Subparagraph (B) requires that states "shall establish competitive price criteria for *each* peer group...." § 1786(h)(11)(B) (emphasis added). Likewise, subparagraph (C) clearly requires that states "shall establish

allowable reimbursement levels for *each* vendor peer group...." § 1786(h)(11)(C) (emphasis added). Thus, the key provisions of the statute require that competitive price criteria *and* allowable reimbursement levels are both established on a peer group-by-peer group basis.

The statute requires that FNS certify state cost containment plans only where the state can demonstrate that its competitive price criteria *and* its allowable reimbursement levels (which, as noted, by terms of the statute must both be established on a peer group-by-peer group basis) do not result in average payments per voucher to WIC-only stores "that are higher than average payments per voucher to *comparable* vendors...." § 1786(h)(11)(D)(ii)(E) (emphasis added). The term "comparable vendors" can only refer to vendors in comparable peer groups, a conclusion which FNS refuses to accept.

Finally, these provisions for establishing competitive price criteria, setting allowable reimbursement levels, and certifying state plans must be read in context with the Reauthorization Act's express requirement that FNS cannot compel states to provide less reimbursement to WIC-only stores than to "comparable" vendors:

> Nothing in this *paragraph* [42 U.S.C. § 1786(h)(11)] shall be construed to compel a State agency to achieve lower food costs if program participants redeem supplemental food vouchers at [WIC-only stores] rather than at [traditional vendors].

§ 1786(h)(11)(A)(i) (emphasis added). Simply put, nothing in the new vendor cost containment paragraph authorizes FNS to require states to implement a system where the

WIC Program would save money when a recipient chooses to redeem benefits at a WIC-only store instead of at a comparable traditional authorized vendor.[23]

### b. The Rule Is Invalid Under *Chevron* "Step One" Because It Is Inconsistent With The Reauthorization Act

In reviewing an agency regulation, this Court is guided by the standard of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984):

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

Here, the Rule cannot stand under this *Chevron* "step one" test because (1) its mandated comparison of WIC-only stores prices to *all* retail store prices renders meaningless the peer group requirements of the statute; and (2) its use of an all-vendor average will compel state agencies to achieve lower food costs if program participants chose to shop at WIC-only stores. In both instances, the Rule violates the "endlessly reiterated principle of statutory construction...that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995) (citations omitted); *see also Murphy Exploration and Prod. Co. v. U.S. Depart. of Interior*, 252 F.3d 473, 481 (D.C. Cir. 2001).

---

[23] It is clear that the Reauthorization Act requires a delicate balance be struck. FNS and state agencies are required to ensure that WIC recipient shopping choices are, in effect, cost neutral. Reimbursements to WIC-only stores cannot result in higher food costs. At the same time, a high degree of care is required in the development of competitive price criteria and allowable reimbursement levels because they cannot be used to achieve lower food costs if a recipient redeems benefits at a WIC-only store. *See* 150 CONG. REC. E1328 (2004) (statement of Rep. Boehner: "The objective is neutrality: for WIC-Only store costs to be at the same levels as comparable market-based vendors." Cost containment is not to be achieved by "driv[ing] vendors out of the program"). FNS failed to find the needed balance.

    **i.**  **Comparison Of WIC-Only Store Prices To Average Of All Retail Store Prices Renders Meaningless The Peer Grouping Requirements Of The Statute**

The Rule makes a charade of the Reauthorization Act's entire vendor peer group system in two regards.

First, while the Rule attempts to pay lip service to the peer group requirements of the statute, it requires that state agencies compare payments to WIC-only stores with payments to *all other* WIC-authorized vendors rather than to comparable traditional stores. Specifically, state agencies must:

> [C]ompare the average cost of each type of food instrument redeemed by [WIC-only stores] against the average cost of the same type of food instrument redeemed by regular vendors.

*New* 7 C.F.R. § 246.12(g)(4)(i)(D), 70 Fed. Reg. at 71,723. State agencies are required to take draconian action if average payments to WIC-only stores under this mandatory calculation are higher than the average payment to all other stores:

> If average payments per food instrument for [WIC-only stores] exceed average payments per food instrument to regular vendors, then the State agency must take necessary action to ensure compliance, such as adjusting payment levels, recouping excess payments, or terminating vendor agreements with [WIC-only stores]....

