IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WOMEN, INFANTS, AND CHILDREN GROCERS ASSOCIATION, NUTRITIONAL FOOD DISTRIBUTORS, INC., COUNTY FOOD SERVICES, INC., and DILLARD FOODS, INC., <br><br> Plaintiffs, <br> v. <br><br> FOOD AND NUTRITION SERVICE, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) Civil Action No. 05-2432 (EGS) ) ) ) ) ) |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1, Plaintiffs National Women, Infants, and Children Grocers Association ("NWGA"), Nutritional Food Distributors, Inc. ("Nutritional Food Distributors"), County Food Services, Inc. ("County Food Services"), and Dillard Foods, Inc. ("Dillard Foods"), respectfully submit this statement of undisputed material facts in support of their motion for summary judgment.

This statement is supported by cited portions of (1) the Declaration of EAnn Robinson ("Robinson Decl."), the Declaration of Michael G. Dillard ("Dillard Decl."), and the Declaration of J. C. Halbert ("Halbert Decl."), submitted with Plaintiffs' motion for preliminary injunction or, in the alternative, temporary restraining order ("TRO"); (2) the Supplemental Declaration of EAnn Robinson ("Supp. Robinson Decl.") and the Supplemental Declaration of Michael G. Dillard ("Supp. Dillard Decl."), submitted with Plaintiffs' reply memorandum in support of motion for TRO; and (3) the Second Supplemental Declaration of EAnn Robinson ("2nd Supp. Robinson Decl."), the Second Supplemental Declaration of Michael G. Dillard ("2nd Supp. Dillard Decl."), and the Supplemental

Declaration of J. C. Halbert ("Supp. Halbert Decl."), submitted with Plaintiffs' motion for summary judgment.

**Plaintiffs**

1. Plaintiff NWGA is a trade association incorporated under the laws of the District of Columbia. NWGA represents business entities that operate "WIC-only" stores. Robinson Decl. ¶¶ 1-2. NWGA has over 29 members, all of which operate WIC-only stores. Robinson Decl. ¶ 2.

2. Since its organization, NWGA has never had, and for 2005 does not anticipate having, annual revenues in excess of $6.5 million. NWGA has no full time employees. Robinson Decl. ¶ 4.

3. Almost all of NWGA's members are small businesses with annual revenues of less than $25 million. The vast majority of NWGA members have annual revenues of less than $6.5 million. A large number of stores are owned by minorities and women. With only rare exceptions, WIC-only stores that are not members of NWGA are smaller operations than average NWGA members. Robinson Decl. ¶ 5.

4. Nutritional Food Distributors operates five WIC-only stores in Oklahoma. Robinson Decl. ¶ 31.

5. The customer base for Nutritional Food Distributors is approximately 85% Hispanic, 10% African American and 5% Caucasian. Many of its Hispanic customers speak English as a second language or not at all. Also, a large number of its customers of all races cannot read. Robinson Decl. ¶ 32.

6. Sales at Nutritional Food Distributors were $5,892,395 as of July 2005. Robinson Decl. ¶ 36.

7. Nutritional Food Distributors employs 21 full time and 2 part time employees. The majority of its employees are Hispanic or African American and nearly all are either fluent in

Spanish or speak enough Spanish to communicate with its customers in order to complete their WIC orders. Robinson Decl. ¶ 33.

8. Dillard Foods operates four WIC-only stores in Arkansas. Dillard Decl. ¶ 4.

9. Dillard Foods estimates it will have annual sales of $2,368,301 in 2005. Dillard Decl. ¶ 7.

10. Dillard Foods serves about 1,000 WIC customers per week. At two of the four stores, 20 to 30% of the customers are Hispanic. At one store, 95% of the customers are African American. Some customers speak and read very little English and some are deaf. Dillard Decl. ¶¶ 4, 6, 9.

