UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WOMEN, INFANTS AND CHILDREN GROCERS ASSOCIATION, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>FOOD AND NUTRITION SERVICE,<br><br>Defendant. | MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 1:05-cv-02432-EGS<br>Judge Emmet G. Sullivan |

## INTRODUCTION

An interim rule issued by the Food and Nutrition Service ("FNS"), a division of the United States Department of Agriculture ("USDA"), and effective on December 29, 2005, imposes statutorily-required cost-containment measures on state agencies that receive grants under the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC").  Under WIC, state agencies provide vouchers to qualified women and children, who then may redeem those vouchers for specific food items from authorized vendors; vendors may then seek reimbursement from the state.  When passing the Child Nutrition and WIC Reauthorization Act of 2004, Pub. L. 108-265, Title II, 118 Stat. 771 (June 30, 2004) ("WIC Reauthorization Act"), Congress determined that the costs of WIC were being driven up by certain vendors for whom WIC sales constituted a majority of their business and who sought reimbursement at above-market rates.

Accordingly, Congress imposed new cost-containment measures especially to constrain the program costs incurred by authorization of these "above-fifty-percent" or "WIC-only" vendors, and authorized the FNS to issue guidance for state implementation of these measures.  Plaintiffs are some of the WIC-only vendors targeted by the statute; they allege that the interim rule's cost-containment provisions are inconsistent with requirements of the WIC Reauthorization Act, the Regulatory

Flexibility Act ("RFA"), the Administrative Procedure Act ("APA"), and the policies of the USDA. Accordingly, they seek declaratory relief that the interim rule is unlawful and injunctive relief preventing implementation of the interim rule.

The FNS, however, has acted in accordance with its statutory mandate. Through the WIC Reauthorization Act, Congress plainly mandated the imposition of two separate, complementary cost-containment goals: First, a state agency must ensure that the average per-voucher cost of food at WIC-only stores does not exceed the average per-voucher cost of food at comparable vendors. Second, the state agency must also ensure that, on the whole, the authorization of WIC-only stores is cost-neutral to the program, i.e., that the redemption of vouchers at WIC-only stores does not result in higher food costs than if the vouchers were redeemed at regular vendors. Equally plainly, the FNS has acted to implement both of these Congressional directives, honoring the Congressional intent to ensure that federal dollars are best spent maximizing the benefits provided to women and children rather than lining the pockets of WIC-only vendors.

The plaintiffs' procedural objections to the interim rule are also unfounded. First, the APA does not require notice-and-comment rulemaking for promulgation of rules related to grants and benefits programs. Second, insofar as the agency has an expressed policy preference to engage in such rulemaking even when not required by the APA, the agency properly found good cause to depart from that preference in light of (1) statutory deadlines within which it was necessary to provide regulatory guidance to the states, (2) express Congressional authorization to issue an interim rule in order to meet that deadline, and (3) the FNS's reasonable determination, in light of the time and diligent effort required to prepare, review, and revise a sound regulation for publication, that the additional months required for notice and comment procedures (perhaps to be followed by still

2

further review and revisions of the rule) would have made it impracticable to meet the congressionally-imposed deadline.  Finally, the RFA challenge is meritless because the RFA does not require a flexibility analysis when, as here, notice and comment is not required by law or when small businesses are not directly regulated by the rule in question.  In any event, the FNS complied with the requirements of the RFA when promulgating the interim rule.

Accordingly, the defendant's motion for summary judgment should be granted.

## STATUTORY AND REGULATORY BACKGROUND

### The Child Nutrition Act

In light of the fact that "substantial numbers of pregnant, postpartum, and breastfeeding women, infants, and young children from families with inadequate income are at special risk with respect to their physical and mental health by reason of inadequate nutrition or health care," Congress enacted section 17 of the Child Nutrition Act of 1966, Pub. L. No. 89-642 (codified at 42 U.S.C. § 1786).  See 42 U.S.C. § 1786(a).  As part of this initiative, WIC provides grants to state agencies  to "provide[] nutrition services and tailored food packages to lower-income pregnant, breast-feeding, and postpartum women, and infants and children who are judged to be at nutritional risk." S. Rep. 108-279, at 2, 2004 U.S.C.C.A.N. 668, 669 (June 7, 2004).  WIC is not an entitlement program; Congress does not set aside funds to allow every eligible individual to participate in the program.  Rather, it is a Federal grant program to the states for which Congress annually authorizes a specific amount of funds.  See 42 U.S.C. § 1786(a), (g).

The Child Nutrition Act authorizes the Secretary of Agriculture to administer WIC, see 42 U.S.C. § 1786, and the Secretary has delegated that power to the FNS, 7 C.F.R. § 246.3(a).  In this capacity, the FNS "provide[s] assistance to State and local agencies and evaluate[s] all levels of

Program operations to ensure that the goals of the Program are achieved in the most effective and efficient manner possible." Id. State agencies are nonetheless responsible for the daily administration of WIC benefits, pursuant to individual state plans approved by the FNS. 42 U.S.C. § 1786(f); 7 C.F.R. §§ 246.3(b), (c).

Among the benefits provided by WIC are food packages that provide participants with nutritionally appropriate foods. See 7 C.F.R. § 246.10. One means by which state agencies may choose to deliver these food packages is a "retail delivery system," through which the women and children are provided with "food instruments" that they may redeem at authorized vendors for approved supplemental foods. Id. § 246.12. Authorized vendors then seek reimbursement from the state for price of the food items provided to WIC beneficiaries. Id. The state agency must ensure that authorized vendors charge competitive prices for food items provided to WIC customers and establish limitations on the prices the state will pay for WIC food items. Id.

**The WIC Reauthorization Act**

In 2004, Congress found that this system had inadvertantly spawned a new breed of entrepreneur, the WIC-only vendor. Because the WIC-only vendors serve predominately WIC customers (who pay in government vouchers and therefore, unlike normal customers, are not price sensitive), there are no competitive pressures on their prices, and the only pricing consideration relevant to WIC-only vendors is the amount the government can be persuaded to pay. S. Rep. 108-279, at 54, 2004 U.S.C.C.A.N. at 715. According to the Senate Report accompanying the Senate version of the WIC Reauthorization Act,

> WIC-only stores tend to charge much higher prices for WIC food items than do regular grocery stores, resulting in significantly higher costs to the federal government and creating long-term cost-containment problems in the WIC program.

4

> Over the past few years, WIC-only stores have redeemed a growing share of WIC vouchers; in fiscal year 2002, WIC-only stores accounted for 9 percent of WIC sales nationwide. Given higher costs in and rapid growth of WIC-only stores, the Committee is concerned that the result of these trends may be significantly higher program costs and, consequently, significant barriers to WIC program access for low-income women and children.

See id. The market forces that were expected to constrain the prices of vendors had no effect on WIC-only vendors, who could take advantage of government largesse to the greatest extent permitted by law and drain the program of funding that would otherwise fund benefits for additional women and children.[1] (Vogel Decl. ¶ 20.)

In order to "ensure sound stewardship of taxpayer dollars," the WIC Reauthorization Act "includes several provisions designed to ensure that the WIC program continues to rely on market forces to contain food costs and that WIC-only stores do not charge higher prices than other stores, leading to waste of federal funds." S. Rep. 108-279, at 55, 2004 U.S.C.C.A.N. at 716. The legislative history states that these provisions are designed to ensure the "cost neutrality" of the authorization of WIC vendors S. Rep. 108-279, at 56-57.

First, in a provision affecting all authorized vendors, the Act requires state agencies to "establish a vendor peer group system" and to "establish competitive price criteria and allowable reimbursement levels for each vendor peer group." See 42 U.S.C. § 1786(h)(11)(A)(i). In these vendor peer group systems, state agencies compare vendors to similarly situated vendors to ensure

---

[1]Congress also found that WIC-only stores were over-charging the government in part due to the provision of "promotional items," items and services outside the scope of the WIC vouchers that are provided "free" to the WIC beneficiary but whose costs are incorporated into the overhead costs (and thus the prices) of the stores in question. In this way, many WIC-only stores were able to attract additional patronage by effectively charging the WIC program for food and services not covered by WIC, a practice now prohibited. See Pub. L. 108-265 § 203(e)(14), 118 Stat. 729 (June 30, 2004) (codified at 42 U.S.C. § 1786(h)(14)); S. Rep. 108-279 at 58, 2004 U.S.C.C.A.N. at 719.

that their pricing is competitive. However, the same statutory section specifically requires that WIC-only vendors be distinguished from regular vendors.[2] Id. § 1786(h)(11)(A)(i)(III)(aa). In lieu of the typical peer group comparison, this subsection imposes several cost-containment provisions related to WIC-only vendors. First, the agency must either establish (1) "separate peer groups for" WIC-only vendors, or (2) "distinct competitive price criteria and allowable reimbursement levels for [WIC-only vendors] within a peer group that contains both [WIC-only vendors] and other vendors." Id. Thus, the state agency has the option of establishing peer groups containing only above-50-percent vendors.

Second, this section requires that the agency "establish competitive price criteria and allowable reimbursement levels" that both (1) meet the same requirements imposed on regular vendors; and – independent of the use of peer groups – (2) "do not result in higher food costs if program participants redeem supplemental food vouchers at [WIC-only vendors] rather than at vendors other than [WIC-only vendors]." Id. § 1786(h)(11)(A)(i)(III)(bb). The Senate Report describes this last requirement thus: "Section 203(e)(10) . . . also requires the state agency to ensure that WIC-only stores are cost neutral to the WIC program by demonstrating that the competitive price criteria and allowable reimbursement levels established for WIC-only stores are designed so as not to result in higher food costs if program participants redeemed their WIC vouchers at WIC-only stores rather than at regular retail vendors." S. Rep. 108-279, at 55, 2004 U.S.C.C.A.N. at 716. Thus, the statute requires that the authorization of WIC-only stores be cost-neutral to the program as a whole.

_____

[2]The statute also makes clear in several places that a state agency is not required to authorize WIC-only vendors at all. See, e.g., 42 U.S.C. §§ 1786(h)(11)(A)(i)(III), (A)(ii)(I), (E). If states elect to authorize such vendors, the additional cost-containment provisions apply.

