UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WOMEN, INFANTS AND CHILDREN GROCERS ASSOCIATION, et. al. <br><br> Plaintiffs, <br><br> v. <br><br> FOOD AND NUTRITION SERVICE, <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.1:05-cv-02432-EGS<br>)<br>)<br>)<br>)<br>)<br>) |

January 17, 2006

## DECLARATION OF RONALD VOGEL

Ron Vogel, for his declaration pursuant to 28 U.S.C. 1746, deposes and says as follows:

1) My name is Ronald Vogel. I am Associate Deputy Administrator for Special Nutrition Programs for the Food and Nutrition Service (FNS) of the United States Department of Agriculture (USDA). I submit this declaration in support of the Defendant's Motion for Summary Judgment in the above-captioned action. The statements made herein are based on my personal knowledge or on information provided to me in the course of performing my duties and responsibilities as Associate Deputy Administrator.

2)   FNS administers the nutrition assistance programs of USDA. The mission of

FNS is to provide children and needy families with better access to food and a

more healthful diet through its food assistance programs and comprehensive

nutrition education efforts.   As Associate Deputy Administrator for Special

Nutrition Programs (SNP) within FNS, I have operational responsibility for the

National School Breakfast and Lunch Programs, the Special Supplemental

Nutrition Program for Women, Infants and Children (WIC), the Child and Adult

Food Care Program, the Summer Food Service Program and a variety of

commodity distribution programs.

3)   I have held the position of Associate Deputy Administrator for Special Nutrition

Programs for the past thirteen years.   Prior to holding this position, I was the

Director of the Supplemental Food Programs Division, which includes WIC, and

Director of the Program Information Division where I was responsible for FNS's

financial and program information management systems.

4)   The Child Nutrition and WIC Reauthorization Act of 2004, Pub. L. 108-265

(Reauthorization Act) was enacted on June 30, 2004. The Act includes

requirements that affect the selection, authorization and reimbursement of WIC

retail vendors. As provided for in the statute, WIC State agencies are required to

implement a peer group system, establish competitive price criteria and set

allowable reimbursement levels in order to contain WIC vendor costs by

ensuring payment of competitive prices for WIC supplemental foods.   The

Reauthorization Act requires WIC State agencies to implement the vendor cost containment provisions not later than December 30, 2005. On November 29, 2005, FNS published an interim regulation titled, "Special Supplemental Nutrition Program for Women, Infants and Children (WIC): Vendor Cost Containment" to establish standards and procedures for state compliance with the statutory vendor cost containment requirements in the Reauthorization Act.

5)    The Reauthorization Act includes over 60 pages of provisions and requirements affecting the administration and operation of the WIC Program and the National School Breakfast and Lunch Programs within my area of responsibility in SNP. After enactment of the Reauthorization Act, FNS immediately began the process of analyzing the legislative requirements and legislative history to determine the actions necessary to implement the Act. FNS issued a total of approximately 70 policy memoranda to implement legislative requirements with specific effective dates, as authorized in the Act. In addition, the FNS issued or will issue a total of 25 regulations to implement all of the requirements in the Act. The number of FNS staff available to work on implementation of the WIC-related portions of the Act was five full-time employees.

6)    In July 2004, per their request, FNS conducted two briefings for Congressional staff members on FNS's plans to implement the Child Nutrition and WIC Reauthorization Act.

7)    As a necessary first step to providing guidance to the States and otherwise implementing the requirements of the Reauthorization Act, FNS prepared and Under Secretary Eric M. Bost sent letters to WIC State agencies and State Health Commissioners in July and August 2004, respectively, regarding the issue of vendor cost containment. WIC State agencies were notified of enactment of the Reauthorization Act and that they must implement the legislative requirements not later than December 30, 2005. The letter to State Health Commissioners indicated USDA's concern about WIC food costs charged by some vendors authorized to accept WIC food instruments. Furthermore, as a first step to assessing the effectiveness of cost containment policies, WIC State agencies were asked to review and assess their vendor selection policies to ensure that only those vendors who offer competitive prices receive WIC authorization.

