# EXHIBIT C

Case 1:05-cv-02432-EGS   Document 13-10   Filed 01/17/2006   Page 2 of 13

# STATE OF TEXAS
## DEPARTMENT OF HEALTH
## BUREAU OF NUTRITION SERVICES

## RETAILER PEER GROUPING STUDY FOR COMPETITIVE PRICING

### Deliverable 3
### Non-Commercial Vendor Recommendations

December 30, 2003

Prepared by:

**Burger, Carroll & Associates, Inc.**
1421 Luisa Street, Suite A
Santa Fe, New Mexico 87505
505-982-9880
www.burgercarroll.com





1421 LUISA STREET, SUITE A
SANTA FE, NM 87505
PHONE: (505) 982-9880
FAX: (505) 982-9820
WWW.BURGERCARROLL.COM

---

*Texas Peer Group Study*
*Non-Commercial Vendor Recommendations*

## Table Of Contents

I. Introduction ............................................................................................. 3
   I.1. Summary ........................................................................................ 3
   I.2. Background ..................................................................................... 3
II. Infant Formula Drop Shippers ............................................................. 4
   II.1. Summary ....................................................................................... 4
   II.2. Methodology ................................................................................. 5
   II.3. Analysis and Findings .................................................................. 6
   II.4. Recommendations ........................................................................ 7
      II.4.1. Primary Recommendation ................................................... 9
      II.4.2. Secondary Recommendation ............................................. 10
III. WIC Only Stores .................................................................................. 11
   III.1. Summary ..................................................................................... 11
   III.2. Methodology ............................................................................... 12
   III.3. Analysis and Findings ............................................................... 12
   III.4. Recommendations ...................................................................... 19
      III.4.1. Primary Recommendation ................................................ 20
      III.4.2. Secondary Recommendation ........................................... 22

*Burger, Carroll & Associates, Inc.*     2     *December 30, 2003*

# I. Introduction

## I.1. Summary

BCA is pleased to submit this document, Non-Commercial Vendor Recommendations, as Deliverable 3 of the Texas WIC Retailer Peer Group Study For Competitive Pricing. The Study was conducted by Burger, Carroll, & Associates, Inc. (BCA) for the Texas Department of Health (TDH), Bureau of Nutrition Services WIC program (*SIT Services Contract: 3242-02-01492, P.O ID # 000208246*). The purpose of this deliverable is to provide recommendations to the Texas WIC Program on how it should manage "non-commercial vendors;" those that drop ship infant formula and/or operate "WIC Only" stores.

This deliverable, which fulfills the final contract requirement, describes non-commercial vendors and their role in providing WIC foods; discusses the implications of their operations in the current Program environment; and, provides recommended alternative management strategies. Following a brief background statement (see I.2, below), this report is presented in two sections: 1) Infant Formula Drop Shippers and 2) WIC Only Stores. For each of these two sections, the report provides the following subsections:

Summary
Methodology
Analysis and Findings
Recommendations

For a comprehensive understanding of study findings and recommendations, readers should also refer to a companion report: *Final Peer Group Recommendations* (BCA, Inc., Deliverable 2.3, *SIT Services Contract: 3242-02-01492, P.O ID # 000208246*, December 8, 2003).

## I.2. Background

In December 2000, the Food and Nutrition Service issued comprehensive new regulations for retailer management which redefined and increased the requirements for states. The December 2000 regulations required states to implement selection criteria to be used when authorizing stores. One of the mandated criteria is that "The State agency must consider the prices a vendor applicant charges for supplemental foods as compared to the prices charged by other vendor applicants and authorized vendors." It is further required that "The State agency must also establish price limitations…. designed to ensure that the State agency does not pay a vendor at a level that would otherwise make the vendor ineligible for authorization. The State agency may establish different competitive price requirements and price limitations for different vendor peer groups…."

BCA has provided Texas a set of peer group recommendations for the typical, commercial WIC retail vendors (95% of all authorized vendors), who conduct the vast majority of WIC food redemption transactions (greater than 85%). These peer groupings will permit the State

---

to comply with the federal regulatory price control requirements in these stores on the basis of the competitive forces in the marketplace.

