## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL WOMEN, INFANTS, AND )
CHILDREN GROCERS ASSOCIATION, )
NUTRITIONAL FOOD DISTRIBUTORS, INC., )
COUNTY FOOD SERVICES, INC., and )
DILLARD FOODS, INC., )
                                              )

               **Plaintiffs,**   )

v.                                  )        **Civil Action No. 05-2432 (EGS)**

FOOD AND NUTRITION SERVICE, )

                      **Defendant.**     )

### MOTION OF
### NATIONAL FEDERATION OF INDEPENDENT BUSINESS LEGAL FOUNDATION
### FOR LEAVE TO PARTICIPATE AS AN *AMICUS CURIAE* AND
### SUBMIT ITS PROPOSED MEMORANDUM OF POINTS AND AUTHORITIES
### SUPPORTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
### REGARDING THEIR REGULATORY FLEXIBILITY ACT CAUSE OF ACTION

Pursuant to Federal Rule of Civil Procedure 7(b), the National Federation of Independent

Business Legal Foundation (NFIB Legal Foundation) hereby respectfully moves this Court for

permission to participate in this action as an *amicus curiae* in support of Plaintiffs' Second Cause

of Action alleging the Federal Defendant violated the Regulatory Flexibility Act, 5 U.S.C. §§

601-612 ("RFA"). Accordingly, Proposed *Amicus* seeks leave of Court to file the attached

Memorandum of Points Supporting Plaintiffs' Motion for Summary Judgment Regarding Their

Regulatory Flexibility Act Cause of Action. All parties to this litigation have stated that they do

not oppose this motion of the filing of the attached Memorandum of Points and Authorities.

### IDENTITY AND INTEREST OF *AMICUS CURIAE*

The NFIB Legal Foundation, a nonprofit public interest law firm established to protect

the rights of America's small-business owners, is the legal arm of NFIB, the nation's oldest and

RECEIVED

JAN 1 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

largest organization dedicated to representing the interests of small-business owners throughout

all 50 states. In 2000, NFIB established a Legal Foundation to protect small businesses from

burdensome and costly government regulations, and to ensure, through the vehicle of judicial

review, that federal and state regulators faithfully abide by the laws that were enacted to protect

America's small businesses. One such statute is the RFA, as amended by the Small Business

Regulatory Enforcement and Fairness Act of 1996. In the last five years, NFIB has brought three

actions challenging violations of the RFA by federal agencies.

NFIB has 600,000 members. NFIB's national membership owns a wide variety of

America's independent businesses, including many small grocers and retailers. NFIB's members

independently own and operate their businesses and are not dominant in their field of operations.

The majority of NFIB members have five employees, gross sales of approximately $350,000 per

year, and net profits of $40,000 to $50,000 annually. Small businesses, including several NFIB

members, would be impacted by the promulgation of the Food and Nutrition Service's (FNS)

interim final rule that implements new vendor cost containment requirements for the Women,

Infants, and Children Program.

The Declarations of Karen Harned, Daniel Greene, and Keith Bracewell are attached as

Exhibits 1, 2, and 3, respectively, to the NFIB Legal Foundation's Proposed Memorandum of

Points and Authorities. These declarations, and the proposed Memorandum of Points and

Authorities, identify and explain in more detail the NFIB Legal Foundation's, NFIB's and

NFIB's members' interests in this important cause of action.

## MATTERS WHICH PROPOSED *AMICUS CURIAE* WILL ADDRESS

The NFIB Legal Foundation will limit its discussion to whether the Food and Nutritional

Service complied with the RFA when it undertook to determine under the RFA, 5 U.S.C. §

605(b), whether the interim final rule in question would not have a significant impact on a substantial number of small entities. The RFA protects small businesses, like those impacted by the interim final rule, by prescribing a detailed, specific process by which federal agencies must assess the impacts of regulatory proposals on small entities and then develop and consider alternatives that would ameliorate such negative impacts. *Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp.2d 32, 43-44 (D.D.C. 2000). Congress also added judicial review provisions to the RFA in 1996. 5 U.S.C. § 611. In doing so, Congress recognized "that agencies have given lip service at best to [the] RFA, and small entities have been denied legal recourse to enforce the Act's requirements." See 142 Cong. Rec. S3242, S3245 (Mar. 29, 1996) (Small Business Regulatory Enforcement Fairness Act – Joint Managers' Statement of Legislative History and Congressional Intent).

Proposed *Amicus* also examines in detail the applicable standard of review, and the historical development of that standard. For its part, Defendant FNS has incorrectly attempted to truncate its and this Court's obligations under the RFA into virtual nullities. Proposed *Amicus* also explains how a legally adequate RFA analysis requires an agency to accurately assess the universe of small entities that its proposal affects before certifying a rule will not have a substantial impact. In this case, by contrast, Defendant FNS has defined the universe of entities affected by the rule in a manner that impermissibly dilutes and masks the rule's significant economic impacts on a substantial number of small businesses, namely, WIC-only vendors. Finally, Proposed *Amicus* explains how in this case Defendant FNS minimized the effect of the rule and ignored its true economic impact on small businesses, most prominently, WIC-only vendors, including NFIB members.

