## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL WOMEN, INFANTS, AND ) 
CHILDREN GROCERS ASSOCIATION, ) 
NUTRITIONAL FOOD DISTRIBUTORS, INC., ) 
COUNTY FOOD SERVICES, INC., and ) 
DILLARD FOODS, INC., ) 
           ) 
           Plaintiffs, ) 
       v. )    Civil Action No. 05-2432 (EGS) 
           ) 
FOOD AND NUTRITION SERVICE, ) 
           ) 
           Defendant. ) 

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JDUGMENT

Philip C. Olsson, Bar No. 172163
Arthur Y. Tsien, Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3537 (fax)

Attorneys for  National Women, Infants, and
Children Grocers Association, Nutritional Food
Distributors, Inc., County Food Services, Inc., and
Dillard Foods, Inc.

January 20, 2006

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... iii

I.    INTRODUCTION ........................................................................... 1

II.   ARGUMENT.................................................................................. 1

    A.    FNS's Interpretation Is Invalid Under *Chevron* "Step One" Because
         The Rule Is Inconsistent With The Plain Language Of The
         The Reauthorization Act.......................................................... 1

         1.    The Standard Advanced By FNS For Cost Neutrality Is Inconsistent
               With The Language And Structure Of Paragraph (11) Of The
               Cost Containment Provisions Of The Reauthorization Act.............. 1

         2.    The Standard Advanced By FNS For Cost Neutrality Renders
               Subparagraph (11)(E) Irrelevant........................................ 4

         3.    FNS Fails To Address The Statutory Prohibition On
               Achieving Lower Food Costs And Effectively Reads It Out
               Of The Statute.................................................................. 6

    B.    FNS Was Required To Engage In Notice-And-Comment Rulemaking........ 8

         1.    Even If The Rule Involved Grants Or Benefits,
               Notice-And-Comment Procedures Were Required .......................... 8

          2.    FNS Did Not Demonstrate "Good Cause" To Avoid
               Notice-And-Comment Procedures.................................... 10

             a.    The Second Vogel Declaration Does Not Provide A
                    Basis For Establishing "Good Cause" And
                    Should Be Disregarded .......................................... 10

              b.    The Reauthorization Act Did Not Authorize FNS
                    To Bypass Notice-And-Comment Procedures...................... 13

              c.    FNS's Unsupported Assertion That It "Worked
                    Diligently" Does Not Excuse Compliance With
                    Notice-And-Comment Procedures......................................... 16

              d.    FNS's Asserted "Compelling Need" Was Not An
                    Excuse To Bypass Notice-And-Comment Procedures .......... 19

e.    The Purported "Temporary" Nature Of The Rule
Did Not Excuse FNS From Using
Notice-And-Comment Procedures ......................................... 20

C.    FNS Violated The Regulatory Flexibility Act ................................. 21

1.    FNS Was Not Exempt From RFA Compliance .................................. 21

2.    FNS Was Required To Conduct An RFA Analysis Because
WIC-Only Stores Are The "Targets" Of The Rule ............................ 23

3.    FNS Did Not Properly Certify That RFA Compliance
Was Unnecessary .............................................................................. 25

4.    FNS's Purported Analysis Was Not Adequate To
Comply With The RFA ..................................................................... 28

III.    CONCLUSION .................................................................................................. 29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Air Transport Ass'n of America v. Department of Transportation*, 900 F.2d 369
(D.C. Cir. 1990) ..................................................................................................18
*American Federation of Government Employees, AFL-CIO v. Block*, 655 F.2d 1153
(D.C. Cir. 1981) ...........................................................................................13,20,21
*American Trucking Association v. EPA*, 175 F.3d 1027 (D.C. Cir. 1999) .........................24
*Asiana Airlines v. F.A.A.*, 134 F.3d 393 (D.C. Cir. 1998) .............................................15
*Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104 (1st Cir. 1997).....................29
*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) ..............................................8, 9
*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ...............................13
*Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855 (D.C. Cir. 2001)....................23, 26
*Chevron, U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837
(1984)...........................................................................................................1
*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ..................11,12,13
*City of Brookings Municipal Telephone Co. v. FCC*, 822 F.2d 1153 (D.C. Cir. 1987) ........11
*Council of Southern Mountains, Inc. v. Donovan*, 653 F.2d 573 (D.C. Cir. 1981)...............16,17, 19
*FDIC v. Meyer*, 510 U.S. 471 (1994) .........................................................................15
*Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380 (1974) ...................................11
*Grand Canyon Air Tour Coalition v. F.A.A.*, 154 F.3d 455 (D.C. Cir. 1998)....................13
*Hill v. Norton*, 275 F.3d 98 (D.C. Cir. 2001)...............................................................13
*Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070 (D.C. Cir. 1978)...............8, 9
*Jama v. Immigration and Customs Enforcement*, 125 S. Ct. 694 (2005) ...........................15
*Kollett v. Harris*, 619 F.2d 134 (1st Cir. 1980) .....................................................18, 21
*Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225 (D.C. Cir. 1994)..............passim
*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile
Insurance Co.*, 463 U.S. 29 (1983) ........................................................................11
*National Association of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d
1272 (D.C. Cir. 2005) ...................................................................................22, 23
*National Association of Psychiatric Health Systems v. Shalala*, 120 F. Supp. 2d 33
(D.D.C. 2000) ................................................................................................29
*Petry v. Block*, 737 F.2d 1193 (D.C. Cir. 1984) ..............................................8, 10, 18
*Qi-Zhuo v. Meissner*, 70 F.3d 136 (D.C. Cir. 1995)..................................................6, 7
*Rodway v. USDA*, 514 F.2d 809 (D.C. Cir. 1975) .................................................passim
*State of N.J., Department of Environmental Protection v. EPA*, 626 F.2d 1038 (D.C.
Cir. 1980) ...................................................................................................passim
*Sugar Cane Growers Co-op of Florida v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002)............10
*Train v. NRDC*, 421 U.S. 60 (1975) .......................................................................24

# FEDERAL STATUTES

5 U.S.C. § 553.................................................................................................passim
5 U.S.C. § 559.................................................................................................14, 20
5 U.S.C. § 604(a)............................................................................................26, 28
5 U.S.C. § 605(b)............................................................................................27
42 U.S.C. § 1758 note.....................................................................................14, 20
42 U.S.C. § 1786.............................................................................................passim

# FEDERAL REGULATIONS

7 C.F.R. § 246.12............................................................................................passim

# OTHER AUTHORITIES

150 CONG. REC. E1328.....................................................................................5-6
36 Fed. Reg. 13,804 (July 24, 1971).............................................................8
70 Fed. Reg. 33,702 (June 9, 2005)...............................................................14
70 Fed. Reg. 39,022 (July 6, 2005)................................................................14
70 Fed. Reg. 71,708 (Nov. 29, 2005)............................................................passim
A Guide for Government Agencies: How to Comply with the Regulatory Flexibility
      Act, Small Business Administration (May 2003).....................................27

## I.    INTRODUCTION

Plaintiffs National Women, Infants, and Children Grocers Association ("NWGA"), Nutritional Food Distributors, Inc. ("Nutritional Food Distributors"), County Food Services, Inc. ("County Food Services"), and Dillard Foods, Inc. ("Dillard Foods") (collectively "Plaintiffs") respectfully submit this memorandum in opposition to the motion of Defendant Food and Nutrition Service ("FNS") for summary judgment, and in further support of Plaintiffs' motion for summary judgment.

