UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WOMEN, INFANTS AND CHILDREN GROCERS ASSOCIATION, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>FOOD AND NUTRITION SERVICE,<br><br>Defendant. | MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 1:05-cv-02432-EGS<br>Judge Emmet G. Sullivan |

## INTRODUCTION

Defendant Food and Nutrition Service ("FNS") is entitled to judgment as a matter of law for the reasons already stated in defendant's Memorandum in Support of the Motion for Summary Judgment. Defendant respectfully submits this additional Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment in order to address specific points raised by the Plaintiffs' Motion for Summary Judgment.

The plaintiffs make a number of erroneous or immaterial statements regarding the factual and legal background of this litigation that merit clarification at the outset. First, to clear up linguistic confusion, plaintiffs' incorrectly state that "[t]he legislation refers to 'above 50 percent' vendors.' In reality, all of the members of this category are WIC-only stores." We have acquiesced in plaintiffs' use of "WIC-only" as synonymous with "above-50-percent," but in fact the above-50-percent category includes stores that serve non-WIC customers as well as WIC customers (and thus are not literally "WIC-only stores"). The Child Nutrition and WIC Reauthorization Act defines this category of suspect vendors to whom additional cost containment measures apply as vendors "for which more than 50 percent of the annual revenue of the vendor from the sale of food items consists of revenue from the sale of supplemental foods that are obtained with food instruments." 42 U.S.C. § 1786(h)(11)(D)(ii)(I)(aa). The record reveals that the FNS struggled a great deal with how to

identify above-50-percent vendors precisely because that was not a category that existed prior to this Act. (Vogel Decl. ¶ 9.) Previously, the FNS had only collected data on true "WIC-only" stores. (Id.) Thus, many parts of the record which refer to "WIC-only" stores are referring to a narrower category than "above-50-percent vendors."[1]

Second, plaintiffs summarize some of the supposed advantages of WIC-only stores, including easier food selection, special services provided by such stores, full redemption of food vouchers, convenient locations and a more "dignified shopping experience" generally. (Pls. SJ Mem. 4-9.). The most notable problem with these allegations is their immateriality to the question at hand. Even if taken to be true in their entirety, the supposed virtues of WIC-only stores (based on evidence not before Congress) can have no possible bearing on the question of whether Congress intended to require aggregate cost-neutrality or whether prior notice-and-comment procedures were required. At best, they constitute the plaintiffs' reasons for disagreement with Congress's decision to place greater importance on cost-containment to extend the WIC Program's benefits to greater numbers of needy women, infants and children, a matter that plaintiffs must take up with the Legislative Branch.

Third, plaintiffs cite a statement from the Chief Economist at the USDA for the proposition that WIC-only stores do not charge more than comparable stores. The memorandum from Keith Collins does show some concern regarding a few specific calculations in a draft of the regulatory impact analysis. (AR 01731.) Again, plaintiffs are merely expressing this disagreement with

---

[1]The email cited by plaintiffs, for example, notes that only about 1241 vendors were WIC-only stores, but estimates that about 2000 authorized vendors may be above-50-percent vendors. (AR 01831.) Because of the unprecedented nature of the "above-50-percent" category, the FNS and state agencies have been forced to deal with estimates (rather than data) on the number of vendors that will meet that criteria, but have consistently been conservative and rounded up the number of entities affected.

Congress's reasons for enacting the vendor cost-containment requirements of the WIC Reauthorization Act, which is not appropriately before this Court. While this memorandum does show some concern regarding a few specific calculations in a draft of the regulatory impact analysis, AR 01731, evidence of the higher prices charged by WIConly stores is abundant elsewhere in the record. See S. Rep. 108-279, at 54; Presentation by Zoe Neuberger, Center on Budget and Policy Priorities (Dec. 10, 2004) (AR 01540-01552); Burger, Carroll & Associates, Inc., Retailer Peer Grouping Study for Competitive Pricing (Dec. 30, 2003) (AR 00456-00466). If anything, the Collins memorandum provides support for the requirement of aggregate cost-neutrality because comparability alone would not check the higher costs associated with WIC-only stores when "above 50 percent vendors would be more heavily represented in higher average price places." (AR 01731.)

Finally, the plaintiffs claim, based on one sentence taken out of context from a single email, that the FNS did not seek input from state agencies in developing the interim rule on cost containment. The email as a whole shows, however, notwithstanding the apparent concern of one state that its input was ignored, that FNS was receptive both to questions and other input from the states. (AR 01837.) In other words, the intended answer to the question posed – whether USDA was "interested in obtaining the input of states" – was clearly yes. The record also provides other copious evidence of that the FNS sought and received input on the rule notonly from the states, but from vendor organizations as well. 70 Fed. Reg. at 71710 (prior consultation with state officials); Vogel Decl. ¶¶ 7-12 & attachments A1-A3, 16 (describing information and other input sought from states, and numerous meetings held with state agencies and vendor trade associations).

## ARGUMENT

## I.    THE INTERIM RULE IS WHOLLY CONSISTENT WITH THE WIC REAUTHORIZATION ACT

As defendant has shown, plaintiffs' contention that the cost-containment provisions of the interim rule, 7 C.F.R. § 246.12(g)(4)(i)(D), (g)(4)(vi), are inconsistent with the WIC Reauthorization Act, are without merit. The WIC Reauthorization Act mandates two complementary cost-containment requirements – aggregate cost-neutrality and comparability. (See Def. SJ Mem 5-7, 16-23.) Thus, Congress has spoken directly to the question at issue, the interim rule faithfully gives effect to both requirements, and the agency's action must be upheld under "Step One" of the Chevron analysis. (Id. at 16-19.) Insofar as plaintiffs raise new allegations under Chevron "Step Two", not contained in the complaint, that two other provisions of the interim rule are unreasonable, those allegations should not be considered, and in any event, are wholly meritless.

A.    **The Interim Rule Implements Two Complementary Cost Containment Measures, as Required by the Statute**

Plaintiffs argue that the aggregate cost-neutrality provision of the interim rule "renders meaningless" both "the peer grouping requirements of the statute" and the "prohibition on achieving lower food costs if participants shop at WIC-only stores" and thus is invalid under Chevron step one. (Pls. SJ Mem. 29-32.) This contention is meritless.

1.    Aggregate Cost Neutrality is Consistent with Peer Grouping

The plaintiffs' argument that the aggregate cost neutrality provision of the interim rule conflicts with the peer grouping requirements is amply refuted in the defendant's initial summary judgment memorandum, because the plain language of the statute's peer group provisions explicitly requires that peer grouping result in aggregate cost neutrality, see 42 U.S.C. § 1786(h)(11)(A)(III)(bb). Futhermore, the statutory section on peer grouping explicitly requires that above-50-percent vendors be distinguished from regular vendors in peer groups, see 42 U.S.C. § 1786(h)(11)(A)(i)(III)(aa) ("if the State agency elects to authorize any [above-50-percent vendors,

it must] distinguish between [above-50-percent vendors] and other vendors."). Thus, it cannot be said, as plaintiffs argue, that comparing the prices of WIC-only vendors to those of all other vendors somehow violates an implicit "comparability" principle in the statute's peer group provisions, when those provisions expressly require that WIC-only vendors be treated distinctly. It is plaintiffs' interpretation of the statute that renders meaningless one of its provisions; the aggregate cost-neutrality provision in section 1786(h)(11)(A)(i)(III)(bb) uses different language than the comparability requirement in section 1786(h)(11)(E) because it is intended to impose a different requirement, not the same one. The comparability requirement and the aggregate cost neutrality requirement impose two distinct and meaningful limits on program costs.

