IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL WOMEN, INFANTS, AND CHILDREN GROCERS ASSOCIATION, | ) ) ) | |
| NUTRITIONAL FOOD DISTRIBUTORS, INC., | ) ) | |
| COUNTY FOOD SERVICES, INC., and | ) ) | Case No. 1:05-cv-02432-EGS |
| DILLARD FOODS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| FOOD AND NUTRITION SERVICE, | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES OF THE CENTER ON BUDGET AND POLICY PRIORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Center on Budget and Policy Priorities ("Center") is a not-for-profit research and policy institute incorporated in the District of Columbia. The Center works at the federal and state levels both on fiscal policy and on public programs and policies that particularly affect low- and moderate-income families and individuals. Over the past two and a half decades, the Center has gained a reputation for producing materials that are balanced, authoritative, accessible to non-specialists, and responsive to issues currently before the country. The Center's materials are used by a wide range of policymakers and not-for-profit

1

organizations.

Since its inception in 1981, the Center has analyzed cost-containment and other funding issues related to the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"). The Center was instrumental in helping to develop, evaluate, and promote a cost containment system under which infant formula manufacturers offer substantial rebates to the WIC program through a competitive bidding process. These rebates reduce the cost of infant formula to the program and have allowed it to serve substantially more low-income families than otherwise could have been served with the federal funds the program has received. The infant formula rebate system now leads to over $1.5 billion in savings annually.

In recent years Congress has attempted to provide sufficient funding for the WIC program so that states would not have to turn away eligible WIC applicants. In setting appropriations levels, Congress has relied heavily on funding estimates and analyses prepared by the Center. In several recent years, the final appropriations legislation that determines the funding level for WIC for the coming fiscal year has included the funding level recommended by the Center. The Center is therefore keenly interested in the implications of vendors charging above-market prices for WIC foods.

The Center is submitting this Amicus Brief to urge the Court to grant the defendant's motion for summary judgment. Since the defendant has thoroughly briefed the substantive and procedural issues raised by the plaintiffs, this Amicus Brief will not repeat the points made by the defendant but will offer additional arguments on selected issues before the court. Specifically, this brief will explain how the reducing excess payments to WIC-only stores would allow the WIC program to serve additional eligible families with limited

federal funds, how FNS' interim regulations are consistent with the text of 42 U.S.C. § 1786(h)(11) and constitute a reasonable interpretation of the statutory language, and the harm to state WIC programs that would result if the relief sought by plaintiffs is granted.

**WIC COST CONTAINMENT HELPS NEEDY FAMILIES**

WIC participation improves the health and diets of low-income women, infants, and children. Unfortunately, not all eligible families participate in WIC. Funding for the WIC program is provided through Congress' annual appropriations process. WIC is not an entitlement program, which means that not all eligible applicants are entitled to benefits. Instead, the number of eligible families that can be served is limited by the funding level provided each year. WIC-only stores that charge high prices drive up program costs and use federal funds that could otherwise be devoted to serving more eligible families. In light of uncertainty about future WIC funding levels, cost-containment is critical to ensuring that available funds are devoted to serving more needy families rather than paying the high prices charged by WIC-only stores.

**WIC PARTICIPATION IMPROVES HEALTH OUTCOMES**

Research shows that the WIC program confers significant health benefits on participants and, therefore, increased participation is consistent with Congressional intent. Babies with low birth weights are more likely to die in infancy or to become disabled or ill. A large body of research has consistently found that WIC contributes to healthier births, including increases in average birth weight and a reduction in the incidence of low birthweight. *See* Effects of Food Assistance and Nutrition Programs on Nutrition and Health (Mary Kay Fox, William Hamilton, and Biing-Hwan Lin, Eds., U.S. Dep't of Agriculture, 2004) pp. 108-115. A 1992 Government Accountability Office (GAO) analysis of the

research on WIC — the only meta-analysis of multiple studies conducted to date — concluded that pregnant women who received WIC benefits were much less likely to have low-birthweight babies. The GAO estimated that prenatal WIC participation reduced the proportion of low-birthweight babies by 25 percent and the incidence of babies born with very low birthweight by 44 percent. *See* General Accounting Office, HRD-92-18 *Early Intervention: Federal Investments Like WIC Can Produce Savings* (April, 1992) pp. 23-24.

