UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WOMEN, INFANTS, AND<br>CHILDREN GROCERS ASSOCIATION, *et. al.*<br><br>Plaintiffs,<br><br>v.<br><br>FOOD AND NUTRITION SERVICE,<br><br>Defendant. | Civil Action No. 05-2432 (EGS) |

### DECLARATION OF LAURIE TRUE

1) My name is Laurie True. I am the Executive Director of the California WIC Association. I submit this declaration in support of the Center on Budget and Policy Priorities' Amicus Brief in the above-captioned action. The statements made herein are based on my personal knowledge or on information provided to me in the course of performing my duties as the Executive Director of the California WIC Association.

2) The California WIC Association ("CWA") is a non-profit organization formed by directors of local WIC agencies in 1992 to represent all parties interested in the operation of the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"). CWA's activities include: training and staff development; public education and advocacy; and participation in maternal and child health, public health, and nutrition education coalitions. CWA members and staff provide leadership by acting as a resource

for organizations dedicated to the promotion of maternal and child health, and by participating on Department of Health Services Advisory Boards and Task Forces.

3) The California WIC program serves an average monthly caseload of approximately 1.3 million women, infants, and children. California's caseload represents about 16 percent of the WIC caseload nationwide.

4) WIC eligibility determination, benefit issuance, nutrition education, and health care referrals are provided to WIC participants by approximately 3,000 staff working at 82 local WIC agencies, with 650 service centers throughout California. Local WIC agencies are responsible for operating the WIC program in accordance with California's state WIC plan, which has been approved by the Food and Nutrition Service ("FNS") of the United States Department of Agriculture ("USDA"), and in accordance with applicable federal and state law. Since December 30, 2005, California has been responsible for compliance with 42 U.S.C. § 1786(h)(11) as amended by the Child Nutrition and WIC Reauthorization Act of 2004 (Pub. L. 108-265).

5) WIC-Only stores began appearing in California in the late nineties, with the opening of a few stores in Los Angeles. By 1999, there were about 200 stores, and this small group of store operators was taking in about 20% of total WIC check redemptions. At that point, WIC providers and policy analysts, including CWA, began taking notice of the WIC-Only phenomenon. By 2005, there were 640 authorized WIC-Only stores in all major

2

urban areas of the state. These 640 stores are owned by 323 corporations, which operate between 1 and 46 stores – chain operators.

6) While these 640 authorized WIC-Only stores in California represent only about 16% of all WIC grocery vendors, they currently redeem nearly half of all WIC checks each month. In June 2005, WIC-only stores redeemed $36 million in WIC checks, which was 47% of all checks redeemed statewide. In June 2005, the majority (63%) of WIC checks redeemed at WIC-only stores were redeemed at a price at or within 5 percent of the maximum allowable amount. All other stores redeemed only 24% of their WIC checks within this high-price range. Department of Health Services, WIC Supplemental Nutrition Branch, June 2005 Data. WIC-only stores are thus increasing WIC food costs in California by approximately $37 million a year, according to an analysis by the Center on Budget and Policy Priorities.

7) The added WIC food costs created by high-cost WIC-Only stores means that significant numbers of eligible low-income women, infants and children at nutritional risk cannot be served by WIC providers in California. Funding does not "run out," with WIC clinics suddenly closing their doors and terminating benefits. Instead, state and local WIC directors manage their funding and caseload within constantly shifting parameters, affected by a host of factors, including participant demographics, farm prices, retail food costs, and Congressional appropriations. Since WIC is not an entitlement program like Food Stamps, the program must operate within a yearly federal appropriation. In recent years, Congress has attempted to provide sufficient funds to provide WIC benefits to all

eligible families that seek them. But high food costs limit a state's capacity to serve all eligible needy families. Prudent state WIC program managers are constantly trying to contain food costs in a variety of ways so that more participants can be served. Infant formula cost containment is federally required, and California also has rebate programs for infant cereal and juices, as well as package size and brand limitations, and other cost-containment measures.