*Id.* This requirement effectively nullifies the peer group provisions of the statute.

Second, the Rule makes FNS certification contingent upon this general averaging test. To be certified by FNS, the Rule requires that states demonstrate that "competitive price criteria and allowable reimbursement levels do not result in average payments per food instrument to these vendors that are higher than average payments per food instrument to comparable vendors...." § 246.12(g)(4)(vi), 70 Fed. Reg. at 71,724. The

Rule's inclusion of the term "comparable" in this sentence, however, is a sham, because the Rule goes on to require that:

> To calculate average payments per food instrument, the State agency *must* include either all food instruments redeemed by *all authorized vendors* or a representative sample of the redeemed instruments.

*Id.* (emphasis added).

The Rule's failure in both of these provisions to compare WIC-only stores with "comparable" stores effectively reads the peer grouping requirements out of the statute. It also renders meaningless the required comparison to "comparable" stores in the statute's certification provision. For this reason, the FNS rule is contrary to the plain language of the Reauthorization Act and this Court should set it aside under *Chevron* "step one."[24]

ii.    **Comparison Of WIC-Only Store Voucher Costs To The Average Of All Retail Store Voucher Costs Renders Meaningless The Prohibition On Achieving Lower Food Costs If Participants Shop At WIC-Only Stores**

By requiring a comparison of WIC-only voucher costs to the voucher costs of all regular vendors, the Rule compels states to seek to achieve lower food costs when a recipient chooses to redeem benefits at a WIC-only store. This is because the use of a

---

[24]    Even assuming for discussion purposes that the Rule is able to survive scrutiny under *Chevron* "step one," it must be set aside. The D.C. Circuit has explained that "[t]he paramount objective [for a reviewing court] is to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future." *Pacific Legal Found. v. Dep't of Trans.*, 593 F.2d 1338, 1343 n.35 (D.C. Cir. 1979) (quoting *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)). FNS has not met its burden. The preamble to the Rule offers no explanation of why FNS declined to compare WIC-only stores to comparable vendors, and the Administrative Record is completely void of any evidence or rationale to support FNS's decision to compare WIC-only stores to all other vendors. Thus, there is no evidence that FNS's Rule is the product of "reasoned decisionmaking." Therefore, the Rule is arbitrary and capricious. *See generally Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52; 5 U.S.C. § 706.

simple average does not reflect what food costs would be if recipients shopped at comparable stores rather than at WIC-only stores. Instead, it merely shows what costs would be if recipients shopped at "average" vendors. The distinction between the costs at comparable WIC-authorized regular vendors and the costs at "average" authorized vendors is significant.

As a practical matter, there is no such thing as an "average" vendor. It is a mathematical fiction that does not properly account for the presence of large, national chains such as Wal-Mart. Unlike WIC-only stores, Wal-Mart and other large retailers have significant purchasing power and their size gives them the ability to purchase products from manufacturers at significantly reduced prices. Often these retail Goliaths are able to offer prices to consumers that are below the wholesale cost for WIC-only stores. *See* Supp. Robinson Decl. at ¶ 3; Supp. Dillard Decl. at ¶ 7.

The effect of Wal-Mart and other large retailers in the calculation of the cost of the "average" vendor is considerable. In Oklahoma, for example, Wal-Mart accounts for approximately 49 of percent retail grocery sales, and all Wal-Mart stores in that state are WIC-authorized vendors. Supp. Robinson Decl. at ¶¶ 5, 6. Likewise, Wal-Mart accounts for over 53 percent of the retail grocery sales in Arkansas. Supp. Dillard Decl. at ¶ 8. As such, their market presence will have a significant impact on the calculation of the average payments per food instrument.