11. County Food Services operates five WIC-only stores in Arkansas. Halbert Decl. ¶ 5.

12. Annual gross sales for County Food Services are estimated to be $2,052,668 for 2005. Halbert Decl. ¶ 7.

13. At all of the County Food Services stores, at least 30% of the customers are Hispanic; at three of those stores, approximately 50% of the customers are Hispanic. At two stores, approximately 25% of the customers are immigrants from the Marshall Islands. Many of the customers cannot speak or read English; many cannot read at all. Employees at County Food Services stores address the language needs of these non-English speaking customers. Halbert Decl. ¶¶ 5, 9.

**The WIC Program And WIC-only Stores**

14. Pregnant and postpartum women, infants and children may be eligible to participate in the WIC Program. A WIC mother enrolls in the WIC Program at the local health clinic. At the clinic, she will receive a WIC voucher each month for each eligible member of her family. In Oklahoma, for example, an eligible mother with an infant and a three-year-old would receive seven or eight separate vouchers each month, three for herself and the three year old and one or two for the

infant depending upon whether the infant is being breastfed and is on cereal and juice yet. The WIC vouchers are in English. The WIC voucher describes a package of food that may be purchased with the voucher. Robinson Decl. ¶ 9.

15. At a traditional grocery store, a WIC mother must perform several steps to redeem her family's vouchers. First, she must search out the WIC authorized food products for each type of food listed on the voucher. For example, most cereals, cheeses and juices available at the store are not authorized products. Moreover, traditional grocery stores do not offer all WIC authorized items. Therefore, some difficulty in locating authorized items may be encountered. Second, the WIC mother must assure that her selection of the WIC authorized item does not exceed the combined volume limit on her family's vouchers. Many WIC authorized products are not available in sizes that correspond with the volume limits authorized on the voucher. Especially when traditional vendors do not offer the full array of WIC authorized products, WIC mothers often have difficulty locating authorized food products that make full use of the authorized volume of each food listed on the voucher. Robinson Decl. ¶ 10; Dillard Decl. ¶ 10; Halbert Decl. ¶ 10.

16. At a traditional grocery store, the WIC mother takes her WIC selections to the checkout counter, where they must be separated from her other purchase items and presented separately for payment. If the WIC mother has selected a food product that is not currently authorized (the list of authorized products changes with some frequency), or an error has been made in the volume of product selected, the checkout line is brought to a halt. The checkout cashier will usually have to call for assistance by loudspeaker, while the WIC mother endures the annoyance of the cashier and persons waiting in line. Robinson Decl. ¶ 12.

17. Sometimes, these problems occur when the WIC mother has done everything correctly. A typical supermarket has 30,000 different SKU's or products. Cashiers sometimes have difficulty

remembering the application of WIC Program rules to various products. An error or misunderstanding by the cashier also brings the checkout line to a halt to the embarrassment of the WIC mother. Robinson Decl. ¶ 13.

18. Many WIC recipients have described being humiliated or stigmatized at a traditional grocery store checkout. Many WIC mothers settle for less than the full volume of product authorized by the WIC voucher to avoid the humiliation of selecting a product that may not be authorized or if she is uncertain about the total volume of product her family's vouchers could purchase. Robinson Decl. ¶ 14; Dillard Decl. ¶ 10; Halbert Decl. ¶ 8.

19. WIC-only store customers may be referred to WIC-only stores by checkout clerks at traditional grocery stores. Dillard Decl. ¶ 11.

20. It is the practice of WIC-only stores to offer for sale every item that is eligible for purchase with WIC vouchers and no other items. With rare exceptions, all purchases are made with WIC vouchers. Most WIC-only stores do not accept cash payment. Robinson Decl. ¶ 2; Halbert Decl. ¶¶ 3, 7; Dillard Decl. ¶ 9.