Finally, a separate section of the statute contains an additional cost-containment measure applicable to WIC-only vendors.  Section 1786(h)(11)(E) requires that a state agency seeking approval to authorize WIC-only vendors must "demonstrate to the Secretary . . . that the competitive price criteria and allowable reimbursement levels established under this paragraph for [WIC-only vendors] do not result in average payments per voucher to [WIC-only] vendors that are higher than than average payments per voucher to comparable vendors other than [WIC-only vendors]."

The legislative history clarifies that the net result of these statutory cost-containment provisions should be the implementation of two distinct cost-containment principles:

> Although the legislative language offers States latitude to design vendor peer groups, competitive price criteria, and maximum reimbursement levels, each State must meet two important cost-containment goals unless exempted by the Secretary.  First, each State must ensure that its aggregate WIC food costs are no higher if WIC participants choose to shop at WIC-only stores than if they shop at regular competitive stores. Second, each State must ensure that average prices, referred to as "average payments per voucher", in WIC-only stores are no higher than average prices in comparable competitive stores.

150 Cong. Rec. S7244-01, 7248 (June 23, 2004) (Statement of Sen. Harkin) (presenting the WIC Reauthorization bill to the Senate).  The first goal (aggregate cost neutrality) is implemented by section 1786(h)(11)(A)(i)(III)(bb).  The second goal (comparability) is implemented by section 1786(h)(11)(E).

The statute directs that state agencies comply with these provisions no later than December 30, 2005.  See 42 U.S.C.§ 1786(h)(11)(G).  Congress directed the USDA to issue guidance to the states "as soon as practicable" and to issue implementing regulations no later than June 30, 2006. See Pub. L. No. 108-265, Tit. V § 501, 118 Stat. 789 (June 30, 2004) (reproduced at 42 U.S.C.

§ 1758 note).  Congress furthermore explicitly authorized the agency to issue an interim final rule in order to expedite the rulemaking process.  See id.

**The Development of the Vendor Cost-Containment Rule**

The process of developing the vendor cost-containment regulations began immediately following the enactment of the WIC Reauthorization Act   From July 2004 through October 2004, the FNS analyzed the requirements of the WIC Reauthorization Act (a statute consuming some 60 pages in the U.S.  Public Laws), briefed members of Congress, and sought extensive information from state agencies (in part through the first FNS WIC Vendor cost-containment meeting with state experts) concerning the states' existing cost-containment practices that FNS determined were critical to the development of the rule.  (Declaration of Ronald Vogel, dated January 17, 2006 ("Vogel Decl.") (filed herewith as Exhibit A), ¶¶ 5-11.)  By December 2004, the FNS had prepared a rough first draft of the rule.  (Vogel Decl. ¶ 11.)  The FNS also conducted meetings with the Food Marketing Institute and the National Grocers' Association to obtain input from vendors as it worked through several drafts of the rule in January and February, meetings that the agency considered "extremely important."[3]  (Vogel Decl. ¶ 12.)

After a full draft of the rule was developed, the rule went through three stages of clearance: internal FNS review, departmental clearance (including 12 offices in USDA), and review by the Office of Management and Budget.  (See Vogel Decl. ¶¶ 13-15.)  On March 17, 2005, the FNS began the formal clearance process within FNS, requiring additional review and revision.  (Vogel Decl. ¶ 14.)  Internal FNS review is conducted in order to establish the regulation's consistency with policy

---

[3]An invitation was also extended to John Bode, a member of plaintiffs' counsel's firm, who did not attend.  (Vogel Decl. ¶ 12.)

directives of the Under Secretary's office and to establish the costs and benefits of a proposed regulatory approach. (Id.) Various statutes, orders, and policies also require specific analyses. For example, the FNS conducted an extensive regulatory impact analysis published as an appendix to the interim rule, an analysis pursuant to the Unfunded Mandates Reform Act of 1995, a federalism summary impact analysis, a civil justice reform analysis, and civil rights impact analysis, an analysis pursuant to the Paperwork Reduction Act of 1995, and a review under the Government Paperwork Elimination Act. See Preamble to the Interim Rule, 70 Fed. Reg. 71708; Vogel Decl. ¶ 11. On May 9, 2005, the FNS Administrator cleared the rule. (Vogel Decl. ¶ 14.)

From May 2005 through July 2005, the interim rule was reviewed by multiple offices within the USDA for legal consistency with all relevant statutes and regulations and for policy consistency with the objectives of the Administration. (Vogel Decl. ¶ 14.) Thus, it was cleared by the USDA General Counsel's office on May 18, 2005. (Id.) Thereafter, for purposes of expedition, the FNS submitted the rule simultaneously to all remaining USDA offices whose clearance was required, including for example, the Office of Budget and Policy Analysis and the Chief Economist. (Id.) The rule was cleared by all necessary USDA officials by the end of July 2005. (Id.)

Next, the rule had to be cleared by the Office of Management and Budget ("OMB") pursuant to Executive Order 12866. The rule was sent to OMB on August 8, 2005, which engaged the FNS on a multitude of technical questions before clearing the rule on November 7, 2005. (Vogel Decl. ¶ 15.) The Information Collection Burden Package was separately cleared by OMB on November 18, 2005. (Id.) Finally, the interim rule was signed by Kate Coler, the Deputy Under Secretary for Food, Nutrition, and Consumer Services on November 22, 2005 and hand-carried to the Federal Register the same day, to be published November 29, 2005. (Id.)

9

The FNS staff devoted to working on WIC-related issues was five full-time employees. (Vogel Decl. ¶ 5.)  At the same time that WIC staff were responsible for preparing the interim rule for publication, the staff also had to devote substantial time and effort to the development of the regulatory guidance for the states mandated by the statute.  Draft guidance was issued and training provided in four FNS regions on July 19-20, 2005.  (Vogel Decl. ¶ 16.)  The FNS issued the draft guidance in the remaining regions on July 27, 2005.  (Id.)  The FNS further provided training on vendor cost containment to state agencies in separate meetings on August 9-11, 2005, on September 27-29, 2005, and on October 18-20, 2005.  (Id.)  The WIC staff also fielded many, extensive questions from state agencies.  (Id.)

Additional concurrent responsibilities of the FNS staff related to the WIC Reauthorization Act included the development of twenty-five regulations and about seventy policy memoranda. (Vogel Decl. ¶ 5.)  Additional concurrent responsibilities of the WIC staff in particular that were not directly related to the development of the interim rule included:  corrective action taken against the State of California regarding vendor cost containment, the implementation of a moratorium on new above-50-percent vendors, and the development of six policy memoranda and four other regulations to implement the WIC Reauthorization Act.  (Vogel Decl. ¶¶ 17-18.)

**The Interim Final Rule**

The FNS's exploration of the cost containment problem posed by WIC-only vendors revealed the same patterns discovered by Congress. WIC-only vendors habitually charge above-market rates and use the most expensive business models.  See 70 Fed. Reg. at 71708, 71724-25; Vogel Decl. ¶ 20.  California provides the most telling example.  Data indicate that the prices WIC-only stores were charging California WIC prices were 13 to 16 percent higher than prices paid to other vendors.

(Vogel Decl. ¶ 17.)  WIC-only prices were significantly higher than even those of comparable stores.  (AR 01546-47.[4])  Despite rapidly rising costs, the California state agency was unable to staunch the flow of cash from the program without federal intervention.  (Vogel Decl. ¶¶ 17, 19-20.)  Data collected in other states are even more dramatic.  In Texas, for example, it was found that prices at WIC-only stores were more than twenty-eight percent higher than the state average.  (AR 00461-62.[5])   Even in relation to prices charged by comparable stores, WIC-only prices were very expensive.  (Id.)

In accordance with its statutory authority, see Pub. L. 108-265, Tit. V, § 501(b), 118 Stat. 789 (June 30, 2004) (reproduced at 42 U.S.C. § 1758 note), FNS promulgated the interim final rule on November 29, 2005.  Interim Rule, Special Supplemental Nutrition Program for Women, Infants and Children (WIC): Vendor Cost Containment, 70 Fed. Reg. 71708 (Nov. 29, 2005).  The preamble to the rule indicates the agency's intent "to maximize the number of eligible women, infants, and children served with available federal funding."  Id.  The rules impose flexible requirements on states, which may "design cost containment practices that would be effective in their own markets and would ensure adequate participant access."  Id.  The FNS explained that it expects to issue further regulations and guidance as State agencies gain experience with the effectiveness of vendor cost containment practices, and "[i]n the interim, . . . that the current rule will substantially accomplish the goal of the Act of containing food costs and ensuring that above-50-percent vendors do not result in higher costs to the program than regular vendors."  Id. at 71708-09.  Thus, in

[4]Presentation by Zoe Neuberger, Center on Budget and Policy Priorities (Dec. 10, 2004) (filed herewith as Exhibit B, AR 01540-01552).

[5]Burger, Carroll & Associates, Inc., Retailer Peer Grouping Study for Competitive Pricing (Dec. 30, 2003) (filed herewith as Exhibit C, AR 00456-00466).

establishing the vendor peer groups required by the WIC Reauthorization Act, the state agencies are granted great leeway to define effective peer groups, competitive price criteria and allowable reimbursement rates.  See 7 C.F.R. § 246.12(g)(4); 70 Fed. Reg. at 71713, 71722.

Under the interim rule, prior to authorizing any WIC-only vendors, a state agency must receive FNS certification of its vendor cost containment system under section 246.12(g)(4)(vi).  In accordance with statutory section 1786(h)(11)(E), this regulatory section requires the state agency "to demonstrate that its competitive price criteria and allowable reimbursement levels do not result in average payments per food instrument to these [WIC-only] vendors that are higher than average payments per food instruments to comparable [non-WIC-only] vendors."  7 C.F.R. § 246.12(g)(4)(vi) (emphasis added); 70 Fed. Reg. at 71724.  The regulation provides further guidance on exactly how to make that calculation.  Id.[6]

Section 246.12(g)(4)(i) contains additional requirements for certification of a state agency that elects to authorize WIC-only vendors.  First, in accordance with statutory section 1786(h)(11)(A)(i)(III)(aa), the rule requires the state agency to distinguish between WIC-only vendors and regular vendors by establishing separate peer groups for WIC-only vendors, or if they do not establish WIC-only peer groups, by establishing distinct competitive price selection and reimbursement criteria for the WIC-only vendors within a peer group.[7]  See 7 C.F.R.