8)    FNS determined that it was critical to gather information on effective competitive price selection criteria and price limitation approaches currently used by WIC State agencies prior to the development of guidance and regulations to implement the vendor cost containment provisions in the Reauthorization Act. Therefore, in July 2004, FNS began collecting information from WIC State agencies, and also began preparations for a WIC Vendor Cost-Containment Meeting with State agencies to further explore effective cost containment strategies. This meeting was held October 5-7, 2004.

9)     Following the October 2004 meeting, it became clear to FNS that a major

challenge in implementing the statute and attendant regulations was the States'

ability to identify currently authorized vendors who received more than 50

percent of their total food sales from WIC sales.  While data on so-called "WIC-

only stores" was relatively easy to secure, data necessary to go further and

identify "above-50-percent vendors" was not.  Total food sales data are not

routinely collected by State WIC Programs. Therefore, substantial staff resources

were dedicated in the months following the October 2004 meeting to developing

the necessary information resources and collection procedures that would permit

States agencies to classify stores as either regular vendors or above-50-percent

vendors, and, in turn be able to begin meaningfully addressing compliance within

the 18- month time frame established by the Congress.

10)     As a result of these and other efforts to collect information from State agencies

and other sources, FNS collected copious data on cost-containment practices and

WIC redemption prices, a few samples of which are attached here as Exhibits 1

(Potential Above-50-Percent Vendors for Fiscal Year 2004, AR 00376-80), 2

(WIC Competitive Pricing Systems Profiles, AR 01061-01140), and 3 (Redacted

Texas Redemption Data for June 2004, including Charts of Active Texas WIC

Vendors and Monthly Averages by Food Item, AR (provided electronically to

plaintiffs)).

11)    After the Vendor Cost-Containment Meeting in October 2004, FNS reviewed the available data and began developing the rule. By December 2004, FNS had a working draft of the interim rule. In addition to the analysis necessary to implement the complex substantive requirements of the Reauthorization Act, FNS was required to assess the impact of the interim rule under various statutory and administrative mandates. Included among these requirements were a regulatory impact analysis under Executive Order 12866, an assessment pursuant to the Unfunded Mandates Reform Act of 1995, a federalism summary impact analysis under Executive Order 13132, a civil justice reform analysis under Executive Order 12988, a civil rights impact analysis pursuant to Departmental Regulation 4300-4, and analysis required under the Paperwork Reduction Act of 1995.

12)    From December 2004 to March 2005, FNS worked through several drafts of the rule. In an effort to gain input from the representatives of WIC vendors, FNS met with the Food Marketing Institute and the National Grocers Association on January 25, 2005, to discuss a number of issues with regard to current retail store policies. An invitation to the meeting was extended to John Bode, a member of plaintiffs' counsel's firm; however, no one from his office was able to attend. These meetings were extremely important in identifying options that would assist States in identifying vendors that received more than 50 percent of their food sales from WIC transactions. These options were incorporated into FNS guidance to States in advance of the publication of the interim rule. FNS ultimately

adopted in the rule a requirement to identify the above-50-percent vendors authorized to participate in their programs.

13)    Following completion of the draft rule in mid-March, 2005, the rule had to undergo review within FNS, at a department-wide level, and at the Office of Management and Budget (OMB). Internal FNS review, which includes 7 offices, is required to ensure a rule's consistency with the policy directives of the Under Secretary for Food, Nutrition and Consumer Services, and to perform a regulatory impact analysis that quantifies its benefits and its costs. After FNS review, the rule enters the department-wide clearance process, which for most USDA regulations requires review and approval by an additional 7 offices within USDA, to ensure their consistency with applicable statutes and other USDA regulations, as well as the policy objectives of the Administration. Finally, OMB approval is required under Executive Order 12866, which provides OMB up to 90 days in which to conduct its review. It is typical with a significant rule to have discussions at each level of review regarding various portions of the regulation. For example, OMB's initial response to FNS regarding the regulation came in the form of ninety written questions. FNS responds to all inquiries by reviewers, which may result in changes to the regulation.