However, there are currently two "non-commercial" types of vendors authorized by the TDH WIC Program that cannot be grouped with commercial stores because of their unique business characteristics. These two non-commercial vendor types are known by the Agency as "Infant Formula Drop Shippers" and "WIC Only" stores.

A drop shipper is a vendor that provides infant formula to WIC participants by shipping the product to the local clinic. Drop shippers can supply contract and special/non-contract formulas. Typically these services are employed when a special formula, prescribed by a physician, is not available in retail stores, or when a client has difficulties, such as the lack of transportation, in obtaining formula at a retail outlet. A drop shipper could be a medical supply house, a retail pharmacy, or a commercial store. Currently, two of the four authorized drop shippers also operate WIC Only stores.

As the name implies, a WIC Only store is a retail outlet that primarily, or in most cases exclusively, serve WIC clients. These stores typically only carry WIC foods and only accept WIC vouchers as tender. As of September 2003, the TDH WIC Program had 102 authorized WIC Only stores located across the state but concentrated in a handful of urban areas.

Recognizing that these non-commercial vendors "do not or primarily do not compete in the commercial market place on the basis of price," the scope of work for this study required recommendation of alternate method(s) for competitive price/peer grouping strategies for these two groups.

# II. Infant Formula Drop Shippers

## II.1. Summary

At this time, there are four contractors within the state that provide special formula through drop shipping. They are:

- Eddie Bryant Enterprises
  (915) 592-8737
  wiomkt@aol.com

- Grocery Services
  (713) 688-7612
  rsolcher@yahoo.com

- Medco Medicaid Services
  (713) 956-5288

00457



*Texas Peer Group Study*
*Non-Commercial Vendor Recommendations*

dhayden.e-medco@sbcglobal.net

- Star Medical Specialties
  ((72) 380-2065

The Texas WIC Program will contract with any qualified shipper that can provide these formulas. Once contracted, these shipping vendors are eligible to bid on orders from local agencies. Local staff are expected to obtain price quotes from at least two contractors and to utilize the least priced vendors.

There are six (6) common elements in the operation of the delivery system:

1. When the local clinic needs formula shipped to a client, it will contact at least two of the contracted drop ship vendors to determine the best price for the formula needed.

2. The local staff identify and select the least price vendor and fax a copy of the authorization voucher (e.g. WIC food instrument) to the selected vendor.

3. The vendor ships the formula to the specified local program site.

4. Once the formula is received, the local staff provides it to the client.

5. The local staff send the original voucher to the vendor.

6. The vendor then sends the completed vouchers on a daily basis to the state for reimbursement.

The system meets the Program's mission of providing critically-needed nutrition assistance to infants despite access barriers. It is convenient for both clients and staff, and has operated without known abuse or fraud for a number of years.

Nevertheless, it is not clear if the drop shipment system as now operated is fully compliant with the recent federal regulatory mandate. As a part of this study, TDH WIC required an assessment of the system in light of the federal requirement and sought the identification of alternative strategies for assuring full compliance.

### II.2. Methodology

The scope of this task area was limited to an assessment of available data and interviews with primary stakeholders and other industry sources. BCA began the effort with a series of onsite and telephone interviews of TDH WIC state staff to clarify the study questions and to obtain available data on the current process. This early data gathering phase coincided with BCA's initial project presentation (04-16-03) to the TDH WIC Advisory Committee. The

*Burger, Carroll & Associates, Inc.*   5   *December 30, 2003*

---

*Texas Peer Group Study*
*Non-Commercial Vendor Recommendations*

briefing provided an opportunity for an in-person preliminary interview with one of the drop shipping vendors who was a member of the Committee.

On August 21, 2003, BCA conducted a formal interview teleconference with three of the four current vendors, as follows:

- Eddie Bryant Enterprises
  (915) 592-8737
  wiomkt@aol.com

- Grocery Services
  (713) 688-7612
  rsolcher@yahoo.com

- Medco Medicaid Services
  (713) 956-5288
  dhayden.e-medco@sbcglobal.net

Finally, BCA consulted with representatives of the infant formula, medical supply and WIC services industries.

[Note: At TDH direction, the sample of vendors for the study's shelf price survey did not include drop ship vendors or standalone pharmacies.]