3

For the foregoing reasons, Proposed *Amicus* NFIB Legal Foundation therefore respectfully requests this Court's leave to file the attached memorandum of points and authorities and to participate in this action to any additional extent that the Court deems informative and constructive.

DATED: January 17, 2006

Respectfully submitted,

David E. Frulla (D.C. Bar No. 414170)
Shaun M. Gehan (D.C. Bar No. 483720)
COLLIER SHANNON SCOTT, PLLC
3050 K Street, N.W., Suite 400
Washington, D.C. 20007
Telephone: (202) 342-8400
Facsimile: (202) 342-8451

OF COUNSEL:

Karen R. Harned
(D.C. Bar No. 456803)
Elizabeth Gaudio
(D.C. Bar No. 458688)
NFIB Legal Foundation
1201 F Street, NW
Suite 200
Washington, DC 20004
Telephone: (202) 314-2061
Facsimile: (202) 484-1566

Counsel for Amicus Curiae National Federation
of Independent Business Legal Foundation

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL WOMEN, INFANTS, AND          )
CHILDREN GROCERS ASSOCIATION,         )
NUTRITIONAL FOOD DISTRIBUTORS, INC.,  )
COUNTY FOOD SERVICES, INC., and       )
DILLARD FOODS, INC.,                  )
                         Plaintiffs,  )
                                      )         Civil Action No. 05-2432 (EGS)
v.                                    )
                                      )
FOOD AND NUTRITION SERVICE,           )
                         Defendant.   )

MEMORANDUM OF POINTS AND AUTHORITIES OF PROPOSED *AMICUS CURIAE*
NATIONAL FEDERATION OF INDEPENDENT BUSINESS LEGAL FOUNDATION IN
SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT REGARDING
THEIR REGULATORY FLEXIBILITY ACT CAUSE OF ACTION

By contemporaneously filed motion, the National Federation of Independent Business

Legal Foundation ("NFIB Legal Foundation") has moved to participate in this action as an

*amicus curiae* with respect to Plaintiffs' Second Cause of Action. Plaintiffs there allege that

Defendant Food and Nutrition Service ("FNS") violated the Regulatory Flexibility Act, 5 U.S.C.

§§ 601-612 ("RFA"), in promulgating new WIC vendor cost reimbursement limits set forth at 70

Fed. Reg. 71708 (Nov. 29, 2005). In summary, Plaintiffs' Second Cause of Action takes cogent

issue with the FNS's finding, purportedly made pursuant to the RFA, 5 U.S.C. § 605(b), that the

interim final rule at issue will not have a "significant impact on a substantial number of small

entities," or "SEISNSE." More generally, this interim rule pertains to agency implementation of

the vendor cost containment provisions of Section 203 of the Child Nutrition and WIC

Reauthorization Act of 2004, P.L. No. 108-625, 118 Stat. 729, 108th Cong., 2d Sess. (June 30,

2004) ("Reauthorization Act").

In its Temporary Restraining Order issued on December 29, 2005, this Court agreed to expedite this important case's summary judgment briefing and consideration. Accordingly, Proposed *Amicus* NFIB Legal Foundation respectfully submits the following (Proposed) Amicus Memorandum of Points and Authorities Supporting Plaintiffs' Motion for Summary Judgment Regarding Their Regulatory Flexibility Act Cause of Action. Not only does NFIB have members adversely affected by FNS's failure to comply with the RFA, Proposed *Amicus* NFIB Legal Foundation has a special and demonstrated interest and expertise in Federal Government-wide RFA compliance. The Proposed *Amicus* thus respectfully submits that it will present additional argument and perspective that will inform this Court's consideration of Plaintiffs' well-founded RFA claim.

## I.    NFIB LEGAL FOUNDATION'S STATEMENT OF INTEREST

The National Federation of Independent Business ("NFIB") "is the nation's oldest and largest non-profit national organization dedicated to representing the interests of owners of a wide variety of small businesses throughout all 50 states." (Declaration of Karen Harned ("Harned Decl.") ¶ 7 (attached hereto as Exhibit 1).) "NFIB established the NFIB Legal Foundation in 2000 to help ensure that federal agencies comply with the law, in their treatment of small businesses. One of the NFIB Legal Foundation's specific concerns was agency compliance with the [RFA]." (*Id.* ¶ 3.)

Congress explained that it designed the RFA, which was enacted in 1980, to:

> establish as a principle of *regulatory issuance* that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation. To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration.

*RFA, Congressional Findings and Declaration of Purposes,* Pub. L. No. 96-354, 94 Stat. 1164,

Sec. 2(b) (codified at 5 U.S.C. § 601) (emphasis added).

The primary purpose of the RFA's requirement for prior analysis is so that agencies

"consider the impact of their regulatory proposals on small entities, analyze effective alternatives

that minimize small entity impacts, and make their analyses available for public comment." U.S.