## II.    ARGUMENT

A.    **FNS's Interpretation Is Invalid Under *Chevron* "Step One" Because The Rule Is Inconsistent With The Plain Language Of The Reauthorization Act**

FNS's interpretation of the Reauthorization Act, as set forth in its Rule and explained in its brief, is at odds with the plain language of the Reauthorization Act in three ways.  Thus, it is invalid under *Chevron* "step one."  *See Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984).

1.    **The Standard Advanced By FNS For Cost Neutrality Is Inconsistent With The Language And Structure Of Paragraph (11) Of The Cost Containment Provisions Of The Reauthorization Act**

FNS posits that there are:

> [t]wo separate, complementary cost-containment goals: First, a state agency must ensure that the average per-voucher cost of food at WIC-only stores does not exceed the average per-voucher cost of food at comparable vendors.  Second, the state agency must also insure that, on the whole, the authorization of WIC-only stores is cost-neutral to the program, i.e., that the redemption of vouchers at WIC-only stores does not result in higher food costs than if the vouchers were redeemed at regular vendors.

1

Memorandum in Support of Defendant's Motion for Summary Judgment ("FNS Mem.") at 2.

Plaintiffs take no issue with what FNS calls the first of these two goals, which is specifically authorized by subparagraph (11)(E) of the Act. However, the second so-called "goal" for which FNS purports to rely on subparagraph (11)(A)(i)(III)(bb) is created from whole cloth and is inconsistent with the plain language and structure of that section. That statutory provision does not, as FNS claims, authorize the provision of the Rule that requires that a state "compare the average cost of each type of food instrument redeemed by [WIC-only] vendors against the average cost" of redemptions by regular vendors when determining whether its system is cost neutral. *See* 7 C.F.R. § 246.12(g)(4)(i)(D).[1]

Paragraph (11) of the statute is captioned *Vendor Cost-Containment* and has several subparagraphs of particular relevance to the present discussion, which are: subparagraph (11)(A) captioned *Peer Groups*, subparagraph (11)(B) captioned *Competitive Pricing*, subparagraph (11)(C) captioned *Allowable Reimbursement Levels*, and finally subparagraph (11)(E) captioned *Cost Containment*. The language that FNS relies on here is contained in subparagraph (11)(A), the new statutory provision authorizing state agencies to establish and manage vendor peer groups.

---

[1]    FNS claims that Plaintiffs are mistaken in their view that this provision also authorizes states to recoup payments to WIC-only stores, and implies that this mistake is evidence of Plaintiffs' overall misunderstanding of the Rule. FNS Mem. at 13. In the same breath, FNS accurately quotes the Rule as requiring that when overpayments are made states "must then take 'necessary action to ensure compliance, such as...*recouping excess payments....*'" *Id.* (quoting 7 C.F.R. § 246.12(g)(4)(i)(D)) (emphasis added). FNS's quote is accurate and Plaintiffs are not mistaken – the Rule unquestionably authorizes recoupments. Reading this section any other way calls into question FNS's ability to understand the plain meaning of its own regulation.

The provision relied upon by FNS within subparagraph (11)(A) requires that state agencies which elect to authorize WIC-only stores must:

> (bb) establish competitive price criteria and allowable reimbursement levels that comply with subparagraphs (B) and (C), respectively, and that do not result in higher food costs if program participants redeem supplemental food vouchers at [WIC-only] vendors... rather than at [other] vendors....

42 U.S.C. § 1786(h)(11)(A)(i)(III)(bb). In establishing competitive price criteria consistent with subparagraph (B) (as required by provision (bb)), a state agency will need to ensure for each peer group "that the retail prices charged by vendor applicants for the program are competitive with the prices charged by other vendors," consider participant access by geographic area, and establish procedures to ensure that a retail store selected for inclusion in the program does not subsequently initiate inappropriate price increases. *Id.* § 1786(h)(11)(B). In establishing allowable reimbursement levels for each peer group pursuant to subparagraph (C), the state agency will need to: (1) establish that payments to vendors in the peer group reflect competitive retail prices, (2) not reimburse a vendor at a level inconsistent with the separately established competitive price criteria, and (3) consider participant access in a geographic area. *Id.* § 1786(h)(11)(C).

It is notable that neither provision (bb) nor subparagraphs (B) and (C) make any reference to comparing the average cost of each type of food instrument redeemed by WIC-only vendors against the average cost of the same type of food instrument redeemed by "regular" vendors, as FNS requires in the Rule at 7 C.F.R. § 246.12(g)(4)(i)(D), which purports to implement the provisions of statutory provision (bb). This is inherently contradictory because provision (bb) is part of the peer group provisions of subparagraph (11) (A) and yet the comparison required by § 246.12(g)(4)(i)(D) of the Rule would not

be performed on a peer group-by-peer group basis. Any comparison based on provision (bb), whether using averages or otherwise, should inherently be between peer groups rather then between WIC-only stores and the universe of "regular" vendors.

The so-called cost neutrality provisions of § 246.12(g)(4)(i)(D) would limit WIC-only voucher redemptions to less than or the average level of regular vendor redemptions. This averaging requirement is not authorized by the Reauthorization Act and is clearly contrary to both the language and the structure of the statute. Thus, the Rule is invalid under *Chevron* "step one."

## 2.    The Standard Advanced By FNS For Cost Neutrality Renders Subparagraph (11)(E) Irrelevant

Pursuant to provision (bb), each state agency is responsible for developing its own peer group-by-peer group competitive price criteria and allowable reimbursement levels for WIC-only stores, taking into account the standards provided by subparagraphs (B) and (C). As previously discussed, FNS reads into provision (bb) the requirement that average per voucher redemptions for these WIC-only stores shall not exceed the statewide average for "regular" stores. In so doing, the Rule ignores the express averaging requirements of subparagraph (11)(E), which require that after each state has developed its cost containment program, FNS must certify that the state developed its competitive price criteria and allowable reimbursement levels in a manner that does not result in higher payments to WIC-only stores than to "comparable vendors." *Id.* § 1786(h)(11)(E). FNS's interpretation renders meaningless the plain language of the certification provision of the statute by establishing a system where allowable reimbursement levels for WIC-only stores will always be set at a level that is lower than for comparable stores.