The FNS implements the aggregate cost neutrality requirement in regulatory section 246.12(g)(4)(i)(D) by requiring (in language that closely tracks the statutory language) that state agencies "ensure that the prices of above-50-percent vendors do not inflate the competitive price criteria and allowable reimbursement levels for the peer groups or result in higher total food costs if program participants transact their food instruments at above-50-percent vendors rather than at other vendors." Subparagraph (g)(4)(i)(D) goes on to describe the quarterly calculation that states must make to implement that requirement, namely a requirement that average payments to above-50-percent vendors not exceed average payments to regular vendors. This is no more and no less than what is required by the closely tracked statutory language requiring state agencies to "establish competitive price critieria and allowable reimbursement levels" that "do not result in higher food costs if program participants redeem supplemental food vouchers at [above-50-percent vendors] rather than at [regular vendors]." 42 U.S.C. § 1786(h)(11)(A)(i)(III)(bb). Notably absent from the statutory language is any qualifier on the regular vendors to whom above-50-percent vendors should be compared, and so the FNS quite rightly requires that WIC-only vendors be compared to all of

them.

The plaintiffs also assert that the comparability provision in the regulation, 7 C.F.R. § 246.12(g)(4)(vi), in fact imposes the same aggregate cost-neutrality requirement again and requires a comparison with all vendors rather than with comparable vendors. The plaintiffs are jousting with strawmen. Subparagraph (g)(4)(vi) is explicitly concerned with comparable vendors. Furthermore, in light of the plaintiffs' misinterpretation of that section, the FNS agreed during the course of the TRO proceedings to provide clarification to the states regarding the meaning of that section and has done so. (See Vogel Supp. Decl.) If ever plaintiffs had any legitimate basis for taking issue with this subparagraph, they have none now, unless their objective is to avoid any meaningful cost-containment requirements altogether.

Furthermore, plaintiffs' interpretation of the aggregate cost-neutrality language in the statute (importing the word comparable into section 1786(h)(11)(A)(i)(III)(bb)) creates an obvious and absurd loophole in the cost containment requirements. Section 1786(h)(11)(A)(i) gives states the option of establishing peer groups that contain *only* above-50-percent vendors. Thus, if subparagraph (h)(11)(A)(i)(III)(bb) only required that the average prices of above-50-percent vendors be limited to the average prices of other vendors in their peer groups, this section would impose no limit at all on the prices of above-50-percent vendors in states that elected the option of having WIC-only peer groups. Congress could not have intended to enact such an absurd loophole that would allow state agencies to evade the cost-neutrality requirements entirely.

2.    The Aggregate Cost Neutrality Requirement Does Not Force States to Achieve Lower Food Costs When WIC-Only Vendors are Authorized

Second, plaintiffs argue that the aggregate cost-neutrality requirement will force state agencies to achieve lower food costs if recipients choose to redeem benefits at above-50-percent

vendors, in asserted violation of the statutory prohibition in section 1786(h)(11)(A)(i).  Plaintiffs grossly mischaracterize the statutory prohibition, the aggregate cost-neutrality requirement and the effects of the interim final rule.

The last sentence of section 1786(h)(11)(A)(i) reads: "Nothing in this paragraph shall be construed to compel a State agency to achieve lower food costs if program participants redeem supplemental food vouchers at [above-50-percent] vendors rather than at vendors other than [above-50-percent vendors]."  Like the preceding subparagraph, this prohibition contains no phrase qualifying "vendors other than [above-50-percent vendors]." Thus, the most natural reading of the section is that overall, state agencies cannot be forced to achieve lower average prices at WIC-only vendors than the average prices at all other vendors.  Other sections of the statute do contain such qualifiers, such as sections 1786(h)(11)(B) ("for each peer group") and 1786(h)(11)(E) ("comparable vendors").  Cf. Russello v. United States, 464 U.S. 16, 23 (1983).  Nothing about the aggregate cost-neutrality provision of the regulation, § 246.12(g)(4)(i)(D), forces states to achieve lower food costs when participants shop at WIC-only vendors rather than other stores, only that the average payments for food items made to WIC-only vendors be no higher than the average payments for those items to other vendors.  Given the plain language of the statute, whatever impact the cost-neutrality requirement might have on plaintiffs' profitability, such effects are mandated by Congress.

Plaintiffs' citations to the legislative history are unavailing.  Only the extension of Congressman Boehner's remarks can be taken to import the concept of comparability into the cost-neutrality provision of section 1786(h)(11)(A)(i)(III)(bb).  As well as being of little probative value (Def. SJ Mem. 21-22 & n.12), such remarks are in conflict with the plain language of the statute, S. Rep. 108-279, at 55-56, 2004 U.S.C.C.A.N. 668, 717 (June 7, 2004), the Statement of Senator Harkin, 150 Cong. Rec. S7244-01, S7248 (June 23, 2004) (Statement of Sen. Harkin) (presenting

the WIC Reauthorization bill to the Senate), and even with the Statement of Maxine Waters, cited by the plaintiffs (Pls. Mem. Supp. Summ. J. 24 n. 22).

Furthermore, plaintiffs greatly exaggerate the effect on their business by continuing to insist that the interim rule requires (1) limiting the prices charged by any WIC-only store to the statewide average, and (2) limiting the prices charged by WIC-only stores to the prices of a superstore. The first statement is inaccurate because the prices of every WIC-only store are not limited to the statewide average. (See Vogel Decl. ¶ 16.) Rather, on average, payments to above-50-percent vendors should not exceed payments to regular vendors as a result of the peer groupings and maximum reimbursement levels chosen by the state. See 7 C.F.R. § 246.12(g)(4)(i)(D). That is a very different proposition. Thus, the maximum reimbursement level for one peer group consisting of above-50-percent vendors could be above the statewide average so long as overall the payments to above-50-percent vendors do not exceed that amount. The second assertion is both immaterial (given the statutory language) and inaccurate. While so-called big-box stores will influence the statewide average payment per voucher (especially in states where such stores are particularly popular and accessible), the statewide average is calculated by taking a weighted average of prices charged at all traditional vendors. See 70 Fed. Reg. at 71718; 7 C.F.R. § 246.12(g)(4)(i)(D). In the initial declaration of EAnn Robinson submitted in support of the TRO, she states that Oklahoma has required WIC-only stores to be competitive with supermarkets like Albertson's, but that nonetheless, her stores account for 11% of WIC redemptions in the State. (Robinson Decl. Supp. TRO ¶ 37.) In other words, WIC-only stores have succeeded in matching the prices even of large supermarkets, an even stricter standard than that required by the interim rule.