Improved birth outcomes lead to health care savings. The GAO analysis estimated that each $1 spent on WIC for pregnant women generated $2.89 in health care savings during the first year after birth and $3.50 in savings over 18 years. *See id.* pp. 28-29. These savings help to reduce the amount the government spends on Medicaid, since Medicaid covers a large share of medical care costs for low-income infants.

Recent research on the diets of children who participate in WIC has shown that participation in the program increases intakes of vitamins B6, folate, and iron and may decrease consumption of added sugar. WIC participation decreases the prevalence of anemia and insufficient iron intake among children. In addition, one recent study found that among children in households with income below 130 percent of the poverty line, WIC participants consumed less fat and more carbohydrates than non-participants. *See* Effects of Food Assistance and Nutrition Programs on Nutrition and Health, at pp. 142-151 and 157-158.

## NOT ALL ELIGIBLE FAMILIES PARTICIPATE IN WIC

Many low-income women, infants, and children who are at nutritional risk do not participate in the WIC program. In 2003 the National Research Council, which is associated with the National Academy of Sciences, estimated that 27 percent of eligible infants do not

participate in WIC, 34 percent of eligible women do not participate in WIC, and 62 percent of eligible children do not participate in WIC. *See* Estimating Eligibility and Participation for the WIC Program, National Research Council of the National Academies, Final Report (2003) Table 8-2.

**WIC-ONLY STORES DRIVE UP WIC FOOD COSTS**

Throughout most of its history, the WIC program has successfully relied upon regular grocery stores to serve as the mechanism for delivering nutritious foods to WIC participants. Participants receive a voucher for specific food items that can be redeemed at any WIC-authorized store at no cost to the participant; the store is then reimbursed by the state WIC program, using federal funds, for the items on the voucher. Each store is reimbursed based on its retail shelf prices.

"WIC-only" stores stock WIC food items and serve WIC customers almost exclusively. As a result, virtually all of their sales revenue comes from the federal Treasury, through the WIC program. WIC-only stores thus have utilized a loophole in the WIC program's underlying statute and regulations to operate outside the regular retail market. Since regular retail food stores need to attract a wide customer base, market forces induce them to keep prices for WIC food items low enough to attract non-WIC shoppers; if a store prices these items too high, it is likely to lose non-WIC customers to other stores. But WIC-only stores have no need to attract non-WIC customers and often do not even accept cash. (*See* Robinson Decl. ¶ 2.) They consequently have no need to keep prices for WIC foods in line with the amounts charged at competitive retail stores.

There is ample evidence that WIC-only stores charge higher prices on average than competitive stores. *See* Regulatory Impact Statement, Table 5, 70 Fed. Reg. 71,728 (FNS,

Nov., 2005); (*see also* Def.'s Mot. for Summ. J., Ex. B). The plaintiffs in this action have not disputed that they charge higher prices than competitive retail vendors. To the contrary, they provide evidence that on average their prices are substantially higher than those of competitive retail vendors: "the average payment made to all regular vendors in Arkansas is approximately 15.2% less than payments made to our stores." (Dillard Supplementary Decl. ¶ 2.)

Plaintiffs' assertion that WIC-only store prices are comparable to those in small competitive stores is readily contradicted. (*See* Pls.' Mot. for Summ. J., p. 9. ("WIC-only store prices are generally comparable to those offered by similar small stores and grocers . . . .")) For example, in October 2003, the average redemption amount in California for the WIC voucher for two gallons of milk, two pounds of cheese, and two dozen eggs was 5 percent higher in WIC-only stores than in competitive stores with one or two cash registers; likewise, the WIC voucher for milk was 6 percent higher in WIC-only stores than in competitive stores with one or two cash registers. (*See* Def.'s Mot. for Summ. J. Ex. B.) Similarly, in December 2004 in Arkansas, 93 percent of the vouchers for children that were redeemed at WIC-only stores were redeemed for an amount at or above 95 percent of the state's maximum reimbursement level. In contrast, that same month, only 13 percent of the vouchers for children that were redeemed at independent stores were redeemed for an amount at or above 95 percent of the state's maximum reimbursement level, and only 33 percent of the vouchers for children that were redeemed at convenience stores were redeemed for an amount at or above 95 percent of the state's maximum reimbursement level. (*See* Attach. A.)