8) Based on current census and health statistics, the California Department of Health Services estimates that up to 400,000 persons (mostly preschool-age children) appear to be eligible, but not participating, in WIC. Local WIC programs in areas of high need are not currently terminating enrolled WIC participants, nor are they putting applicants on waiting lists – yet. However, when federal funding is inadequate or threatened (as it has been many times in the past), California WIC program staff take steps to slow down active outreach. Missed appointments may not be followed up with phone calls; enrollment appointments may take longer to obtain. With more funding available, outreach and active enrollment procedures recommence.

9) The clear fiscal impact of high-cost stores on California WIC's bottom line has been evident for some time. However, the California Department of Health Services (which administers the WIC program) has had difficulty instituting vendor cost containment measures through state law and regulations alone. The existing state vendor regulations have been on the books for over twenty years and are inadequate and outdated. Since 1998, in response to retail cost data showing rapid proliferation of these high-cost stores, as well as new federal regulations and state law, the Department has been attempting to promulgate new WIC vendor

4

regulations. Until very recently, these efforts have been stymied due to pressure from WIC-Only store owners, who have hired several influential lobbying firms. The WIC Branch worked on a comprehensive regulatory package from 2001-2002 with steady input from a WIC Grocer Advisory Committee, whose active members included a large contingent of WIC-Only store owners, as well as other stakeholders. The new regulations were designed to control, using managed authorization and vendor peer-groups, the pricing of WIC foods used by the thousands of retail stores who partner with WIC to provide benefits to WIC participants. The elimination of vendor-specific information and the "Must Not Exceed" amounts from the printed WIC check, along with the implementation of vendor peer groups, were key components of the reform package. In March of 2003, draft regulations were finally completed, and were shared with the Grocer Advisory Committee and other interested parties, as an informal input opportunity before formal promulgation of proposed state regulations. Lobbyist representatives from the WIC-Only industry responded actively, and met with members of the Legislature and with Governor Davis. By June of 2003, it became clear that the regulatory package was not going anywhere, and progress ceased. When the Schwarzenegger administration took office in November 2003, the standstill continued due to the Executive Order putting a moratorium on all regulations. Without the new regulatory authority, California WIC officials have therefore been unable to put limitations on authorizing high-cost stores, nor could they implement fair or meaningful reimbursement levels. As a result, the number of WIC-Only stores grew rapidly, and their percentage of WIC voucher redemptions skyrocketed, from 11% in 1997 to over 47% in June 2005—an alarming trend that caught the attention of Congress. The new federal statutory provisions are therefore forcing California to get regulations in place that will

contain vendor costs fairly and effectively. But it will be extremely difficult to get new state regulations in place in the absence of federal regulations.

10) Achieving compliance with the provisions of 42 U.S.C. § 1786(h)(11) includes, but is not limited to: a thorough examination of existing vendor management policies (including peer group criteria, competitive price criteria, and reimbursement criteria), an assessment of whether those policies will achieve compliance, the design of changes to those policies to ensure compliance, reprogramming of management information systems to reflect policy changes, adherence to state administrative and regulatory procedures to implement policy changes, notice to vendors, and amendments to contracts with vendors to reflect the policy changes.

11) If, as requested by the plaintiffs in this action, the interim regulations are vacated and FNS is required to publish proposed regulations and seek comments on them before developing and publishing final regulations, the California WIC program would be placed in the untenable position of having to comply with the statutory provisions of 42 U.S.C. § 1786(h)(11) without any regulations in place on which to rely.

12) Under such circumstances the California WIC program would have no certainty that FNS would ultimately consider its revised vendor peer group system, competitive pricing criteria, and allowable reimbursement levels, developed in reliance on the interim regulations, in compliance with the provisions of 42 U.S.C. § 1786(h)(11). If FNS ultimately concluded that California had not adequately complied with the statute, the WIC program would have to go through the same steps again.

I declare under penalty of perjury that the foregoing is true and correct. Further, I certify that I am qualified and authorized to file this Declaration.

*[signature]*

Laurie True
Executive Director
California WIC Association