By applying to WIC-only stores a test based on average payments per food instrument for all stores, FNS will subject WIC-only stores that are operating in compliance with the competitive price criteria and reimbursement levels set for their peer group and for any comparable peer group to retroactive sanctions and recoupments, and

31

face termination of their vendor contracts. By forcing a rigid comparison and effectively tying competitive price criteria and reimbursement levels to the imaginary "average" traditional WIC retailer, the impact of the Rule is to achieve lower food costs when a recipient chooses to shop at a WIC-only store, in contravention of the statute.[25] This is due to the fact that allowable reimbursement levels for WIC-only stores will be limited to that of the average regular WIC retailer.

Thus, the Rule effectively reads out of the statute the express statutory language in § 1786(h)(11)(A)(i) that "[n]othing in this paragraph shall be construed to compel a State agency to achieve lower food costs if program participants redeem supplemental food vouchers at [WIC-only stores] rather than at [traditional vendors]." FNS's interpretation violates the fundamental principle of statutory construction that surplus language is disfavored and that meaning should be accorded to all words in a statute. *Qi-Zhuo*, 70 F.3d at 139; *Murphy Exploration*, 252 F.3d at 481. This Court should set aside the Rule under *Chevron* "step one" because it is inconsistent with the plain language of the Reauthorization Act.

### c. The Rule Is Invalid Under *Chevron* "Step Two" Because Of Its Retroactive Effects And Failure To Consider Participant Access

Even if the statutory language were silent or ambiguous (and it is not), the Rule cannot stand. Under *Chevron* "step two," where a court concludes that the statute is

---

[25]    FNS is well aware of the significant difference between the "average" vendor and a WIC-only vendor. The Administrative Record includes surveys of state redemption data for FY 2004. *See, e.g.,* AR 01013-01017. States were not asked to compare prices of "comparable" stores, but were asked to report average redemption data for: (1) all vendors; (2) WIC-only vendors; and (3) non-WIC-only vendors. In Alabama, for example, there was difference of over $8 between the cost of a WIC-only store and an "average" retailer for the redemption of a coupon for milk, cereal, juice and cheese. *Id.* at 01014.

silent or the language is ambiguous, the court owes an agency interpretation deference only if that interpretation is based on a permissible construction of the statute and leads to reasonable results. *Chevron*, 467 U.S. at 843-44. Moreover, only those agency interpretations adopted through notice-and-comment rulemaking are automatically entitled to *Chevron* deference; where (as here) agency interpretations are adopted through less formal means, a lower degree of deference is generally appropriate. *See United States v. Mead Corporation*, 533 U.S. 218 (2001); *see also Barnhart v. Walton*, 535 U.S. 212 (2002). When judged by these standards, two provisions of the Rule fail: the recoupment requirement, and participant access.

> **i.    There Is No Statutory Authorization For Requiring Retroactive Recoupment**

FNS has construed the Reauthorization Act as allowing it to mandate "recoupment." This demand for retroactive payments from the states and their authorized vendors is not a permissible construction of the Reauthorization Act. In the Rule, FNS mandates that in the event that average payments per food instrument redeemed by WIC-only vendors exceed the average cost of the same type of food instrument redeemed by regular vendors, the state agency must take "action to ensure compliance, such as...recouping excess payments, or terminating vendor agreements...." *New* 7 C.F.R. § 246.12(g)(4)(i)(D). This regulatory language will compel states to seek recoupment of payments and to terminate WIC-only vendors whose average payments per food instrument exceed the average payments for regular vendors, even though the WIC-only vendors comply with the FNS-mandated, state-established competitive price criteria and allowable reimbursement levels for their peer group.

The Reauthorization Act requires each State agency to establish "competitive price criteria for each peer group" and "allowable reimbursement levels for supplemental foods for each vendor peer group...." 42 U.S.C. § 1786(h)(11). Plaintiffs agree that each State agency must assure that vendors comply with the competitive price criteria and allowable reimbursement levels for their peer group.

However, nothing in the Reauthorization Act authorizes retroactive recoupment of payments or the termination of vendors on the basis of ex post facto calculations of statewide averages. There is no language in the Reauthorization Act which permits FNS to compel States to retroactively calculate statewide average payments and to seek recoupment from WIC-only vendors whose average payments are in the 51st percentile and higher, when these vendors are already in full compliance with the competitive price criteria and allowable reimbursement levels authorized and required by the statute.