21. The WIC voucher redemption process can be difficult for WIC mothers who have special challenges, including: do not speak English as a first language, or do not read English; have difficulty adding the authorized volumes on the family's vouchers and comparing that total to the volume size of one or more product volumes; difficulty remembering the authorized list of products; and not being comfortable with friends and neighbors seeing them participating in the WIC Program. These WIC mothers, especially, are more likely to redeem their WIC vouchers for less than the full volume of food that the voucher authorizes. WIC mothers who have children who tend to be particularly demanding in the grocery store setting also find the WIC voucher redemption process a

challenge in a traditional grocery store. Robinson Decl. ¶ 15; Dillard Decl. ¶¶ 9, 10; Halbert Decl. ¶¶ 9, 10.

22. In WIC-only stores, every item that is eligible for purchase with the WIC voucher is typically offered for sale and no other food products are sold. In the vast majority of WIC-only stores, the WIC mother simply presents her vouchers to a checkout clerk who asks the mother her food choices. Then, the clerk quickly fills the purchase with the full volume of the WIC mother's choice of each WIC food on the voucher. Even in WIC-only stores with grocery aisles where the WIC mother selects her food choices, the clerk assists her at checkout to assure that she has selected packages that provide the full volume of product authorized by the family's vouchers. Robinson Decl. ¶ 16; Halbert Decl. ¶ 3, 7; Dillard Decl. ¶ 9.

23. WIC-only stores may hire current and former WIC participants from the local community to work in their stores. WIC-only store personnel generally can communicate in the same language as their WIC customers. The WIC-only store clerks are knowledgeable about the WIC Program and sympathetic to providing a dignified shopping experience for their customers. Robinson Decl. ¶ 17; Halbert Decl. ¶¶ 5, 6.

24. WIC-only stores are more likely than traditional vendors to fully redeem a recipient's food benefits. As a result, the average payment for a voucher redeemed at a WIC-only store is used to purchase a larger volume of food than the average payment for a voucher redeemed at a traditional grocery store. Robinson Decl. ¶ 18; Halbert Decl. ¶ 10; Dillard Decl. ¶ 9.

25. WIC-only stores are often located in places that are very convenient for WIC participants. It is common for WIC-only stores to be located in close proximity to local WIC clinics; in ethnic neighborhoods, where the language services offered by WIC-only stores are especially important;

6

and near military bases, where many young, service families have incomes within the WIC Program edibility guidelines. Robinson Decl. ¶ 19. Halbert Decl. ¶ 5.

26. Shoppers at WIC-only stores must make a separate trip to another retailer to purchase non-WIC food items. Some shoppers at WIC-only stores report that they will not stay in the WIC Program if they must redeem their vouchers at non-WIC-only stores. Dillard Decl. ¶¶ 8, 10, 16; Halbert Decl. ¶ 12; Robinson Decl. ¶ 20.

**Harm Resulting From FNS's Interim Final Rule**

27. If the interim final rule ("the Rule") published on November 29, 2005 is implemented as written, extensive irreparable harm will be done to all of the small businesses operating WIC-only stores around the country. Robinson Decl. ¶ 21.

28. First, the Rule repeatedly invites states to avoid the burden of establishing a regulatory system for WIC-only stores by electing to remove all WIC-only stores from the state's WIC Program. NWGA members view the Rule's publication and implementation timetable, coupled with the Rule's threats to recover funds from any state that does not implement the Rule on time as a calculated, powerful incentive for states to remove all WIC-only stores from their programs. NWGA members are deeply concerned that in this context, at least some states are likely to conclude that the only practical means to comply with requirements of the Rule is to elect to disallow WIC-only store participation in their state's Program. Robinson Decl. ¶ 21-22.

29. Second, the Rule's requirement for a comparison of average per voucher payments to WIC-only stores and all traditional vendors will force WIC-only store prices so low that few if any WIC-only stores can survive. It forces WIC-only store prices far below the prices of comparable stores. In addition, WIC-only stores are subject to recoupment of WIC payments if it turns out that average voucher payments to all traditional vendors are below the average of voucher payments to

WIC-only stores. So, untenable price cut problems are compounded by potential recoupment of past payments. If the certainty of devastating price cuts does not force WIC-only stores to close, the uncertainty regarding potential recoupment of payments will. Robinson Decl. ¶ 23.