---

[6]During the TRO proceedings, the plaintiffs expressed apprehension that this subparagraph could be misinterpreted to implement the cost containment principle in statutory section 1786(h)(11)(A)(i)(III)(bb).  As defendant agreed to do during the parties' discussions concerning the terms of the TRO, the FNS has clarified that this particular section is meant to require only a comparison to comparable regular vendors.

[7]The status of new vendors must also be assessed within six months.  7 C.F.R. § 246.12(g)(4)(i)(B).  The possibility of authorizing new WIC-only vendors is largely irrelevant for now, given language in a recent appropriations act prohibiting grants to state agencies that

12

§ 246.12(g)(4)(i)(A). Second, in order to ensure that state agencies meet the cost-neutrality requirement of statutory section 1786(h)(11)(A)(i)(III)(bb), the rule requires state agencies to "compare above-50-percent vendors' prices against the prices of [regular] vendors" in setting the competitive price criteria and reimbursement levels for WIC-only vendors. 7 C.F.R. § 246.12(g)(4)(i)(C).

Finally, pursuant to the same cost-neutrality provisions of § 1786(h)(11)(A)(i)(III)(bb), and to "ensure that the prices of above-50-percent vendors do not inflate the competitive price criteria and allowable reimbursement levels for the peer groups or result in higher total food costs," the specific regulation at issue here, 7 C.F.R. § 246.12(g)(4)(i)(D), requires that on a quarterly basis state agencies ensure that statewide average payments per food instrument for above-50-percent vendors do not exceed the statewide average payments per food instrument for regular vendors. To comply with this requirement, the state agency must compute statewide average payments quarterly, and if average payments per food instrument to WIC-only vendors are higher than those to regular vendors, they must then take "necessary action to ensure compliance, such as adjusting payment levels, recouping excess payments, or terminating vendor agreements with above-50-percent vendors whose prices are least competitive and that are not needed to ensure participant access." Id.[8]

---

authorize new for-profit WIC-only vendors. See Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act of 2006, Pub. L. No. 109-97 § 787, 119 Stat. 2120 (November 10, 2005).

[8]During the TRO proceedings, plaintiffs were under the impression that the regarding recoupments of excess payments would allow state agencies to recoup monies paid to WIC vendors who had redeemed food instruments within the applicable maximum reimbursement amounts. The FNS has subsequently clarified to states that the rule is not intended to permit such a practice.

The net result of all of these provisions is the implementation of the two separate, complementary cost-containment requirements imposed by the statute.  First, state agencies must demonstrate that their cost-containment measures do not result in higher average payments per voucher to WIC-only stores than to comparable regular vendors.  <u>See</u> 42 U.S.C. § 1786(h)(11)(E); 7 C.F.R. § 246.12(g)(4)(vi).  Second, state agencies must demonstrate that the cost-containment measures do not result in higher food costs if WIC vouchers are redeemed at a WIC-only store rather than at a regular vendor.  <u>See</u> 42 U.S.C. § 1786(h)(11)(A)(i)(III)(bb); 7 C.F.R. § 246.12.(g)(4)(i)(D).

As noted above, by the terms of the WIC Reauthorization Act, these provisions must be implemented by state agencies on December 30, 2005.  <u>See</u> 42 U.S.C. § 1786(h)(11)(G); 70 Fed. Reg. at 71708.  Thus, in order to assist the states in implementing the statutory requirements, the interim rule was to become effective December 29, 2005.

**Procedural History**

Plaintiffs are several WIC-only vendors.  They filed a complaint before this Court on December 16, 2005 ("Compl."), and moved for a temporary restraining order.  The complaint and the papers filed thereafter allege that the interim final rule is unlawful for a number of reasons.  In the first cause of action, the plaintiffs claim that the regulations are unreasonable and contrary to plain statutory language because the statute requires a comparison of WIC-only vendors only to "comparable" vendors.  (Compl. ¶¶ 57-62).  In the second cause of action, plaintiffs allege that the FNS failed to assess the potential economic impact on small businesses as required by the RFA. (Compl. ¶¶ 63-70.)  Finally, plaintiffs allege that the issuance of an interim final rule without notice-and-comment rulemaking runs afoul of both the APA and stated USDA policy.  (Compl. ¶¶ 71-82.)

Accordingly, the plaintiffs sought a nationwide temporary restraining order to prevent implementation of the offending portions of the interim rule.

On December 30, 2005, this Court issued a limited temporary restraining order ("TRO") preventing FNS enforcement of one provision (and two sentences of another provision) of the rule against state agencies regarding payments to a specified list of vendors.

## ARGUMENT

Defendant FNS should be awarded summary judgment, Fed. R.Civ. P. 56(b), because "there is no genuine issue as to any material fact," and the defendant is "entitled to judgment as a matter of law." See Dist. Intown Prop. Ltd. P'ship v. Dist. of Columbia, 198 F.3d 874, 878 (D.C. Cir. 1999). In a case such as this one brought under the APA, whether agency action was contrary to law is a legal issue that a court resolves on the basis of the administrative record. American Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

I.    THE INTERIM FINAL RULE IS FULLY CONSISTENT WITH THE PLAIN LANGUAGE
      AND INTENT OF THE WIC REAUTHORIZATION ACT

Plaintiffs' first claim, that the interim rule is contrary to the WIC Reauthorization Act, fails as a matter of law. The rule is entirely consistent with the plain language and purpose of the Act, and reflects, at the very least, a reasonable construction of its terms.

When reviewing an agency's construction of a statute, courts apply the familiar two-step Chevron standard. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). "At the first step, [courts] ask whether the statute's plain terms directly address the precise question at issue." Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 125 S.Ct. 2688, 2702 (2005) (internal quotation marks omitted). Then, if the statute is ambiguous as to that

precise point, courts "defer at step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make." Id. Thus, any "reasonable explanation of how an agency's interpretation serves the statute's objectives" can support a permissible construction, but an explanation that is "arbitrary, capricious, or manifestly contrary to the statute," cannot. See Northpoint Technology, Ltd. v. F.C.C., 412 F.3d 145, 151 (D.C. Cir. 2005) (internal quotation marks omitted); see also N.L.R.B. v. United Food & Commercial Workers' Union, Local 23, 484 U.S. 112, 123 (1987).[9]

A.     The Plain Language of the WIC Reauthorization Act Requires Implementation of Two Different Cost-Containment Principles.

Plaintiffs' principal contention is that 7 C.F.R. § 246.12(g)(4)(i)(D), which implements § 1786(h)(11)(A)(i)(III)(bb) of the statute, is contrary to the express terms of the WIC Reauthorization Act because the rule requires a comparison of costs between WIC-only vendors and all other WIC vendors, rather than "comparable" WIC vendors.  (Compl. ¶¶ 57-62.)  But it is plaintiffs' arguments that ignore the plain language and intent of the statute.

The WIC Reauthorization Act imposes two cost-containment requirements.  First, it requires that a state agency "demonstrate to the Secretary . . . that the competitive price criteria and allowable reimbursement levels established under this paragraph for [WIC-only vendors] do not result in

---

[9]Under United States v. Mead Corp., "administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. 218, 226-27 (2001).  In the WIC Reauthorization Act, Congress expressly delegated authority to the agency to promulgate these rules, see Pub. L. 108-265, Tit. V, § 501(b), 118 Stat. 789 (June 30, 2004) (codified at 42 U.S.C. § 1758 note), and the interim final rule is an exercise of that authority, see Preamble to Interim Rule, 70 Fed. Reg. at 71708.

average payments per voucher to [WIC-only] vendors that are higher than than average payments per voucher to comparable vendors other than [WIC-only vendors]."  42 U.S.C. § 1786(h)(11)(E). Second, it also requires that price criteria and reimbursement levels "do not result in higher food costs if program participants redeem supplemental food vouchers at [WIC-only vendors] rather than at vendors other than [WIC-only vendors]." Id. § 1786(h)(11)(A)(i)(III)(bb); see also 150 Cong. Rec. S7244-01, S7248 (June 23, 2004) (Statement of Sen. Harkin) (presenting the WIC Reauthorization bill to the Senate).  This provision makes no reference to "comparable" vendors and contains no other limiting description of the regular vendors to which above-50-percent vendors are being compared.  Thus, the most natural reading of this language is that, in an aggregate comparison, food costs must remain the same if WIC-only stores are authorized.  The regulation requires that states calculate that comparison on a quarterly basis in order to ensure the statutory requirement is met. 7 C.F.R. § 246.12(g)(4)(i)(D).

Plaintiffs contend that in implementing the second of these requirements, § 1786(h)(11)(A)(i)(III)(bb) (through 7 C.F.R. § 246.12(g)(4)(i)(D)), FNS was authorized only to require that WIC-only vendors be compared with other comparable vendors.  In support of this position, however, plaintiffs cannot rely on section 1786(h)(11)(A)(i)(III)(bb), but instead must cite the entirely separate cost-containment principle contained in 42 U.S.C. § 1786(h)(11)(E).  The language of section 1786(h)(11)(E) does indeed require the comparison of WIC-only vendors to "comparable" regular vendors for the purpose of establishing that payments to WIC-only vendors are no higher on average than the average payment to ordinary vendors.  That requirement is met in the relevant implementing provision, 7 C.F.R. § 246.12(g)(4)(vi), which instructs the states to ensure that their "competitive price criteria and allowable reimbursement levels do not result in average

17

payments per food instrument to these [WIC-only] vendors that are higher than average payments per food instruments to <u>comparable</u> [non-WIC-only] vendors" [emphasis added].  But no such limitation to comparable vendors appears in 11(A).