14)    The regulation entered the formal clearance process within FNS on March 17. As a result of this internal FNS review, the rule had to undergo revision before it could be circulated outside FNS for clearance at the Department level. The

regulation left FNS on May 9, 2005, for clearance by USDA's Office of the General Counsel (OGC). After reviewing the rule for consistency with applicable statutes and other regulations, OGC cleared the rule on May 18, 2005. Thereafter, in order to expedite the clearance process, the rule was submitted for simultaneous review by all other remaining USDA offices whose clearance was required, including policy review within the USDA Office of Budget and Program Analysis and by USDA's Chief Economist. The rule was cleared by all necessary USDA offices by the end of July 2005.

15)    On August 8, 2005, USDA delivered the rule to OMB for its review pursuant to Executive Order 12866. On September 30, 2005, OMB responded with ninety technical questions to FNS concerning the cost impact of the rule as a whole, to which FNS in turn responded, in writing, within 2-3 weeks. Subsequently, OMB submitted thirteen additional substantive comments, requiring FNS to make changes, which included changes to the Regulatory Flexibility Act analysis accompanying the rule. Afterward, OMB cleared the rule itself on November 7, 2005. As required by 5 C.F.R. § 1320, prior to the publication of a rule, OMB cleared the information collection burden package submitted at approximately the same time as the Vendor Cost Containment Rule, on November 18, 2005. On November 22, 2005, the rule was signed by Kate Coler, Deputy Under Secretary, Food, Nutrition, and Consumer Services and hand-carried to the Federal Register for publication.

16)    Concurrent with the development of the interim cost containment rule, FNS was also responsible, as required by the Reauthorization Act, for developing a guidance document for WIC State agencies to assist them in implementing the legislative vendor cost containment requirements. The guidance and an extensive training program were developed by FNS in time to provide to WIC State agencies in four of the seven FNS Regions on July 19-20, 2005. The guidance document was provided to WIC State agencies in the remaining three FNS Regions on July 27, 2005. (The guidance, which did not carry the force of law, did state that state agencies could not pay WIC-only stores more than the statewide average payment per food voucher for regular vendors until the state had their cost containment system certified by FNS. However, this statement was not included as a requirement in the interim rule, and FNS has since issued further guidance to the states retracting that statement.) FNS was also responsible for responding to substantial numbers of oral and written inquiries about the statute and its requirements from a variety of State agencies, some of which were in the process of drafting changes to State regulations in order to comply with the Child Nutrition and WIC Reauthorization Act. On August 9-11, 2005, FNS conducted training sessions on the guidance and implementation of the legislative requirements for WIC State agencies in the Mountain Plains Region. FNS conducted training sessions for WIC State agencies in the Western Region on September 27-29, 2005. In addition, on October 18-20, FNS conducted training sessions for WIC State agencies in the Midwest Region.

17) From July 2004 through the Summer of 2005, simultaneous with preparing for the WIC Vendor Cost-Containment Meeting and development of guidance and regulations to implement the vendor cost containment requirements, FNS WIC staff was also involved in an extensive review of data and ongoing communications, both verbally and in writing, with the State of California regarding vendor cost containment. Under Secretary Bost notified the State in August 2004 that FNS was withdrawing approval of the California WIC State agency's fiscal year 2004 State Plan vendor competitive pricing policies, and was requiring immediate corrective action. This action was necessary because although the California WIC Program had already experienced dramatic increases in food costs, a 16 percent increase in food costs in one year, it requested additional WIC funds to cover increased food costs. In addition, FNS received data from California which indicated that the WIC Program paid the 650 WIC-only stores that operated in the State, prices for WIC foods that were 13 to 16 percent higher than prices paid to other authorized vendors for comparable foods.