### II.3. Analysis and Findings

By all accounts, the drop shipping of infant formula represents a fairly small proportion of total TDH formula redemptions. Unfortunately, the use of the standard voucher for ordering and reimbursement, which is also used in the "commercial" process, makes it difficult for TDH to track transaction volume and there appears to be no other standard reporting process for that purpose.

Internal TDH WIC assessments have identified the following concerns about the system as it is now operated, including:

1. The absence of formal price controls, since there is not a contracted price.

2. The lack of a process for ensuring local staff compliance with the requirement to obtain quotes from at least two vendors and to select the lowest price.

3. The potential lack of competition in pricing, since the current system may permit inappropriate consideration of service advantages over cost issues.

Discussions with the current drop ship vendors contributed their perspectives:

*Burger, Carroll & Associates, Inc.*   6   *December 30, 2003*

**BCA**                                                                 *Texas Peer Group Study*
                                                                        *Non-Commercial Vendor Recommendations*

1. There is a strong sense among the vendors that the system resolves a significant access problem for some WIC clients in both rural and urban areas.

2. Not all of the vendors knew that the clinic was to solicit and receive two bids from approved drop shippers, and then choose the least expensive.

3. Prices of formula from the manufacturer generally increase in February of each year. Two of the vendors professed to changing their WIC formula prices only in response to such manufacturer price increases.

4. Since their cost includes the shipping, it is important to consider total cost when setting the maximum allowable price (which is pre-printed on the voucher).

5. The largest challenge the vendors face in meeting WIC's needs is the absence of advance information on the anticipated volume of WIC purchases. Thus they either risk inadequate inventories or loss resulting from stale date products.

6. Related to the above, the vendors are constrained in their ability to achieve cost-savings through volume purchasing. Typically they can only purchase by the lot (i.e. a truckload), whereas larger shipments could achieve better price economies.

Discussions with various industry representatives contributed to the sense that the system as operated could benefit from enhancement. An infant formula representative concurred with the observation that a greater certainty and/or quantity of WIC business could create cost economies. A medical supplier added that shipping costs could also be lowered through greater volume for a given shipping vendor. Several industry representatives expressed surprise when told that the system did not include a contracted price.

Anecdotal evidence from state and local staff suggests that the current process would inevitably encourage local staff to consider vendor service and familiarity in the selection process. One of the current vendors contributed that "the clinics know who has the best prices and will probably contact that shipper for delivery."

Although the current vendors were not asked to provide information on their revenue and profits from the WIC drop ship contracts, all seemed interested in retaining them. Privately, one even reported that WIC drop shipping represented a significant profit center in their business.

### II.4. Recommendations

BCA considered a number of alternative strategies for enhancing the current system. This assessment was guided by the following principles:

---

**BCA**                                                                 *Texas Peer Group Study*
                                                                        *Non-Commercial Vendor Recommendations*

- The system must ensure compliance with the relevant federal regulations;
- There must be an effective method for containing cost;
- There needs to be an economical, routine reporting and monitoring process; and,
- The integrity of the system must not be compromised.

The first alternative would be to upgrade the current process. The current system as operated appears to be deficient in at least the first three considerations listed above. Enhancement of the current system in which local staff continue to exercise procurement authority on a per transaction basis would require, at a minimum:

- A formal reporting and auditing process;
- Constraints on price based on prevailing competitive trends in the drop shipping marketplace; and,
- Improved accountability for both agency and contractor compliance.

The single largest constraint to adoption of these enhancements is cost. A notable advantage of the current system is that it operates within the context of the retail-based food delivery system. As such it does not require much in the way of unique administrative systems. Development of a more elaborate food delivery administrative structure specific to drop shipping, in parallel to the retail system, would likely make the entire process cumbersome and unaffordable.

BCA also considered ways to adapt the process to the peer group methods it has proposed for the commercial stores. There were a number of barriers to this approach. For one, shippers do not necessarily have registers, a key characteristic in the proposed grouping formula. Secondly, shippers can serve all areas of the state, so their county location is not truly an indicator of their business dynamic, as it is for retail sites.

Finally, BCA considered the option of linking drop shippers to the prices of the limited number of retail pharmacies authorized by the Program. For example, drop ship vendors could be compared to pharmacies around the state that provide the same formula as they do. These commercial retailers sell the same formulas to WIC clients, as do the drop shippers. They also receive their stock from distributors, as do the drop shippers.