Small Business Admin. Office of Advocacy, A Guide for Government Agencies: How to

Comply with the Regulatory Flexibility Act ("Guide for Government Agencies") at 1 (*available*

*at* http://www.sba.gov/advo/laws/rfaguide.pdf)[1]; *see also Nat'l Ass'n of Psychiatric Health Sys.*

*v. Shalala,* 120 F. Supp.2d 32, 43-44 (D.D.C. 2000).

More specifically, Proposed *Amicus* NFIB and its Legal Foundation have filed over 20

comments with various federal agencies on RFA compliance matters to help ensure Federal

government-wide attention to and compliance with the RFA. In these efforts, NFIB works

closely with the SBA Office of Advocacy to insure that the RFA is "monitored and enforced."

---

[1]     Under the RFA, the SBA's Office of Advocacy is chartered to "monitor agency
compliance with this chapter." Advocacy also has authority to appear in court on the side of
small businesses against other agencies in RFA-based challenges. 5 U.S.C. § 612(a)-(b). One
court has thus termed the Office of Advocacy the Federal Government's RFA "watch-dog."
*Southern Offshore Fishing Ass'n ., Daley,* 995 F. Supp. 1411, 1435 (M.D. Fla. 1998) (*SOFA I*).
Pursuant to this statutory authority, the SBA Office of Advocacy has issued and revised the
referenced RFA training materials. Furthermore, by Executive Order, President George W. Bush
has required that all federal agencies develop "written procedures and policies . . . to ensure that
the potential impacts of agencies' draft rules on small businesses . . . are properly considered
during the rulemaking process." Further, this Executive Order directs the Office of Advocacy, as
it does via the Guide for Government Agencies, to provide agencies with information on how to
comply with the President's directive and enhances SBA's opportunity to ensure agency RFA
compliance in individual rulemakings. E.O. 13272, *reprinted at* 67 Fed. Reg. 53461 (Aug. 16,
2002).

Further, NFIB has itself brought or intervened in cases, such as this one, to protect its members' interests in a robust regulatory flexibility process.[2]  (*Id.* ¶¶ 5, 6, 4.)

The NFIB Legal Foundation, and NFIB more generally, serve an important mission in ensuring agency fidelity to the RFA.  Just this year, the Court of Appeals for the District of Columbia Circuit recognized the RFA's importance in federal rulemaking, when it held that the Federal Communications Commission's failure to undertake required regulatory flexibility analyses is not an error which can be considered "harmless."  *U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29, 42 (D.C. Cir. 2005).

NFIB's members, moreover, have a specific and particularized interest in the FNS cost containment rule at issue here.  NFIB has many members who are engaged in the retail grocery business, including establishments whose business is fifty percent or more dependent on sales through vouchers to participants in the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"), also known as "WIC-only stores."  (*Id.* ¶ 8, 9.)  Mr. Daniel Greene, for example, is an owner of small, WIC-only enterprise located in El Cajon, California, and a member of NFIB and the Plaintiff National Women, Infants, and Children Grocers Association ("NWICGA").  (Declaration of Daniel Greene ("Greene Decl.") ¶¶ 2-4 (attached hereto as Exhibit 2).)  Mr. Keith Bracewell and his wife similarly own and operate WIC-only stores in Bakersfield, California, and he also belongs to NFIB and NWICGA.  (Declaration of Keith Bracewell ("Bracewell Decl.") ¶¶ 2-4 (attached hereto as Exhibit 3).)

---

[2]     For instance, in *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272 (D.C. Cir. 2005), NFIB recently prevailed on its own single-count RFA claim.  The NFIB has also brought the following two actions  *NFIB v. Leavitt*, No. 1:01-CV-900-PF (D.D.C.), *sub nom Ad Hoc Metals Coalition v. Leavitt*, No. 1:01-CV-776-PF, and *Nat'l Federation of Independent Business v. Architectural and Transportation Barriers Compliance Board*, No. 1:05-CV-01329 (D.D.C.).

As these declarants explain, by and large, their small, WIC-only businesses have higher operating costs than larger, full-service grocery stores due to their lack of buying power, their inability to arrange for private label deals, and the additional transaction costs involved in participating so extensively in this government program. (Greene Decl. ¶ 6; Bracewell Decl. ¶ 8.) Furthermore, these specialized stores are differently situated, mostly in poor areas with concentrations of WIC-eligible women and children. They also provide special services to WIC program participants, unavailable at the large grocery store chains. (Bracewell Decl. ¶ 5.) As a result of all these factors, these WIC-only stores have thin profit margins and would suffer if reimbursed at price levels obtained at a universe that includes the largest chain supermarkets. (*Id.* ¶ 7; Greene Decl. ¶ 8).