4

FNS admits that its interpretation of the statute would create a two-ceiling test, with one creatively lowered regulatory ceiling that is so restrictive that it renders meaningless the precise ceiling that Congress prescribed for FNS to use in certifying the appropriateness of state agency cost containment:

> As a practical matter, it is probably the case that the cost neutrality provision in subsection 1786(h)(11)(A) [embodied in 7 C.F.R. § 246.12(g)(4)(i)(D)] usually provides a lower ceiling on maximum reimbursements than the comparable vendors provision in subsection 1786(h)(11)(E) [embodied in FNS certification requirement in 7 C.F.R. § 246.12(g)(4)(vi)]. That does not render the two cost containment provisions inconsistent. The lesser of the ceilings will control costs.

FNS Mem. at 22.

Not only is the Rule's interpretation of provision (bb) inconsistent with the plain language of that statutory provision and dissonant with the statute as a whole, it is directly contrary to the clearly expressed intent of Congress. The FNS interpretation of provision (bb) imposes on state competitive price criteria and reimbursement levels a regulatory low ceiling that renders meaningless the clearly prescribed statutory ceiling for FNS certification of those same criteria and levels. Thereby, FNS defeated a clearly prescribed statutory standard for FNS review of state discretion. If there could be any doubt about appropriate interpretation of the plain statutory language, the legislative history of the provision makes clear that the Rule is directly contrary to Congressional intent.

In explaining the cost containment provision of the conference report, Chairman Boehner explained, "The objective is neutrality; for WIC-only store costs to be at the same level as costs at comparable market-based vendors." 150 CONG. REC. E1328

(2004) (statement of Rep. Boehner).   In his reference to provision (bb), Chairman Boehner explained, "This language is a statement of the general cost neutrality objective previously explained.  It is not to be construed to compel a rigid cost limitation test." *Id.*

Had Congress intended the development of competitive price criteria and allowable reimbursement levels for WIC-only stores be done without regard for "comparable" vendors, there would have been no need to include the term "comparable" in the certification section.   Congress, however, expressly chose to condition FNS certification on an assurance that state regulation of WIC-only stores is based on "comparable" vendors.  As the Rule now stands, WIC-only stores will not be judged by the certification standard contained in subparagraph (11)(E), because 7 C.F.R. § 246.12(g)(4)(i)(D) requires states to develop their cost containment systems based on comparisons with "average" rather than "comparable" vendors.  As such, the certification by FNS required by subparagraph (11)(E) of the statute will never be able to be conducted pursuant to the standard set forth in that subparagraph.

FNS's interpretation effectively renders the cost containment certification provision surplusage.  Its interpretation violates the fundamental principle of the statutory construction that nothing in the statute is to be considered as surplusage.  *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995).   Therefore, FNS's interpretation is inconsistent with the plain language of the Reauthorization Act and invalid under *Chevron* "step one."

      3.     **FNS Fails To Address The Statutory Prohibition On Achieving Lower Food Costs And Effectively Reads It Out Of The Statute**

Finally, FNS fails to address in any fashion the statute's clear prohibition against compelling states to achieve lower food costs if program participants redeem

supplemental food vouchers at WIC-only stores. 42 U.S.C. § 1786(h)(11)(A)(i).[2] *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Plfs. Mem.") at 29-30. In and of itself, the failure to address this provision exposes a glaring deficiency in the agency's ability to interpret its own statute. More troubling is the fact that FNS admits that its interpretation of the statute would violate this provision. Specifically, FNS admits that its implementation of 42 U.S.C. § 1786(h)(11)(A) (embodied in 7 C.F.R. § 246.12(g)(4)(i)(D)) will result in lower reimbursements than provided to comparable vendors. FNS Mem. at 22. Congress was abundantly clear that nothing in 42 U.S.C. § 1786(h)(11) authorizes FNS to compel lower food costs if a WIC recipient chooses to shop at a WIC-only store. FNS's brief, however, admits that is how FNS intends to implement the statute and that food costs will be lower when recipients choose a WIC-only store over a comparable vendor. *Id.*

Thus, FNS's interpretation effectively reads out of the statute the prohibition against compelling states to achieve lower costs if WIC participants shop at WIC-only stores. FNS violates the fundamental principle of the statutory construction that nothing in the statute is to be considered as surplusage. *Qi-Zhuo*, 70 F.3d at 139. Therefore, FNS's interpretation is inconsistent with the plain language of the Reauthorization Act and invalid under *Chevron* "step one."

---

[2]    That prohibition, importantly, is applicable to all of paragraph (11) (42 U.S.C. § 1786(h)(11)), not just the peer grouping provisions of subparagraph (11)(A). This is clear from its unambiguous statement that it applies to "this paragraph," *i.e.* all of 42 U.S.C. § 1786(h)(11).

**B.    FNS Was Required To Engage In Notice-And-Comment Rulemaking**

    **1.    Even If The Rule Involved Grants Or Benefits, Notice-And-Comment Procedures Were Required**

FNS asserts that the Rule relates to grants or benefits and, therefore, under 5 U.S.C. § 553(a)(2), FNS was excused from compliance with the APA's notice-and-comment requirements. FNS Mem. at 25-28. This argument is without merit.

FNS expends much effort directing the Court to Black's Law Dictionary and the case law of *other* Circuits to avoid the impact of *Rodway v. USDA*, 514 F.2d 809 (D.C. Cir. 1975) and its progeny. Whatever the law elsewhere, the law of the D.C. Circuit is very clear -- regardless of whether the notice-and-comment requirements arise from 5 U.S.C. § 553 or from the 1971 *Federal Register* notice (36 Fed. Reg. at 13,804 (July 24, 1971)), and regardless of whether the Rule relates to grants and benefits, the APA's prior notice-and-comment requirements apply to FNS's Rule.[3]

FNS relies upon *Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1084 (D.C. Cir. 1978) and *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980) to assert that because the WIC Program involves grants and benefits, the Rule is exempt from notice-and-comment. FNS Mem. at 25. Keeping in mind "that the various exceptions to the notice-and-comment provisions of section 553 will be narrowly construed and only reluctantly countenanced" (*State of New Jersey Department of Environmental Protection v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980), these cases do not support an exemption from section 553 here.

---

[3]     While other Circuits might afford the 1971 *Federal Register* notice less deference because, as FNS asserts, it is a "voluntary practic[e]" (FNS Mem. at 27), the D.C. Circuit has soundly rejected this argument. *See, e.g., Petry v. Block*, 737 F.2d 1193, 1197 n.12 (D.C. Cir. 1984).

As *Humana* sets forth, the statutory exemption only applies where a federal grant or benefit is "clearly and directly implicated." 590 F.2d at 1082. Such is not the case here, for the Rule sets forth requirements for the States to follow in the administration of the WIC Program, in particular, as applied to WIC-only stores. *See* 70 Fed. Reg. 71,708 71,724 (Nov. 29, 2005) ("The parties affected by this regulation are the USDA's Food and Nutrition Service (FNS), state agencies that administer the WIC Program, and retail vendors that are authorized to accept WIC food instruments"). Thus, the actual benefits to WIC beneficiaries are not "clearly or directly implicated."