Plaintiffs essentially argue that there was no need for Congress to limit their average payment to the average payments of regular vendors, that it would be more fair to limit their average payments

only to the average payments of comparable regular vendors. It is clear, however, that Congress (and the agency) found that there are two different ways in which WIC-only stores drive up prices. First, they can exploit the customers' lack of price sensitivity in order to charge prices that are above-market, even as compared to other small stores. See S. Rep. 108-279, at 54; Presentation by Zoe Neuberger, Center on Budget and Policy Priorities (Dec. 10, 2004) (AR 01540-01552); Burger, Carroll & Associates, Inc., Retailer Peer Grouping Study for Competitive Pricing (Dec. 30, 2003) (AR 00456-00466). The plaintiffs' claims that they are personally unaffected by their customers' lack of price-sensitivity notwithstanding, the evidence is clear that such above-market pricing occurs.[2] Second, the absence of price-sensitivity of WIC customers means that WIC-only stores expand food sales at the most expensive end of the market. See S. Rep. 108-279, at 54 ("WIC-only stores tend to charge much higher prices for WIC food items than do regular grocery stores, resulting in significantly higher costs to the federal government and creating long-term cost-containment problems in the WIC program."); 70 Fed. Reg. at 71725 ("The growth of these stores, an increase from about 800 stores in 18 states in 2000 to over 1200 stores in 20 states in 2004, appears to have increased WIC food costs."); Burger, Carroll & Associates, Inc., Retailer Peer Grouping Study for Competitive Pricing (Dec. 30, 2003) (AR 00456-00466); Vogel Decl. ¶ 20. Thus, they not only draw customers from small, high-priced stores, but also draw customers from "superstores" and supermarkets. Congress specifically and explicitly acted to contain both of these adverse effects on program costs.

### B.    The Interim Rule Is Based on a Permissible Construction of the WIC Reauthorization Act.

---

[2]If above-market pricing as compared to comparable vendors did not occur, there would be no reason to establish the required comparison to comparable vendors that plaintiffs admit is mandated by the statute.

Notwithstanding that the interim rule is entirely consistent with the plain language of the WIC Reauthorization Act, plaintiffs maintain that the rule is not based on a permissible construction of the statute, and therefore must be invalidated under "Step Two" of the <u>Chevron</u> analysis.  This argument rests, in turn, on two assertions:  first, that the interim rule impermissibly requires the states to retroactively "recoup[ ] excess payments" from vendors (Pl. SJ Mem. at 33) (quoting 7 C.F.R. § 246.12(g)(4)(i)(D)); and, second, that it does not represent a reasonable interpretation of statutory requirements that state agencies consider "participant access in a *geographic area*" in establishing cost criteria and allowable reimbursement levels for vendor peer groups.  <u>Id</u>. at 35 (emphasis in original) (quoting 42 U.S.C. § 1786(h)(11)(C)(iii)).  Plaintiffs' argument fails for any (and all) of numerous reasons.

    1.   <u>Plaintiffs are not entitled to litigate their newly asserted retroactivity and "participant access" claims</u>**.**

As an initial matter, plaintiffs' claims that the interim rule requires unauthorized retroactive recoupment of benefits, and unreasonably interprets the Act's provisions regarding consideration of participant access, appear for the first time in their summary judgment brief.  Plaintiffs do not assert these claims in their complaint, which faults the rule solely for requiring comparisons of prices charged at WIC-only stores to the prices charged at all traditional (rather than comparable) vendors. (<u>See</u> Complaint, ¶¶ 58-62, <u>see also</u> <u>id</u>., ¶ 44.)  Because plaintiffs did not plead their retroactivity and "participant access" claims, but instead have raised them only now, at the summary judgment stage, they are not properly before the Court, and should be rejected.  <u>See</u> <u>Nat'l Treasury Employees Union v. Helfer</u>, 53 F.3d 1289, 1295 (D.C. Cir. 1995); <u>Baloch v. Norton</u>, 355 F. Supp. 2d 246, 261 (D.D.C. 2005) (citations omitted).  Plaintiffs should not be permitted to raise entirely new claims at the last minute when, under the compressed schedule of this litigation, defendants are given little more than

three days' time to respond to them.[3]

More fundamentally, plaintiffs are not entitled to litigate these claims because they have not established their Article III standing to raise them, and the claims, in any event, are not ripe. The requirement that litigants establish their standing to sue is "an essential and unchanging part of the case-or-controversy requirement" of Article III, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), and to meet "the irreducible constitutional minimum of standing," id.,"[a] plaintiff must allege personal injury [that is] fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984). At the summary judgment stage, those allegations must be supported "by affidavit or other evidence of specific facts" establishing plaintiffs' injury at the defendant's hands. Defenders of Wildlife, 504 U.S. at 561 (internal quotation marks and citation omitted).

Plaintiffs are not entitled to challenge the recoupment provisions of the rule as impermissibly retroactive, because they have neither asserted, nor established by any evidence of record, that any of the individual vendor plaintiffs, or any members represented by plaintiff NWGA, are currently

---

[3] Likewise, plaintiffs' assertion that the interim rule is arbitrary and capricious because "the preamble . . .offers no explanation of why FNS declined to compare WIC-only stores comparable vendors" in 7 C.F.R. § 246.12(g)(4)(i)(D) (Pl. SJ Mem. at 30 n.24) appears for the first time in their summary judgment brief, is not pled in the Complaint, and should therefore be rejected as not properly before the Court. In any event, "normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider," Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983), as indicated by the letter and intent of the agency's enabling statute. See, e.g., Arent v. Shalala, 70 F.3d 610, 616-17 (D.C. Cir. 1995); Environmental Defense Fund v. EPA, 852 F.2d 1309, 1313-14 (D.C. Cir. 1988). As noted above, § 1786(h)(11)(A)(i)(III)(BB), the provision of the WIC Reauthorization Act implemented by 7 C.F.R. § 246.12(g)(4)(i)(D), makes no reference to comparability. Indeed, it expressly requires that WIC-only stores be distinguished from other vendors -- even those in the same peer groups -- not treated the same as comparable vendors. Comparability, therefore, is manifestly not one of the "relevant factors" that Congress intended FNS to consider when implementing this provision of the statute, and the agency cannot be faulted, therefore, if it did not do so.

the subjects of, or have been imminently threatened with, an action for recoupment required by the interim rule. See Defenders of Wildlife, 504 U.S. at 560 (injury in fact must be "actual or imminent," not "conjectural or hypothetical," to satisfy the standing requirement). Likewise, they lack standing to challenge the rule on "participant access" grounds, as they have not even alleged, much less established, that any of them have been injured, or are imminently threatened with injury, because of a state's establishment of competitive price criteria or allowable reimbursement levels that do not give due consideration to participant access, or that such failure on the state's part is "traceable" to the provisions of the interim rule. It is immaterial, moreover, that plaintiffs arguably might have standing to challenge the price-comparison provisions of the rule, 7 C.F.R. § 246.12(g)(4)(i)(D), (g)(4)(vi). "Standing is not dispensed in gross . . . [A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." Lewis v. Casey, 518 U.S. 343, 358 & n.6 (1996).