Moreover, plaintiffs' suggestion that their higher prices are driven by higher food

6

costs is questionable. Regardless of whether the WIC program should be sustaining stores with higher food costs, analyses by USDA's Chief Economist and by USDA's Economic Research Service suggest that costs associated with operating a WIC-only store might be lower than the costs associated with operating a small competitive store as a result of the limited foods that need to be stocked and the opportunity for WIC-only stores to obtain volume discounts similar to larger stores. (*See* Excerpts of Admin. R. Cited by Plaintiffs Jan. 17, 2006, at pp. AR 01731 ("These above 50 percent stores compete by having lower cost structures than stores with large varieties of foods.") and AR 02076 ("Although sales volume may typically be equivalent to a small grocery store or convenience store, unlike these stores, the Above-50-percent vendors carry a much smaller variety of items with relatively high inventory turnover. As a result, Above-50-percent vendors may be able to obtain volume discounts from wholesale suppliers relative to similar volume grocery stores as well. Lower food costs contribute to greater margins relative to other similar-volume retailers.").)

**LIMITED FUNDING MEANS COSTS-CONTAINMENT IS CRITICAL TO SERVING NEEDY FAMILIES**

Even if plaintiffs' assertion that WIC-only stores have higher overhead costs were accurate, sustaining those stores would be contrary to the goals of the WIC program. Indeed, the proliferation of WIC-only stores charging high prices is undercutting basic program goals and driving up WIC food costs. Since WIC is a discretionary program that relies on limited funds made available through the annual Congressional appropriations process, increases in WIC food costs mean either that fewer eligible families can be served with the program's limited dollars or that Congress must appropriate ever-increasing amounts just to

7

serve the same number of people. While in recent years the program has received sufficient funding so that states have not had to turn away eligible applicants, states adjust the amount of outreach they do based on the availability of funds. Every dollar spent by a state on excessively priced WIC foods is unavailable to serve additional applicants.

When state WIC programs are not concerned about running out of federal food funds, they conduct more aggressive outreach and are able to serve more eligible applicants. States are made aware of their annual WIC grant by FNS once the appropriations law is enacted each year and plan accordingly. State WIC programs increase or decrease their outreach activities in response to whether they anticipate having enough funds to serve additional families. *See* True Decl. ¶ 7 and ¶ 8. If excess reimbursements to WIC-only stores are prevented, state WIC programs will be able to reach out to more eligible families that are not currently participating in WIC and enroll them.

Congressional appropriators have indicated their concern about the costs associated with WIC-only stores by prohibiting states from authorizing new WIC-only stores until FNS has certified the state as being in compliance with 42 U.S.C. § 1786(h)(11)(E). See Pub. L. 109-097, Title VII § 787. To comply with budget targets it set last April, Congress cut fiscal year 2006 funding for domestic programs by $15 billion, or 3.5 percent on average, below the 2005 level adjusted for inflation. Congress may make similar or deeper cuts in future years.

Plaintiffs' argument that if they close their WIC-only stores, their customers "would abandon the Program rather than seek to redeem their vouchers at a traditional retailer" is speculative. (Pls.' Mem. in Supp. of Mot. for Prelim. Inj. or, In the Alternative, for T.R.O., p. 18.) The weak evidence provided by the plaintiffs, in the form of a non-representative

8

survey conducted among a tiny sample of WIC participants is both methodologically unsound and unconvincing. (*See* Pls.' Mot. for Summ. J., p. 6.) Based on FNS' estimate in its Regulatory Impact Analysis that approximately 12 percent of WIC voucher redemptions pass through WIC-only stores, we estimate that approximately 88 percent of WIC participants — or 7 million individuals each month — manage to get their WIC voucher redeemed at regular competitive grocery stores. *See* 70 Fed. Reg. 71,725.

While it is clear that WIC funds being spent on excess reimbursements to WIC-only stores are not available to serve additional participants, there is no sound research evidence to support the notion that WIC-only stores contribute to increased participation in the WIC program. In fact, the opposite may be the case, since the higher per-voucher payments made to WIC-only stores can leave a state with fewer resources to serve additional participants.

Between 2001 and 2005, a period during which WIC-only stores in California went from accounting for 30 percent of WIC voucher redemptions to 48 percent of WIC voucher redemptions, WIC participation in California grew at half the rate as in other states. (*See* Attach. B.)

If excess charges are prevented, more eligible families can be served with the WIC program's limited dollars. Based on FNS' estimate that implementation of the interim regulations would prevent excess charges of at least $75 million annually, for a given appropriation level, the WIC program will be able to serve an additional 100,000 needy women, infants, and children each year if the interim regulation is implemented.