It is well-settled that federal agencies may not retroactively recoup sums from their regulated entities absent express Congressional authorization. The Supreme Court struck down an attempt by the Department of Health and Human Services to retroactively recoup money from Medicare service providers, stating that:

> Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (citations omitted).

The problem with the retroactive requirement in *Bowen* and with the retroactive requirement here is that they are intended to subject an entity providing goods or services to the government to financial obligations that it could not have calculated or quantified at the time the goods or services were provided, and where the financial recoupment

would not be based on any act or omission by the provider of goods or services. It is perfectly sensible that the law does not look with favor on retroactive arrangements and requires any retroactivity to have explicit statutory authorization.

Thus, absent express legislative language authorizing retroactive recoupments, the Reauthorization Act cannot be construed to have the retroactive effect mandated by the Rule. The Reauthorization Act contains no such retroactive language, and the Rule's attempt to require states to seek retroactive recoupments is void, without effect, and not a permissible or reasonable construction of the statute. Thus, the Rule fails under *Chevron* "step two."

### ii.    The Rule Is An Unreasonable Interpretation Of The Statutory Requirements To Consider Geographical Factors And Participant Access

The Rule is an unreasonable interpretation of the Reauthorization Act's requirement that participant access be a critical factor in establishing vendor peer groups, competitive price criteria, and reimbursement levels. The statute is express that participant access should be an overarching concern in establishing peer groups and the competitive price criteria and allowable reimbursement levels within those groups. For example, the statute requires that, in establishing allowable reimbursement levels, "the State agency *shall* consider participant access in a *geographic area*." 42 U.S.C. § 1786(h)(11)(C)(iii) (emphasis added). The only guidance the Rule provides on this requirement is an overly broad statement that "geography" can be measured by "metropolitan or other statistical areas that form distinct labor and products markets...." *New* 7 C.F.R. § 246.12(g)(4)(ii)(A), 70 Fed. Reg. at 71,723.

The "geographic area" that the statute refers must be read together with the requirement for participant access and can only be reasonably interpreted to mean the area in which a WIC recipient would reasonably choose to shop.    The Rule does not, but should, take into consideration where a WIC recipient would shop if the WIC-only store were not an option.    Since the WIC Program is targeted at lower-income individuals, recipients may not have the same shopping options as most Americans, and many cannot simply get in a car and drive to a supermarket or "box store."  A number of factors affect a recipient's choice of shopping venue, and it is naive to assume that, in the absence of a WIC-only store, a recipient would chose, or even be able to find, an "average" cost store. *See* Robinson Decl. ¶ 19.  It is more reasonable to expect that the most logical choice would be to shop at another conveniently located authorized vendor, and many of these alternative vendors will have costs to the WIC Program that are equal or higher than the prices at WIC-only stores.  Robinson Decl. ¶ 39.

The use of "metropolitan or other statistical areas that form distinct labor and products markets," *new* 7 C.F.R. § 246.12(g)(4)(ii)(A), requires that states consider shopping venues that are not realistic options for WIC recipients.[26]  The intent of the Reauthorization Act calls for a more tailored consideration of "geographic area."  Thus, the Rule provides an unreasonable interpretation of the Reauthorization Act and should be set aside by this Court under *Chevron* "step two."

---

[26]    The Metropolitan Statistical Area for the Washington, D.C. region extends from, for example, Fredericksburg, VA in the south to Frederick, MD in the north.  *See* http://www.census.gov/population/estimates/metro-city/List1.txt.    It defies common sense to suggest that a consumer would travel such a large distance to do weekly grocery shopping.