30. The Rule defeats the entire principle of limiting prices to the prices of comparable stores. Large box stores, like Wal-Mart, are not comparable to most other stores because they not only have direct-from-manufacturer buying power, they purchase in such volumes that they also receive promotional allowances and other manufacturer concessions of great value. Supermarket chains with their own wholesale supply systems cannot match the prices of the large box stores. Smaller grocers, including almost all WIC-only stores, must purchase all of their food from wholesalers, often at prices similar to the retail prices of large box stores. These fundamental differences between types of grocery stores are why the WIC Program historically has set price limitations by vendor peer groups and why the new law calls for limiting prices to comparable vendors. Robinson Decl. ¶¶ 13, 24; Dillard Decl. ¶ 12.

31. While prices at WIC-only stores are probably higher than those at a large box store like Wal-Mart, they are often competitive with prices charged by other retailers. Halbert Decl. ¶ 14, Robinson Decl. ¶ 37.

32. Since large box stores account for a high volume of WIC redemptions, they tend to set the average for the payments to all traditional vendors. For example, in Oklahoma, Wal-Mart alone accounts for 22% of WIC redemptions. Robinson Decl. ¶ 25.

33. The Rule does not account for clear differences in the vouchers redeemed by WIC-only stores and traditional vendors. A primary reason why customers shop at WIC-only stores is the assistance they receive in fully utilizing their WIC vouchers. So, the average payment for vouchers at WIC-only stores reflects a payment for the full volume of food authorized for purchase with the

WIC voucher. On the other hand, vouchers redeemed at traditional grocery stores often are not redeemed for the full amount of food authorized for purchase with the voucher. To fail to adjust for this fundamental difference makes the comparison of average voucher payments an "apples and oranges" comparison that is always stacked against the WIC-only store. Robinson Decl. ¶ 26.

34. A conservative estimate is that the Rule will force 90% of all WIC-only stores to close within 60 days of implementation. Robinson Decl. ¶ 27.

35. The closure of WIC-only stores will harm the stores and their employees and business allies. In addition, many WIC participants will be adversely affected by closure of WIC-only stores. Some WIC participants are likely to drop out of the WIC Program rather than redeem their benefits in the traditional vendor setting. This Rule does not advance the public benefit of the WIC Program. Robinson Decl. ¶¶ 28, 39-40; Dillard Decl. ¶¶ 14-16; Supp. Dillard Decl. ¶¶ 2, 9-11; Halbert Decl. ¶ 19.

36. It cannot be assumed that WIC participants will shop at the same large, big box stores as other WIC participants if WIC-only stores close. WIC-only store customers are already making a special grocery store trip to find a better setting to redeem their WIC vouchers. If they stay in the WIC Program, some or many participants may seek to redeem their vouchers at other small grocery stores where they can get the same personal assistance they receive at WIC-only stores. Robinson Decl. ¶ 39.

37. WIC-only stores and their trade association have tried to consult with FNS on the Rule. FNS Administrator Roberto Salazar refused a request to provide an opportunity for notice and comment on the Rule. FNS would not discuss development of the Rule when WIC-only stores were present at a meeting of state WIC administrators on July 19 through 21, 2005. Robinson Decl. ¶¶ 7-8; Supp. Robinson Decl. ¶ 10.

38. For the fiscal year ending July 2005, Nutritional Food Distributors's pre-tax profits were ½ % of sales. Nutritional Food Distributors expects to operate at a substantial loss upon implementation of the Rule, due to its limitation of payments to the average of payments to non-WIC-only vendors. If the Rule goes into effect, Nutritional Food Distributors will close within 60 days. Robinson Decl. ¶ 40; Supp. Robinson Decl. ¶¶ 1-2, 5.