In their reply brief in support of their motion for a TRO, plaintiffs argued that because section 1786(h)(11)(A)(i)(III)(bb) of the statute concerns the establishment of vendor peer groups, the concept of comparability should be imported into the requirements of that subsection by implication. However, for the separate purpose of establishing that the redemption of supplemental food vouchers at WIC-only vendors rather than at ordinary vendors does not result in higher food costs to the program, section 1786(h)(11)(A)(i)(III)(bb) imposes no requirement that WIC-only vendors be compared solely to comparable vendors; indeed, the term "comparable" does not appear in the text of section 1786(h)(11)(A)(i)(III)(bb).  Thus, plaintiffs' position entirely ignores the language of § 1786(h)(11)(A)(i)(III)(bb), because there Congress explicitly requires cost neutrality as between WIC-only vendors and other vendors generally, exactly the comparison that FNS requires the states to make in 7 C.F.R. § 246.12(g)(4)(i)(D).  Any attempt to import the word "comparable" into § 1786(h)(11)(A)(i)(III)(bb), so as to limit the basis of the comparison, distorts Congress's clearly expressed intent.  <u>See</u> <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration and internal quotation marks omitted).  Furthermore, such an interpretation would render section 1786(h)(11)(A)(i)(III)(bb) superfluous by interpreting it to have the same meaning as section 1786(h)(11)(E).  <u>See</u> <u>City of Roseville v. Norton</u>, 348 F.3d 1020, 1028 (D.C. Cir. 2003) ("It is generally presumed that Congress does not intend to enact surplusage.").

Finally, the fact that subsection (11)(A) generally concerns the establishment of vendor peer groups, in no way suggests, as plaintiffs have argued, that Congress intended that WIC-only stores be compared only with other similar situated vendors. To the contrary, subsection 11(A) explicitly requires that WIC-only vendors <u>not</u> be treated the same as regular vendors, even comparable vendors. <u>See</u> 42 U.S.C. § 1786(h)(11)(A)(i)(III). Under this subsection, states are directed to "distinguish" WIC-only vendors from other vendors either by establishing separate peer groups for WIC-only vendors, or if peer groups contain both WIC-only nad regular vendors, then establishing distinct price criteria for the WIC-only vendors within a peer group. <u>Id</u>. A provision that expressly requires states to distinguish WIC-only vendors from regular vendors, even if they are in the same peer group, cannot be read to require that they be treated alike.

    B.    <u>At a Minimum, the Cost Neutrality Requirement of the Interim Rule Reflects a Reasonable Interpretation of the Statutory Language</u>.

The interim rule is not merely consistent with but also represents a more than reasonable construction of section 1786(h)(11)(A)(i)(III)(bb) that is fully in line with the cost-containment purposes of the statute. S. Rep. 108-279, at 55-57, 2004 U.S.C.C.A.N. at 716.[10] If a state elects to authorize WIC-only stores to participate in the program, the statute requires that the redemption of vouchers at WIC-only vendors rather than at other vendors "not result in higher food costs" to the program." 42 U.S.C. § 1786(h)(11)(A)(III)(bb). The legislative history clearly establishes that the

---

[10]During the TRO proceedings, the plaintiffs suggested that the Senate Report should be disregarded because it referenced an earlier version of the bill. The Report references the June 7, 2004 version of the Senate bill, but it nonetheless provides strong evidence of Congressional intent. First, the cost neutrality language codified in 11(A) is unchanged from the June 7th version, although its placement in the Act was changed. <u>See</u> Sen. Rep.108-279, at 122-23. (June 7th language is at (11)(E)(i)). Second, nothing anywhere in the legislative history tends to negate the evidence provided by the Senate Report that Congress intended to curb the skyrocketing costs incurred due to above-50-percent vendors.

intent of this provision is to check the skyrocketing prices of WIC-only stores by ensuring that the authorization of WIC-only vendors is cost-neutral to the program as a whole. S. Rep. 108-279, at 55, 2004 U.S.C.C.A.N. at 716. If the average cost of food items at WIC-only stores is no higher than at regular vendors, then their participation will not result in higher costs to the program, precisely the outcome required by the statute. The regulation at issue here, 7 C.F.R. § 246.12(g)(4)(i)(D), accomplishes that objective by requiring that overall, the average food costs at WIC-only vendors not exceed the average costs of the same items at regular vendors. The regulation simply requires that states do exactly that statutorily-required calculation on a quarterly basis. See 7 C.F.R. § 246.12(g)(4)(i)(D).[11]

Plaintiffs' construction of the statute is not only contrary to its plain language, as discussed above, but would also be contrary to its intent. Twisting the statutory language to limit the section 1786(h)(11)(A)(i)(III)(bb) cost comparison of vouchers redeemed at WIC-only stores solely to vouchers redeemed at "comparable" stores costs would frustrate the purposes of the legislation, because WIC-only stores would be compared to the most expensive regular vendors (small stores with high overhead costs). (Vogel Decl. ¶ 20). Thus, limiting the comparison in the manner suggested by plaintiffs  means that the costs imposed on the program by WIC-only vendors would likely continue to increase, id., contrary to the express purpose and requirement of the statute that authorizing WIC-only vendors to participate in the program "not result in higher food costs," 42 U.S.C. § 1786(h)(11)(A)(i)(III)(bb).

---

[11]In addition to Senator Harkin's statement before the Senate, 150 Cong. Rec. S7244-01, S7248 (June 23, 2004) (Statement of Sen. Harkin), Senator Harkin and Senator Thad Cochran later wrote a letter to the USDA confirming the understanding of the WIC Reauthorization Act described above. (See AR 00656-58 (filed herewith as Exhibit D, AR 00656-00658).)

Any attempt to avoid the cost-neutrality goal of the WIC Reauthorization Act frustrates the clearly expressed intent of Congress. The high-priced business models of many WIC-only stores would often result, under plaintiffs' construction, in comparison of WIC-only stores with the most expensive of "comparable" vendors and the proliferation of expensive WIC-only stores in numbers that a competitive market would not support. (See Vogel Decl. ¶ 20.) For example, a 2003 peer group study in Texas noted the tendency of WIC-only stores to expand the food sales volume at the priciest end of the market:

> WIC programs authorize small stores, knowing they are higher priced, to ensure that participants have adequate access to benefits. In many cases these small stores are in rural areas where large stores are greater distances apart. The Program can afford this policy in part because few clients shop in the smaller stores, or only shop there on occasion (such as for convenience purchases like milk). But in high volume urban areas of the State, WIC Onlys do twice as much volume as small commercial stores (1-2 and 3-4 register stores). With their higher volume and propensity for high prices, placing WIC Onlys in a peer group with small commercial stores would increase, rather than contain food costs.

AR 00465 (filed as Exhibit C herewith).

In support of their position, plaintiffs cite remarks by Congressman Boehner of Ohio, 150 Cong. Rec. E1328-02, but these remarks, apparently never delivered to the House and published after enactment of the statute, cannot explain away the operation of the second cost-containment requirement adopted in section 1786(h)(11)(A)(i)(III)(bb). In any event, "statements by individual congressmen are not strong evidence of congressional intention," and where, as here, there is "evidence to the contrary," courts should "disregard them." United States v. FCC, 652 F.2d 72, 85 (D.C. Cir. 1980); see also Chrysler Corp. v. Brown, 441 U.S. 281, 311 (1979) ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history.").[12]

---

[12]Moreover, items published in the Extension of Remarks are not spoken by a member of Congress on the floor or otherwise made available to members prior to publication. In this case, the

Finally, there is no inconsistency in the use of two complementary cost-containment principles. Each provides a separate ceiling on program costs. On average, WIC-only stores cannot charge more than comparable vendors; can the authorization of WIC-only stores result in higher program costs if WIC-only stores use higher-price operating models.[13]  As a practical matter, it is probably the case that the cost neutrality provision in subsection 1786(h)(11)(A) usually provides a lower ceiling on maximum reimbursements than the comparable vendors provision in subsection 1786(h)(11)(E).  That does not render the two cost containment provisions inconsistent.  The lesser of the ceilings will control costs.  Furthermore, WIC-only stores could operate on a larger scale such that a comparison to comparable vendors in some cases would impose lower costs on WIC-only than a comparison to all regular vendors.  Regardless, however, of which is the lower ceiling in a given State or at a given time, states that authorize WIC-only stores must comply with both of them.  Hence, far from any conflict arising between the terms of the interim rule and the WIC

---

remarks of Congressman Boehner (although dated June 24, 2004) were not even published until July 8, 2004 – a week after enactment of the statute and a week after they may have influenced anyone's vote or any relevant legislative history.  Such statements are weak evidence or no evidence of legislative intent.  See City of Harrisburg v. Franklin,  806 F.Supp. 1181, 1184 (M.D. Pa. 1992).

[13]The preamble to the interim rule provides some insight into how these two cost-containment measures will work together.  In the sample charts on page 71718, for example, the WIC-only vendors result in much higher average food costs in part because 92.81 percent of them fall in the most expensive peer group.  70 Fed. Reg. at 71718.  Thus, "a State agency that consistently reimburses above-50-percent vendors at or near the highest food instrument redemption amounts, while reimbursing most regular vendors at lower levels, would have difficulty meeting the cost neutrality requirement."  Id. at 71719.  On the other hand, "for above-50-percent vendors to not result in higher costs to the program than regular vendors, the State agency's payments to these vendors should resemble payments to regular vendors in dollar amount and distribution among peer groups."  Id.

Reauthorization Act, the cost-containment provisions of the rule are in complete accord with the plain language of the corresponding provisions of the statute.[14]

      C.    The Voucher-to-Voucher Comparison Is a Reasonable Means to Ensure that the Participation of WIC-Only Vendors Does Not Result in Higher Food Costs

      In their motion for a TRO (but not in the Complaint), Plaintiffs assert that the voucher-to-voucher comparison employed by the rule is unreasonable because it "fails to account for fundamental differences in vouchers redeemed at WIC-only stores and traditional vendors," assertedly, that beneficiaries can more likely redeem the full amount of their food instruments at WIC-only stores. (Pls. Mem. Supp. TRO at 23.) Section 1786(h)(11)(A)(i)(III)(bb) requires that states establish competitive price criteria and allowable reimbursement levels for WIC-only vendors "that do not result in higher food costs if program participants redeem supplemental food vouchers at [WIC-only vendors] rather than at [other] vendors." The statute does not speak directly to the question of how to compare "food costs" for this purpose. But considering the statutory mandate that costs be no higher "if program participants redeem supplemental food vouchers at [WIC-only] vendors," it was perfectly reasonable of FNS to prescribe, as it has effectively done in 7 C.F.R. § 246.12(g)(4)(i)(D), that states ascertain whether food costs are higher or not by comparing the average cost per voucher when "program participants redeem supplemental food vouchers at [WIC-only] stores" to the average cost per voucher when "program participants redeem supplemental food

--------

      [14]The plaintiffs' declarations in support of the TRO further imply that the interim rule requires that the maximum reimbursement rate for WIC-only vendors be the average reimbursement rate for all other vendors. (See, e.g., Halbert Decl. ¶ 16.) However, the regulations require only that the average payment per food instrument to WIC-only vendors not exceed the average payment per voucher to regular vendors. 7 C.F.R. § 246.12(g)(4)(i)(D). Thus, the maximum reimbursement rate applied to any individual WIC-only vendor could be above the statewide average so long as, overall, payments to WIC-only vendors remain no higher than the statewide average for regular vendors.

vouchers at . . . [other] vendors." <u>See</u> 7 C.F.R. § 246.12(g)(4)(i)(D) ("To comply with this requirement, the State agency must compare the average cost of each type of food instrument redeemed by above-50-percent vendors against the average cost of the same type of food instrument redeemed by regular vendors"). While one can imagine many different levels of precision in calculating "food costs" to the program,[15] FNS reasonably determined that comparing reimbursements per food instrument is the most efficient and realistic way to compare food costs without imposing undue administrative burdens on state agencies. Its determination is consistent with the purposes of the statute and reasonable within the meaning of <u>Chevron</u>.