18) Concurrent with the development of the vendor cost containment guidance and regulations, FNS WIC staff was also responsible for the development of six policy memoranda and four other regulations to implement the Reauthorization Act, including one proposed regulation to implement historic revisions to the WIC food packages. Further, the WIC office was also responsible for developing a policy memorandum to implement the requirements of the Consolidated Appropriations Act, 2005, which established a prohibition on the authorization of

new above-50-percent vendors. Extensive technical assistance was necessary and provided by this office to FNS Regional offices and WIC State agencies on the implementation of the moratorium on the authorization of new above 50-percent vendors.

19)     FNS decided to issue an interim final regulation on vendor cost containment, with the comment period after publication rather than prior to the effective date, for several reasons. First, Congress expressly authorized the agency to issue an interim rule. Second, although Congress gave FNS two years to issue a final regulation, the States had only eighteen months from the date of enactment to implement the requirements of the Act, and some State agencies advised FNS that they would likely need federal regulatory authority to meet the requirements of the Act. Therefore, FNS decided to issue an interim regulation to assist State agencies in meeting the implementation deadline. Third, the time constraints on FNS were significant given the extensive data collection and study that were required. Even this interim rule was promulgated much more quickly than the norm in USDA. A notice and comment period prior to the effective date of the rule would have required not only several months to receive and review public comments on the proposed rule, but in the event of any resulting changes to the rule, the changes have to be drafted and again undergo the same internal review and clearance process within the Department, as well as up to three months' review again at OMB. All told, this could have added another several months to the process, rendering it highly doubtful that a rule could be in place by the

statutory deadline for the States to implement the Reauthorization Act. Fourth, the potential cost savings stemming from the implementation of the rule is conservatively estimated at $75 million annually. By issuing an interim rule, the Program would begin to realize these cost savings sooner and as a result would be able to serve additional participants. Finally, as discussed in the Preamble to the Rule, it is crucial to collect data from States before issuing a final rule. The interim rule is intended to provide States flexibility and guidance in implementation of the statutory mandate on December 30, 2005 while the FNS undertakes additional study.

20)    Based on State data and FNS's extensive experience in the area, the Agency believes that above-50-percent vendors have driven up the costs of the WIC program by routinely charging above-market prices. If States do not act to constrain these costs, above-50-percent stores will continue to drain the program of much-needed funding. Since WIC is not an entitlement program, it must operate on a finite annual appropriation. In the past, the program operated for many years with insufficient funds to provide benefits to all eligible applicants and waiting lists were created. Without effective cost containment measures, it is entirely possible that we would need to turn away eligible applicants because of insufficient funding. As recently as fiscal year 2004, the State of California was allocated an additional $26.4 million in WIC contingency funds, which was above its grant, to cover increased food costs. Without these additional funds, the State agency would have been forced to turn away eligible women and children.

Effective cost containment measures also ensure that the program is fiscally responsible in using taxpayer dollars. The plaintiffs' interpretation of the statute will prevent states from effectively containing costs. The limitation of the average payments to above-50-percent vendors only to the average payments to allegedly comparable vendors with no further limit would still result in higher total program costs because such vendors may be disproportionately compared with the most expensive regular vendors, for example, convenience stores and single-proprietor ("mom and pop") operations that lack the economies of scale of major national and independently owned grocery store chains. Such a comparison may result in payments for WIC-only stores at the highest reimbursement level and less total monies available for the provision of benefits. In short, the plaintiffs' interpretation would frustrate the Congressional purpose of assuring that the authorization of WIC-only stores is cost neutral to the program as a whole.

I declare under penalty of perjury that the foregoing is true and correct. Executed on: January _17_, 2005.

_____
Ronald Vogel
Associate Deputy Administrator
Special Nutrition Programs
Food and Nutrition Service
United States Department of Agriculture