The analysis concluded however that the similarities ended there. The overall business dynamics of retail versus drop ship operation differ considerably, inclusive of the following considerations:

- As noted above in regard to all retail operations, drop shippers do not generally have cash registers and are not necessarily a location-dependent business;

00459

Retail prices include the distribution channel cost only as far as the store shelf; the drop ship price must add the shipping cost from the shelf to the clinic; and,

The retail pharmacy business is built on a diversity of products, considerably beyond medical products; the drop shipper's product offering is generally narrower.

Ultimately it was concluded that the drop ship vendor was not truly a marketplace peer of retail vendors for the purposes of peer grouping.

Finally, BCA concluded that the most promising alternative to the current process was to consolidate and streamline the contracting process.

### II.4.1. Primary Recommendation

> TDH WIC should adopt a competitive, statewide, single source drop-shipping contract.

*Discussion*

A bid for drop shipping formulas could be structured in different ways. Bids could be for each type or brand of formula. Bids could also be structured for specific geographic areas or throughout the state.

Some of the current contracted drop shippers seemed to favor a single-source, statewide contract. They suggested that it would have the best chance of achieving savings through economies of scale. They also noted that whether a shipper is in the same town or across the State, they all provide overnight delivery. Finally, they suggested that capacity was a business issue; in other words a vendor would need to provide the capacity required by the State, and demonstrate that it could do so in its bid proposal.

*Advantages*

TDH WIC gains an efficient and accountable process and likely reduction in overall food and administrative services costs. A competitive procurement process is consistent with standard TDH business practices and compliant with federal regulatory standards.

While the current four contractors are geographically dispersed, they are all capable of shipping to any area of the State. Evidence suggests that some, if not all, of the current vendors have the capacity to serve the entire state, and/or could form contracting teams under a single prime contractor to do so. The size of the entire statewide business would likely draw interest from other medical supply businesses, both within and beyond Texas.

The contract would establish set prices for the term of the agreement, with strict criteria for approval of prices changes. Since there would be a single source, the system would not rely on local staff to ensure cost containment. A component of the contracted statement of work could include both electronic and hardcopy reporting, a common feature of supply contracts.

From the industry perspective, the larger business volume affords opportunities for economies of scale in product procurement, inventory maintenance, order handling, shipping and accounting processes.

*Disadvantages*

For TDH, the primary disadvantage is the requirement for a formal procurement. The current procurement process requires time and staff resources that are constrained and committed to other priorities. This challenge would be mitigated to some degree by the duration of the resulting contract, but must be considered in selecting this alternative. There might also be some resistance from local agencies who feel ownership of the current process and have concern that the new one would not work as well.

For the private sector, the disadvantage is limited to any current vendors who are unable to participate in the new contract.

There would be no apparent effect on WIC clients.

*Conclusions*

TDH WIC is correct in its concerns that the current process does not fully comply with federal regulations nor afford the level of accountability the Agency requires. A fully competitive, single source contract would streamline the process and meet the needs of both the Agency and the contractor in a manner superior to the current process.

### II.4.2. Secondary Recommendation

> TDH Should Undertake a Comprehensive Assessment of WIC Infant Formula Delivery, in Both the Commercial and Drop Shipping Systems

*Discussion*

In a companion study report (BCA, 11-8-03), BCA reported that in the commercial stores the "pricing of infant formula... does not appear to be competitive." BCA recommended that TDH WIC initiate an investigation to determine the underlying causes of the non-competitive pricing of WIC-approved infant formula, enlisting the assistance of representatives of the retailer community in this effort.

In this assessment of the drop shipping system, BCA reached the conclusion that TDH cannot ensure price competitiveness.

**BCA**                                                    *Texas Peer Group Study*
                                                           *Non-Commercial Vendor Recommendations*

BCA also took note of the emerging problem of trafficking of stolen, stale and mislabeled infant formula in Texas and other states, as is the focus of a concurrent current TDH initiative.

On balance, it would seem prudent for TDH to undertake a comprehensive assessment of the entire WIC infant formula delivery process, merging the concerns about pricing, accountability and integrity. As noted in the prior report, BCA encourages TDH to consider the feasibility of direct delivery of a larger portion of its formula via drop shipment to the local agencies, or directly to client homes, as a potential response to all three concerns.