The interests of the NFIB Legal Foundation in a meaningful and thorough RFA process and the interests of NFIB members involved in the WIC-only retail business are harmed by the FNS's rule. This rule was promulgated without adherence to the requirements of the RFA, specifically because its finding of no SEISNSE lacks any rational basis. For instance, a requirement that states implement systems to insure that small, independently owned, WIC-only stores charge on average the same prices as all WIC-certified stores – including mammoth retail chains like Wal-Mart, Albertson's, Food Lion, *etc.* – has a clear and immediate negative impact on small entities like El Cajon Nutrition Center and Basic Foods. (Greene Decl. ¶ 6-8; Bracewell Decl. ¶ 7.) A meaningful RFA process would help identify alternatives which meet the FNS's statutory objectives, while protecting the interests of NFIB, its members, and other small WIC-only stores.

## II.    STANDARD OF REVIEW

The Federal Defendant tries to create the inaccurate impression that its obligations under the RFA are little more than ministerial, and the court's reviewing authority is perfunctory. (*See* Def.'s Opp'n to Pl.'s Mot. for a TRO ("Def.'s Opp'n") at 27). In the Defendant's truncated recitation, the extent of FNS's obligation under the RFA was to "certif[y] its belief that the rule would not have a significant economic impact," and that this was the result of a "'reasonable' and 'good faith' effort to comply with the Act." (*Id.*) The standards are more rigorous.

Turning first to the Court's review authority, the RFA's judicial review provisions state that review is subject to the standards set forth in "Chapter 7" of the Administrative Procedure Act ("APA"), specifically 5 U.S.C. § 706. 5 U.S.C. § 611(a)(1) & (2); *see also Nat'l Ass'n for Home Care v. Shalala,* 135 F. Supp. 2d 161, 168 (D.D.C. 2001) ("*NAHC*"); *Blue Water Fisherman's Ass'n v. Mineta,* 122 F. Supp. 2d 150, 175 (D.D.C. 2000) ("The standard of review is the same as that under the APA"). According to the legislative history for the Small Business Regulatory Enforcement Fairness Act ("SBREFA") of 1996, Pub. L. No. 104-121, 110 Stat. 857, which enacted the RFA's judicial review provisions: "[I]f the court finds that a final agency action was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law, the court may set aside the rule or order the agency to take other corrective action."[3] 142 CONG. REC. S3245 (daily ed. Mar. 29, 1996) (statement of Sen. Bond). While judicial review

---

[3]    Similarly, SBREFA's main drafter confirmed sub-section 611(a)(1) & (2)'s express terms, stating:

> ... Review under these sections is not limited to the agency's compliance with the procedural aspects of the RFA; final agency actions under these sections will be subject to the normal judicial review standards of Chapter 7 of Title 5.

142 CONG. REC. E571-01, E574 (daily ed. Apr. 19, 1996) (remarks of Rep. Hyde). Chairman Hyde further specifically stated that the "normal" standards include the "arbitrary and capricious" standard. *Id.*

under APA standards is limited, it is not perfunctory. *Oceana, Inc. v. Evans*, 384 F. Supp. 2d

203, 212 (D.D.C. 2005) ("[T]his Court undertakes a 'searching and careful' examination . . . ."),

*quoting Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378 (1989).

Nor can Defendant water down its own obligations under the RFA. It must do more than

give RFA compliance a try. Defendant recites a distilled standard from certain appellate cases to

the effect that the "RFA . . . requires nothing more than that the agency file a [final regulatory

flexibility analysis or] FRFA demonstrating a 'reasonable, good-faith effort to carry out [RFA's]

mandate.'"[4] To accurately define an agency's RFA obligations, however, it is important to

understand the genesis of the standard that certain appellate courts apply and occasionally

identify essentially in short-hand. More specifically, that standard, in part, was derived from one

of the first cases brought under the SBREFA amendments to the RFA, *Associated Fisheries of*

*Maine, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997). In that case, the First Circuit found that

the RFA imposes upon agencies obligations similar to those under the National Environmental

Protection Act ("NEPA"). The court explained that, as with the RFA's analytical requirements,

"[t]he [environmental impact statement] requirement is meant to inform the agency and the

public about potential adverse ecological effects and about the availability, if any, of less harmful

alternatives prior to a final decision on the fate of a particular project or rule." *Id. See also Nat'l*

*Ass'n of Psychiatric Health Sys.*, 120 F. Supp. 2d at 44 n.8 (also analogizing the RFA to NEPA

EIS requirements).

---

[4]     *U.S. Cellular Corp. v. F.C.C.,* 254 F.3d 78, 88 (D.C. Cir. 2001), *quoting Alenco*
*Commun., Inc. v. F.C.C.,* 201 F.3d 608, 625 (5th Cir. 2000).

*Associated Fisheries of Maine* then proceeded to analogize judicial review of agency RFA compliance to that respecting NEPA. 127 F.3d at 114. In both instances, judicial review is subject to APA standards. While deferential, it is not toothless. For instance, *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 4 (D.D.C. 2000), found NEPA violations based on the Commerce Department's failure to consider whether more comprehensive analyses were required, consider a reasonable range of alternatives, and explain the impacts of the proposed action and alternatives.[5] *Id.* at 20-21. The RFA requires consideration of similar factors, but from a small business perspective. Thus, while subsequent decisions have distilled the NEPA-based standards set forth in *Associated Fisheries of Maine*, they do not and should not truncate courts' and agencies' APA-based obligations.