FNS's reliance upon *Batterton*, 648 F.2d at 700, is similarly misplaced. In fact, this case underscores FNS's error in not first publishing the Rule for prior notice-and-comment. In *Batterton*, the D.C. Circuit concluded that regardless of whether the formula challenged in the case was exempt from notice-and-comment procedures under section 553(a)(2) as involving grants or benefits, the APA's prior notice-and-comment requirements applied. The Court stated that the Department of Labor, like USDA here:

> has expressly waived this exemption by its own regulation which provides: It is the policy of the Secretary of Labor that in applying the rule making provisions of the APA the exemption therein for rules relating to public property, loans, grants, benefits or contracts shall not be relied upon as a reason for not complying with the notice and public participation requirements thereof.

648 F.2d at 700.

Moreover, whether the Rule even "directly implicates" WIC Program benefits is immaterial. In its 1971 *Federal Register* notice, USDA (like the Department of Labor in *Batterton*) committed to abiding by the prior notice-and-comment requirements of the APA in all such rulemakings, and may not evade them here. The D.C. Circuit was very

clear that the 1971 *Federal Register* "fully bound the Secretary to comply thereafter with the procedural demands of the APA." *Rodway*, 514 F.2d at 814.

More recent case law, not cited in FNS's brief, continues the unequivocal holding of *Rodway*. In both *Petry v. Block*, 737 F.2d 1193 (D.C. Cir. 1984) (involving payments under the Child Care Food Program), and *Sugar Cane Growers Cooperative of Florida v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) (involving direct USDA payments under a payment-in-kind program), the D.C. Circuit analyzed the USDA rules at issue under traditional APA principles, without regard to whether the 1971 *Federal Register* notice applied. Such APA analysis was appropriate because, as the D.C. Circuit stated, USDA had "essentially waived" the grants and benefits exemption of section 553(a)(2). *Sugar Cane Growers*, 289 F.3d at 95 n.5.

### 2. FNS Did Not Demonstrate "Good Cause" To Avoid Notice-And-Comment Procedures

FNS asserts that it demonstrated "good cause" to avoid notice-and-comment rulemaking. FNS Mem. at 27-37. As discussed below, all of FNS's arguments are without merit.

### a. The Second Vogel Declaration Does Not Provide A Basis For Establishing "Good Cause" And Should Be Disregarded

As a threshold matter, FNS offers a second Declaration of Ronald Vogel ("Sec. Vogel Decl.") to supplement its incomplete Administrative Record.[4] The second Vogel Declaration is an attempt to insert into the record of this case testimony about documents,

---

[4]     A previous Vogel Declaration dated December 22, 2005 was provided by FNS in connection with its opposition to Plaintiffs' motion for a temporary restraining order.

meetings, drafts, and guidances which do not appear in the previously supplied Administrative Record. The Second Vogel Declaration should be disregarded.

In his second Declaration, Mr. Vogel describes letters, meetings, "several drafts of the Rule," layers of review within USDA, Office of Management and Budget ("OMB") review of the Rule (including over 90 written comments from OMB and FNS responses to those questions), development of the Guidance, and comments from state agencies on the Guidance. Sec. Vogel Decl. ¶¶ 7-19.   FNS offers this extensive description in a litigation declaration as a demonstration of its good faith and diligent efforts to promulgate a timely rule.   FNS Mem. at 30-35.   Yet, virtually none of the underlying documentation is in the Administrative Record.   In the Administrative Record there are no drafts, no OMB questions and responses, and no comments from State agencies.

Under the well-established case law, judicial review of an agency decision must be based upon the administrative record that was before the agency, and not upon an accumulation of affidavits and arguments assembled after the decisions are made and the rule is issued that are not part of, and are not a substitute for, the administrative record. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983).   This principle applies to rationalizations offered for the first time in litigation affidavits and to the arguments of litigation counsel.   *Overton Park*, 401 U.S. at 419; *Federal Power Comm'n. v. Texaco, Inc.*, 417 U.S. 380, 397 (1974).   "Post hoc rationalizations advanced to remedy inadequacies in the agency's record or its explanation are baseless."   *City of Brookings Mun. Telephone Co. v. FCC,* 822 F.2d 1153, 1165 (D.C. Cir.1987).

In *Rodway*, the D.C. Circuit rejected the litigation affidavits of two USDA officials that were offered to provide the basis and purpose of the rule:

> "[C]ourts have traditionally looked with hostility upon explanations of agency officials submitted in affidavit form during the course of litigation.*** [W]e see no reason to depart from the well settled rule that litigation affidavits are an unacceptable basis for appellate review of agency decision-making.

514 F.2d at 816 (citing *Overton Park*, 401 U.S. at 419).  The same result should apply here.

Most fundamentally, to establish a good cause exemption, the agency must "incorporate[] the finding and a brief statement of reasons therefor in the rules issued." 5 U.S.C. § 553(b)(B).  The preamble to the Rule itself invokes *only* necessity as the basis for the claimed good cause exemption:

> [The Reauthorization Act] requires that guidance to implement [the cost containment provisions] be issued as soon after the date of enactment as practicable, and authorizes the issuance of interim final regulations.  Therefore, Under Secretary Eric M. Bost has determined, in accordance with 5 U.S.C. 553(b), that prior notice and comment would be *unnecessary*, and that good cause exits for making this rule effective without first publishing a proposed rule.

70 Fed. Reg. at 71,712 (emphasis added).

In its brief, relying on the second Vogel Declaration, government counsel strongly urge *additional* grounds on which the agency had "good cause" to forgo notice-and-comment procedures, above and beyond the reason stated in the Rule's preamble.  FNS now asserts that prior notice-and-comment were, in addition to "unnecessary," also "impracticable" and possibly not in the "public interest" pursuant to 5 U.S.C. § 553(b)(B).  Litigation counsel and Mr. Vogel urge good cause is established because, among other things:  (1) FNS had a short implementation period of only 18 months in

which to promulgate the Rule; (2) FNS has been working very diligently on the Rule; (3) rulemaking generally is burdensome and time-consuming; (4) the states needed guidance and any delay in the Rule will cause a loss in the projected $75 million in annual savings; and (5) the Rule is temporary. FNS Mem. at 30-37. FNS's invocation of a good cause exemption on these grounds should be rejected as *post hoc* rationalizations.

Having based its findings of good cause in the Rule's preamble on the basis of necessity alone, FNS may not now use litigation briefs and *post hoc* declarations, which describe materials not in the Administrative Record, to establish an exemption on the *additional* grounds of "impractability" or "public interest." *See, e.g., American Federation of Government Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("the agency's use of the [good cause] exemption should be incorporated within the published rule"). "[I]t is well understood that the courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Hill v. Norton*, 275 F.3d 98, 105 (D.C. Cir. 2001) (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168). The reviewing court may consider "only the regulatory rationale actually offered by the agency during the development of the regulation, and not the post-hoc rationalizations of its lawyers." *Grand Canyon Air Tour Coalition v. F.A.A*, 154 F.3d 455, 469 (D.C. Cir. 1998). As previously discussed above, the post hoc statements of agency officials in litigation affidavits are no more persuasive. *Overton Park*, 401 U.S. at 419.