Plaintiffs' retroactivity and "participant access" claims must also be rejected on prudential ripeness grounds. In deciding whether a case is ripe for review as a prudential matter, a court must examine the "'fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)). Plaintiffs' claims are not yet fit for decision because, at this time, only weeks after the interim rule took effect, and well in advance of any application of its recoupment or "participant access" provisions, "the challenged polic[ies] [are] not sufficiently fleshed out to allow the court to see the concrete effects and implications of [the agency's] decision . . .." Chamber of Commerce v. Reich, 57 F.3d 1099, 1100 (D.C. Cir. 1995); NTEU, 101 F.3d at 1432. Furthermore, plaintiffs have identified no genuine

12

hardship that would befall them if consideration of these claims were postponed, as they have raised no allegation, nor presented any evidence, that these provisions of the rule have any immediate "effect on the[ir] day-to-day business," Abbott Labs., 387 U.S. at 152, "command [them] to do anything or refrain from doing anything,"or "now inflict[ ] significant practical harm upon the interests that [they] advance[ ]." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998). Thus, the Court cannot entertain plaintiffs' retroactivity and participant access claims at this time, because they are prudentially unripe. Wyoming Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 38 (D.C. Cir. 1999).

> ## 2.    All Provisions of the Interim Rule are Reasonable Interpretations of the Statute.

Plaintiffs' retroactivity and "participant access" claims fail in any event on the merits.  As an initial matter, contrary to plaintiffs' assertion, the interim final rule is entitled to Chevron deference.  See Barnhart v. Walton, 535 U.S. 212, 221 (2002) ("the fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due.") (internal citation omitted).  The controlling case on the issue of when Chevron deference is due specifically notes that notice-and-comment rulemaking is not determinative of whether deference is due; the Court has "found reasons for Chevron deference even when no such administrative formality was required and none was afforded." United States v. Mead Corp. 533 U.S. 218, 231 (2001).  Rather, "administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Mead, 533 U.S. at 226-2.  In the WIC Reauthorization Act, Congress expressly

13

delegated authority to the agency to promulgate these regulations, see Pub. L. 108-265, Tit. V, § 501(b), 118 Stat. 789 (June 30, 2004) (codified at 42 U.S.C. § 1758 note), and the interim final rule is an exercise of that authority, see Preamble to Interim Rule, 70 Fed. Reg. at 71708.

a. <u>The Interim Rule Does Not Mandate Retroactive Recoupments</u>

The first new <u>Chevron</u>-step-two argument presented by plaintiffs is that the interim final rule supposedly mandates retroactive recoupment of payments to WIC-only vendors, a mandate allegedly in excess of the FNS's statutory authority. The regulatory language at issue is that which directs states that are not in compliance with the aggregate cost neutrality requirement to "take action to ensure compliance" including "recouping excess payments." 7 C.F.R. § 246.12(g)(4)(i)(D). Plaintiffs are once again tilting with strawmen. As the FNS has maintained all along and has expressly advised the states, this section of the rule does *not* permit states to retroactively impose new cost criteria or allowable reimbursement levels on WIC-only vendors by recouping payments, which wehn made, were within the then-existing maximum reimbursement range. (Suppl. Vogel Decl.) The agency's interpretation of its own rule is entitled to controlling weight. <u>See</u> <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994) (holding that agency's interpretation of its own regulation is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation").In other words, plaintiffs' assertion that this provision has retroactive effect is just wrong.[4]

_____

[4]As an aside, plaintiffs mention that the interim rule allows "retroactive payments from the states." There is no citation or explanation for this statement, but it may refer to the heretofore unchallenged sentence of the rule that says "[i]f FNS determines that a State agency has failed to ensure that above-50-percent vendors do not result in higher costs to the program than if participants transact their food instruments at regular vendors, FNS will establish a claim against the State agency to recover excess food funds expended and will require remedial action." 7 C.F.R. § 246.12(g)(4)(i)(D). If plaintiffs mean to argue that this portion of (g)(4)(i)(D) is also impermissibly retroactive, they face additional barriers. First, they cannot

b. <u>Geography and Participant Access</u>

The plaintiffs further argue the interim rule fails to reasonably implement the statute's direction that state agencies "consider participant access by geographic area" for the purposes of determining competitive price criteria and allowable reimbursement levels. <u>See</u> 42 U.S.C. § 1786(h)(11)(B)(ii), (C)(iii). This argument, too, is just wrong. The interim rule directly implements this requirement by closely tracking the language of the statute. In section 246.12(g)(4), it directs that "[i]n establishing competitive price criteria and allowable reimbursement levels, the State agency must consider participant access by geographic area," just as stated in the statute. The preamble to the interim final rule confirms the importance of participant access and makes specific suggestions as to how a state agency should proceed if there are no alternative vendors in the area with prices that meet the State agency's competitive price selection criteria. 70 Fed. Reg. at 71717.

To support their argument, the plaintiffs mistakenly point to a different provision of the interim rule that requires consideration of geography for the separate purpose of establishing vendor peer groups. Pls. SJ Mem 35-36 (citing 7 C.F.R. § 246.12(g)(4)(ii)(A) (directing state agencies to use "[a]t least two criteria for establishing peer groups, one of which must be a measure of geography, such as metropolitan or other statistical areas that form distinct labor and products markets")). This is wholly separate from and in addition to the direction to consider participant

_____

possibly establish standing to bring a claim on behalf of the states who might in the future face a claim. Second, the establishment of a claim against the state for failing to keep the WIC-only stores cost-neutral is not "retroactive" within the meaning of <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 208 (1988), because it does not apply to payments made before the effective date of the statute. The state agency's statutory obligation as of December 30, 2005 is to maintain cost neutrality, an obligation which the FNS will thereafter enforce. Excess monies spent by the state are illegally spent under federal law. Finally, the statute provides the FNS ample power to recover illegally spent monies from states. <u>See</u> 42 U.S.C. § 1786(f)(10) (explicitly allowing the agency to taken action against states, including to "withhold such amounts of the State agency's funds for nutrition services and administration as the Secretary deems appropriate.").

15

access in a geographic area set forth in section 246.12(g)(4)(i).

Thus, both of plaintiffs' contentions that the interim rule is based on unreasonable interpretations of the WIC Reauthorization Act fail on their merits as well. Defendant is therefore entitled to summary judgment on plaintiffs' substantive statutory claims.

## II.  THE FNS DID NOT VIOLATE THE APA BY PROMULGATING AN INTERIM FINAL RULE

The plaintiffs argue that the FNS violated the notice-and-comment provisions of the APA by making the interim regulations effective withour prior opportunity for public comment. The FNS, however, properly exercised its discretion to override its policy preference for prior notice and comment in light of explicit Congressional authorization to do so, and other considerations supporting a "good cause" determination.

### A.     The Cases Cited by Plaintiffs are Distinguishable

The plaintiffs argue that "the 1971 Federal Register notice fully binds USDA to compliance with the procedural notice-and-comment demands of the APA." (Pl. Mem. Supp. Summ. J. 19.) Both cases cited by the plaintiffs, however, expressly note that the agency is NOT bound by the APA (which contains exceptions for grants and benefits) but by its own policy statement. See Sugar Cane Growers Coop. of Fla. v. Veneman, 289 F.3d 89, 95 (D.C. Cir. 2002); Rodway v. USDA, 514 F.2d 809, 813 (D.C. Cir. 1975). Thus, the usual standard of review of an agency's interpretation of its own policy should apply. See TRT Telecommunications Corp. v. FCC, 857 F.2d 1535, 1552 (D.C. Cir. 1988) (holding that "judicial deference is quite high in respect" of "the FCC's interpretation and administration of its own procedural rules . . . , as befits the orderly and appropriate relationship which should obtain between an independent agency and the courts.")