**FNS' INTERIM REGULATIONS ARE CONSISTENT WITH THE PLAIN LANGUAGE OF THE REAUTHORIZATION STATUTE AND REFLECT A REASONABLE INTERPRETATION**

With the Child Nutrition and WIC Reauthorization Act of 2004 (Pub. L. 108-265),

Congress endeavored to close the loophole that has permitted WIC-only stores to charge high prices for WIC foods. That statute included two distinct cost-containment goals, which are now codified at 42 U.S.C §§1786(h)(11)(A)(i)(III)(bb) and 17(h)(E).

Under 42 U.S.C. § 1786(h)(11)(A)(i)(III)(bb), states must ensure the cost neutrality of WIC-only stores by establishing competitive pricing and allowable reimbursement criteria that "do not result in higher food costs if participants redeem supplemental food vouchers at [WIC-only vendors] rather than at [other vendors]." In other words, states that elect to authorize WIC-only stores need to establish appropriate criteria so that authorizing such stores does not result in higher costs in the aggregate than if WIC-only stores were not authorized.

The second cost-containment goal is found at 42 U.S.C § 1786(h)(E). Under it, states must establish reimbursement criteria that "do not result in average payments per voucher to [WIC-only stores] that are higher than average payments per voucher to comparable [other vendors]."

These two distinct cost-containment goals are independent and complementary. States would face no conflict in complying with both simultaneously. Nonetheless, compliance with one goal does not automatically guarantee compliance with the other. Specifically, a state that chooses to authorize WIC-only stores may achieve the second of the two cost-containment goals without automatically achieving the first. The second goal focuses on a comparison of reimbursements for a subset of WIC-only stores to reimbursements for a subset of regular competitive stores that share certain characteristics that make them "comparable" to the WIC-only stores. In contrast, the first goal focuses on aggregate statewide food costs.

10

WIC-only store owners have urged states to consider the allegedly higher operating costs of WIC-only stores when determining "comparability." As explained above, it is questionable whether the operating costs of WIC-only stores are as high as those of small competitive grocery stores. Nonetheless, when complying with the second, per-voucher cost-containment goal, states might choose to compare WIC-only stores to small retail stores with relatively higher operating costs and higher prices. Under such a scenario, average per-voucher reimbursements to WIC-only stores would be no higher than average per-voucher reimbursements in, say, convenience stores. But participants who shop at WIC-only stores may be drawn away from lower-price competitive stores — where the vast majority of WIC participants do, in fact, shop. If that is the case, then aggregate food costs statewide would be higher as a result of the authorization of WIC-only stores. The state would be in compliance with the second cost-containment goal (codified at 42 U.S.C § 1786(h)(11)(E)) but the state would not be in compliance with the first cost-containment goal (codified at 42 U.S.C § 1786(h)(11)(A)(i)(III)(bb)).

Plaintiffs argue that FNS' interpretation of 42 U.S.C § 1786(h)(11)(A)(i)(III)(bb) in the interim regulations published on November 29, 2005 (70 Fed. Reg. 17,708-17,731) renders meaningless the peer group requirements of the statute in 42 U.S.C § 1786(h)(11)(A). (*See* Pls.' Mot. for Summ. J. at III.B.3.i.) But plaintiffs ignore the plain language of 42 U.S.C § 1786(h)(11)(A)(i)(III)(bb), which requires states to "establish competitive price criteria and allowable reimbursement levels that comply with subparagraphs (B) and (C), respectively, *and* that do not result in higher costs if program participants redeem supplemental food vouchers at [WIC-only stores] rather than [other vendors]" (emphasis added). The requirement that authorization of WIC-only stores not

11

result in higher aggregate food costs is specifically a requirement that applies *in addition to* the peer group requirements.

Plaintiffs' argument that FNS' requirement that states compare average reimbursements for WIC vouchers redeemed at WIC-only stores to average reimbursements for vouchers redeemed at other stores is inconsistent with the statute (*see* Pls.' Mot. for Summ. J. at III.B.3.ii) is wrong. Plaintiffs argue that "there is no such thing as an 'average' vendor." *Id.* at 31. The cost-containment goal contained in 42 U.S.C § 1786(h)(11)(A)(III)(bb) can be considered a requirement that a state's WIC food costs may be no higher as a result of participants shopping at WIC-only stores than the state's WIC food costs would be if participants shopped at competitive retail stores. While it is impossible to know exactly what program costs would be in the absence of WIC-only stores, a reasonable estimate can be developed by assuming that in the absence of such stores, WIC participants who now shop at WIC-only stores would make similar shopping choices as other WIC participants and thus would redeem vouchers at similar costs. By requiring states to achieve cost neutrality by demonstrating that average reimbursements for WIC vouchers redeemed at WIC-only stores are not higher than average reimbursements for WIC vouchers redeemed at all regular competitive stores, FNS is relying on just such a reasonable assumption.