**C.    THIS COURT SHOULD VACATE THE ENTIRE RULE**

Having established that Plaintiffs are entitled to summary judgment, Plaintiffs respectfully request that the Court vacate the Rule and remand the matter to FNS for re-promulgation in accordance with section 553 of the APA and the RFA. Such relief is appropriate here and well supported in this Circuit. Where an agency promulgates a rule "without observance of [the APA] procedure required by law," the rule is "unlawful and set aside." *Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(D)). Thus, "[i]f an appellant has standing-which is undeniable here-and prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order" and the matter remanded to the agency for re-promulgation in accordance with APA requirements. *American Bioscience*, 269 F.3d 1077, 1084, 1086 (citing *Association of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1061 (D.C. Cir. 2000)). "[T]he the appropriate remedy is to vacate the rule and remand it to the [agency] with instructions to truly begin anew the APA mandated notice and comment procedures with the open mind required by governing authorities." *Spirit of the Sage*, 294 F. Supp. 2d at 90 (citing *American Bioscience*, 269 F.3d at 1084).[27]

As the D.C. Circuit has stated, and as this Court adopted:

> We have made clear that when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their

---

[27]    *See also Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003); *Air Transport Ass'n*, 900 F.2d at 380 ("[o]rdinarily, when agency rules have been invalidated, the agency may not rely on those rules until they have been repromulgated in accordance with the APA"); *Reeder v. FCC*, 865 F.2d 1298, 1306 (D.C. Cir. 1989) (making "no judgment on the merits of [the] rules," court vacated the rules for failure to comply with section 553 and remanded to the agency).

> application to the individual petitions is proscribed. ... The
> [APA] permits suit to be brought by any person "adversely
> affected or aggrieved by agency action." In some cases the
> "agency action" will consist of a rule of broad applicability;
> and if the plaintiff prevails, the result is that the rule is
> invalidated, not simply that the court forbids its application
> to a particular individual.

*National Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir.

1998) (internal quotations and citations omitted), cited in *Doe v. Rumsfeld*, 341 F. Supp.

2d 1, 17-19 (D.D.C. 2004). Where, as here, the violation arises from an invalidly

promulgated rule of broad and general applicability and Plaintiffs will be adversely

affected, the appropriate remedy is to vacate the Rule. Under this controlling authority,

there is no basis for limiting relief to Plaintiffs.

In sum, FNS flagrantly violated the APA by failing to subject its Rule to prior

notice-and-comment. The Rule itself goes beyond what is authorized by statute. The

WIC-only stores had no opportunity to engage the agency on the Rule officially, and

force the agency to at least acknowledge and address their concerns on the record, as an

agency must do prior to adopting a final rule. The prejudice to Plaintiffs is evident and

encompasses far more than a deprivation of the procedural protections the APA and RFA

afford. Harm to the Plaintiffs' businesses and livelihoods is amply demonstrated in the

record. Robinson Decl. at ¶¶ 21-28, 39-40; Dillard Decl. at ¶¶ 13-16; Halbert Decl. at

¶¶ 15-19; Supp. Dillard Decl. ¶¶ 1-3, 9; Supp. Robinson Dec. ¶¶ 1-2. Moreover, the

survey data discussed in Section II.A, *supra* show that a rule that forces WIC-only stores

out of business will also prejudice the WIC participants who patronize those stores. Such

an outcome is contrary to the intent of FNS's Rule: "to maximize the number of eligible

women, infants, and children served with available Federal funding." 70 Fed. Reg. at

71,708. FNS's efforts to exclude WIC-only stores will also exclude many of the neediest participants.

Given the extremity of the APA procedural violations, the Rule's substantive defects, and the harm to the Plaintiffs and WIC recipients, the appropriate remedy is to vacate the Rule and remand the matter to FNS to re-promulgate the Rule in compliance with the APA and the RFA.

## IV. CONCLUSION

As a result of the procedural and substantive deficiencies discussed above, FNS's actions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), and without observance of procedure required by law, in violation of the APA, 5 U.S.C. § 706(2)(D). Therefore, this Court should grant Plaintiffs' motion for summary judgment.

Dated:  January 17, 2006                 Respectfully submitted,


                                         Philip C. Olsson, Bar No. 172163
                                         Arthur Y. Tsien, Bar No. 411579
                                         OLSSON, FRANK AND WEEDA, P.C.
                                         1400 16th Street, N.W., Suite 400
                                         Washington, D.C. 20036-2220
                                         (202) 789-1212
                                         (202) 234-3537 (fax)

                                         Attorneys for  National Women, Infants,
                                         and Children Grocers Association,
                                         Nutritional Food Distributors, Inc., County
                                         Food Services, Inc., and Dillard Foods, Inc.