39. Implementation of the Rule will harm Dillard Foods because the company will have to operate at a substantial loss upon implementation. Dillard Foods estimates its monthly gross sales at $220,000, all of which is WIC Program sales. For 2005, Dillard Foods, Inc. has achieved a profit of approximately 6% of gross sales, approximately $13,200 per month. According to the payment schedule provided by the State of Arkansas, the average payment made to all regular vendors in Arkansas is approximately 15.2% less than payments made to our stores. Therefore, Dillard Foods estimates that under the Rule, it will experience a $33,400 decline in monthly gross revenue and result in a monthly operating loss of approximately $20,200. Dillard Foods also faces significant costs associated with going out of business. Since the Rule would force Dillard Foods to operate at a substantial loss, any delay in closing down the stores would only result in deepening losses and increasing the potential for bankruptcy. Supp. Dillard Decl. ¶¶ 1-2, 9-11.

40. FNS is requiring the State of Arkansas Department of Health, with which County Food Services has its vendor agreement, to demonstrate that "average payments per food instrument" for WIC-only stores not exceed "average payments per food instrument" for regular vendors. Halbert Decl. at ¶ 15.

41. FNS intends to pursue recoupment and recovery of any payments received by a WIC-only store in excess of the average per voucher payment made to non-WIC-only vendors each month. Supp. Dillard Decl. ¶ 5; Halbert Decl. ¶ 16.

10

42. Based on reports of average payments per food instrument, County Food Services determined that payment at the "average payment per food instrument" is significantly below the cost of operation of County Food Services and significantly below prices allowed for many independent and smaller grocery stores. Continued operation at these payment levels would mean substantial, immediate loses for County Food Services. In addition to closing the company's WIC-only stores, County Food Services would also incur other expenses associated with closing the business. Halbert Decl. ¶¶ 15-16.

43. On January 12 and/or 13, 2006, customers of the three plaintiffs who operate WIC-only stores were asked to fill out a survey regarding redemption of WIC vouchers. Cumulatively, these surveys demonstrate that WIC-only store customers have been badly treated at regular grocery stores (35%), were embarrassed (36%), had difficulty getting the full amount of food allowed by the voucher (12%), and had difficulty finding the WIC-authorized food they wanted (76%). If WIC-only grocery stores were closed, less than half of the participants (34%) are confident that they would stay in the WIC Program, a substantial number say that they would drop out (20%), and the largest number simply don't know (45%). *See* 2nd Supp. Robinson Decl., 2nd Supp. Dillard Decl., and Supp. Halbert Decl.

44. Some survey respondents shared their experiences redeeming WIC vouchers, including the following:

- "You always gets something wrong everytimes you go into it grocery store. It never fails!! This way you get ever thing correct & don't get embaresed!"

- "My son was premature & was on specialty formula that the grocery store refused to carry. Only the WIC center made sure to stock it for us."

- "Was in the gro. store waiting in line and a man behind me said everyone wants something for nothing. People just look at ya weird."

*See* 2nd Supp. Robinson Decl., 2nd Supp. Dillard Decl., and Supp. Halbert Decl.

45. On December 29, 2005, the House and Senate Interim Committees on Public Health, Welfare, and Labor of the Arkansas State Legislature adopted a resolution requesting that the Arkansas Congressional delegation review the impact of the Reauthorization Act. 2nd Supp. Dillard Decl. ¶ 7.

Dated: January 17, 2006                    Respectfully submitted,

 

                                      Philip C. Olsson, Bar No. 172163
                                      Arthur Y. Tsien, Bar No. 411579
                                      OLSSON, FRANK AND WEEDA, P.C.
                                      1400 16th Street, N.W., Suite 400
                                      Washington, D.C. 20036-2220
                                      (202) 789-1212
                                      (202) 234-3537 (fax)

                                      Attorneys for National Women, Infants, and Children Grocers Association, Nutritional Food Distributors, Inc., County Food Services, Inc., and Dillard Foods, Inc.