Plaintiffs' declarations in support of the TRO offer no supporting evidence for the assertion that vouchers are more likely to be fully redeemed at WIC-only vendors. Congress found, to the contrary, that WIC-only vendors cost the program more than other vendors because of their above-market prices, not necessarily because of a superior ability to redeem food instruments fully. <u>See</u> S. Rep. 108-279, at 54, 2004 U.S.C.C.A.N. at 715; <u>cf.</u> 70 Fed. Reg. at 71708. Regardless of the reason, the statute requires that "food costs" to the WIC program be no "higher" "if program participants redeem [their] vouchers at [WIC-only] vendors," and the interim rule faithfully implements that mandate. Plaintiffs argue, in essence, that there are good reasons why WIC-only

---

[15]Using some of the Arkansas vouchers attached to the Dillard Declaration submitted in support of the TRO as an example, the agency could have chosen to compare the prices of specific food categories to identical categories (thus, WIC-approved cereal to WIC-approved cereal, even if one person buys Cheerios and another Blueberry Morning) and weight various price comparisons based on total consumption. Or the agency could compare the prices of more specific categories based on the item (thus, gallons of whole milk to gallons of whole milk even though the general food category printed on the instrument is "Fat free, 1%, 2%, or whole milk"). The agency could even require brand-, amount-, and date-specific item-to-item comparison in order to maximize the accuracy of the calculation of average "food costs." At some point, absolute precision becomes unworkable. Congress did not clearly prescribe the method used to calculate "food costs."

should be permitted to impose higher costs on the program, but that is a matter they will have to take up with Congress, rather than the FNS, or this Court.

II.    NEITHER THE APA NOR AGENCY POLICY REQUIRED FNS TO ENGAGE IN NOTICE-AND-COMMENT RULEMAKING PRIOR TO PROMULGATION OF THE INTERIM RULE

The plaintiffs raise two arguments regarding FNS's decision not to engage in notice in comment prior to issuing the interim rule. First, the plaintiffs argue that FNS violated the notice and requirement of the APA as codified in 5 U.S.C. § 553. (Compl. ¶¶ 71-77.) Second, the plaintiffs maintain that FNS violated its own agency policy statement that requires notice and comment before the issuance of a rule. (Compl. ¶¶ 78-82.) The plaintiffs' APA claim fails as a matter of law, and good cause justifies an exemption from compliance with the agency's policy statement.

A.    The APA Does Not Require Notice and Comment on Rules Related to Grants or Benefits

Under section 553 of the APA, an agency is required to provide notice of a proposed rulemaking in the Federal Register and an opportunity to comment on the proposed rule. Lincoln v. Vigil, 508 U.S. 182, 195 (1993). However, the requirements of section 553 expressly do not apply to rulemakings "relating to . . . public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2); Lincoln, 508 U.S. at 196. The D.C. Circuit has described the exclusion for "benefits" from these requirements in 553(a)(2) as "very broad" and held that Medicare "[r]egulations governing the amount of reimbursement allocable to providers . . . plainly implicate administration of Medicare funds" and "can only be viewed as 'relating to' those benefits." See Humana of South Carolina, Inc. v. Califano, 590 F.2d 1070, 1083-84 (D.C. Cir. 1978). See also Batterton v. Marshall, 648 F.2d 698, 700 (D.C. Cir. 1980) ("[O]rdinarily, a methodology related to disbursement of benefits would fall outside the APA.")

The interim rule challenged in the present case involves a grant and a benefit program. Black's Law Dictionary defines a "grant-in-aid" as a "sum of money given by a governmental agency to a person or institution for a specific purpose; esp., federal funding for a state public program."[16] The WIC program involves such grants-in-aid to state agencies for the provision of supplemental foods to eligible individuals. 42 U.S.C. § 1786(c)(1). FNS issued the interim rule under its authority to oversee the Special Supplemental Nutrition Program for Women, Infants and Children. 70 Fed. Reg. at 71708. The regulation in question directly "relat[es] to" to the administration of these grant funds. A state agency that fails to meet the federal requirements becomes ineligible for receipt of federal WIC funds.

Black's Law Dictionary defines "benefit" as "[f]inancial assistance that is received from an employer, insurance, or a public program (such as social security) in time of sickness, disability, or unemployment." The WIC Program is a public assistance program, whose stated purpose is "to provide . . . supplemental foods and nutrition education through any eligible local agency that applies for participation in the program," to "pregnant, postpartum, and breastfeeding women, infants, and young children from families with inadequate income [who] are at special risk with respect to their physical and mental health by reason of inadequate nutrition or health care." 42 U.S.C. § 1786(a). These benefits are intended to serve as a supplement to food stamp, soup kitchen, and other benefits programs. Id. § 1786(c)(1)(A), (B), (C). The interim rule challenged in the present case furthers the goals of the Special Supplemental Nutrition Program by "reducing unnecessary food expenditures, which increases the potential to serve more eligible women, infants, and children for the same cost."

---

[16]This is most likely what is meant by the term "grant" in the context of the APA. Black's Law Dictionary defines "grant" more broadly as an "agreement that creates a right of any desription other than the one held by the grantor."

70 Fed. Reg. at 71709.  Like the provider reimbursement regulation at issue in Humana, the interim

rule "plainly implicate[s]" the administration of grant funds used to provide public benefits.

Accordingly, as the interim rule involves the Special Supplemental Nutrition Program, a

grant and benefits program, section 553 does not govern the promulgation of the rule.

B.    Good Cause Existed to Depart from the USDA's Preference for Notice-and-
Comment Rulemaking.

Although the APA does not require notice and comment for rules relating to public grants

or benefits, the USDA has a standing policy statement, issued in 1971, providing that the Department

will "give notice of proposed rule making and . . . invite the public to participate in rule making

where not required by law," including in cases involving public grants or benefits.  See Statement

of Policy, 36 Fed. Reg. 13804 (July 24, 1971).  Like the APA itself, the policy statement permits an

exemption "where an agency [of USDA] finds for good cause that compliance would be

impracticable, unnecessary or contrary to the public interest," so long as the agency has a "substantial

basis therefor."  Id.

An agency's decision to depart from its own policy preference for notice-and-comment

rulemaking without a reasoned basis for that decision may in some circumstances be considered

arbitrary and capricious.  See Rodway v. USDA, 514 F.2d 809 (D.C. Cir. 1975) (holding that USDA

violated the APA by failing to provide notice and comment on food stamp rules without providing

any reason or developing any record).  However, the courts treat an agency's decision to depart from

its own voluntary practices with more deference than an agency's decision to depart from

Congressionally-mandated procedures.  See Alcaraz v. Block, 746 F.2d 593 (9th Cir. 1984) ("[W]hile

we assume the agency must carefully follow the law of section 553 even though self adopted, the

congressional policy for interpreting good cause extremely narrowly does not operate.");

<u>Philadelphia Citizens in Action v. Schweiker</u>, 669 F.2d 877, 885-86 (3d Cir. 1982) (finding good cause to depart from similar policy statement of HHS in part because the agency was bound only by its policy statement, not the APA). Such deference is merely an application of the well-settled principle that agencies are entitled to significant deference in the interpretation of their own rules. <u>See</u> <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994) (holding that agency's interpretation of its own regulation is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation"); <u>Amoco Production Co. v. Watson</u>, 410 F.3d 722, 728-29 (D.C. Cir. 2005) (same).

The D.C. Circuit has identified a number of factors that support an agency's determination of good cause to forgo notice and comment. <u>See</u> <u>Mid-Tex Elec. Coop. v. Fed. Energy Regulatory Comm'n</u>, 822 F.2d 1123, 1132 (D.C. Cir. 1987). Several of these factors provide a substantial basis for FNS's good cause determination in this case.

1. <u>The FNS Was Specifically Authorized to Issue an Interim Rule</u>.

First, Congressional intent to dispense with notice and comment is good cause to do so. <u>See</u> <u>Asiana Airlines v. FAA</u>, 134 F.3d 393, 398 (D.C. Cir. 1998) (finding proof of clear congressional intent to avoid notice and comment procedures in statement requiring publication of interim rules); <u>Methodist Hospital of Sacramento v. Shalala</u>, 38 F.3d 1225, 1237 (D.C. Cir. 1994) (citing Congress's intent to issue interim rule followed by notice and comment as proof of good cause).

Congress explicitly authorized the issuance of an interim final rule to implement provisions in the WIC Reauthorization Act: "The Secretary may promulgate interim final regulations to implement the [Act]." Pub. L. 108-265, Tit. V, § 501(b), 118 Stat. 789 (June 30, 2004) (codified at 42 U.S.C. § 1758 note). The agency relied in part on this authority in making its good cause determination. <u>See</u> 70 Fed. Reg. 71712; Vogel Decl. ¶ 19. As the D.C. Circuit has observed,

28

instructions by Congress to an agency to issue an interim final rule express congressional intent to depart from the usual notice-and-comment procedure of issuing a proposed rule and considering public comments before an interim rule is published.  See Asiana Airlines, 134 F.3d at 398; Methodist Hospital, 34 F.3d at 237; Mid-Tex Electric Corp., 822 F.2d at 1124.  By authorizing "interim final regulations," Congress must be understood as extending to USDA the option of doing just that – issuing an interim rule without first providing notice-and-comment, to ensure that a rule was in place by the December 2005 deadline placed on the states to comply with the statute.