*Advantages*

A comprehensive, systemic approach to the current challenges of infant formula delivery is warranted by the size and breadth of the problem. Inevitably, a change in one area will affect all others. Importantly, establishment of comprehensive remedies offers the greatest long-term utility.

*Disadvantages*

Combining the issues across three areas -- prices in commercial stores, the cost of drop shipping, and trafficking -- has the potential of over-complicating the response to each. However, TDH appears to well-understand the issues and alternatives in each area.

The anti-trafficking initiative has been underway for some time and may be slowed by addition of the other considerations. Conversely, the current efforts might be considered as mid-term solutions until longer term, structural enhancements are achieved.

*Conclusion*

Overall, TDH WIC operates a sound and accountable food delivery system. The findings regarding infant formula are the most significant of the current study, as infant formula purchases represent over half of TDH's WIC food expenditures.

There are no obvious or simple solutions to the overall issue of infant formula cost and accountability. A comprehensive approach is thus appropriate and warranted.

## III. WIC Only Stores

### III.1. Summary

One of the emerging issues in the WIC retail business nationally is the growth of "WIC Only Stores". These non-retail food stores provide only WIC eligible foods to WIC clients. They

---

**BCA**                                                    *Texas Peer Group Study*
                                                           *Non-Commercial Vendor Recommendations*

are generally located close to WIC clinics so that clients leaving the clinic will see them and realize that they might not have to travel to a retail store to purchase their WIC foods. Although they have long existed in very small numbers, WIC Only stores have proliferated in some other states in the past few years (notably in California and Puerto Rico). Today, there are 102 WIC Only stores throughout the State of Texas, representing approximately 4% of authorized WIC vendors. Between June 2002 and June 2003, these stores redeemed $54,361,861 in food vouchers, nearly 11% of all food dollars for the period.

WIC Only stores must follow the same WIC rules as mainstream retail food stores. However, as discussed below, these unique businesses are generally not subject to the same pricing constraints. WIC Only stores tend to be among the most expensive, in Texas and nationally. Due to their unique business dynamics, it is difficult to establish a peer group system that will have the effect of constraining WIC food costs in these stores. Given the high prices and unique characteristics of WIC Only stores, TDH WIC is concerned that current policy and procedure for the authorization and management of these stores may not comply with the new federal regulatory standards.

### III.2. Methodology

As in the other study task areas, BCA began with a series of onsite and telephone interviews of TDH WIC state staff to clarify the study questions and to obtain available data on the current process.

BCA drew primarily on the data and analysis related to the larger study effort associated with commercial retailers:

    The Shelf and Characteristics Survey of a Sample of Stores

    The WIC Redemption Transactions For the Same Period For All Stores

As a part of the larger analysis effort, BCA examined the characteristic variables of WIC Only pricing in comparison to the commercial stores.

A comprehensive description of this methodology is presented in Chapter II of the companion study report (BCA, 12-08-03).

BCA also conducted informal interviews with a few of the currently authorized Texas WIC Onlys and with WIC officials in some of the other States where WIC Only stores operate.

### III.3. Analysis and Findings

As previously indicated, the analysis of both the shelf price survey and the actual redemption data revealed that WIC Only stores were consistently higher priced than most other stores and where, on balance, the most expensive place for WIC clients to shop. The average redemption value of a WIC Only voucher in the Study's WIC Redemption Transactions

00461

**BCA**  Texas Peer Group Study
Non-Commercial Vendor Recommendations

dataset was $29.70, versus $21.30 for all commercial stores, a difference exceeding 28 percent.

In fairness, the overall average is simplistic and misleading. A review of the data suggests that small commercial stores get an inordinate proportion of milk-only vouchers (generally for 1.5 to 2.5 gallons). This is not particularly surprising, as "convenience" purchasing of small quantities of perishable products, particularly with milk, tend to favor small stores. Large commercial stores and WIC Only stores, especially in urban areas, are more likely to be the choice for large package shopping trips. Since the milk voucher is a low cost redemption, it would pull down the average cost of all redemptions for stores with a high percentage of these vouchers.