In fact and contrary to the illusion that the Defendant seeks to create, under the RFA, courts have reviewed no SEISNSE certifications such as FNS's in the case at bar carefully, especially where, as here, the agency's finding of no SEISNSE is cursory, hedged, and filled with internal contradictions. *See, e.g., Nat'l Ass'n of Psychiatric Health Sys.*, 120 F. Supp. at 43-44; *SOFA I*, 995 F. Supp. at 1436; *North Carolina Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650, 654-55 (E.D. Va. 1998) ("*NCFA II*"). It is thus simply not the case that the RFA is subject to a

---

[5]     Furthermore, while the RFA is considered primarily procedural, *U.S. Cellular*, 254 F.3d at 88, that statute imposes "action forcing provisions" that require agencies to focus attention on the impacts of various proposed alternatives on small businesses, just as NEPA does through the procedural requirement of "evaluating a proposed project's environmental impact." *See North Buckhead Civic Ass'n v. Skinner*, 903 F.3d 1533, 1540 (11th Cir. 1990), *citing Robertson v. Methow Valley Citizens Ass'n*, 490 U.S. 332, 348-49 (1989). And, failure to adhere even to the RFA's purely procedural mandates is not an error which can be considered "harmless." *See U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d at 42 (stating there is no "argument that the Commission's failure was harmless, as it is impossible to determine whether a final regulatory flexibility analysis which must include an explanation for the rejection of alternatives designed to minimize significant economic impact on small entities, *see* [5 U.S.C.] § 604(a)(3) - would have affected the final order when it was never prepared in the first place").

standard of review regarding whether the agency simply checked the appropriate procedural boxes as it proceeded through the rulemaking.

## III.    ARGUMENT

The FNS undertook to comply with the RFA when it issued its no SEISNSE finding pursuant to 5 U.S.C. § 605(b).  More specifically, FNS's cost containment rule thus states that it "has been reviewed with regard to the requirements of the Regulatory Flexibility Act (5 U.S.C. 601-612).  FNS does not believe this rule will have" a SEISNSE.  70 Fed. Reg. at 71709.

The FNS acted appropriately in initiating RFA processes.  After reviewing the RFA's legislative history, this Court itself has concluded "that '[t]he legislation is intended to be as inclusive as possible, and doubts about its applicability should be resolved in favor of complying with the provisions of the Act.'" *NAHC*, 135 F. Supp. 2d at 168, *quoting* 126 CONG. REC. H24589 (Sep. 8, 1980) (House Statement of RFA Issues) (alteration in original).  Accordingly, "[t]he statement's context clearly shows that Congress intended that agencies err on the side of caution in determining whether to perform regulatory flexibility analyses." *Id.*

Once the FNS initiated RFA analyses, it was obliged not to accord them short shrift. Congress added the RFA's judicial review provisions when it enacted SBREFA in 1996.  In countermanding the RFA's original specific preclusion of judicial review, Congress recognized "that agencies have given lip service at best to [the] RFA, and small entities have [heretofore] been denied legal recourse to enforce the Act's requirements." *See* 142 CONG. REC. S3242, S3245 (daily ed., Mar. 29, 1996) (Small Business Regulatory Enforcement Fairness Act - Joint Managers' Statement of Legislative History and Congressional Intent).  Among other RFA elements, an agency's section 605(b) certification and its compliance with 5 U.S.C. § 604 are judicially reviewable.  5 U.S.C. §§ 611(a)(1)-(2).  This is the basis for the Court's jurisdiction

over Plaintiffs' RFA claim.[6]  As explained herein, the FNS has made (at least) three judicially-recognized errors in the SEISNSE it undertook.

### A.    There is No Record Basis for Certification

The RFA requires an agency head to make a "certification" of no SEISNSE for the agency to discharge itself from further RFA obligations.  As Plaintiffs have demonstrated, the FNS has made no actual certification under Section 605(b).  All the record contains is FNS's conclusory conjecture that, "FNS does not *believe* this rule will have a" SEISNSE.  70 Fed. Reg. at 71709.  The law requires more.  The RFA places the affirmative duty on the regulating agency to calculate its rule's economic impact on small businesses.  *See North Carolina Fisheries Ass'n v. Daley*, 16 F. Supp. 2d 647, 653 (E.D. Va. 1997) (*NCFA I*).