### b.   The Reauthorization Act Did Not Authorize FNS To Bypass Notice-And-Comment Procedures

FNS asserts that by authorizing "interim final regulations," Congress must be presumed to have intended to exempt FNS from prior notice-and-comment. FNS Mem. at 29. FNS is mistaken.

13

As discussed in Plfs. Mem. at 20 and the cases cited, the section 559 of the APA requires that any modification to the requirements of prior notice-and- comment contained in section 553 be express. The statement that the agency "may issue interim final regulations" (section 501(b) of the Reauthorization Act, 42 U.S.C.A. § 1758 note) is not so express, and indeed, says nothing about exempting notice-and-comment whatsoever.

Merely using the term "interim final regulation" is not sufficiently express to presume Congressional intent to exempt FNS. The APA does not define "interim final regulation." The term is not defined in the Reauthorization Act. FNS cites to no judicial definition Congress may be presumed to have had knowledge of and incorporated into the Reauthorization Act. There is, thus, no basis for presuming that use of the term "interim final regulations" necessarily means a rule promulgated without prior notice-and-comment. In fact, agencies frequently publish interim final rules following a notice of proposed rulemaking and comment. *See, e.g.,* 70 Fed. Reg. 33,702 (June 9, 2005); 70 Fed. Reg. at 39,022 (July 6, 2005).

FNS further seems to argue that the statutory language that FNS "may issue interim final regulations" should be construed by this Court as "conferring significantly greater leeway to forego prior notice-and-comment than might otherwise be the case." FNS Mem. at 30. FNS cites to no particular authority for this extraordinary proposition that "may" should be read as "shall," even when sandwiched between mandates ("shall" issue a guidance; "shall" issue final rules (42 U.S.C. § 1758 note)). Even apart from the D.C. Circuit's instruction that all exceptions to the APA's notice-and-comment requirements are to be "narrowly construed and only reluctantly countenanced" (*State of*

14

*N.J*, 626 F.2d at 1045), FNS's assertion is at odds with well-worn canons of statutory construction. Among other things, unless Congress explicitly states otherwise, courts are to construe a statutory term in accordance with its ordinary or natural meaning. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). In this case, "[t]he word 'may' customarily connotes discretion," particularly "where, as here, 'may' is used in contraposition to the word 'shall.'" *Jama v. Immigration and Customs Enforcement*, 125 S. Ct. 694, 703 (2005).

Relying again upon case law contrary to *Rodway* and its progeny, FNS further argues that because the obligations to follow notice-and-comment arise only from a "voluntary" agency policy, the permissive authority of the Reauthorization Act is more than sufficient to "infer" authority to dispense with prior notice-and-comment. FNS Mem. at 29. Yet, as demonstrated in Plfs. Mem. at 21-22, Congress has, where it has wished to do so, plainly and explicitly exempted USDA from all prior notice and requirements arising under *both* section 553 *and* the 1971 *Federal Register* notice. The fact that Congress did not so exempt FNS in the Reauthorization Act is compelling evidence that it intended FNS to comply with prior notice-and-requirements in promulgating the cost containment rule.

Two cases on which FNS relies, *Asiana Airlines v. F.A.A.*, 134 F.3d 393, 396 (D.C. Cir. 1998), and *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225, 1236 n.18 (D.C. Cir. 1994), do not support reading a notice-and-comment exemption into the Reauthorization Act. In *Asiana Airlines*, 134 F.3d at 397-399, the D.C. Circuit held that the following statutory language was sufficiently express to exempt the agency from § 553: "The Administrator shall publish in the Federal Register an initial fee schedule and associated collection process as an interim final rule, pursuant to which public comment

will be sought and a final rule issued." The statutory language in *Methodist Hospital*, 38 F.3d at 1236 n.18, was similarly far more explicit than the language at issue here: "The Secretary shall cause to be published in the Federal Register a notice of the interim final DRG prospective payment rates…no later than September 1, 1983, and allow for a period of public comment thereon." The Reauthorization Act is nothing like the express exemptions in these statutes.

c.      **FNS's Unsupported Assertion That It "Worked Diligently" Does Not Excuse Compliance With Notice-And-Comment Procedures**

FNS further asserts that good cause has been shown because the agency has worked diligently to meet its deadlines in a timely fashion. FNS Mem. at 30-35. Assuming for discussion purposes that FNS can establish good cause in a litigation declaration for reasons not set forth in the Rule's preamble, that contention must nevertheless fail here where 17 months elapsed between the time the Reauthorization Act was signed into law on June 30, 2004 and the publication of the Rule on November 29, 2005.

The APA does not identify diligence and trying hard as bases for demonstration of good cause sufficient to avoid notice-and-comment procedures. Indeed, in the instances in which agency diligence has been a factor in a finding of good cause, the D.C. Circuit has only recognized the exemption from prior notice-and-comment "guardedly, based on the totality of the special circumstances presented." *Council of Southern Mountains, Inc. v. Donovan,* 653 F.2d 573, 582 (D.C. Cir. 1981). In that case, the D.C. Circuit held that the Secretary of Labor had established good cause to dispense with notice-and-comment in providing for an extension of compliance with a final rule

16

(already preceded by prior notice-and-comment) because, among other things, the record showed the agency acted diligently, the circumstances causing the delay were beyond the agency's control, the record showed the agency had intended to implement the regulation on schedule, and the agency's delay in final implementation was of short duration – for approximately 6 months. 653 F.2d at 581-82. Moreover, the D.C. Circuit cautioned this was likely a "unique" case. *Id.* at 582.

None of the unique factors that warranted exception from section 553 in *Council of Southern Mountains* is present here. Among other things, there is no proposed rule that preceded the final rule. The evidence of diligence is not provided in the Administrative Record, but in the arguments of litigation counsel and the post hoc declarations of agency officials (which, as discussed above, should be disregarded). There is also no evidence that FNS intends to move quickly, given that it has provided a 12-month comment period on the Rule and took a year to circulate a draft Guidance (still not final) that it was required to issue "as soon as practicable." Even if agency diligence were a basis for finding "good cause," FNS has not met the burden of showing that diligence here.[5]

Next, FNS bemoans the clearance and approval processes of rulemaking as further bases for its asserted good cause exemption. FNS Mem. at 32-34. However, 5 U.S.C. § 553(b)(B) has no exemption from prior notice-and-comment because rulemaking is burdensome for the agency. Moreover, the burdens of which FNS complains are borne by all agencies that promulgate rules. Indeed, Congress and the President have imposed these requirements to assure that all agency rules meet certain

---

[5]    Any claim of agency diligence is totally undermined by the fact that FNS expects a final rule in late 2008, 30 months after the June 30, 2006 statutory deadline. *See* 70 Fed. Reg. at 71,709.

legal and policy goals.   To conclude that an agency demonstrates good cause to avoid prior notice-and-comment under these circumstances would be to write section 553's requirements out of the APA.  If FNS's Rule is exempt from notice-and-comment on this basis, every rule any agency promulgates could be similarly exempt.