The plaintiffs argue that because Rodway states that the USDA "essentially waived" the APA

exemptions, the USDA has somehow managed to rewrite the APA and made it impossible for Congress to override the notice-and-comment requirements without an express citation to the APA. Under the plaintiffs' interpretation, the USDA has adopted a policy statement that has greater force than a subsequent Congressional enactment. Of course, Rodway stands for the far less extraordinary proposition that an agency cannot ignore its own rules on a whim. In Rodway, the agency developed no record and offered no prior explanation whatsoever for its failure to provide notice and comment. 514 F.2d at 814. Similarly, in Sugar Cane Growers, the USDA claimed that the challenged provision was not a rule at all and thus offered no prior explanation for foregoing notice and comment. 289 F.3d at 95-96. In neither case did the agency make a good cause determination or rely upon explicit Congressional authority to issue an interim final rule.

As noted in Philadelphia Citizens in Action v. Schweiker, 669 F.2d 877, 885-86 (3d Cir. 1982), an agency policy statement on notice and comment is entitled to less weight than a statute, and Congress should not have to expressly cite an agency policy statement in order to override it. This Court should still find that the explicit Congressional authorization to issue an interim final rule trumps an earlier, general agency policy statement to the contrary.

Regarding the good cause determination, plaintiffs criticize the length of time it took for the FNS to complete its work on the rule (Pls. SJ Mem. 13), but have offered no evidence to call into question FNS's diligent efforts to develop the rule and have not questioned (nor could they) the need to provide regulatory guidance to the states in time for the December 2005 effective date of the statute. As discussed at length in the Defendant's Memorandum in Support of Summary Judgment, both can be grounds for a determination of good cause to forego prior notice and comment. See, e.g., Council of Southern Mountains, Inc. v. Donovan, 653 F.2d 573, 581 (D.C. Cir. 1981) (noting among other factors that the agency acted "diligently" and "resourcefully" to complete the necessary

research and analysis); American Federation of Government Emp., AFL-CIO v. Block, 655 F.2d 1153, 1157 (D.C. Cir. 1981) ("absence of specific and immediate guidance from the Department in the form of new standards would have forced reliance by the Department upon antiquated guidelines, thereby creating confusion among field administrators"). This is not a case implicating the courts' concern that an agency might "simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures." See Council of Southern Mountains, Inc., 653 F.2d at 581. Rather, the FNS began immediately upon enactment of the statute to gather data and information needed in order to develop the rule, and thereafter continued diligently to work to complete the rule in the short amount of time provided. (See generally Vogel Decl.)

**B.    The FNS Properly Exercised its Discretion to Forego Notice and Comment Prior to the Effective Date**

The plaintiffs' argument against the FNS's good cause determination challenges only the adequacy of relying on the Congressional language expressly granting such authority. The plaintiffs' position rests entirely upon the idea that, in other statutes, Congress has specifically mandated the issuance of an interim rule pursuant to which public comment should be sought. Such statutory citations do not amount to precedent for the proposition that Congress cannot grant the agency the discretion to forego prior notice and comment in other terms. As defendant has explained, an "interim final rule," with or without further elaboration, is inherently to be distinguished from a proposed rule requiring public notice and comment before it may become effective. (Def. SJ Mem. 28-30 & n. 17 (citing Asiana Airlines v. FAA, 134 F.3d 393, 398 (D.C. Cir. 1998))

Nor have the plaintiffs attempted to explain what else Congress may have meant by its direction that the agency "may promulgate interim final regulations to implement the [Act]." Pub.

L. 108-265, Tit. V, § 501(b), 118 Stat. 789 (June 30, 2004) (codified at 42 U.S.C. § 1758 note).  As should be evident, "the word 'may' clearly connotes discretion."  Martin v. Franklin Capital Corp., 126 S. Ct. 704, 709 (2005) (internal quotation marks omitted).  Congress thus uses the word "may" in order to commit a decision to the sound  discretion of the agency.  See, e.g., Dickson v. Secretary of Defense, 68 F.3d 1396, 1401 (D.C. Cir. 1995) ("When a statute uses a permissive term such as "may" rather than a mandatory term such as 'shall,' this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show deference to the agency's determination."); Shell Oil Co. v. EPA, 950 F.2d 741 (D.C. Cir. 1991) ("the provision's use of the permissive word 'may' guarantees the EPA's discretion in the civil enforcement arena."); Zhu v. INS, 300 F.Supp.2d 77, 81 (D.D.C. 2004) ("the use of the word 'may' creates a presumption of discretion under normal rules of statutory interpretation.").  Thus, if the FNS's discretionary decision to promulgate and interim final rule is to be reviewed at all, it should be reviewed for abuse of discretion.  Given an undisputed record of the agency's diligent efforts to complete its work, this Court should find that the agency acted well within its authorized discretion in promulgating an interim rule.

Here, Congress intended to give the agency the discretion to issue an "interim final regulation," i.e., an effective regulation pursuant to which public comment could be sought.  In lieu of any alternative explanation of what an "interim final rule" might be or what other discretion the Act confers, the plaintiffs have taken the wholly untenable position that this provision of the WIC Reauthorization Act is mere surplusage, which confers upon the agency no additional discretion because it is trumped, so plaintiffs remarkably assert, by the USDA's 1971 policy statement.  It should go without saying that Congress's legislative authority cannot be subordinated in this fashion to an agency policy statement.

19

III.    **PLAINTIFFS' CLAIM UNDER THE REGULATORY FLEXIBILITY ACT
         IS MERITLESS.**

     A.    **Under the Settled Law of This Circuit, the RFA Does Not Mandate Analysis of
             a Rule's Impact on Small Entities That Are Not Directly Regulated by the Rule.**

As defendant has already shown, plaintiffs' RFA claim must fail because, under the terms

of the statute, and controlling D.C. Circuit authority, the RFA does not apply to the circumstances

of this case. (Def. SJ Mem. at 37-40.) In any event, the RFA analysis that the FNS performed, of

its own accord, satisfied all of the RFA's requirements. (Id. at 40-45.)

As the D.C. Circuit has consistently held now for more than 20 years, see Mid-Tex Elec.