Plaintiffs also argue that the interim regulations "read out of the statute the express statutory language § 1786(h)(11)(A)(i) that '[n]othing in this paragraph shall be construed to compel a state agency to achieve lower food costs if program participants redeem supplemental food vouchers at [WIC-only stores] rather than at [traditional vendors].'" (Pls.' Mot. for Summ. J., p. 32.) Like 42 U.S.C § 1786(h)(11)(A)(i)(III)(bb), the statutory

12

language quoted above pertains to aggregate state WIC food costs. In other words, 42 U.S.C § 1786(h)(11)(A)(i) contains two requirements related to aggregate state WIC food costs: aggregate state WIC food costs shall not be higher as a result of participants redeeming vouchers at WIC-only stores and states shall not be *compelled* to achieve lower aggregate state WIC food costs as a result of participants redeeming vouchers at WIC-only stores.

When read together these two provisions leave two acceptable outcomes: aggregate state WIC food costs in the presence of WIC-only stores may be equal to what they would be in the absence of such stores or states may choose, though not be compelled, to achieve lower aggregate state WIC food costs in the presence of WIC-only stores than what they would achieve in their absence. Nothing in the interim regulations compels states to achieve lower aggregate food costs if they authorize WIC-only stores than they would achieve if they did not authorize such stores. A state would be compliant with 7 C.F.R. 246.12(g)(4)(i)(D) if the statewide average cost per food instrument in WIC-only stores were equal to the average cost per food instrument in other stores.

Plaintiffs' argument that as a result of comparing average prices in WIC-only stores to average prices in competitive stores, WIC-only stores would be able to charge no more than the lowest cost retailers is similarly incorrect. (*See, e.g.*, Robinson Supplemental Decl. ¶ 6 ("I expect the average payment to non-WIC-only vendors to approximate Wal-Mart prices.").) In fact, the average reimbursement level for competitive stores, as calculated under USDA's methodology, would be weighted to reflect participants' actual shopping choices. To the extent that participants shop at competitive stores that charge higher prices than the lowest-price stores, average reimbursements to WIC-only stores could be higher than average reimbursements to the lowest-price stores.

For example, in Arkansas, 38 percent of WIC reimbursements to regular competitive stores during fiscal year 2004 were made to small chains, independent stores, convenience stores, and other such stores. (*See* Attach. A.) To the extent that reimbursements to these stores were higher than reimbursements to large chain stores, average reimbursements to WIC-only stores also could be higher. Similarly, plaintiffs assert that Wal-Mart accounts for 22 percent of WIC redemptions in Oklahoma. (*See* Pls.' Statement of Undisputed Material Facts in Support of Mot. for Summ. J. ¶ 32.) While Wal-Mart redemptions will affect the statewide average reimbursement to competitive stores, to the extent that reimbursements to other stores are higher than reimbursements to Wal-Mart, average reimbursements to competitive stores will be higher and average reimbursements to WIC-only stores also could be higher.

**THE RELIEF SOUGHT BY THE PLAINTIFFS WOULD HARM STATE WIC PROGRAMS**

Under 42 U.S.C § 1786(h)(11)(G), state WIC programs were required to comply with the provisions of 42 U.S.C § 1786(h)(11) no later than December 30, 2005. State WIC agencies, including those in states that do not authorize WIC-only stores, have therefore taken steps to implement changes to their vendor management policies, peer group criteria, competitive price criteria, allowable reimbursement levels, and management information systems to come into compliance with the provisions of 42 U.S.C § 1786(h)(11). Some of these steps have been taken in reliance on FNS' interim regulations.