Plaintiffs observe that the Reauthorization Act does not expressly authorize the USDA to forego prior notice and comment in so many words, and argue therefore that it does not provide the kind of express modification required to make an exception to the APA's requirements.  See Pl. Mem. Supp. TRO 26-29; Asiana Airlines, 134 F.3d at 397.  But, inasmuch as the APA's rulemaking requirements do not apply in the first place in the context of the grants and benefits program at issue here, plaintiffs' argument is wide of the mark.  Here, where notice and comment is required only by agency policy and not by the APA, the authority to issue an interim rule is a more than sufficient basis to infer foregoing prior notice and comment.  See Philadelphia Citizens, 669 F.2d at 885-86 (explaining that "Congress surely is not obliged to state explicitly that statutes it enacts fit within exceptions to regulations or policies formulated solely by an administrative agency" and that "congressional silence . . . in no way reveals an intent on its part that the good cause exception [to agency policy requiring notice and comment] not apply").[17]

---

[17]In both Asiana Airlines, 134 F.3d at 396, and Methodist Hospital, 38 F.3d at 1236 n.18, the statutes in question contained language, not present in the WIC Reauthorization Act, that expressly required that public comment be taken on the interim final rules once published.  That is a distinction without a difference.  Although the Reauthorization Act does not refer to public comment following publication of the interim rule, an interim final rule is inherently to be distinguished from a proposed rule, see Asiana Airlines, 134 F.3d at 398 ("the agency was to

Plaintiffs also focus on the distinction that in <u>Asiana Airlines</u> and <u>Methodist Hospital</u>, the statutory language was mandatory rather than discretionary.  But even discretionary language must be construed by a court as conferring significantly greater leeway to forego prior notice and comment than might otherwise be the case.  If the Court were to hold otherwise, "the resulting process would be so nearly indistinguishable from normal notice and comment as to deprive this special procedural provision of any effect and to thwart the apparent intent of Congress in enacting the special procedure."  <u>Asiana Airlines</u>, 134 F.3d at 398.

        2.     <u>The FNS Worked Diligently to Meet the Difficult Congressionally-imposed Deadline</u>.

Another relevant factor in the good cause determination is the specific timeline set by Congress in the WIC Reauthorization Act for implementation of the regulation.  "[D]eviation from APA requirements has been permitted where congressional deadlines are very tight and where the statute is particularly complicated."  <u>Methodist Hospital of Sacramento v. Shalala</u>, 38 F.3d 1225, 1236 (D.C. Cir. 1994); <u>see also</u> <u>Petry v. Block</u>, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (characterizing limited time given by Congress for adoption of regulations as "crucial factor" in good cause analysis).

Although the time period at issue in this case is somewhat longer than those in <u>Methodist Hospital</u> or <u>Petry</u>, the record shows unambiguously that FNS worked diligently to complete the interim rule, amidst manifold other obligations imposed upon it by the WIC Reauthorization Act, and in no way abused the discretion Congress conferred upon it to forego prior notice and comment. The WIC Reauthorization Act mandated the issuance of guidance to the states "as soon as

---

issue not a proposed rule, but an 'interim final rule.'"), and thus, by its nature, does not require <u>prior</u> notice and comment to become effective.

practicable" and the issuance of a final rule by June 30, 2006. Congress further authorized the issuance of an interim final regulation. Regardless of FNS action, state agencies are statutorily required to be in compliance with the vendor cost containment provisions of the Act by December 30, 2005. 42 U.S.C. § 1786(h)(11)(G). Thus, the December 30, 2005 deadline is a significant one for providing meaningful guidance to the states, a deadline on which the agency relied in issuing its interim rule. See 70 Fed. Reg. 71708 (implementation date); Vogel Decl. ¶ 19.

Concurrent with the development of the interim final rule on vendor cost containment, the WIC Reauthorization Act itself imposed numerous other regulatory responsibilities on the FNS and its staff. Since the statute's enactment June 30, 2004, the FNS has issued approximately 70 policy memoranda and worked on 25 regulations related to the Act, some of which are still in progress. (Vogel Decl. ¶ 5.) Notwithstanding these competing requirements, immediately following enactment, the FNS (with an available staff of only five full-time personnel to work on the rule) began its analysis of the Act and of State vendor cost containment mechanisms. (Id.) From July through October 2004, FNS conducted two briefings for Congressional staff members, began collecting information from state agencies, and prepared for and conducted a WIC Vendor Cost-Containment Meeting held October 5-7, 2004. (Id. ¶¶ 6-11.) The collection and analysis of information regarding, inter alia, the effectiveness of current vendor cost- containment practices, was a prerequisite to deciding how to implement the statutory standards. For example, one particular problem faced by the agency was how to identify above-50-percent vendors as required by the statute. (Vogel Decl. ¶ 9.) Because state agencies did not routinely collect total food sales data from vendors, it was necessary to begin by developing resouces that would permit classification of vendors as either regular vendors or above-50-percent vendors. (Id.) This and other copious

research had to be done before the agency could responsibly develop a rule.  (See id. ¶¶ 9-10 & attached exhibits).

By December 2004 (less than two months following the completion of these essential information-gathering efforts), the FNS had a working draft of the interim rule.  (Vogel Decl. ¶ 11.) From December 2004 to March 2005, the FNS worked through several drafts of the rule.  (Vogel Decl. ¶ 12.)  In order to gain input from the representatives of WIC vendors, the FNS met with representatives from the Food Marketing Institute and the National Grocers Association.  (Id.) In addition, numerous statutes and regulations require assessments of the impact of any rule.  Thus, the FNS was required to conduct an extensive regulatory impact analysis under Executive Order 12866, an analysis pursuant to the Unfunded Mandates Reform Act of 1995, a federalism summary impact analysis under Executive Order 13132, a civil justice reform analysis under Executive Order 12988, a civil rights impact analysis pursuant to Departmental Regulation 4300-4, an analysis required under the Paperwork Reduction Act of 1995 and a review under the Government Paperwork Elimination Act.  (Id. ¶ 11.)

In March 2005, the interim rule entered the formal clearance process, which requires review and approval within FNS and by twelve departmental offices in USDA.  (Vogel Decl. ¶¶ 13-14.) These clearance procedures are not rubber stamps to be expected quickly and pro forma.  At each step, it is typical "to have discussions with each reviewer regarding various portions of the regulation," and the "FNS responds to all inquiries by reviewers which may result in changes to the regulation."  (Id. ¶ 13.)   First, internal FNS review required continued analysis, comment and revision based on a review for consistency with applicable statutes and with the policy directives of the Under Secretary for Food, Nutrition and Consumer Services.  (Id. ¶¶ 13-14.)  The regulation left FNS on May 9, 2005 for clearance by the USDA Office of General Counsel ("OGC"), who reviewed

the rule for consistency with applicable statutes and regulations and cleared it in less than ten days. (Id. ¶ 14)  Thereafter, the FNS submitted the rule simultaneously to all other offices of the USDA whose clearance was required.  Each clearance point reviewed the rule for consistency with applicable statutes and regulations, as well as the policy objectives of the administration.  (Id. ¶ 13.) The rule was cleared by all necessary USDA offices, including policy review by the Office of Budget and Policy Analysis, by the end of July 2005.  Id. ¶ 14.

Although the USDA had effectively completed its review by August, Executive Order 12866 requires an additional review by the Office of Management and Budget, which has 90 days in which to complete its review.  OMB received the rule August 8, 2005.  (Vogel Decl. ¶ 15.)  Its intial response to the rule on September 30, 2005 was to submit 90 technical questions to FNS, to which the FNS responded in a matter of weeks.  (Id.)  OMB subsequently posed 13 additional comments, and as a result of OMB.'s comments, the FNS revised the the Regulatory Flexibility Act analysis. (Id.)  OMB cleared the rule November 7, 2005.  (Id.)  On November 18, 2005, OMB separately cleared the information collection burden package.  (Id.)  On November 22, 2005, the rule was signed by Kate Coler, Deputy Under Secretary, Food, Nutrition, and Consumer Services and hand-carried to the Federal Register for publication.  (Id.)

Although the above-described process was indubitably burdensome as a result of numerous statutory and administrative requirements, it was not the agency's only significant responsibility during this timeframe.  The concurrent responsibilities most directly related to the rule were the development of draft guidance and providing training to state agencies.  The draft  guidance was issued in July 2005 and extensive training was provided to state agencies in all seven FNS regions between July and October 2005.  (Vogel Decl. ¶ 16.)  Simultaneous with the development of the guidance and the interim rule, the WIC staff in FNS had to undertake significant corrective action

against the California WIC agency, develop six policy memoranda, develop four other regulations related to the WIC Reauthorization Act. and implement a statutorily required moratorium on new above-50-percent vendors. (Id. ¶¶ 17-18.)

Moreover, as of October 2005, the FNS as a whole was responsible for 45 regulations at various stages of development, three long-term actions and five completed actions; five active regulations were directly related to WIC.[18] Unified Agenda, Department of Agriculture Semiannual Regulatory Agenda, 70 Fed. Reg. 64308, 64313-15, 64347-62 (October 31, 2005). See also 70 Fed. Reg. 26562, 26567-68, 26602-18 (May 16, 2005) (48 regulations in development, two long-term actions, and six completed actions); 69 Fed. Reg. 72892, 72897-98, 72929-43 (December 13, 2004) (50 regulations in development, two long-term actions, one completed action). In short, the FNS has been more than fully occupied by its myriad regulatory responsibilities; the five WIC staff members nonetheless made the Vendor Cost Containment Rule an important priority and succeeded in completing it within the timeframe specified by the statute.