Nevertheless, WIC Only stores in Texas are very expensive. For the eight highest volume vouchers, representing 96% of total redemption dollars, WIC Onlys have the highest average price in all but a handful of cases. For example, for infant formula, representing 52% of redemption dollars statewide, WIC Onlys are the most expensive on average across the board. For the very common voucher number 70 (25% of non-formula redemption dollars), containing peanut butter, cereal, milk, eggs, cheese and juice, the WIC Only average price is higher than all stores except for a few 1-2 register rural stores.

The differing business models of the WIC Onlys versus "mainstream" stores would seem to account for this cost pattern. In a typical grocery business, WIC accounts for a mere fraction of total sales. In order to attract the bulk of their customers, these stores must compete on the basis of price and service. WIC Only stores do little if any business with price-sensitive customers and therefore are free to compete solely on the basis of service. It is this greater level of service -- including locations nearby WIC clinics, WIC knowledgeable and/or bi-lingual staff, and WIC-specific gifts or incentives -- that is cited by WIC Only entrepreneurs as their primary advantage to WIC clients. However, as these stores are only limited in how much service they can afford to offer by the maximum prices WIC will allow (and can afford), the highest-cost situation soon develops. Unlike their price-competitive neighbors, the WIC Only store is free to price all its items at the maximum price the "market" (e.g. the WIC agency) will bear.

An excellent example of this pricing phenomenon is graphically demonstrated in the following charts. They depict the distribution of redemption transaction by price for the high volume #69 voucher in both WIC Only and small commercial stores (1-2 register and 3-4 register) across the low, medium and high cost county groupings proposed by this study for grouping commercial stores (see BCA, 12-08-03). A data table is also provided for the reader's convenient reference. The 69 voucher contains beans, cereal, milk, eggs, cheese and juice, and accounts for 26% of all non-formula redemptions.

In all of the commercial stores, the transactions reveal a "normal distribution" (*aka* bell curve). This is to be anticipated due to the variety of choices the customer has in a mixed package of this sort. But the WIC Only distributions are narrower and tend toward the maximum allowable price. One statistical measure of this range or "spread" is the standard

---

**BCA**  Texas Peer Group Study
Non-Commercial Vendor Recommendations

deviation. A higher standard deviation reflects a wider distribution. The standard deviations for the WIC Onlys range from $0.85 to $1.78; for the commercial stores (1-2, 3-4 registers), they range from a low of $2.05 to a high of $3.43. Bear in mind that the commercial stores used for this comparison are small ones with limited selection and inventory. Larger stores with 10 or more registers have standard deviations for this voucher ranging from a low of $2.88 to a high of $3.84.

Food Voucher 69: Beans, Cereal, Milk (any), Eggs, Cheese, Juice

| County Type / # of Registers | Low | | | Medium | | | High | | |
|---|---|---|---|---|---|---|---|---|---|
| | Numb of Obs. | Mean | Std. | Numb of Obs. | Mean | Std. | Numb of Obs. | Mean | Std. |
| 01 to 2 | 103 | 28.20 | 3.43 | 2,476 | 29.06 | 2.15 | 9,177 | 31.34 | 2.05 |
| 03 to 4 | 971 | 27.26 | 3.15 | 2,925 | 28.08 | 2.65 | 2,743 | 39.50 | 2.48 |
| 05 to 6 | 1,914 | 26.80 | 2.77 | 9,881 | 26.96 | 2.82 | 3,658 | 28.58 | 2.25 |
| 07 to 9 | 2,465 | 26.31 | 3.22 | 27,028 | 26.58 | 2.77 | 3,268 | 27.46 | 2.91 |
| 10 to 19 | 2,567 | 26.31 | 3.17 | 42,793 | 26.53 | 2.88 | 8,799 | 27.55 | 3.08 |
| 20 plus | 1,599 | 23.21 | 3.84 | 29,786 | 24.74 | 3.51 | 20,263 | 25.45 | 3.08 |
| WIC Only | 294 | 28.95 | 0.85 | 12,360 | 29.53 | 1.75 | 7,019 | 30.66 | 1.45 |



Food Voucher 69: Beans, Cereal, Milk (any), Eggs, Cheese, Juice
WIC-Only, County Group = Low