More specifically, the SBA Office of Advocacy has explained that "[t]he preparation of the required analysis calls for due diligence, knowledge of the regulated small entity community, sound economic and technical analysis, and good professional judgment."  Guide for Government Agencies at 14.  FNS's SEISNSE analyses, such as they are, demonstrate none of these attributes.  Likewise, this district will invalidate an agency's untutored claim of no

---

[6]    The FNS made its inapt SEISNSE finding in connection with issuing an interim final rule.  In this specific instance, the agency's interim final rule provides notice and solicits comment on further rulemaking proceedings that the Reauthorization Act requires it to conduct. *See* 70 Fed. Reg. at 71708, 71709.  More specifically, the Reauthorization Act's administrative provisions, contained in Title V, require FNS to issue guidance to implement, *inter alia*, the instant cost containment rules specified in Section 203(e)(10) of that Act, but allow the Secretary to issue, as he has done in this instance, such guidance as an interim final rule.  P.L. No. 108-265, §§ 501(a)-(b).  However, and significantly, the Reauthorization Act then mandates that, "Not later than 2 years after the date of enactment of this Act, the Secretary shall promulgate regulations to implement the amendments described in subsection (a)."  *Id.*, § 501(c).  FNS has incorporated the interim final rule into this Section 501(c) rulemaking process.  The RFA is triggered if notice and comment rulemaking is required not only by the Administrative Procedure Act, but also by "any other law," which, in this instance is the WIC Reauthorization Act, § 501(c).  *See* 5 U.S.C. §§ 603(a) & 604(a).  *Cf. Asiana Airlines v. FAA*, 134 F.3d 393, 396-98 (D.C. Cir. 1998) (Congress may provide for differing, context-specific administrative processes with individualized rulemaking requirements).

SEISNSE. For example, it has rejected a Department of Health and Human Services RFA

analysis when, among other things, the agency "did not obtain data or analyze available data on

the impact of the final rule on small entities, nor did she properly assess the impact the final rule

would have on small entities." *Nat'l Ass'n of Psychiatric Health Sys.*, 120 F. Supp. 2d at 43.

FNS cannot rejoin in defense that it is not required to conduct a "formal" economic

analysis. As *NCFA I* correctly explained, "While the federal government cannot be expected to

explore every possible contingency before certifying that there is no significant impact, the

government must make some showing that it has at least considered the potential effects of" the

specific action is it considering. *See* 16 F. Supp.2d at 652. In that instance, the court concluded

that even though the agency was maintaining a fish quota at the same level as the previous year,

it could not simply assume that this action would have no adverse economic impact the next

year. *Id.* at 653. As a result, the court ordered the Secretary to "undertake enough analysis to

determine whether the quota had a significant impact on small entities." *Id.*

Nor, finally, is agency temporizing or uncertainty an adequate basis for a no SEISNSE

certification. The RFA's legislative history unequivocally, specifically counsels that "[t]he

legislation is intended to be as inclusive as possible, and doubts about its applicability are to be

resolved in favor of complying with provisions of the Act." 126 CONG. REC. H24588, H24589

(Sept. 8, 1980); *NAHC*, 135 F. Supp. 2d at 168.

Finally, as a fundamental matter under the APA, any such certification must have a

rational basis in the administrative record. One searches this administrative record in vain for

any supporting RFA analyses, or any focused consideration of the rule's potential economic

impacts on WIC-only, or indeed any, small businesses. Agency conclusions lacking such a

rational administrative record basis cannot stand. *See, e.g., Atlantic Fish Spotters Ass'n v. Daley*, 8 F. Supp.2d 113, 116 (D. Mass. 1998).

### B.    The FNS Has Diluted the Universe of Small Entities Subject to the Rule

In the FNS's RFA arguments in its rule, it explains that "currently between three and four percent of the approximately 45,000 authorized vendors will need to make changes in the prices that they offer the WIC program in order to be deemed competitive." 70 Fed. Reg. at 71709.

This facile analysis is not consistent with the RFA. First, it does not identify how many of the 45,000 authorized vendors are in fact small businesses. The first step in any RFA analysis is to identify the universe of small entities, including small businesses, affected by the rule. *See Northwest Mining Ass'n v. Babbitt*, 5 F. Supp.2d 9, 15 (D.D.C. 1998) (invalidating rule for failure to identify correct universe of small mining businesses affected by new regulatory bonding requirement). As the RFA watchdog agency, SBA Office of Advocacy, has stated: "To know whether a regulatory proposal affects a substantial number of small entities, the regulator must first know how many regulated entities exist and which are small." *See* Guide for Government Agencies at 15.

Second, the FNS claim fails to consider the actual number of authorized vendors that the rule is designed to affect. The rule's cost containment provision calls for peer grouping, which encompasses all WIC authorized vendors; however, WIC-only stores represent the principal target of the regulation.

As explained above, rather than seeking to identify and define a universe of WIC-only vendors for its SEISNSE analyses, the FNS inappropriately bases these analyses, such as they are, on *all* authorized WIC vendors. A legally adequate Section 605(b) certification requires, however, that the agency accurately assess the universe of small entities that its proposal affects.

In *SOFA I*, for example, NMFS/NOAA claimed that a 50 percent reduction in the commercial

catch quota for large coastal sharks would impact anyone with a commercial large coastal shark

fishing permit, regardless of whether that person ever commercially landed a shark; in fact,

although 2000-plus fishermen held commercial shark fishing permits, only 326 of these permit

holders commercially harvested any of these sharks and only 100-150 permit holders regularly

caught the quota. 995 F. Supp. at 1435. The court rejected this attempt to game the numbers.

*Id.* at 1435-36; *see also NCFA II*, 27 F. Supp. 2d at 658-61 (detailing and excoriating efforts to

extend affected universe to dampen economic impacts as Section 605(b) strategy).