FNS asserts that prior notice-and-comment was "impracticable" due to the impending statutory deadline of the Reauthorization Act.   FNS Mem. at 3-4.   As compared to other cases of true, short congressionally mandated deadlines, however, the implementation period for the Reauthorization Act was leisurely, allowing 18 months from the date of enactment before the statute became effective.  The case law of the D.C. Circuit is clear that 18 months is more than sufficient time for an agency to comply with its statutory deadlines and promulgate a rule.  *Compare Methodist Hospital*, 38 F.3d at 1235-36 (statute exempting agency from prior notice enacted in April, interim final rules to be published by September 1); and *Petry*, 737 F.2d at 1195-96 (exempted from notice-and-comment where regulations to be promulgated within 60 days of enactment) *with State of N.J.*, 626 F.2d at 1042 (180 days from enactment was sufficient time to comply with prior notice-and-comment procedures); *Air Transport Ass'n of America v. Dep't of Trans.*, 900 F.2d 369, 379 (D.C. Cir. 1990), *remanded*, 498 U.S. 1077 (1991), *vacated as moot*, 933 F2d 1043 (D.C. Cir. 1991) (two years sufficient to promulgate regulations), and *Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir. 1980) (14 months from enactment of statute to statutory deadline provided sufficient time for agency to comply with both its statutory deadline and the APA).  In this case, a good cause exemption cannot reasonably be made out when FNS "had a substantial period of time within which to propose regulations, the promulgation of which it knew was both necessary and forthcoming in

the future." *Methodist Hospital*, 38 F.3d at 1237 (quoting *American Federation*, 655 F.2d at 1158).

<blockquote>

d.     **FNS's Asserted "Compelling Need" Was Not An Excuse To Bypass Notice-And-Comment Procedures**

</blockquote>

FNS asserts that there was a "compelling need" to issue the Rule without prior notice-and-comment because of the looming statutory deadline and the need to provide guidance to the states. FNS Mem. at 35-36. Even assuming for discussion purposes that FNS can establish good cause in a litigation declaration for reasons not set forth in the Rule's preamble, that argument is without merit.

As discussed in section II.B.2.c *supra*, a statutory deadline, standing alone, is not sufficient to warrant dispensing with prior notice-and-comment, absent other factors not present here. *State of N.J.*, 626 F.2d at 1042. "Otherwise, an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures." *Council of Southern Mountains*, 653 F.2d at 581.

In fact, FNS has it backwards, as the need for guidance to the states was another factor weighing in favor of prior notice-and-comment. The D.C. Circuit has emphasized the importance of prior notice-and-comment in circumstances such as those presented here where the states play an important role in implementation of federal requirements. "[W]here the heaviest responsibilities rest upon state governments and where federalism concerns are implicated, the usefulness and desirability of the APA's notice-and-comment provision may be magnified." *State of N.J.*, 626 F.2d at 1047.

Nor is FNS's assertion that the projected $75 million annual savings warrants dispensing with notice-and-comment persuasive. Saving the government money and imposing higher costs upon regulated entities are indeed frequent consequences of government rules. *See, e.g., Rodway*, 514 F.2d at 812 (challenge to food stamp coupon allotment). For the government to obtain these benefits, and at the expense of regulated industry, the agency must first follow the APA.

> e.  **The Purported "Temporary" Nature Of The Rule Did Not Excuse FNS From Using Notice-And-Comment Procedures**

Last, FNS contends that it should be permitted to dispense with prior notice-and-comment because its Rule is temporary, flexible, and allows for a 12-month comment period. FNS Mem. at 36-37. As with FNS's other arguments, this one, too, has no merit.

This Rule cannot fairly or rationally be characterized as "temporary" in any respect given that: the Rule's impact is being felt immediately as it will force WIC-only stores out of business in a matter of weeks; FNS is allowing 12 months of comment; and FNS does not anticipate completing the rulemaking for another 3 years, until 2008.[6] 70 Fed. Reg. at 71,709. In this Rule, FNS has far exceeded what is appropriate and permissible for an interim final rule. *American Federation*, 655 F.2d at 1157-58 (an interim rule should be reserved for rare emergencies and should be no more extensive than is necessary to meet that emergency). FNS's long comment period and even longer implementation schedule for a final rule are not the indicia of the temporary, interim, and

---

[6]     Indeed, if the comment period persists until November 29, 2006, and the "interim" rule persists until 2008, FNS will have violated the Reauthorization Act, which requires that the agency issue final regulations by June 30, 2006. Reauthorization Act § 502(b)(2); *see* 42 U.S.C.A. § 1758 note.

narrow measures this Court permits to allow agencies sufficient flexibility to address true emergencies "for good cause" without first providing prior notice-and-comment.

Finally, the purpose of section 553 is "to afford persons an opportunity to influence agency action in the formulative stage, *before* implementation, when the agency is more likely to be receptive to argument." *Kollett*, 619 F.2d at 145 (internal citations and quotations omitted) (emphasis added). "[P]ermitting the submission of views after the effective date (of a regulation) is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way." *American Federation*, 655 F.2d at 1158 (citations and quotations omitted). As such, a post-effective date, 12-month comment period cannot cure the failure to follow section 553 due to "the psychological and bureaucratic realities of *post hoc* comment rule-making." *State of N.J.*, 626 F.2d at 1050.

C.     **FNS Violated The Regulatory Flexibility Act**

FNS proffers four separate rationalizations to support its contention that it did not violate the RFA. Plaintiffs address each of FNS's arguments below and show why each argument is without merit.

1.     **FNS Was Not Exempt From RFA Compliance**

FNS contends that it was not required to conduct an RFA analysis because it was not required to engage in notice-and-comment rulemaking. FNS Mem. at 38. Plaintiffs generally address in Section II. B, *supra,* why the Rule was not exempt from the APA's prior notice-and-comment requirements in 5 U.S.C. § 553.

Turning to the intersection between the RFA and section 553 of the APA, an agency cannot lawfully justify its decision to forgo an RFA analysis simply by stating

that it was not required to publish a general notice of proposed rulemaking under section 553. Rather, the agency must evaluate whether its regulation is, in fact, a "rule" that "grant[s] rights, impose[s] obligations, or produce[s] other significant effects on private interests." *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1285 (D.C. Cir. 2005).[7]

In *National Ass'n of Home Builders*, the D.C. Circuit stated that it has "not hesitated to consider an agency pronouncement issued without meeting required APA procedures a rule" for purposes of triggering the RFA. *Id.* The Army Corps of Engineers had argued that the permits it issued were not "rules" that required an RFA analysis because the Corps did not follow the notice-and-comment procedures of section 553. The D.C. Circuit rejected that argument and deemed the permits to be "rules" because they "grant rights, impose obligations, [and] produce other significant effects on private interests." *Id.* at 1285. Thus, the permits qualified as "rules" for purposes of triggering compliance with the RFA.