Coop. v. FERC, 773 F.2d 327, 342 (D.C.Cir.1985), and most notably in American Trucking Ass'n

v. EPA, 175 F.3d 1027, 1045 (D.C. Cir. 1999), rev'd in part on other grounds, Whitman v. American

Trucking Assoc., 531 U.S. 457 (2001), the RFA does not require an agency to assess the impact of

a rule on small entities that are not directly regulated by the rule. (See Def. SJ Mem. at 39 (and

additional authorities cited therein)). That is the situation here: the interim rule places detailed

obligations on state agencies, to ensure their compliance with the cost-containment requirements

imposed on them by the statute. The rule places no regulatory obligations whatsoever on WIC

vendors, and it is immaterial to the RFA's applicability that rule may be "target[ed]" at or ultimately

"intended to affect" the economic behavior of small entities such as plaintiffs. Cement Kiln

Recycling Coalition v. EPA, 255 F.3d 855, 869 (D.C. 2001).[5]

Plaintiffs do not even acknowledge these precedents, much less attempt to give any reason

why they do not control the question of the RFA's applicability in this case. They merely suggest

---

    [5] As defendant has also shown, the RFA also does not apply here because neither the
APA, 5 U.S.C. § 553, nor any other "law," required FNS to engage in notice-and-comment
rulemaking prior to issuing the interim rule. (See Def. SJ Mem. at 38 & n.21; Def. TRO Opp. at
22-25.)

that the statute may be enforced against FNS on the ground that the agency "conceded the applicability of the RFA" by including an RFA analysis in the preamble to the interim rule.  (Pl. SJ Mem. at 23.) That argument is also foreclosed by precedent.  In <u>Cement Kiln</u>, the Environmental Protection Agency, like FNS here, performed an RFA analysis that it "did not believe the statute required" but conducted all the same "in the 'spirit' of the RFA."  255 F.3d at 868.  Nonetheless, on appeal, the D.C. Circuit rejected the petitioners' claims concerning the sufficiency of the EPA's analysis, on the settled ground that the RFA required no analysis in the first place as to small entities that were not subject to (but only indirectly affected by) the regulation in question.  <u>Id</u> at 869.  This Court should rule likewise in the case at bar.

**B.**     **Even if the RFA Applied, FNS Properly Certified That the Interim Rule Will Have No Significant Economic Impact on a Substantial Number of Small Entities.**

Even in cases to which the RFA would otherwise apply, the statute provides that its requirements are not applicable where "the head of the agency certifies that the rule will not . . . have a *significant* economic impact on a *substantial* number of small entities."  5 U.S.C. § 605(b) (emphasis added).  Having decided in this instance to undertake an RFA analysis on its own initiative, FNS concluded and properly certified, in the words of the statute, that it "does not believe that th[e] rule will have a *significant* economic impact on a *substantial* number of small entities." 70 Fed. Reg. at 71709 (emphasis added).  (<u>See</u> Def. SJ Mem. at 40-43.)  Although plaintiffs make no effort to explain why the RFA applies at all in this case, they purport to take issue with FNS's certification of no significant impact.  The attempt fails, however.

As the D.C. Circuit has explained, because the RFA is "*[p]urely* procedural" in nature, "it requires nothing more than that the agency file [an RFA analysis] demonstrating a reasonable, good faith attempt to carry out [RFA's] mandate."  <u>U.S. Cellular Corp. v. FCC</u>, 254 F.3d 78, 88 (D.C. Cir.

2001) (internal quotation marks and citation omitted; emphasis and first alteration added).  Plaintiffs

maintain that FNS's certification is "erroneous and unreasonable," however, on two grounds.  (Pl.

SJ Mem. at 24)  First, they argue that FNS's certification is contradicted by its own statement that

the rule "may have a significant economic impact on a *small* number of vendors."  (Pl. SJ Mem. at

23, quoting 70 Fed. Reg. at 71709.)  There is no contradiction, however, between acknowledging

that the rule might have a significant impact on a "small number" of vendors, and the agency's

conclusion that it nonetheless will not have a significant impact on a "substantial number" of

vendors.  Id.

Plaintiffs also focus on FNS's estimates that "between three and four percent of the

approximately 45,000 authorized vendors," as many as 1,800 stores, "will need to make changes in

th[eir] prices" as a result of the rule, id., and that "WIC-only vendors represent[ ] about 2.5 percent

of all WIC vendors," approximately 1,125 stores.  Id. at 71725.  It is unreasonable, plaintiffs state,

to conclude that this number of stores constitutes a "small number of entities."  (Pl. SJ Mem. at 24.)

Yet again, however, plaintiffs have mischaracterized FNS's conclusions.  As defendant has now

twice explained, see Def. SJ Mem. at 41; Def. TRO Opp. at 28, FNS never concluded or stated that

the interim rule would have a *significant* impact on 2.5, 3, or 4 percent of WIC vendors.  Three-to-

four percent represents the agency's estimate of the number of WIC vendors that would have to

"make changes" of any kind in their prices, no matter how trivial or insignificant.  That is to say, it

is the number of small entities, in FNS's estimation, on which the rule would have any impact, not

necessarily a significant one.  Nor, therefore, did FNS base its finding of no significant impact, as

plaintiffs assert, on a conclusion that 1,100 to 1,800 vendors is an *in*substantial number of small

entities.  (Pl. SJ Mem. at 24.)  Rather, it is based on the agency's determination that the rule will

have a *significant* impact on only a small number of these 1,100 to 1,800 entities.  Thus, plaintiffs

have demonstrated no grounds for even questioning that FNS made "a reasonable, good faith attempt to carry out [RFA's] mandate," U.S. Cellular Corp., 254 F.3d at 88, when it determined that the rule would have no significant economic impact on a substantial number of small entities.[6]  Their RFA claim must fail on this ground, as well.

## C.    The Agency's Regulatory Flexibility Analysis Met All of the RFA's Requirements

Defendant also has shown that the preamble to the interim rule, taken together with the regulatory impact analysis appended thereto, satisfies all of RFA's requirements for a regulatory flexibility analysis under 5 U.S.C. § 604(a).  See Def. SJ Mem. at 43-45; 5 U.S.C. 605(a) (an RFA analysis may be performed "in conjunction with or as part of any other agenda or analysis required by any other law").  Plaintiffs, who focus their argument exclusively on defendant's certification of no significant impact under § 605(b), make no effort whatsoever to contest the sufficiency of defendant's analysis under §604(a).  For this reason as well, defendant is entitled to summary judgment on plaintiffs' claim under the RFA.

## IV.    THE APPROPRIATE REMEDY FOR THE ALLEGED ERRORS IS NOT VACATUR OF THE ENTIRE INTERIM RULE

In their memorandum supporting summary judgment, plaintiffs argue that, in the event that this Court finds that the rule was improperly issued without proper notice and comment or without

---

[6]For this very reason, plaintiffs' reliance on Nat'l Ass'n of Psychiatric Health Sys. v. Shalala, 120 F. Supp. 2d 33 (D.D.C. 2000) ("NAPH"), is entirely misplaced.  What the Court found to be "'severely lacking'" in that case, Pl. SJ Mem. at 24 (quoting id. at 43), was the agency's RFA analysis of its final rule under 5 U.S.C. § 604(a).  The Court had nothing to say about the agency's earlier finding, under § 605(b), that its proposed rule would have no significant impact on small businesses; indeed, that certification was uncontested by the plaintiffs.  See NAPH, 120 F. Supp. 2d at 43.  Accordingly, this precedent lends no support whatsoever to plaintiffs' position.

an RFA, the Court must vacate the entire rule. (Pls. SJ Mem. 37-39.)  In fact, however, plaintiffs

must first establish standing as to each remedy sought and prejudice as to each failure to provide

notice and comment, and even then vacatur is not necessarily the appropriate remedy.

### A.     Plaintiffs Lack Standing to Seek Wholesale Vacatur of the Interim Rule

As discussed above, Article III standing "is not dispensed in gross."  Lewis v. Casey, 518

U.S. 343, 358 n. 6 (1996); see also Natural Resources Defense Council v. Pena, 147 F.3d 1012 (D.C.