If the relief sought by plaintiffs is granted, and the interim regulations are vacated and FNS is ordered to publish proposed regulations and solicit comments before promulgating interim or final regulations, state WIC programs would be put in a bind. They

would have to comply with the statutory provisions regarding vendor cost containment without regulations delineating what USDA will consider when assessing compliance. Plaintiffs themselves assert that "[w]ithout an effective regulation that defines the parameters of the certification process and how States should determine comparability of stores, state compliance is impossible." (Pls.' Reply Mem. in Supp. of Mot. for T.R.O., p. 6.) Plaintiffs' assertion assumes that states would not even attempt to comply with the statutory provisions in the absence of regulations. In light of the costs associated with excessive payments to WIC-only stores, such an outcome would be undesirable and could result in fewer needy women and children receiving nutrition assistance through WIC. (Such an outcome would also be contrary to Congressional intent as indicated by the December 30, 2005 compliance date.) As explained above, Congress may not provide sufficient funding to keep up with the above-market prices charged by WIC-only stores, in which case eligible applicants would have to be turned away. Alternatively, even if Congress attempts to provide sufficient funding to serve all eligible applicants, the funds that states devote to higher reimbursements to WIC-only stores cannot be used to serve a greater portion of low-income families at nutritional risk.

Another likely possibility is that states would attempt to comply with the statutory provisions using a trial and error approach. If a state attempted to comply, but did so in a way that FNS does not ultimately deem compliant, states could face fiscal penalties or would have to make additional changes to their vendor management policies. Making repeated changes to vendor peer groups, competitive price criteria, reimbursement criteria, and other vendor policies is costly to states, drawing upon limited administrative funds, and creates

uncertainty for vendors and WIC participants. *See* Knolhoff Decl. *See also* Maisano Decl. and True Decl.

**CONCLUSION**

For the foregoing reasons, amicus respectfully requests that this Court grant Defendant's motion for summary judgment.

DATED:     January 20, 2006

                                                WELFARE LAW CENTER, INC.

                                                */s/ Marc Cohan*
                                                Marc Cohan, of Counsel
                                                Mary R. Mannix, of Counsel
                                                275 Seventh Avenue, Suite 1205
                                                New York, New York 10001
                                                Tel: (212) 633-6967


                                                SONOSKY, CHAMBERS, SACHSE,
                                                    ENDRESON & PERRY, LLP

                                                */s/ Reid Chambers*
                                                Reid Peyton Chambers (D.C. Bar No. 148296)
                                                Anne D. Noto (D.C. Bar No. 460438)
                                                1425 K Street, N.W., Suite 600
                                                Washington, D.C. 20005
                                                Tel: (202) 682-0240

                                                *Counsel for Proposed Amicus*

## ATTACHMENT A:
## Center on Budget and Policy Priorities Analysis
## of Data from the Arkansas WIC Program

|  | REDEMPTIONS (FISCAL YEAR 2004) | PERCENTAGE OF STORES THAT REDEEMED THE CHILD FOOD INSTRUMENT AT OR ABOVE 95% OF THE STATEWIDE MAXIMUM (DECEMBER 2004) |
|---|---|---|
| Large Chain/Corp | $ 26,825,202 | 0 |
| Small Chain/Corp | $ 7,858,782 | 0 |
| Independent | $ 7,620,835 | 12.8% |
| Convenience | $ 532,530 | 33.3% |
| Other | $ 92,343 | 14.3% |
| WIC-Only | $ 14,655,224 | 92.9% |
| **Total** | **$ 57,584,916** | |
| Total to Small, Independent, Convenience, and Other | $ 16,104,489 | |
| Total to Non-WIC-Only Stores | $ 42,929,692 | |
| Total to Small, Independent, Convenience, and Other as a percentage of Total to Non-WIC-Only | 38% | |

Data Source: Arkansas WIC Program

## ATTACHMENT B:

## Center on Budget and Policy Priorities Analysis

## of Data from the California WIC Program and USDA

| DATE | TOTAL REDEMPTIONS | NUMBER OF WIC-ONLY STORES | TOTAL REDEMPTIONS AT WIC-ONLY STORES | REDEMPTIONS AT WIC-ONLY STORES AS A PERCENTAGE OF TOTAL REDEMPTIONS |
|---|---|---|---|---|
| September 2001 | $60,525,153.29 | 373 | $18,236,828.50 | 30% |
| September 2005 | $72,408,097.35 | 616 | $34,777,893.30 | 48% |

| | CALIFORNIA PARTICIPATION | PARTICIPATION ELSEWHERE |
|---|---|---|
| Fiscal Year 2001 | 1,243,509 | 6,062,068 |
| Fiscal Year 2005 | 1,309,374 | 6,713,356 |
| Growth | 5% | 11% |

Data Source: California WIC Program; USDA

18