On the other hand, the provision of notice and comment on the Vendor Cost Containment Rule would have delayed the implementation of new cost containment measures mandated by the statute well beyond the December 30, 2005 deadline. A notice-and-comment period prior to the rule's effective date would have required months to receive and review public comments. (Vogel Decl. ¶ 19.) Even more significantly, any resulting changes to the rule would have had to be drafted and undergo the same review and clearance procedures again, including up to three months of review

---

[18]  The Unified Agenda is compiled and published in the Federal Register semi-annually, in compliance with the Regulatory Flexibility Act. 5 U.S.C. § 602. That act requires that federal agencies publish semiannual agendas of regulatory actions they are preparing. See Unified Agenda, 70 Fed. Reg. 26562 (May 16, 2005).

at OMB.  (Id.)  It is unlikely in the extreme that these processes could have been completed by the statutory deadline.  (Id. ¶ 19.)

        3.    <u>There was a Compelling Need to have Regulations in Effect by December 30, 2005</u>.

The FNS had excellent reasons to view December 30, 2005 as a necessary deadline for issuing a vendor cost containment rule.[19]  (Vogel Decl. ¶ 10.)  States were absolutely required to be in compliance with the statutory cost containment requirements by that date. 42 U.S.C. § 1786(h)(11)(G).  Because the states must take action regardless, there exists no good reason not to act.  Leaving the states to act without federal guidance could have resulted in ineffective, inconsistent, or even unnecessarily harsh application of the statute's requirements, to the benefit of no one.  State compliance with the statute is, moreover, a prerequisite for receipt of federal funds, and the absence of a rule would have left state agencies in a highly uncertain position as to how they could demonstrate their compliance and thus their continued eligibility for federal grants in aid.

Furthermore, insofar as the failure to issue a rule could have effectively resulted in nonimplementation of the Congressional mandate, important cost savings would be lost.  These savings are estimated at $75 million annually. 70 Fed. Reg. 71709.  "By issuing an interim rule, the Program would begin to realize these cost savings sooner and as a result would be able to serve

---

[19]Very short Congressional deadlines are not a prerequisite for good cause based on other factors.  In some cases where good cause is found, time constraints on the agency are not a factor at all.  For example, the agency found, and the Court upheld, good cause in <u>Mid-Tex</u>, despite the fact that the urgency arose, not from tight deadlines, but from a Court decision vacating the prior rule as arbitrary and capricious; nonetheless "the public interest in having a clear and identifiable" rule supported good cause.  <u>See</u> 822 F.2d at 1131-32.  <u>See also</u> <u>American Maritime Ass'n v. United States</u>, 766 F.2d 545, 554 n. 14 (D.C. Cir. 1985) (noting that good cause existed based on immediate practical need); <u>Universal Health Services of McAllen, Inc. v. Sullivan</u>, 770 F. Supp. 704 (D.D.C. 1991) (finding that although the agency's "dilatoriness" was a factor in the need for an interim rule, there was good cause based in part on fulfilling Congressional intent).

additional participants." (Vogel Decl. ¶ 19.) If the WIC program were to end up insufficiently funded as a result of rising food costs, the worst impact of delay would not fall upon the agency or the WIC-only vendors; it would fall upon the intended beneficiaries – low-income women and children. (Vogel Decl. ¶ 20.)

    4.  The Temporary Nature of the Interim Rule Allows for Data Collection and Flexibility

  In addition to the necessity of providing regulatory guidance to the states in advance of the implementation deadline established by Congress in the WIC Reauthorization Act, the temporary nature of the interim rule is a "significant factor" in determining whether an agency's good cause determination is justified. Tenn. Gas Pipeline Co. v. Fed. Energy Regulatory Comm'n, 969 F.2d 1141 (D.C. Cir. 1992). Even before issuing the interim final rule on November 29, FNS issued a lengthy guidance in July 2005, received and reviewed comments from state agencies, and made changes to the guidance on the basis of those comments. (See Vogel Decl ¶ 16.) The agency solicited the opinion of WIC vendors as well. (Id. ¶ 12.) In the preamble to the interim rule, FNS explains that it "will be collecting and analyzing [still further] data from State agencies, in anticipation of issuing a final rule." 70 Fed. Reg. at 71709. These data will demonstrate how states chose to implement particular requirements for vendor peer groups, competitive price criteria, and reimbursement levels. FNS would then be in a position to "consider a reasonable number of regulatory alternatives" based on its findings. Id. Anticipating that comments from affected businesses would be beneficial at this point, FNS established a comment date of November 29, 2006, in advance of a final rule. Id. at 71708. Thus, even though the interim rule did not include full notice and comment when it was issued, the informal comment process the agency underwent beforehand, and its intent to follow additional comment procedures in advance of the final rule

supports the good cause determination.[20]  See Petry, 737 F.2d at 1203 (holding that any presumption against a "late" comment period may be overcome by proof that agency has been open-minded in accepting comments regarding the interim rule); Universal Health Servs. Inc. v. Sullivan, 770 F. Supp. 704, 721 (D. D.C. 1991) (finding that "the Secretary's failure to engage in pre-promulgation notice and comment was at least partially cured by allowing the opportunity for post-promulgation comment").

Taken together, the above considerations amply suffice to provide a "substantial basis" for the agency's determination under its own policy statement., and under the discretion extended to it in section 501 of the Act, to issue an interim final rule with public comment afterward rather than beforehand.

III.    THE FNS FULLY COMPLIED WITH ANY REQUIREMENTS IMPOSED BY THE REGULATORY FLEXIBILITY ACT

The plaintiffs further contend that the FNS failed to follow the requirements of the Regulatory Flexibility Act ("RFA") in promulgating the interim rule.  The RFA requires agencies to consider the effect that their regulations will have on small entities, analyze effective alternatives that may minimize a rule's impact on such entities, and make their analyses available for public comment.  5 U.S.C. §§ 601-604.  When applicable, the RFA, as amended, requires an agency to make available for public comment an initial regulatory flexibility analysis describing a proposed rule's effect on small businesses, 5 U.S.C. § 603(a), and discussing significant alternatives that could

_____

[20]  In addition, without a temporary interim rule that would allow FNS to determine how state agencies are carrying out the mandates of the Reauthorization Act, it is difficult to see how the agency could effectively set a final rule.  See Nat'l Ass. of Broadcasters v. FCC, 740 F.2d 1190, 1200 (D.C. Cir. 1984) (recognizing the agency's "authority to approve services on an experimental basis in an effort to gather . . . data to be used in the completion of a regulatory framework" as long as the agency acts within its statutory obligations).

accomplish the same objectives while reducing any significant economic impact on small businesses, id. § 603(c). Correspondingly, when applicable, the RFA requires the agency to issue a final regulatory flexibility analysis when it issues the final rule. 5 U.S.C. § 604(a).

> A.    The RFA Does Not Apply Because Notice and Comment Was Not Required

The Regulatory Flexibility Act applies to agency rulemakings in three situations: (1) the agency has promulgated a "final rule" under 5 U.S.C. § 553, (2) the agency is required by "any other law to publish a general notice of proposed rulemaking," or (3) the agency promulgates a final interpretive rule involving the internal revenue laws of the United States. 5 U.S.C. § 604(a). None of these situations is presented by the interim rule issued by FNS. For the reasons discussed in Part II, section 553 of the APA does not apply to rulemakings related to grants and benefits, and agency policy also does not require notice and comment for promulgation of this rule.[21] Thus, the RFA imposes no requirements on this rulemaking.

> B.    The RFA Only Requires an Analysis of the Impact on Directly Regulated Businesses

---

[21]Moreover, even if this Court finds that the agency policy statement required notice and comment in this case, the policy statement is not "law" within the meaning of the RFA. Although an agency's unexplained deviation from a previously articulated statement of policy may be subject to review under the APA "arbitrary and capricious" test, e.g. Union of Concerned Scientists v. Nuclear Regulatory Comm'n, 711 F.2d 370, 381, the Statement of Policy is not, in and of itself, a "law." See Pacific Gas & Electric Co. v. Fed. Power Comm'n, 506 F.2d 33, 38 (D.C. Cir. 1974) ("The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy."); see also City of Los Angeles v. McLaughlin, 865 F.2d 1084, 1087 (9th Cir. 1989) (upholding agency's waiver of statement of policy applying APA notice and comment requirements); Alcaraz v. Block, 746 F.2d 593, 611 (9th Cir. 1984) ("[R]ulemaking requirements for agencies managing benefits programs are still voluntarily imposed. . . . [I]t is only the Department's own statement of policy that applies the notice and comment provisions to rulemaking in these programs."); Philadelphia Citizens, 669 F.2d at 881 (explaining that "Congress did not require" HHS to comply with policy statement; compliance was voluntary). The USDA's intention to follow notice-and-comment procedures voluntarily should not result in the USDA being inadvertently bound to follow other incidental procedures to which it is not statutorily obligated.

The RFA does not require a regulatory flexibility analysis of the rule's impact on WIC-only vendors for a second and independent reason. As the D.C. Circuit has expressly and repeatedly held, the RFA does not require that an agency assess the impact of a rule on all small entities that may be affected by the rule, only those directly regulated. See Cement Kiln Recycling Coalition v. EPA, 255 F.3d 855, 869 (D.C. 2001) (holding that agency has no obligation to conduct RFA analysis on small entities indirectly harmed by a regulation, even if that regulation is "intended to affect" the entities' behavior); American Trucking Assoc. v. EPA, 175 F.3d 1027, 1045 (D.C. Cir. 1999) (holding that EPA's regulation requiring states to develop environmental controls directly regulates states, not potential polluters, and therefore no RFA analysis of effect on potential polluters was necessary), rev'd in part on other grounds, Whitman v. American Trucking Assoc., 531 U.S. 457 (2001); Michigan v. EPA, 213 F.3d 663 (D.C. Cir. 2000) (same); Motor & Equip. Mfrs. Ass'n v. Nichols, 142 F.3d 449, 467 & n. 18 (D.C. Cir. 1998) ("An agency is under no obligation to conduct a small entity impact analysis of effects on entities which it does not regulate.") (internal quotation marks omitted).