00462



Food Voucher 69: Beans, Cereal, Milk (any), Eggs, Cheese, Juice
WIC-Only, County Group = Medium



Food Voucher 69: Beans, Cereal, Milk (any), Eggs, Cheese, Juice
WIC-Only, County Group = High



Food Voucher 69: Beans, Cereal, Milk (any), Eggs, Cheese, Juice
1 – 2 Registers, County Group = Low



Food Voucher 69: Beans, Cereal, Milk (any), Eggs, Cheese, Juice
3 – 4 Registers, County Group = Low

Texas Peer Group Study
Non-Commercial Vendor Recommendations



Food Voucher 69: Beans, Cereal, Milk (any), Eggs, Cheese, Juice
1 – 2 Registers, County Group = High



Food Voucher 69: Beans, Cereal, Milk (any), Eggs, Cheese, Juice
3 – 4 Registers, County Group = High

Texas Peer Group Study
Non-Commercial Vendor Recommendations



Food Voucher 69: Beans, Cereal, Milk (any), Eggs, Cheese, Juice
1 – 2 Registers, County Group = Medium



Food Voucher 69: Beans, Cereal, Milk (any), Eggs, Cheese, Juice
3 – 4 Registers, County Group = Medium

**BCA**                                                                 *Texas Peer Group Study*
                                                                        *Non-Commercial Vendor Recommendations*

Texas WIC has attempted to contain the food costs of WIC Only stores by placing them in the cost bands for the area within which they reside. However, the stores often charge the maximum amount allowed in that band for the food they sell.

Admittedly, WIC Only stores can be advantageous to the client.

1. The fact that the store is located very close to the clinic may provide easy access for clients.
2. Foods carried by the WIC Only stores are always the correct WIC items. WIC clients are required to sort out WIC items from other items.
3. Most of the time, WIC Only stores provide staff that understand the rules and mission of the Program; they may even speak the client's native language.
4. The stigma of being singled-out as a "WIC" or "Welfare" mom is not present at a WIC Only store since all other customers also belong to WIC.

On the other hand, there are disadvantages to the client as well as the State:

1. Since WIC Only stores charge higher prices than the regular retail vendors, fewer clients can be served.
2. Purchasing food at WIC Only stores does not help a WIC client to learn good purchasing practices and food choices since there is no comparison shopping.

For new clients a WIC Only store can be particularly appealing, since there is no need to learn and apply all of the rules during their first shopping trip.

On balance, the issue may not be a question of whether or not WIC Onlys provide a valuable service. The real question is, can the Program afford them.

### III.4. Recommendations

Placing WIC Only stores in a peer group presents a unique set of problems. WIC Only stores are similar to one another, but very different than stores in the normal retail food business, whether they are small or large stores. BCA examined a number of different approaches.

One method of monitoring the prices of WIC Only stores is to place them into one of the register-based peer groups being established for their geographic area. Generally, WIC Only stores have few cash registers, which would place them with a group of stores that have higher food costs.

The positive aspect of this approach is that the state would not have to set up separate rules for WIC Only stores versus the regular retail stores. The negative aspect is that smaller

---

**BCA**                                                                 *Texas Peer Group Study*
                                                                        *Non-Commercial Vendor Recommendations*

stores will have price limits that are probably above those in the present band system, thereby allowing the WIC Only stores to charge an even greater amount for their foods.

WIC programs authorize small stores, knowing they are higher priced, to ensure that participants have adequate access to benefits. In many cases these small stores are in rural areas where large stores are greater distances apart. The Program can afford this policy in part because few clients shop in the smaller stores, or only shop there on occasion (such as for convenience purchases like milk). But in high volume urban areas of the State, WIC Onlys do twice as much volume as small commercial stores (1-2 and 3-4 register stores). With their higher volume and propensity for high prices, placing WIC Onlys in a peer group with small commercial stores would increase, rather than contain food costs.

Another method for using the peer grouping system would be to place WIC Only stores in the peer structure based on a negotiated placement. It can be argued that the volume of WIC Only sales matches that of larger stores in the system. Further, since WIC Onlys price to the maximum, while large stores must price on a competitive basis to keep their other customers, a maximum for WIC Onlys based on the larger commercial stores would provide a reasonable price control.