   In the case at bar, the small business WIC-only vendors should comprise the universe for

RFA purposes. According to FNS, only about 3 to 4 percent, or about 1,350-1,800 entities, of

the circa 45,000 WIC-authorized vendors are WIC-only vendors.[7] 70 Fed. Reg. at 71709. The

agency goes on to state: "These vendors tend to be smaller grocery stores that serve WIC

participants exclusively or predominantly . . . ." *Id.* Accordingly, under the Federal Defendant's

own analyses (cursory as they may be), almost all of the true subjects of the regulation face a

major impact, and yet the FNS obscures this reality through the artifice of defining the universe

as all WIC-certified vendors.

   Furthermore, the intensity of the impact of a regulation on a class of small regulated

entities may amount to a significant impact on a substantial number of small entities, even if the

number of entities affected in this significant way are not, numerically, remarkably large. The

declarations explain that WIC-only stores, in part because of their small size, are forced into

different, and more expensive wholesale distribution channels than, for instance, major grocery

---

[7]    It is not clear from its purported RFA analyses how the FNS derived these figures. "The
record fails to contain an adequate explanation of the agency's calculation, if any, leaving no
possibility to gauge its rationality, which is manifestly suspect." *SOFA I*, 995 F. Supp. at 1435.

chains, discount "big box" stores, and discounters such as Wal-Mart. As SBA has explained,

"Significance should not be viewed in absolute terms, but should be seen as relative to the size of

the business, the size of the competitor's business, and the impact the regulation has on larger

competitors. For example, a regulation may be significant solely because the disparity in impact

on small entities may make it more difficult for them to compete in a particular sector of the

economy than large businesses." Guide for Government Agencies at 17.

In the current instance, the smallest regulated businesses – WIC-only stores – are both the

target of the regulation and, correspondingly, the most impacted. By failing to recognize these

impacts on the relevant universe of small entities, FNS has acted arbitrarily and capriciously and

failed to meet the requirement of reasoned decision-making.[8]

### C.    A Final Regulatory Flexibility Analysis Cannot Save a Fundamentally Flawed No SEISNSE Finding

The FNS explained that it intends to conduct additional RFA analyses. The rule explains:

> As FNS is concerned about these [economic] impacts, we plan to collect
> data on the implementation of this interim final rule and the options States
> select in order to better assess the impact for the final rulemaking and the
> Final Regulatory Flexibility Analysis and publish it for comments.

70 Fed. Reg. at 71709. Such analyses cannot cure FNS's flawed no SEISNSE finding, but

instead just emphasize its short-comings.

---

[8]    Parenthetically, it is also not sufficient for the FNS simply to state the number of WIC-authorized vendors that it summarily projects will be adversely impacted by the rule, without considering the impacts of the rule on these entities' profitability and viability. This is not the first time an agency has ignored information regarding profitability in a Section 605(b) analysis. In *NCFA II*, the court acted to curb agency impropriety by holding that the agency had acted arbitrarily and capriciously in "ignoring readily available data," 27 F. Supp.2d at 659, including information about individual firm profitability. *Id.* at 659 and 667-68. In imposing injunctive relief under the RFA, the court wryly observed, "[a]s in most agencies, profit and loss is not a consideration in the Secretary's own budget so there is little or no basic understanding of fixed or variable costs or net or gross profit." *Id.* at 659 n.12.

More specifically, by starting with a flawed no SEISNSE finding, the agency will build its RFA analyses on an irretrievably faulty foundation that serves to truncate its consideration of its rule's true small business impacts.  Indeed, the FNS made its no SEISNSE finding notwithstanding its express recognition that:

> In fulfilling the intent of the Child Nutrition and WIC Reauthorization Act of 2004, the rule may have a significant economic impact on a small number of vendors that have been authorized to participate in the WIC Program.  These vendors tend to be smaller grocery stores that serve WIC participants exclusively or predominantly, have large volume of WIC transactions, and are not subject to the retail market forces that keep food prices at competitive levels.

70 Fed. Reg. at 71709.  Further and in contrast to its myopia under the RFA, FNS concluded that this rule is "significant" for Executive Order 12866 purposes, 70 Fed. Reg. at 71708-09.[9]

Accordingly, the FNS has implemented a rule that is focused on reducing revenues to a specifically identified category of small businesses, to their economic detriment and to the detriment of their already-tenuous competitive position *vis-à-vis* larger grocery outlets and discount stores with more favorable wholesale supply arrangements.  Thus, FNS already apprehends (but will not acknowledge for RFA purposes), that these cost containment provisions are not only designed to, but will in fact, have a significant adverse impact on the small business, WIC-only vendors that are the principal focus of the cost containment rule.

---

[9]    Executive Order 12866 defines a "significant regulatory action" as one which may have an "annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities" or one which may "[m]aterially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof." 58 Fed. Reg. 51735 (Oct. 4, 1993).  While the proposed rule does not specify the basis for its finding of significance, it is much more likely the former, as the rule does not have a federal budgetary impact and is projected to provide a benefit to the participants, while materially, and negatively, impacting "a sector of the economy," *i.e.,* the WIC-only markets. *See* 70 Fed. Reg. at 71709.