Similarly, FNS argues that its Rule did not require an RFA analysis. FNS Mem. at 38. That argument, like the Corps' argument, must fail. The Rule is aimed at regulating WIC-only stores (*see* 70 Fed. Reg. at 71,724) and, as demonstrated in Plaintiffs' declarations, the Rule will have significant economic consequences for those small businesses. *See* Halbert Decl. at ¶ 16-17, Dillard Decl. at ¶ 13-15, Robinson Decl. at ¶ 40 (submitted with Plaintiffs' TRO memorandum).

Alternatively, FNS contends that, if notice-and-comment were mandated by USDA's 1971 regulation (waiving the notice-and-comment exception under section

---

[7]    Interestingly, FNS does not cite to or make any attempt to distinguish this seminal and recent case on federal agencies' obligations under the RFA.

553(b)) rather than by the APA, USDA's 1971 regulation is not a "law" that triggers the RFA. FNS Mem. at 38 n.21. FNS's argument is without merit, as it is immaterial whether FNS was required under section 553 of the APA or under USDA's 1971 regulation to undertake notice-and-comment. What matters is whether FNS's Rule "grant[s] rights, impose[s] obligations, or produce[s] other significant effects on private interests." *Nat'l Ass'n of Home Builders*, 417 F.3d at 1285.

**2.  FNS Was Required To Conduct An RFA Analysis Because WIC-Only Stores Are The "Targets" Of The Rule**

FNS contends that it was not required to conduct an RFA analysis because WIC-only stores are not "directly regulated" by the Rule. FNS Mem. at 39. FNS is wrong, as neither the cases it cites nor the Rule's preamble supports its position.

FNS relies on *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001), but that case actually supports Plaintiffs' position. In that case, the D.C. Circuit stated that application of the RFA "turn[s] on whether particular entities are the 'targets' of a given rule." Here, WIC-only stores are unmistakably the "targets" of FNS's Rule. FNS concedes in the preamble to the Rule that "the parties affected by this regulation are the USDA's Food and Nutrition Service (FNS), State agencies that administer the WIC Program, and *retail vendors that are authorized to accept WIC food instruments*." 70 Fed. Reg. at 71,724 (emphasis added). *See* Vogel Decl. ¶ 3 (the Rule's two primary cost containment principles "apply to" [WIC-only stores]) (submitted with FNS's opposition to Plaintiffs' TRO motion). To say that the Rule will not directly affect WIC-only stores is absurd—the rule is specifically designed to economically regulate these small businesses.

FNS also relies on *American Trucking Association v. EPA*, 175 F.3d 1027 (D.C. Cir. 1999). In *American Trucking*, several small businesses challenged the Environmental Protection Agency's ("EPA") final rule that revised the national ambient air quality standards ("NAAQS") and argued that the EPA had improperly certified that the revised NAAQS would not have a significant economic impact on a substantial number of small entities. *American Trucking*, 175 F.3d at 1043. The EPA argued, and the Court agreed, that an RFA analysis was not required because the NAAQS do not regulate small entities; rather, any impact on small businesses would be indirect and dependent on how each state decided to comply with the NAAQS.

Here, FNS contends that the scenario in *American Trucking* is analogous to the scenario before this Court. FNS Mem. at 39. However, FNS overlooks key differences in the amount of discretion afforded to the states in determining how to comply with EPA's NAAQS and with FNS's Rule. Both EPA's NAAQS regulation and FNS's Rule require states to submit implementation plans to the EPA for approval. Any parallel stops there, however. The EPA was prohibited from rejecting a state plan if it disagreed with "the wisdom of a State's choices of emission limitations." *Id.* at 1044 (quoting *Train v. NRDC*, 421 U.S. 60, 79 (1975)). The D.C. Circuit concluded that "a State may, if it chooses, *avoid imposing upon small entities any of the burdens* of complying with a revised NAAQS." *Id.* (emphasis added). Thus, the discretion afforded to the states allowed them to determine *which entities* would bear the burdens of the revised NAAQS. *American Trucking*, 175 F.3d at 1045.

In comparison, FNS's Rule is targeted exclusively at small entities (*i.e.*, WIC-only stores) and is far more limited in terms of state discretion than the EPA's NAAQS

regulation. Unlike the NAAQS regulation, FNS's Rule does not set a standard and allow each state to determine which entities will bear the burden of ensuring that the state is in compliance. Rather, FNS's Rule is explicit in setting forth requirements for certification of state plans. *See new* 7 C.F.R. § 246.12(g)(4)(i)(D), 70 Fed. Reg. at 71,723 and *new* 7 C.F.R. § 246.12(g)(4)(vi), 70 Fed. Reg. at 71,724. Thus, unlike the EPA's NAAQS regulation, there is no question that small entities (*i.e.,* WIC-only stores) will be substantially impacted by this Rule, in part because state agencies have little or no flexibility under the certification provision. As such, *American Trucking* is inapplicable.

### 3.  FNS Did Not Properly Certify That RFA Compliance Was Unnecessary

FNS contends that it met its obligations under the RFA because it "certified" that an RFA analysis was unnecessary since the Rule will "not have a significant economic impact on a substantial number of small entities." FNS Mem. at 40 (citing 70 Fed. Reg. at 71,709; 5 U.S.C. § 605(b)). FNS's attempt to characterize its purported RFA analysis as a "certification" pursuant to section 605(b) is without merit.

To qualify as a "certification" under section 605(b), the head of the agency must certify that the rule will "not have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). The head of FNS did not provide an adequate certification nor did FNS conduct a sufficient RFA analysis to support such a certification.[8] Rather, the Rule only includes a brief, conclusory, and erroneous statement

---

[8]     FNS is well aware of how to "certify" in accordance with the RFA. Eight days before promulgation of the Rule, FNS published a separate regulation implementing another provision of the Reauthorization Act, wherein the FNS Administrator "certified that this rule will not have a significant economic impact on a substantial number of small entities." 70 Fed. Reg. at 70,031, 70,032.

that the agency "does not believe this rule will have a significant economic impact on a substantial number of small entities." 70 Fed. Reg. at 71,709. To compound its error, FNS followed that statement with the contradictory admission that the Rule "may have significant economic impact" on a small number of entities. *Id.*

Thus, FNS's only basis for seeking to avoid an RFA analysis is that the number of small entities which may experience a "significant economic impact" is not "substantial." FNS's determination of what constitutes a "substantial number of small entities, " FNS Mem. at 41, is flawed.