Cir. 1998).  Thus, "the right to complain of one administrative deficiency" does not "automatically

confer[] the right to complain of all administrative deficiencies."  Id.  Rather, for each and every

form of relief sought, a plaintiff must demonstrate standing, see Friends of the Earth, Inc. v. Laidlaw

Environmental Services, Inc., 528 U.S. 167, 185 (2000), and "[t]he remedy must of course be limited

to the inadequacy that produced the injury in fact that the plaintiff has established."  Lewis, 518 U.S.

at 357.  Although standing to bring a notice-and-comment claim does not require proof that the rule

would be different had notice and comment been followed, Sugar Cane Growers Coop, 289 F.3d at

95, it does require both pleading and proof that the challenged provision caused an injury-in-fact,

see Defenders of Wildlife, 504 U.S. at 573 (an individual can only enforce procedural rights if "the

procedures in question are designed to protect some threatened concrete interest of his that is the

ultimate basis of his standing").

The plaintiffs cannot begin to establish standing to challenge each and every provision of the

interim rule.  Indeed, the only portion of the regulation from which they have begun to even allege

an injury-in-fact is section 246.12(g)(4)(i)(D), which implements the aggregate cost-neutrality

requirement.  They may argue (but have not proven) that the promulgation of that portion of the

regulation without prior public comment results in economic hardship to their businesses.  The scope

of the rule, however, goes well beyond the plaintiffs' concerns with the agency's interpretation of

cost neutrality. For example, the rule implements both the requirement from 42 U.S.C. § 1786(h)(11)(A) that states establish peer groups for all authorized vendors and the requirement from section 1786(h)(11)(E) that the FNS certify that average payment per voucher to aobve-50-percent vendors not exceed average payments per voucher to comparable vendors. The plaintiffs have not plead any injury caused by the promulgation of either of those requirements without notice and comment.[7] Plaintiffs should not be permitted to exploit their asserted injury from one provision of the rule to frustrate entirely the Congressional objectives of cost-containment that the rule is intended to implement.

**B.    Failure to Provide Notice and Comment Does Not Require Vacatur Where the Plaintiffs Have Not Alleged Prejudice**

The harmless error doctrine requires that the plaintiffs demonstrate some prejudice from the failure to provide notice and comment in order to obtain relief under the APA. See PDK Laboratories Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.") That standard is not particularly demanding in this context. See Sugar Cane Growers Coop. v. Veneman, 289 F.3d 89, 96 (D.C. Cir. 2002); McLouth Steel Products Corp. v. Thomas, 838 F.2d 1317, 1324 (D.C. Cir. 1988). Nonetheless, the courts will find that an error is harmless where the agency's approach is "the only reasonable one," Sheppard v. Sullivan, 906 F.2d 756, 761-62 (D.C. Cir. 1990), or where the agency "had adequate and independent grounds" for its approach, Steel Manufacturers Ass'n v. EPA, 27 F.3d 642, 649 (D.C. Cir. 1994). Cf. New Jersey v. EPA, 626 F.2d 1038, 1050 (D.C. Cir. 1980) (setting aside only challenged portions of the

---

[7]Indeed, the plaintiffs spend some time in their brief arguing that the comparability requirement does NOT adversely affect their businesses.

regulations even though the entirety was issued without notice and comment).

There is no conceivable way that plaintiffs could demonstrate "prejudice" from those portions of the rule which they concede are mandated by the statute, such as the requirement to establish peer groups for all authorized vendors, or the comparability requirement of section 246.12(g)(4)(vi). The plaintiffs have not, and cannot, demonstrate prejudice from either of these requirements as enforced in the interim rule because they merely implement the statutory mandate. The only provision of the rule as to which the plaintiffs have advanced any argument at all of unreasonability (or even of a desire to change it) is 7 C.F.R. § 246.12(g)(4)(i)(D), and if this Court should agree with the agency that such provision faithfully executes the statute, failure to provide notice and comment as to this provision would also be harmless.[8] Thus, even if this Court finds that notice-and-comment procedures were required prior to the effective date of the interim rule, the error is harmless as to large portions of the rule, and the Court should not prevent enforcement of those portions of the rule mandated by the statute.

C.    **Even if this Court Finds Prejudicial Error, Vacatur is an Unnecessary and Unduly Burdensome Remedy**.

Even when prejudice is shown, the D.C. Circuit has "commonly remanded without vacating an agency's rule or order" whether "the failure lay in lack of reasoned decision making," International Union, United Mine Workers v. Federal Mine Safety & Health Admin., 920 F.2d 960, 966-67 (D.C. Cir. 1990), or in failures to observe the procedures required by law, Sugar Cane

_____

[8]For the first time in the Plaintiffs' Motion in Support of Summary Judgment, the plaintiffs make two additional allegations regarding the reasonableness of the rules, neither of which is contained in the complaint: that the rule unreasonably authorizes retroactive sanctions and that the rule unreasonably implements the geographic area requirement. Even if these arguments could reasonably be construed to be issues about which plaintiffs would have made comments, they are wholly meritless for the reasons described above and cannot possibly underlie a showing of prejudice.

Growers, 289 F.3d at 97-98.  In the exercise of its discretion, the Court should consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." United Mine Workers, 920 F.2d at 966-67.   United Mine Workers and similar cases recognize the commonsense position that procedural and even substantive flaws in agency decisionmaking should not compel vacatur when the potential disruption is not justified by the likelihood that a fatal error was committed.  See also Sugar Cane Growers, 289 F.3d at 97-98 (refusing to vacate rules where notice and comment was improperly omitted because vacatur would not avoid the harms allegedly caused by the rule and would invite regulatory chaos); Rodway, 514 F.2d at 817-18 (remanding without vacating food stamp allotment regulations because of their "critical importance . . . to the functioning of the entire food stamp system," and ordering notice and comment on the challenged rule within 120 days); Western Oil and Gas v. EPA, 633 F.2d 803, 813 (9th Cir. 1980) (noting that the Court's "intervention into the process of environmental regulation" could have unpredictable negative consequences and "should be accomplished with as little intrusiveness as feasible," and holding that remand without vacatur was appropriate in order "to avoid thwarting in an unnecessary way the operation of the Clean Air Act . . . during the time the deliberative process is reenacted").

Thus, in United Mine Workers, the court permitted an order relaxing safety precautions at a mine to stand while the agency reevaluated its findings.  920 F.2d at 963-65.  The court did so despite finding substantive flaws in the agency's reasoning.  Id. at 964-66.  Nevertheless, the court reasoned that because there was "no basis for concluding that the deficiencies of the order will prove substantively fatal" the order should stand while the agency reconsidered.  Id. at 967.  And it reached that conclusion even though there was no evidence that vacatur would have substantially disrupted mine operations, thus making vacatur more workable.  Id.