American Trucking is firmly settled law in the D.C. Circuit, and it is difficult to imagine a more closely parallel case. In American Trucking, the Court held that the National Ambient Air Quality Standards ("NAAQS") promulgated by the Environmental Protection Agency did not directly regulate small entities because the NAAQS directly imposed requirements only on state agencies. See American Trucking, 175 F.3d at 1045. The NAAQS regulation imposed detailed requirements on state agencies concerning the regulation of businesses that produce air pollution; nonetheless state agencies, not the polluters were the directly regulated entities and the RFA imposed no requirement to conduct an analysis of the regulatory impact on polluters. Id. In the present case,

the entities regulated by the interim rule are the state agencies that are required to establish peer groups and competitive price criteria, not WIC-only stores. Furthermore, the state agencies have broad flexibility in how they implement the requirements of the interim regulation. Thus, for this reason as well, FNS had no obligation to conduct an RFA analysis of the interim rule's impact on WIC-only vendors such as plaintiffs.

C.     The FNS Certification is Sufficient to Satisfy the RFA

The RFA does not require a regulatory flexibility analysis where the head of the agency certifies that the regulation will not have a significant economic impact on a substantial number of small entities. See 5 U.S.C. § 605(b); Transmission Access Policy Study Group v. Fed. Energy Regulatory Comm'n, 225 F.3d 667, 737 (D.C. Cir. 2000).

Although a certification was unnecessary in the present case for the reasons discussed above, FNS examined whether a full RFA analysis was necessary in promulgating the interim rule. Ultimately, the agency concluded that an RFA analysis was unnecessary because the regulation would "not have a significant economic impact on a substantial number of small entities." 70 Fed. Reg. at 71709; 5 U.S.C. § 605(b). The plaintiffs believe that this certification fails to comply with the mandates of the RFA for two reasons: (1) FNS did not "make a formal certification" or "provide the factual basis for this certification," and (2) FNS's explanation for why no significant economic impact was expected was internally inconsistent. (Pls. Mem. Supp. TRO at 25.) Neither argument has merit.

FNS complied with all of the requirements in the RFA in certifying its belief that the rule would not have a significant economic impact on a substantial number of entities. The RFA does not impose a substantive mandate on federal agencies. See United States Cellular Corp. v. FCC, 254 F.3d 78, 88 (D.C. Cir. 2001) (describing RFA as "purely procedural" device); see also Associated

Fisheries, Inc. v. Daley, 127 F.3d 104, 114 (1st Cir. 1997) (holding that RFA does not command agencies to take substantive measures).  Accordingly, agencies are required only to engage in a "reasonable" and "good faith" effort to comply with the Act.  U.S. Cellular, 254 F.3d at 88.  When an agency concludes that a full RFA analysis is not necessary, it is required to certify that conclusion, publish the conclusion in the Federal Register, and include a statement providing the factual basis for the conclusion.  5 U.S.C. § 605(b).  Here, the agency stated that the rule would not have a significant economic impact on a substantial number of small entities, 70 Fed. Reg. at 71709; it published this conclusion in the Federal Register under a section of the preamble entitled "Regulatory Flexibility Act," id.; and it provided a factual basis for this certification, id.  These procedural steps are all that the RFA requires.

In its discussion of the Regulatory Flexibility Act, FNS explained that the interim rule "may have a significant economic impact on a small number of vendors that have been authorized to participate in the WIC program," as "[o]nly those vendors that are able to meet competitive pricing requirements will be able to continue participating in the program."  Id.  The plaintiffs argue that this explanation contradicts FNS's ultimate conclusion that no significant impact is anticipated.  However, in order for an RFA assessment to be required, the "significant impact" must be felt by a "substantial number" of small entities, not a "small number" of authorized vendors, as FNS found.  5 U.S.C. § 605(b).  Plaintiffs point to FNS's estimate that "between three and four percent" of the current authorized WIC vendors will "need to make changes in the prices that they offer . . . in order to be deemed competitive."  Id.  As this statement makes clear, that three-to-four percent figure includes *all* WIC vendors who may need to make *any* price change, no matter how minor.  It is not a statement that 3-4 percent of all WIC vendors will face a "significant" impact.  (Declaration of Ronald Vogel in Opposition to Plaintiffs' Motion for a TRO, ¶ 8.)  The plaintiffs' artful use of

ellipses in quoting from the RFA certification cannot obfuscate the FNS's explanation that it anticipated that only a small number of WIC-only vendors would face a significant impact such as a severe decline in profits or closure of the business.  70 Fed. Reg. at 71709.

Moreover, it is currently infeasible to do a more detailed regulatory flexibility analysis because, as FNS explains in its discussion of the RFA in the preamble to the interim rule, it is currently infeasible to estimate precisely how many small entities will be significantly affected by the application of the interim rule. 70 Fed. Reg. at 71709.  The reason for this difficulty is that the rule does not directly regulate WIC vendors, as discussed above.  Instead, the rule requires state agencies to "establish a vendor peer group system and distinct competitive price criteria and allowable reimbursement levels" in order to ensure that vendors offer the "lowest practicable food prices consistent with adequate participation access." Id. at 71722, section 246.12(g)(1), (4).  With regard to the plaintiffs in the present case, the state agencies must ensure that average payments to above-50-percent vendors do not exceed "average payments for the same food item to comparable vendors." Id. at 71723, section 246.12(i)(D).

Thus, it is the state agencies who ultimately establish the competitive price plan required by the Rule and determine whether vendors are complying with the rule's requirements.  Those same state agencies are responsible for establishing the peer group methodology, and they determine whether exemptions should be allowed from the requirements of the rule.  Id. at 71708 ("FNS considered mandating specific means of developing peer groups, competitive price criteria and allowable reimbursement levels . . . .  However, given State agencies' responsibility to manage WIC as a discretionary grant program, the varying retail food market conditions in each State, and the wide variations in current vendor cost containment systems . . . FNS believes that State agencies need flexibility to develop their own peer groups, competitive price criteria and allowable

reimbursement levels.") Until the state agencies act, it is difficult, if not impossible, to define the magnitude of the harm that above-50-percent WIC vendors would suffer without "convert[ing the] rulemaking process into an exercise in economic modeling" that the RFA does not require. Cement Kiln, 255 F.3d at 869. Accordingly, a fuller RFA analysis than that FNS could practicably perform at this juncture would be unnecessary, even if the RFA applied.

D.     The Regulatory Impact Analysis is Sufficient to Satisfy the RFA

When applicable, the RFA requires that an agency make publish an of a rule's impact on small entities. See generally 5 U.S.C. § 604(a). That analysis can be published anywhere with the rule in question; the form it takes is wholly irrelevant, and duplicative analyses may be avoided. See 5 U.S.C. § 605(a) ("Any Federal agency may perform the [regulatory flexibility analyses] in conjunction with or as a part of any other agenda or analysis required by any other law if such other analysis satisfies the provisions of such sections."); Blue Water Fisherman's Ass'n v. Mineta, 122 F.Supp.2d 150, 175 (D.D.C. 2000) (citing Associated Fisheries of Maine v. Daley, 127 F.3d 104, 115 (1st Cir. 1997)).

The preamble to the interim rule and the regulatory impact analysis published as an appendix to the interim rule, taken together (see 5 U.S.C. § 605(a)), satisfy all of the requirements of the RFA. First, a regulatory flexibility analysis requires "a succinct statement of the need for, and objectives of, the proposed rule." See 5 U.S.C. § 604(a)(1). This is clearly contained in both the preamble, see 70 Fed. Reg. at 71708-09, and the regulatory impact analysis, see 70 Fed. Reg. at 71724-25. Next, the analysis must contain "a description of and an estimate of the number of small entities to which the proposed rule will apply, or an explanation of why no such estimate is available." 5 U.S.C.

§ 604(a)(3).[22]   The regulatory impact analysis describes the affected parties, including "State agencies that administer the WIC Program, and retail vendors that are authorized to accept WIC food instruments." 70 Fed Reg. at 71724.  Both the regulatory impact analysis and the preamble estimate the numbers of states and businesses likely to be affected, <u>see</u> 70 Fed. Reg. at 71709, 71727-28, but as discussed above, the FNS reasonably concluded that it is currently infeasible to do a more detailed analysis that singles out small entities, 70 Fed. Reg. at 71709.  Next, the RFA requires "a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record."  5 U.S.C. § 604(a)(4).   The interim rule imposes "reporting, recordkeeping and other compliance requirements" only on state agencies, and those administrative burdens are considered in great detail in the regulatory impact analysis.  <u>See</u> 70 Fed. Reg. at 71725-28.

Finally, the RFA requires an analysis of "significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities."  5 U.S.C. § 604(a) (5).  The agency describes the interim rule as implementing the legislative mandate in the broadest and most flexible manner that still provides meaningful guidance.  <u>See</u>, <u>e.g.</u>, 70 Fed. Reg. at 71708 ("[T]he rule gives State agencies flexibility to design cost containment practices that would be effective in their own markets and would ensure adequate participant access.").  Thus, rather than a series of possible alternatives,

---

[22]  5 U.S.C. § 604(a)(2) requires a summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis" that an agency is required under § 603(b) to issue with the proposed rule.  But, inasmuch as FNS properly determined that it was not required to issue a proposed rule or provide for public comment thereon before issuing the interim rule, there were no such comments to be summarized in this instance.

the regulatory impact analysis considers all more specific alternatives as a class: "FNS considered mandating specific means of developing peer groups, competitive price criteria, and allowable reimbursement levels in order to ensure that the outcome of this legislation was achieved." Id. at 71730. The FNS concluded, however, that there was a dearth of information about the effectiveness of different practices in varying markets, and that "[m]andating more specific means . . . could have unintended, negative consequences on participant access, food costs and administrative burden." Id. Thus, to minimize any unintended economic impact of the rule, the FNS left it to the states to develop cost containment practices within broad guidelines until more information and data are available on effective approaches to vendor cost containment.

In short, the impact analyses published with the interim rule provide the most detailed regulatory flexibility analysis that is possible prior to implementation and are more than sufficient to satisfy the "good faith" compliance required by the RFA. See U.S. Cellular, 254 F.3d at 88.

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests that its motion for summary judgment be granted.

Dated:  December 23, 2005                    Respectfully submitted,


                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             KENNETH L. WAINSTEIN
                                             United States Attorney

                                             JAMES J. GILLIGAN
                                             Assistant Director, Federal Programs Branch

/s/ Amy E. Powell
AMY E. POWELL
Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W. Rm. 7217
Washington, D.C. 20530
Telephone:        (202) 514-9836
Facsimile:         (202) 616-8202
Email:             amy.powell@usdoj.gov

Attorneys for Defendants