Realistically, the proxy approach is difficult to defend, since the two business types have little if anything in common. On the one hand, inventory volumes and sale of non-WIC items provide a range of business models for commercial stores with no applicability to WIC Only stores. WIC Only stores, on the other hand, benefit from a low overhead associated with their limited inventory and advertising requirements.

Ultimately, a method is needed by which WIC Only stores can be authorized when the Program can be certain they are affordable. In other words, the Program can afford the higher service levels in WIC Only stores so long as they are cost-neutral in comparison to commercial stores.

BCA is proposing to meet this criteria by basing the WIC Only criteria on a model that recognizes the difference between price competitive and non-price-competitive businesses.

### III.4.1. Primary Recommendation

> Establish a Peer Group System that Distinguishes Between Price-Competitive (Subgroup A) and Non-Price-Competitive (Subgroup B) Stores

#### Discussion

Price competitive stores are those that must set their prices in a manner which is consistent with the practices of their competitors. The peer group approach proposed to TDH for use in commercial stores reflects this understanding. Stores are grouped with others in their market segment and maximum prices are established for each segment based on market trends.

00465

TDH WIC, while embracing this approach, needs a convenient method for determining whether or not a store belongs in this subgroup.

Based on work in other states, BCA has identified a readily available proxy measure for this competitive factor: Food Stamps sales volume.

If a store is competitive, its food stamps sales volume will typically be 2-3 times greater than its WIC volume. This difference is explained by the fact that food stamps customers must be price sensitive, since they receive a dollar allotment as opposed to the food prescription benefit in WIC. Thus, food stamp recipients will not do much shopping in high priced stores. In our work to date, we have not come across a commercial store with a food stamp volume less than 2 times a WIC volume. As a WIC state agency, TDH has ready access to the USDA database on food stamps sales transactions.

WIC only stores and other stores that cater (and price) specifically to WIC will not appeal to very many food stamp customers. Thus, any store with a higher volume of WIC sales than food stamp sales is not likely to be a price-competitive store.

These non-price-competitive, or subgroup B stores, do not have peers in the commercial world and compete only on the basis of service and convenience to the WIC customer. Thus, the Program can only afford them if they are cost neutral. To achieve this standard, BCA recommends that the Subgroup B stores would be held to a maximum price equal to the average for subgroup A stores in their geographic group of counties.

The Program's monthly assessment of data relating to the criteria from the previous month will determine which subgroup the food vendor will be in for current month. The maximum amount for each food instrument type and peer group in subgroup B is the mean value of redemption price for all food instruments of that specific type in the corresponding subgroup A county group that were redeemed within the prior twelve-week period.

It is assumed that subgroup B vendors will price their redemptions at the maximum for each food instrument for subgroup B is be posted by the Program on its and should be available to each food vendor by phone contact with the state agency.

*Advantages*

For TDH WIC, the proposed approach for non-competitive stores assures compliance with the federal mandate while protecting a convenient service for some of its WIC clients. It is defensible and consistent with the market-based approach to be employed for competitive stores.

For the WIC client, the proposal keeps WIC-specialty stores available without reducing the Program's capacity.

---

For the WIC-specialty stores, it provides a means to stay in business.

*Disadvantages*

For the Agency, the proposal requires routine analysis of the Food Stamps Program's online database. It also requires a process to determine and maintain a public source of the maximum prices allowed non-competitive stores.

For the WIC-specialty stores, there may be cases in which their WIC business volume is insufficient to sustain a profitable enterprise at the prevailing average commercial prices. In some of these cases, the business may need to expand. In others, it may close. (It is anticipated that a number of current WIC Only stores have sufficient volume to remain in business under this model.)

The only deleterious affect on WIC clients occurs if they lose access to a WIC-specialty store in which they prefer to do their WIC shopping.

*Conclusion*

The proposed solution is consistent with federal regulatory standards, protects the mission and integrity of the Program, and provides a means through which WIC clients may continue to have the choice to shop in WIC-specialty stores. While it may have a negative effect on a number of store owners, it represents a fair and equitable solution to the current problem, i.e. WIC cannot afford the extra service of WIC-specialty stores at its current price.

### III.4.2. Secondary Recommendation

None.



00466