The agency's failure to acknowledge, and then act upon, its recognition of the cost

containment rule's impact on the small WIC-only businesses that are its focus both irretrievably

taints and impermissibly truncates any subsequent RFA analyses. *SOFA I*, a seminal RFA case,

also involved an agency's failed effort to absolve its flawed SEISNSE determination via

completion of a final regulatory flexibility analysis. *SOFA I* rejected the effort, explaining:

> NMFS's refusal to recognize the economic impacts of its regulations on small businesses also raises serious question about its efforts to minimize those impacts through less drastic alternatives. Section 604(a)(5) requires each [final regulatory flexibility analysis] to "descri[be] ... the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes" and then to explain why the agency chose a particular course. NMFS may not have rationally considered whether and how to minimize the 1997 quotas' economic impacts because the agency fundamentally misapprehended the unraveling economic effect of its regulations on small businesses.

> I am mindful that the RFA does not require mechanical exactitude. However, the statute compels the Secretary to make a "reasonable, good-faith effort," prior to issuance of a final rule, to inform the public about potential adverse effects of his proposals and about less harmful alternatives. *Associated Fisheries,* 127 F.3d at 114-15. Consideration of the record as a whole convinces me that the Secretary's defalcation unlawfully compromised his ability to render a reasoned and informed judgment with respect to the reduced quotas' economic impact on small businesses.

995 F. Supp at 1436-37.

Similarly, the FNS's statement that it can rectify its previous and compounding RFA

failures by preparing a final regulatory flexibility analysis in connection with its final cost

containment rule misunderstands the fact-finding and analytical processes the RFA intends.

Indeed, the RFA does not simply mandate the completion of a terminal analysis (*i.e.*, a FRFA

under 5 U.S.C. §604); rather, it prescribes a detailed process to ensure that an agency's FRFA is

well-informed and based on adequate fact-finding, analyses, and small business out-reach.

More specifically, once an agency recognizes its rule's SEISNSE, or the potential for that impact, *see NAHC*, 135 F. Supp. 2d at 168, the agency must take steps to enhance small entities' ability to participate in rulemaking processes. 5 U.S.C. § 609(a). For instance, such outreach should include special notification to small entities of the agency's intentions, as well other specific small business outreach efforts such as "the conduct of open conferences or public hearings concerning the rule for small entities including soliciting and receiving comments over computer networks . . . ." *Id.*, § 609(a)(3)-(4).

This small business outreach is designed to inform the agency's subsequent analyses under the RFA, which continue with the preparation of an initial regulatory flexibility analysis or "IRFA" pursuant to 5 U.S.C. § 603.[10] Next, after taking public comments on the IRFA, the regulating agency must prepare a FRFA, and publish the FRFA along with the final rule. *Id.* § 604.[11] Accordingly, the FNS cannot, as it has attempted to do, satisfy its obligations under the RFA by postponing them to a later FRFA. Rather, this Court should require the FNS to fulfill its undertaking to comply with the RFA by rationally considering the interim final rule's economic impact on small businesses before proceeding any further to implement onerous requirements that will unnecessarily and illegally bankrupt small, WIC-only businesses.

---

[10]     An IRFA identifies the proposed rule, articulates the proposal's objectives and legal bases, describes and estimates the number of potentially affected small entities, describes the proposal's projected compliance costs, and describes alternatives the agency has identified which accomplish its stated objectives while minimizing any projected significant small entity economic impact. *Id.* § 603.

[11]     Each FRFA must summarize the public comments, the agency's response, any changes to the proposal, "the steps the agency has taken to minimize the significant economic impact on small entities," and the agency's decision making regarding the alternatives. *Id.* § 604(a)(2), (5).

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary

Judgment as to the RFA claims in their Second Cause of Action and deny the Federal

Defendant's Cross-Motion for Summary Judgment as to these claims.


Dated:  January 17, 2006                   Respectfully submitted,

                                           David E. Frulla (D.C. Bar No. 414170)
                                           Shaun M. Gehan (D.C. Bar No. 483720)
                                           COLLIER SHANNON SCOTT, PLLC
                                           3050 K Street, N.W., Suite 400
                                           Washington, D.C.  20007
                                           Telephone:  (202) 342-8400
                                           Facsimile:  (202) 342-8451

                                           Counsel for Proposed *Amicus* NFIB Legal Foundation

                                             OF COUNSEL:

                                           Karen R. Harned
                                           (D.C. Bar No. 456803)
                                           Elizabeth Gaudio
                                           (D.C. Bar No. 458688)
                                           NFIB Legal Foundation
                                           1201 F Street, NW
                                           Suite 200
                                           Washington, DC 20004
                                           Telephone:  (202) 314-2061
                                           Facsimile:  (202) 484-1566

                                           Counsel for Amicus Curiae National Federation of
                                           Independent Business Legal Foundation