It is incumbent upon an agency to consider how many small businesses affected by the regulation will suffer a significant economic impact. *See Cement Kiln*, 255 F.3d at 869. In addressing the RFA, FNS concluded that it did not need to evaluate the economic impact of the Rule on WIC-only stores because, in the agency's view, the number of WIC-only stores was not a substantial number of small entities, but rather "a small number of vendors that have been authorized to participate in the WIC Program." 70 Fed. Reg. at 71,709. FNS's analysis is based on the wrong denominator. The 45,000 authorized vendors noted in FNS's RFA analysis represent *all* of the stores participating in the WIC Program, including tens-of-thousands of stores that do not meet the "small business" definition. The RFA does not mandate that an agency determine how many of the *total* number of regulated businesses will suffer a significant economic impact. Rather, the RFA requires that an agency consider a subset of those regulated businesses, the number of small entities. 5 U.S.C. § 604(a)(3). Thus, for purposes of this Rule, the denominator should be the number of small entities (*i.e.,* 1,125 to 1,800 WIC-only stores) affected by the Rule.

After establishing the denominator, FNS's next step should have been to determine the equation's numerator. If the numerator represented a "substantial number" of the small entities included in the denominator, then FNS was required to conduct an RFA analysis.[9] Neither the RFA conclusions set forth in the Rule's preamble nor the Administrative Record indicates that the agency properly undertook this task. Thus, FNS's purported certification does not comply with the requirements of section 605(b).

Finally, in addition to requiring that the agency publish its certification and a succinct statement explaining the reasons for the certification, section 605(b) also requires that the agency "provide such certification and statement to the Chief Counsel for Advocacy of the Small Business Administration." There is no evidence in the Administrative Record that FNS complied with this requirement, thus further evidencing that FNS did not make a "good faith" effort to comply with the certification requirements of the RFA.

---

[9]     Although Plaintiffs acknowledge that courts do not defer to the Small Business Administration's ("SBA") interpretation of the RFA because the SBA does not administer the RFA, Plaintiffs' discussion of the analysis that must be undertaken prior to certifying that a regulation will not have a "significant economic impact on a substantial number of small entities" is consistent with the guidance provided in SBA's "A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act" (explaining that a "substantial number is not likely to be five small firms in a industry with more than 1,000 small firms. On the other hand, it is important to recognize that five small firms in a industry with only 20 small firms would be a substantial number"). *Id.* at 20 (available at http://www.sba.gov/advo/laws/vfaguide.pdf). Clearly, the focus of the inquiry is the number of *small* firms – not the number of *all* firms – affected by the regulation. As Plaintiffs have demonstrated, the Rule will have a significant economic impact on a substantial number of the small entities (*i.e.,* WIC-only stores) affected by the Rule. *See* Robinson Decl. at ¶ 27 (stating that as a conservative estimate, "the Rule will force 90% of all WIC-only stores to close within 60 days of implementation").

4.    **FNS's Purported Analysis Was Not Adequate To Comply
With The RFA**

FNS claims that the preamble to the Rule and the regulatory impact analysis
published as an appendix to the Rule, when taken together, satisfy all of the requirements
of section 604(a) of the RFA.  FNS Mem. at 43.  FNS is wrong.

Section 604(a) requires that a final regulatory flexibility analysis contain, among
other provisions:

> a description of the steps the agency has taken to minimize
> the significant economic impact on small entities consistent
> with the stated objectives of applicable statutes, including a
> statement of the factual, policy, and legal reasons for
> selecting the alternative adopted in the final rule and why
> each one of the other significant alternatives to the rule
> considered by the agency which affect the impact on small
> entities was rejected.

FNS did not satisfy this requirement.  Most notably, FNS failed to describe the
steps it took to "minimize the significant economic impact on small entities," including
an explanation of "why *each one* of the other significant alternatives to the rule
considered by the agency which affect the impact on small entities was rejected."  5
U.S.C. § 604(a)(5) (emphasis added).  Instead, FNS states that it is "not feasible to
accurately estimate the rule's impact on small entities."  70 Fed. Reg. at 71,709.
Calculating that estimate would have been possible with regard to WIC-only stores if the
agency had properly determined the number of small entities affected by the Rule, rather
than erroneously focusing on the total number of authorized vendors.  *See* section II.C.3,
*supra*; *see also* Sec. Vogel Decl. at ¶ 9 (admitting that "data on so-called 'WIC-only
stores' was relatively easy to secure").

FNS did explain why it chose not to mandate specific means of developing peer groups, competitive price criteria and allowable reimbursement levels. *See* FNS Mem. at 45 (citing 70 Fed. Reg. at 71,730). However, FNS wholly failed to describe what steps it took to minimize the significant economic impact on small entities.

This Court reviewed a similar RFA analysis in *National Association of Psychiatric Health Systems v. Shalala*, 120 F. Supp. 2d 33 (D.D.C. 2000). In that case, the Court found the RFA analysis proffered by the Secretary of Health and Human Services to be "severely lacking" because she failed to make a "reasonable, good-faith effort to canvass major options and weight their probable effects." *Id.*, (quoting *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 116 (1st Cir. 1997)). FNS's RFA analysis is similarly deficient. As with the RFA analysis provided in *National Association of Psychiatric Health Systems*, "there is no discussion of what other significant alternatives which affect the impact on small entities were considered (if any in fact were considered), and why those alternatives were rejected."[10] *Id.* at 44. Thus, FNS failed to satisfy the requirements of section 604(a).

## III.  CONCLUSION

For the reasons discussed above, and in Plaintiffs' opening memorandum, this Court should deny FNS's motion for summary judgment and grant Plaintiffs' motion for summary judgment. This Court should vacate the entire Rule, and remand to FNS for

---

[10]    FNS's consideration of alternatives focused exclusively on whether to require more specific means of developing peer groups, competitive price criteria and allowable reimbursement levels. FNS Mem. at 43 (citing 70 Fed. Reg. at 71,730). In explaining why it rejected that alternative, FNS stated that doing so "could have unintended, negative consequences on participant access, food costs, and administrative burden." 70 Fed. Reg. at 71,730. Entirely absent from FNS's calculus was the significant economic impact the Rule would have on small entities.

repromulgation in accordance with the APA's notice-and-comment rulemaking requirements and the RFA.


Dated:  January 20, 2006                    Respectfully submitted,


                                            Philip C. Olsson, Bar No. 172163
                                            Arthur Y. Tsien, Bar No. 411579
                                            OLSSON, FRANK AND WEEDA, P.C.
                                            1400 16th Street, N.W., Suite 400
                                            Washington, D.C. 20036-2220
                                            (202) 789-1212
                                            (202) 234-3537 (fax)

                                            Attorneys for  National Women, Infants,
                                            and Children Grocers Association,
                                            Nutritional Food Distributors, Inc., County
                                            Food Services, Inc., and Dillard Foods, Inc.