Considerations supporting remand without vacatur in this case include the necessity for immediate state compliance with the statute's requirements, the pressing public interest in having some regulation in place, and the flexible nature of the current interim rule.[9]  The statute mandates that state agencies comply with the statutory cost-containment measures as of December 30, 2005. See 42 U.S.C. § 1786(h)(11)(G).  That compliance date is not contingent upon any action by the FNS.  The December 30 date has two implications here.  First, the harms alleged by plaintiffs cannot be avoided by vacatur of the rule.  Especially if this Court upholds the FNS's interpretation of the statutory cost containment provisions, the state agencies are legally obligated to comply with those statutory provisions regardless of the effectiveness of the interim rule.  Even if this Court does not uphold the rule substantively, state agencies are under an obligation to interpret those provisions themselves and attempt to comply.[10]  The only harms identified by plaintiffs are a direct result of state compliance with the statutory mandate.

Second, the December 30 compliance date is itself a compelling reason for having an effective rule in place pending further agency decisionmaking.  Courts have frequently found remand to be sufficient when the challenged rule was important for effectuating Congressional intent, or where a particularly important interest was implicated.  See, e.g., Rodway, 514 F.2d at 817-18;

---

[9]All of the reasons supporting a good cause determination in the defendant's initial memorandum also support a finding that remanding without vacatur is appropriate.  (Def. Mem. Supp. Summ. J. 27-37.)  Thus, even if this Court finds that there was no good cause to forego prior notice and comment based on those considerations, it could hold that those factors nonetheless prove a need to have some rule in place and order notice and comment procedures to be completed expeditiously.

[10]Indeed, there is some reason to believe that states acting without federal guidance will crack down on above-50-percent vendors MORE harshly if acting without federal guidance. When regulations go into effect, state agencies will be subject to corrective action by the FNS if they have failed to comply with the cost containment provisions of the statute, giving states every reason to protect their bottom line.

Western Oil and Gas, 633 F.2d at 813. The disruptive consequences of having no vendor cost containment rule in effect despite the compliance requirement would be substantial. State agencies must comply with the statute's cost-containment measures and demonstrate their compliance to the FNS in order to receive WIC grants. See 42 U.S.C. § 1786(f)(1)(C)(i). The interim rule comprises the FNS's standards and procedures for that determination. Without an effective rule in place, state agencies will be without guidance as to how they should implement the statute's requirements in a fair and effective manner consistent with Congress's intent, and as to how to demonstrate their complianceto the FNS. Similarly, the FNS has no fair, effective and objective way to go about assessing state compliance.

Even more compelling than the resulting regulatory uncertainty is the frustration of the purpose of both Congress and the FNS in maximizing the number of eligible women and children who can receive benefits under the program. Because WIC is not an entitlement program which can assure available funds, every extra dollar spent underwriting the above-market profits of WIC-only vendors (while the rule preventing such underwriting is subject to further agency decisionmaking procedures) is a dollar better spent – so Congress has determined – actually feeding eligible women and children. See Vogel Decl. ¶ 20.

A final consideration counseling against vacatur is the flexibility of the interim rule. When courts have vacated rules due to failure of notice and comment, they have done so to ensure that the agency in question keeps an "open mind" about the matter at hand. See, e.g., Spirit of the Sage Council v. Norton, 294 F.Supp.2d 67 (D.D.C. 2003). The interim vendor cost containment rule, however, is designed to provide maximum flexibility in implementation of the statutory requirements and specifically to be a rule pursuant to which comment is taken and future changes made; the FNS's plan to be flexible and make future changes to the rule is reiterated throughout the preamble to the

final rule.[11]  Thus, bureaucratic inertia or ego is not implicated by public comment and criticism on

the rule; public comment and revision has been the FNS's practice and the FNS's plan.   See also

Petry v. Block, 737 F.2d at 1203 (holding that any presumption against a "late" comment period may

be overcome by proof that agency has been open-minded in accepting comments regarding the

interim rule); Universal Health Servs. Inc. v. Sullivan, 770 F. Supp. 704, 721 (D. D.C. 1991) (finding

that "the Secretary's failure to engage in pre-promulgation notice and comment was at least partially

cured by allowing the opportunity for post-promulgation comment").[12]

_____

[11]See, e.g., 70 Fed. Reg. at 71708 ("the rule gives State agencies flexibility to design cost
containment practices"; "FNS may develop further regulations and guidance to improve WIC
vendor cost containment"); at 71709 ("FNS will be collecting and analyzing data";"we plan to
collect data on the implementation of this interim final rule and the options states select"; "this
rule sets forth principles to guide State agency efforts, while allowing State agencies the
flexibility to meet the legislative requirements through a variety of acceptable approaches"); at
71714 ("FNS believes that State agencies will continue learning and adopting more efficient
ways of containing food costs"; "this interim rule continues to allow State agencies broad latitude
in establishing peer groups").
     Furthermore, the FNS has already demonstrated its receptivity to comments.  See Vogel
Decl. ¶ 16 (describing particular change made to the rule as a result of the distribution of draft
guidance) ¶ 12 (describing substantive advice taken from meeting with representatives of WIC
vendors).  Indeed, as a result of misinterpretations of the rule in the course of this litigation, the
FNS has clarified to state agencies that the interim rule was not intended to authorize retroactive
recoupment.  (Suppl. Vogel Decl.)

[12]The same considerations apply even if the interim rule is found to be substantively
deficient. The D.C. Circuit has repeatedly allowed remand without vacatur even if the rule is
found to be substantively deficient.  See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Com'n,
988 F.2d 146 (D.C. Cir. 1993) (citing cases and refusing to waive fee-assessment rule despite
holding that agency had failed to adequately explain differences between exempt and non-exempt
entities because it was "conceivable" that an explanation existed; court merely remanded for
further consideration without vacating the rule).  See also Advocates for Highway and Auto
Safety v. Federal Motor Carrier Safety Admin., 429 F.3d 1136, 1152 (D.C. Cir. 2005)
(remanding rather than vacating substantively deficient rule based on balancing of the interests);
U.S. Telecom Ass'n v. F.B.I., 276 F.3d 620, 627 (D.C. Cir. 2002) (remanding to the agency "for a
more adequate explanation"); County of Los Angeles v. Shalala, 192 F.3d 1005 (D.C. Cir )
(finding no "rare circumstances" that would warrant a break with the "established administrative
practice" of remanding without vacating); Fertilizer Inst. v. United States Environmental
Protection Agency, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (despite holding that agency

In short, vacatur is not appropriate unless there is near certainty that the agency cannot ultimately correct the procedural, or even substantive, flaws in its order, and unless there will be little disruption caused by vacating the rule.  Since none of these criteria is met here, the proper procedure is to leave the interim rule in place while permitting the agency to correct any shortcomings in its decisionmaking process.  United Mine Workers, 920 F.2d at 967; see also Allied Signal, Inc. 988 F.2d at 150-51; Fertilizer Inst., 935 F.2d at 1312.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Plaintiffs' Motion for Summary Judgment be denied, and that its own motion be granted.

Dated:   January 20, 2006                    Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

JAMES J. GILLIGAN
Assistant Director, Federal Programs Branch

/s/ Amy E. Powell
AMY E. POWELL
Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W. Rm. 7217
Washington, D.C. 20530
Telephone:     (202) 514-9836
Facsimile:     (202) 616-8202
Email:         amy.powell@usdoj.gov

Attorneys for Defendants

---

substantively misinterpreted governing statute, the court permitted the challenged regulation to stay in place while the agency reconsidered because vacatur would seriously disrupt the EPA's ability to respond to actual emergencies).

31