**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
                                    )
NATIONAL WOMEN, INFANTS, AND        )
CHILDREN GROCERS ASSOCIATION et al.,)
                                    )
                  Plaintiffs,       )
                                    )
         v.                         )    Civil Action No.
                                    )    05-2432 (EGS)
                                    )
FOOD AND NUTRITION SERVICE,         )
                                    )
                  Defendant.        )
                                    )
```

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Plaintiffs bring this action to challenge the interim rule issued by defendant Food and Nutrition Service ("FNS"), an agency of the U.S. Department of Agriculture ("USDA"). The interim rule implements provisions of the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"). 42 U.S.C. § 1786. Plaintiffs argue that in promulgating the interim rule, the FNS failed to abide by the notice and comment rulemaking requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b), and failed to conduct an analysis consistent with the requirements of the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq.* Plaintiffs also argue that the interim rule is contrary to the underlying statute and to Congressional intent. *See* Pls.' Mot. for Summ. J. at 1-2. Pending before the Court are the parties' cross motions for summary judgment. A

hearing on the motions was held on January 26, 2006.  Upon

careful consideration of the parties' cross motions, the

responses, replies and supplemental motions thereto, oral

arguments, and the entire record, the Court DENIES plaintiffs'

Motion for Summary Judgment and GRANTS defendant's Motion for

Summary Judgment.  Accordingly, plaintiffs' claims are DISMISSED

WITH PREJUDICE.


## II.   BACKGROUND

### A.   *The Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC")*

Plaintiffs are National Women, Infants, and Children Grocers

Association ("NWGA"), Nutritional Food Distributors, Inc., County

Food Services, Inc., and Dillard Foods, Inc.  NWGA is a small,

voluntary, not-for-profit trade organization. Complaint ¶ 4.

The other named plaintiffs are small businesses operating in

Arkansas and Oklahoma. Complaint ¶¶ 5-7.

The Special Supplemental Nutrition Program for Women,

Infants, and Children ("WIC") is a nation-wide federal program

that provides supplemental foods and nutrition education to

lower-income pregnant, breast-feeding, and postpartum women, and

infants and children who are at nutritional risk.  *See* 42 U.S.C.

§ 1786(a).  The Secretary of Agriculture ("Secretary") is

authorized to carry out WIC,  42 U.S.C. § 1786(c)(1), and the

Secretary has delegated the administration of WIC to the Food and

Nutrition Service ("FNS").  7 C.F.R § 246.3(a).   In 2005, WIC

served approximately 8 million participants, including
approximately 1.9 million women, 2.1 million infants, and 4
million children ages five and under.  *See* Complaint ¶ 11.  WIC
is expected to serve roughly 8.5 million participants in 2006.
*Id.*

WIC is a federal grant-in-aid program. 42 U.S.C. §
1786(c)(1).  Through WIC, states receive grants to provide
supplemental foods and nutrition education to lower-income women,
infants and children who are determined by a competent
professional authority to be at nutritional risk.  *Id.*
Individual state agencies are responsible for implementing WIC
within their states.  State agencies are required to authorize
the participation of retail food stores ("authorized vendors"),
create vendor agreements that govern the contractual relationship
between the state and authorized vendors, establish price
limitations for paying authorized vendors, train authorized
vendors, and monitor compliance.  *See* Complaint ¶ 28; 7 C.F.R. §§
246.3(b) and 246.12.

The women and children eligible to participate in the
program receive "food instruments" or vouchers from state and
local agencies which they can exchange for supplemental food
packages that are tailored to meet their needs. 42 U.S.C. §
1786(d); Complaint ¶ 29.  For example, in exchange for her
voucher, a pregnant woman may receive a food package that
includes fluid milk, eggs, cereal, juice, and dry beans. 7 C.F.R.

§ 246.10(c)(5).  WIC participants must redeem their vouchers at retail food vendors who have received prior authorization from respective state agencies to carry pre-approved supplemental foods. Complaint ¶ 15, 28.  These preauthorized vendors then submit the vouchers for reimbursement from the states. *Id.*

There are approximately 45,000 retail vendors authorized to redeem WIC vouchers. Complaint ¶ 15.  Generally, authorized vendors are corner grocery stores, neighborhood supermarkets, and big box stores such as Target and Walmart. *See* Transcript of Hearing on Motion for Summary Judgment (Jan. 26, 2006) ("01/26/06 Tr.") at 4.  Of the 45,000 authorized vendors, there are approximately 1,200 vendors who specialize in redeeming WIC vouchers.[1]  Complaint ¶ 15.  These vendors are known in the industry as "WIC-only" vendors.  *See* 01/26/06 Tr. at 4. Only 20 states have WIC-only vendors.  Complaint ¶ 15.  WIC-only vendors focus on WIC participants' varied needs and offer them specialized services. Complaint ¶ 17-23.  WIC-only stores often hire current and former WIC participants who are knowledgeable about the Program and can help shoppers identify what size package of which authorized brands to get under their particular voucher. *Id.*

---

[1] These vendors are defined as those who generate more than 50 percent of their annual revenue from the sale of supplemental foods to WIC participants. 42 U.S.C. §1786(11)(h)(D)(ii).

**B.    *The Child Nutrition and WIC Reauthorization Act of 2004***

On June 30, 2004, Congress passed the Child Nutrition and WIC Reauthorization Act of 2004 ("Reauthorization Act").  Pub. L. No. 108-265.  This law reauthorized WIC through 2009 and made a number of substantive changes to the underlying statute. Congress imposed cost containment measures on state agencies in order to constrain rising program costs.  *See* 42 U.S.C. § 1786(h)(11).

These cost containment measures were designed to control rising food costs associated with WIC-only vendors. *See* 01/26/06 Tr. at 72-74.  The cost containment provision addresses Congress's concern that WIC-only vendors, unlike regular food retail vendors, operate outside of the competitive market forces because WIC-only vendors do not need to keep their food prices low and competitive in order to attract non-WIC customers.  *See* S. Rep. No. 108-279, at 53-57, 2004 U.S.C.C.A.N. 668, at 714-718. Since WIC customers pay in government vouchers, they are not likely to be as sensitive to food prices. *Id*.  WIC customers will receive what is denoted on their voucher regardless of the food price. *Id*.  The Senate Report accompanying the Senate version of the Reauthorization Act states:

> This [cost containment] provision is designed to respond to a new type of store in the WIC program, so-called WIC-only stores. . . . Available evidence suggests that WIC-only stores, on average, tend to charge much higher prices for WIC food items than do regular grocery stores, resulting in significantly higher costs to the federal government and creating long-term cost-containment problems in the WIC program. . . . [Because WIC-only stores] have no need to

5

attract non-WIC customers. . . [they] have no incentive to
set prices that are determined by market forces. . . . In
order to ensure sound stewardship of taxpayer dollars, the
Child Nutrition and WIC Reauthorization Act of 2004 includes
several provisions designed to ensure that the WIC program
continues to rely on market forces to contain food costs and
that WIC-only stores do not charge higher prices than other
stores leading to waste of federal funds. . . . It also
requires the state agency to ensure that WIC-only stores are
cost neutral to the WIC program. . . . S. Rep. No. 108-279,
at 54-55, 2004 U.S.C.C.A.N. 668 at 715-716.

Congress established certain important deadlines for the

implementation of the cost containment provision of the

Reauthorization Act.  Congress provided: (1) States "shall

comply" with the cost containment provision by December 30, 2005,

42 U.S.C. § 1786(h)(11)(G); (2) the Secretary "shall" issue

guidance to state agencies "as soon as practicable," 42 U.S.C. §

1758 Notes; (3) the Secretary "shall" promulgate a final

regulation by June 30, 2006, *Id.*; and (4) the Secretary "may"

promulgate interim final regulations to implement the cost

containment provision (no date specified), *Id.*  The first three

deadlines are congressionally mandated, whereas Congress used the

permissive term "may" with regard to the interim final rule.

### C.   *Procedural History*

On November 29, 2005, the FNS published the interim rule in

the Federal Register. *See* 70 Fed. Reg. 71708.  The interim rule

was to go into effect on December 29, 2005, a day before the

states were required to implement the cost containment

provisions. *Id.*   On December 16, 2005, plaintiffs moved for a

temporary restraining order asking the Court to enjoin the

implementation of the interim rule.  A hearing on the motion was
held on December 28, 2005, and the Court granted plaintiffs'
motion.  The Court provided a brief explanation for its ruling in
open court the following day, and stated that it was not
persuaded at that juncture that the FNS had complied with the
notice and comment requirements under § 553 of the Administrative
Procedure Act ("APA"); nor was the Court persuaded that the
government was not required to conduct an analysis under the
Regulatory Flexibility Act ("RFA").  *See* Transcript of Hearing on
Motion for Temporary Restraining Order (Dec. 29, 2005) ("12/29/06
Tr.") at 5-6.  Thus, the Court enjoined the FNS through February
9, 2006, from taking any enforcement actions against the named
plaintiff businesses and the members of the named plaintiff trade
organization under 7 C.F.R. § 246.12(g)(4)(i)(D) and §
246.12(g)(4)(vi). *See* 2005 WL 3576840 (D.D.C. Dec. 29, 2005).
With regard to 7 C.F.R. § 246.12(g)(4)(vi), the Court specified
that its injunction was "only to the extent that sentences two
and three of that provision may be construed to require States to
compare average payments per food instrument to above-50-percent
vendors (WIC-only stores) to average payments per food instrument
made to all other WIC vendors rather than to other comparable WIC
vendors." *Id.*  On January 26, 2006, pursuant to a request of
the Court and with the consent of the parties, the temporary
restraining order was extended through February 23, 2006, to
afford the Court a reasonable period of time within which to

resolve the pending motions.

### III.      STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56*; Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In ruling on cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975). Further, in APA review cases, whether agency action was contrary to law is a legal issue that a Court resolves on the basis of the administrative record. *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

Moreover, review of an agency's construction of the statute which it administers is a two-fold inquiry under *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). "First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter. . . . [the Court] must give effect to the unambiguously expressed intent of

Congress." *Chevron,* 467 U.S. at 842-3.  The Court must look at the statutory provision in context when determining whether it speaks directly to the question at issue.  *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132-33 (2000). However, if the statute is "silent or ambiguous," the next question for the Court is "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 67 U.S. at 843.  Further, "[t]he Court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction" in order to conclude that the agency's construction was reasonable.  *Id.* at 843, n.11.


IV.   **STATUTORY CONSTRUCTION CHALLENGE**

A.   **The Vendor Cost Containment Provision**

The vendor cost containment provision of the Reauthorization Act has two distinct cost-containment goals. "First, each State must ensure that its aggregate WIC food costs are no higher if WIC participants choose to shop at WIC-only stores than if they shop at regular competitive stores.  Second, each State must ensure that average prices, referred to as 'average payments per voucher' in WIC-only stores are no higher than average prices in comparable competitive stores." 150 Cong. Rec. S7244-01, 7248 (June 23, 2004) (Statement of Sen. Harkin) (presenting the WIC Reauthorization bill to the Senate).  The first goal (aggregate cost neutrality) is codified in 42 U.S.C. §

1786(h)(11)(A)(i)(III)(bb) ("subsection (bb)") and the second goal (comparability) is codified in 42 U.S.C. § 1786(h)(11)(E) ("subsection (E)").

With these dual goals in mind, the vendor cost containment provision requires the following.  First, the cost containment provision requires state agencies to "establish a vendor peer group system" for all authorized WIC vendors in their respective states and to "establish competitive price criteria and allowable reimbursement levels for each vendor peer group."  42 U.S.C. § 1786(h)(11)(A)(i).  In these vendor peer group systems, state agencies compare vendors to similarly situated vendors to ensure that their pricing is competitive. *Id.*  When establishing vendor peer groups, the cost containment provision requires WIC-only vendors to be distinguished from other regular vendors. *Id.* § 1786(h)(11)(A)(i)(III)(aa).  State agencies can do this in one of two ways: (1) by creating a separate peer group composed of WIC-only vendors; or (2) by establishing separate price criteria and reimbursement levels for WIC-only vendors if they are in a peer group with regular vendors. *Id.* § 1786(h)(11)(A)(i)(III)(aa)(AA), (BB).

Second, the cost containment provision requires state agencies to establish competitive price criteria and reimbursement levels that "do not result in higher food costs if program participants redeem supplemental food vouchers at [WIC-only vendors] rather than at vendors other than [WIC-only

10

vendors]." *Id.* § 1786(h)(11)(A)(i)(III)(bb) ("subsection (bb)"). As explained above, subsection (bb)'s goal is to keep food costs neutral, regardless of whether WIC participants patronize WIC-only vendors or regular vendors.

Third, the cost containment provision does not "compel" state agencies "to achieve lower food costs" if WIC participants choose to shop at WIC-only vendors rather than at regular vendors. *Id.* § 1786(11)(A) (last paragraph).

Fourth, a state need not authorize any WIC-only vendors to participate in the program at all. 42 U.S.C. § 1786(h)(11)(A)(i)(III).  If it chooses to do so, however, it must satisfy an additional cost containment comparability provision found at § 1786(h)(11)(E) ("subsection (E)").  This section provides that if WIC-only vendors are authorized then the state agency must ensure that "the competitive price criteria and allowable reimbursement levels [for WIC-only vendors] do not result in average payments per voucher to [WIC-only vendors] that are higher" than average payment to comparable regular vendors. *Id.* § 1786(h)(11)(E).

### B.   *The Interim Rule*

The FNS promulgated the interim rule on November 29, 2005. 70 Fed. Reg. 70708.  In accordance with § 1786(h)(11)(A)(i), the rule states that a "state agency must establish a vendor peer group system and distinct competitive price criteria and allowable reimbursement levels for each peer group."  7 C.F.R. §

246.12(g)(4). In accordance with § 1786(h)(11)(A)(i)(III)(aa),
the interim rule provides for two ways to distinguish WIC-only
vendors within an established peer group.  A state agency can
establish a separate peer group for WIC-only vendors, or if it
does not establish WIC-only peer groups, the agency must
establish distinct competitive price selection and reimbursement
criteria for WIC-only vendors within a peer group with regular
vendors.  *Id.* § 246.12(g)(4)(i)(A).

Turning to subsection (bb), which articulates the aggregate
cost neutrality goal of the cost containment provision, the
interim rule requires state agencies to "compare the average cost
of each type of food instrument redeemed by [WIC-only vendors]
against the average cost of the same type of food instrument
redeemed by regular vendors."  *Id.* § 246.12(g)(4)(i)(D).  In
other words, the interim rule compares WIC-only vendors with *all*
WIC vendors.

Finally, under the interim rule, prior to authorizing any
WIC-only vendors, a state agency must receive FNS certification
of its vendor cost containment system. *Id.* § 246.12(g)(4)(vi). In
accordance with subsection (E), which articulates the
comparability goal of the cost containment provision, §
246.12(g)(4)(vi) of the rule provides that states must
"demonstrate that its competitive price criteria and allowable
reimbursement levels do not result in average payments per food
instrument to [WIC-only vendors] that are higher than average

12

payments per food instrument to comparable [regular] vendors."
Here, WIC-only vendors are being compared with all *comparable* WIC
vendors.  The rule then explains how the states are to arrive at
their average payment calculations. *Id.* § 246.12(g)(4)(vi).

### C. *Plaintiffs' Statutory Construction Challenge*

Plaintiffs challenge § 246.12(g)(4)(i)(D) of the rule as
being inconsistent with the plain language and purpose of
subsection (bb) of the statute under step one of *Chevron*.
Plaintiffs argue that the interim rule's comparison of  WIC-only
vendors with *all* WIC vendors is contrary to the plain language of
the statute.   Further, plaintiffs argue that the interim rule's
comparison of the average costs of vouchers redeemed at WIC-only
vendors with the average costs of vouchers redeemed at *all* WIC
vendors is contrary to the last paragraph of § 1786(h)(11)(A)'s
prohibition on achieving lower food costs if WIC participants
shop at WIC-only stores.  Finally, plaintiffs contend that the
interim rule's retroactive recoupment and participant access
provisions are not based on a permissible construction of the
statute under step two of *Chevron*.

### D. *The Word "Comparable" is Not Found in §  1786(h)(11)(A)(i)(III)(bb)*

To achieve the aggregate cost neutrality goal of subsection
(bb), the interim rule requires state agencies to "compare the
average cost of each type of food instrument redeemed by [WIC-
only vendors] against the average cost of the same type of food
instrument redeemed by regular vendors." 7 C.F.R. §

13

246.12(g)(4)(i)(D).  Plaintiffs argue that the interim rule's interpretation is contrary to the plain language of subsection (bb) and that the statute requires WIC-only vendors to be compared with other *comparable* vendors and not with all regular vendors.  In arriving at this reading of subsection (bb), plaintiffs would have the Court import the word "comparable" to subsection (bb) where no such word is found.  The only section of the statute where the word "comparable" appears is in subsection (E), which provides that average payments to WIC-only vendors are not to be higher than average payments to comparable vendors. 42 U.S.C. § 1786(h)(11)(E).

Under the law of statutory construction, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).  The Court will not read into subsection (bb) what is not stated therein, nor will the Court ignore the plain language of subsection (bb). The most natural reading of subsection (bb) is that food costs must remain the same whether or not WIC-participants redeem their vouchers at WIC-only vendors or at regular vendors.  Any attempt to import the word "comparable" into subsection (bb) to limit the basis of the comparison would distort Congress's clearly expressed intent. While the plain language of subsection (E) requires comparison of

14

WIC-only vendors to *comparable* regular vendors for the purpose of establishing average payments, the plain language of subsection (bb) requires comparison of WIC-only vendors to all regular vendors in order to keep food costs low.

### E.  Last Paragraph of Section 1786(h)(11)(A) Must be Read in Context

Plaintiffs also argue that if subsection (bb) is to be read and understood as suggested by the interim rule then that provision would violate the last paragraph of § 1786(h)(11)(A), which provides that "[n]othing in this paragraph shall be construed to compel a State agency to achieve lower food costs if program participants redeem supplemental food vouchers at [WIC-only vendors] rather than at vendors other than [WIC-only vendors]." Plaintiffs contend that if WIC-only vendors are compared with all regular vendors, the interim rule would compel state agencies to achieve lower food costs when WIC participants redeem their vouchers at WIC-only stores in direct contravention of the last paragraph of § 1786(h)(11)(A).

Plaintiffs' construction of the statute ignores the plain language of the statute and takes the language out of context. When the last paragraph of § 1786(h)(11)(A) is read together with the preceding subparagraphs, the meaning of that section becomes plainly clear - state agencies cannot be forced to achieve lower average prices at WIC-only vendors than the average prices at all other vendors. Cost containment and neutrality are the goals of the Reauthorization Act, thus, state agencies are directed to

ensure that WIC-only vendors' costs are not higher, but at the
same time not forced to be any lower, than the average costs of
regular vendors.

### F.   Plaintiffs' Reading of the Statute Would Create a Loophole Unintended by Congress

Plaintiffs further argue that since subsection (bb) is found
under a section entitled "Peer Groups," price and cost
comparisons based on subsection (bb) should be between peer
groups rather than between WIC-only stores and regular vendors.
If the statute is to be read as suggested by the plaintiffs,
however, a loophole would be created in subsection (bb).  As
noted above, § 1786(h)(11)(A)(i) provides states with the option
of establishing vendor peer groups that contain just WIC-only
vendors.  If, as suggested by the plaintiffs, subsection (bb)
requires average prices of WIC-only vendors to be compared with
the average prices of other vendors in their peer group,
subsection (bb) would impose no limit at all on the prices of
WIC-only vendors in states that elect to have WIC-only peer
groups.  The Court is not persuaded that Congress intended to
enact such a loophole that would allow state agencies to evade
the cost containment requirements.  Despite the artful arguments
of plaintiffs, the plain language of subsection (bb) requires
comparison of WIC-only vendors with all regular vendors.

### G.   Participant Access

Finally, plaintiffs contend that the interim rule provides

inadequate guidance for § 1786(h)(11)(C)(iii).[2]

---

[2] At the outset, defendant argues that plaintiffs do not have standing to challenge the rule on participant access grounds because they have not alleged any injury in fact that is fairly traceable to the challenged rule. Plaintiffs do not address this argument in their pleadings; however, the Court will address it briefly here.

To satisfy the case or controversy requirement of Article III of the Constitution, a plaintiff must show (1) that it has suffered a concrete and particularized injury that is actual or imminent not merely conjectural or hypothetical, (2) that the injury is fairly traceable to the challenged action of the defendant, and (3) that injury is fairly redressable by a decision of this Court. *See, e.g., Friends of the Earth v. Laidlaw Environmental Services,* 528 U.S. 167, 180-81 (1992); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Court finds that the harm to the plaintiff trade organization and to its members as a result of the promulgation of the interim rule constitutes a real and actual injury that is fairly traceable to the rule. Further, an injunction preventing implementation of the rule would redress this injury.

Defendant also argues that this claim should be rejected on ripeness grounds. Defendant contends that plaintiffs' claim is not yet fit for decision because the challenged rule went into effect only weeks prior and no concrete effect of the rule is evident at this time. Further, plaintiffs have failed to identify a genuine hardship that would befall them if this claim was postponed.

To determine whether an administrative action is ripe for review, courts must "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 808 (2003). Under the first prong, the Court must look to see whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 2006 WL 250234, at * 4 (D.C. Cir. Feb. 3, 2006). If the issues raised are purely legal, then a claim is "presumptively reviewable." *Id.* Under the second prong, the Court must consider "not whether [the parties] have suffered any 'direct hardship,' but rather whether postponing judicial review would impose an undue burden on them or would benefit the court." *Id.* If the Court sees no "significant agency or judicial interests militating in favor of delay" then "[lack of] hardship

Specifically, plaintiffs contend that the rule is invalid under *Chevron* step two because the FNS unreasonably interpreted the statute's requirement that participant access be a critical factor in establishing vendor peer groups, competitive price criteria and reimbursement level. *See* Pl.'s Mot. for Summ. J. at 36 ("[t]he Rule does not, but should, take into consideration where a WIC recipient would shop if the WIC-only stores were not an option."). Contrary to plaintiffs' assertions, the interim rule directly implements the Reauthorization Act's demand that state agencies "consider participant access by geographic area." 42 U.S.C. § 1786(h)(11)(B)(ii), (C)(iii).

Section 1786(h)(11)(C)(iii) provides, "[i]n establishing allowable reimbursement levels, the State agency shall consider participant access in a geographic area." The interim rule directly implements this provision by closely tracking the language of § 1786(h)(11)(C)(iii). Section 246.12(g)(4) of the interim rule states that "[i]n establishing competitive price criteria and allowable reimbursement levels, the State agency must consider participant access by geographic area." The

---

cannot tip the balance against judicial review."  *Id.*

The Court concludes that plaintiffs have raised a purely legal claim. Plaintiffs are challenging the legality of the interim rule by alleging that the rule falls short of the statutory mandate and that defendant's implementation of the rule would violate the statute. Given the purely legal nature of plaintiffs' challenge to the interim rule, the Court concludes that the issue is fit for judicial resolution and that their participant access claim is ripe for review.

interim rule is anything but unreasonable; it virtually echos the language of the statute.[3]

Further, defendant is correct to point out that in order to support their argument, plaintiffs rely on a provision of the interim rule that is inapposite.  Plaintiffs direct the Court to 7 C.F.R. § 246.12(g)(4)(ii)(A) which mentions geography but only in the context of establishing peer groups.  *See* Def.'s Opp. at 15; Pls.' Mot. for Summ. J. at 36; 7 C.F.R. § 246.12(g)(4)(ii)(A) (directing state agencies to use "[a]t least two criteria for establishing peer groups, one of which must be a measure of geography, such as metropolitan or other statistical areas that form distinct labor and product markets").  That provision of the rule does not implement nor does it purport to implement §

---

[3] Since the participant access claim is challenging the the interim rule's scope, an argument could be made that plaintiffs are challenging the reasonableness of the interim rule, which is an inquiry under arbitrary and capricious review. *See Arent v. Shalala*, 70 F.3d 610, 615-16 (D.C. Cir. 1995) (recognizing that "*Chevron* review and arbitrary and capricious review overlap at the margins").

Under the arbitrary and capricious standard, a reviewing court must look to ensure that the agency did not rely "on factors which Congress has not intended it to consider,...failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). When plaintiffs' challenge is analyzed under this standard, the Court finds the interim rule to be anything but arbitrary and capricious.  The rule relies wholly on the factors Congress has intended it to consider.

1786(h)(11)(C)(iii).

In conclusion, plaintiffs' challenge to the FNS' construction of the Reauthorization Act under step one and step two of *Chevron* fails as a matter of law.[4]  The cost containment provisions of the interim rule are consistent with the plain language and purpose of the Reauthorization Act.  Further, the interim rule relating to participant access is based on a

---

[4] Plaintiffs argue in their Motion for Summary Judgment that the retroactive recoupment of excess payments from states and their authorized vendors is an impermissible construction of the Reauthorization Act.  The Court finds that this issue is moot in light of the fact that the FNS emphatically assured the Court and the plaintiffs during the January 26, 2006 hearing and in their Supplemental Memorandum in Support of Defendant's Motion for Summary Judgment that the recoupment provision of the interim rule is not retroactive. *See* Def.'s Supplemental. Mem. in Supp. of Mot. for Summ. J. at 5-7; 01/26/06 Tr. at 2, 10, 45-46.  As stated by the FNS, if a state retroactively recouped its costs, it would be acting contrary to the law.  01/26/06 Tr. at 46.

Although it was made abundantly clear at the January 26, 2006 hearing to all parties that retroactive recoupment is not an issue in this case, plaintiffs have again raised the issue in their Supplemental Motion in Support of Motion for Summary Judgment. Plaintiffs are clearly misconstruing what the interim rule means by recoupment of excess payments. The words "recouping excess payments" appear in a sentence discussing the different ways a state agency may enforce the cost containment requirement against WIC-only vendors who are not in compliance. 7 C.F.R. § 246.12(g)(4)(i)(D).  If WIC-only vendors are in compliance with the states' established competitive price range and reimbursement levels, then no recoupment is allowed. *See* Attach. to Vogel Decl. (Jan. 20, 2006) (a state agency is not permitted "to recoup any payment to a vendor that is within the established maximum allowable reimbursement level for that vendor. . . for cost containment purposes"); *see also* 01/26/06 Tr. at 84. Therefore, in light of the fact that plaintiffs have not raised any new arguments as to retroactive recoupment, that issue is moot. In any event, should states attempt to retroactively recoup costs - which is doubtful - plaintiffs can seek relief in courts of competent jurisdiction.

permissible construction of the statute.

**V.   NOTICE AND COMMENT REQUIREMENT UNDER THE ADMINISTRATIVE PROCEDURE ACT**

Plaintiffs claim that the Secretary violated the notice and comment provision of the APA by not affording them a meaningful opportunity to comment on the interim rule prior to its promulgation.  In response, defendant first argues that § 553 of the APA is not applicable to the interim rule because the interim rule relates to grants which are explicitly exempted from § 553. Second, even if § 533 is applicable, the FNS had "good cause" to forego the procedure.

Section 553 of the APA requires agencies to publish a "[g]eneral notice of proposed rule making" and "to give interested persons an opportunity to participate in the rulemaking. . ." 5 U.S.C. § 553(b), (c).  The purpose of the statute is to "provide both notice and meaningful opportunity to comment." *Asiana Airlines et al., v. Federal Aviation Administration*, 134 F.3d 393, 396 (D.C. Cir. 1998).  The requirements of § 553, however, do not apply to rulemakings "relating to agency management or personnel or to public property, loans, *grants*, benefits, or contracts."  5 U.S.C. § 553(a)(2) (emphasis added); *see also Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1084 (D.C. Cir. 1978) (noting that the § 553(a)(2) exception exists because where public benefits or entitlements are concerned "the congressional aim was

21

to afford agencies procedural latitude regardless of the interest of affected parties and the public generally in contributing to formulation of the exempted rule"). Further, an agency may depart from notice and comment procedures for "good cause." *See* 5 U.S.C. § 553(b)(B) (notice and comment does not apply "when the agency for good cause finds. . . that notice and public procedure thereon are impracticable, unnecessary or contrary to the public interest").

The WIC Program does appear to relate to public "grants." Therefore, the interim rule would appear to be exempt from the APA. However, in 1971, USDA issued a policy statement providing that USDA will "give notice of proposed rulemaking and . . . invite the public to participate in rulemaking where not required by law," including rulemaking relating to grants and benefits. Statement of Policy, 36 Fed. Reg. 13804 ("1971 Policy Statement") (July 24, 1971). Although the interim rule is exempt from § 553 of the APA, USDA's 1971 Policy Statement fully binds the agency to the procedural requirements of the APA. *See Rodway v. United States Dept. of Agriculture*, 514 F.2d 809, 814 (D.C. Cir. 1975) ("[i]t is, of course, well settled that validly issued administrative regulations have the force and effect of law. Thus, [the 1971 Policy Statement] fully bound the Secretary to comply thereafter with the procedural demands of the APA."). In promulgating the interim rule, the FNS had to comply with the notice and comment procedure of § 553 of the APA as adopted by

the 1971 Policy Statement, unless exempted from compliance.

As in § 553 of the APA, the 1971 Policy Statement allows for a "good cause" exemption.  The 1971 Policy Statement states that "where an agency [of USDA] finds for good cause that compliance would be impracticable, unnecessary or contrary to public interest," it may depart from the notice and comment procedure, so long as the agency has a "substantial basis therefore."  36 Fed. Reg. 13804.

The FNS contends that it had good cause to forego notice and comment and offers four reasons for its good cause determination. First, it was specifically authorized by Congress in the Reauthorization Act to issue an interim rule.  Second, the FNS worked diligently to meet the congressionally-imposed deadline. Third, it had a compelling need to have the interim rule in place by December 30, 2005, the effective date of the Reauthorization Act.  Finally, the interim rule is a temporary rule that allows for data collection and flexibility.

Agency attempts to avoid the notice and comment procedure under the APA are closely scrutinized.  *See New Jersey Dept. of Environmental Protection v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980) (holding that exceptions under § 533 must be "narrowly construed and only reluctantly countenanced" in order to assure that "an agency's decisions will be informed and responsive"); *Asiana,* 134 F.2d at 396 ("[w]e have looked askance at agencies' attempts to avoid the standard notice and comment procedures");

23

*Council of the Southern Mountains v. Donovan*, 653 F.2d 573, 580
(D.C. Cir. 1981) (noting that the court had "recently admonished
agencies that circumstances justifying reliance on [the good
cause exception] are indeed rare and will be accepted only after
the court has examined closely proffered rationales justifying
the elimination of public procedures").  In fact, "just because
the agency itself adopted the requirements of section 553(b) and
(c). . . does not mean that it may follow the procedure
arbitrarily, or use good cause to manipulate the procedures to
its own uses." *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir.
1984). *See also Rodway*, 514 F.2d at 814.  Therefore, the Court's
inquiry should be thorough, and the Court must look to the
totality of the circumstances in order to determine whether the
defendant justifiably invoked the good cause exception to notice
and comment procedure.  *Petry v. Block*, 737 F.2d 1193, 1200 (D.C.
Cir. 1984).  *See also Mid-Tex Electric Coop., Inc. et al., v.
Fed. Energy Regulatory Comm'n*, 822 F.2d 1123, 1132 (D.C. Cir.
1987) ("good cause inquiry is inevitably fact- or context-
dependent").

Upon careful examination of the FNS' justifications for its
decision to forego the notice and comment procedure, the Court
concludes that the combination of four reasons advanced by
defendant establishes the requisite good cause.  This not a
case where an agency has engaged in dilatory tactics between the
enactment of the statute and the publication of the interim rule,

or simply waited until the day of a statutory deadline to raise
the good cause banner and attempt to promulgate a rule without
undertaking notice and comment.  The totality of the
circumstances of this case persuades the Court that the FNS has
been diligent in its efforts to promulgate an interim rule to
provide the guidance needed by the states to comply with the
Reauthorization Act.

First, it is significant that Congress authorized the
issuance of an interim rule. *See* 42 U.S.C. § 1758 Notes ("The
Secretary may promulgate interim final regulations to implement
[the Reauthorization Act].").  By using the word "may," Congress
granted the USDA some discretion to issue an interim rule without
first providing notice and comment in order to ensure that a rule
was in place by December 30, 2005, the effective date of the
statute.[5]

---

[5] Plaintiffs argue that since the Reauthorization Act does
not expressly authorize the USDA to forego prior notice and
comment, the FNS is required to abide by § 553.  Congress can
modify the requirements of prior notice and comment procedures
under § 553 of the APA when its intent to do so is stated
expressly.  *See* 5 U.S.C. § 559 ("[s]ubsequent statute may not be
held to supersede or modify this subchapter...except to the
extent that it does so expressly.").  Plaintiffs contend that the
word "may" does not constitute an express authorization from
Congress to forego notice and comment.  Plaintiffs' argument
misses the mark.  In this case, notice and comment is not
required by the APA but by the USDA's 1971 Policy Statement.
Thus, Congress did not explicitly exempt rulemaking related to
the Reauthorization Act from notice and comment because the APA
is not applicable in the first instance. *See Philadelphia
Citizens in Action v. Schweiker*, 669 F.2d 877, 885-86 (3d Cir.
1982) (explaining that "since Congress specifically does not
require notice and comment where grants or benefits are involved
[rather it is Health and Human Services own internal policy that

"When a statute uses a permissive term such as 'may' rather than a mandatory term such as 'shall,' this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show deference to the agency's determination." *Dickson v. Secretary of Defense*, 68 F.3d 1396, 1401 (D.C. Cir. 1995).  Although the Reauthorization Act required states to comply with the statute by December 30, 2005, the agency implementing the statute has until June 30, 2006, to promulgate final regulations.  Thus, for six months states would be without any guidance as to how to implement the Reauthorization Act.  Exercising its discretion, the FNS promulgated an interim rule to cover the period between enactment of the statute and promulgation of the final regulation.  The FNS' decision to issue the interim rule to cover this period of six months should be given deference for the agency was exercising its discretion in a reasonable manner.  In order for the states to receive federal funding under WIC, they must be in compliance with the Program's specific requirements.  In the absence of a rule, state agencies would be at a loss as to how to implement the new provisions of the statute, how to continue demonstrating their compliance with the requirements, and how to remain eligible for future funding.

---

requires it]....Congress surely is not obliged to state
explicitly that statutes it enacts fit within exceptions to
regulations or policies formulated solely by an administrative
agency.").

Second, the FNS maintains that the specific time line set by Congress for implementation of the statute should be considered in the good cause determination.  In conjunction with the tight time line, the FNS argues that it worked diligently to complete the interim rule and has not abused its discretion to forego prior notice and comment.

"As a general matter, strict congressionally imposed deadlines, without more, by no means warrant invocation of the good cause exception.  Nevertheless, deviation from APA requirements has been permitted where congressional deadlines are very tight and where the statute is particularly complicated." *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225, 1236 (D.C. Cir. 1994).  The congressional deadline in this case was not as pressing as in cases where good cause exception has been invoked and found to be appropriate.  *See, e.g., Petry,* 655 F.2d at 1200-01 (agency's decision to forego notice and comment was grounded in good cause when Congress provided the agency with 60 days to promulgate the regulation); *Philadelphia Citizens in Action v. Schweiker*, 669 F.2d 877, 883 (3d Cir. 1982) (the fact that Congress provided the agency with 49 days to promulgate and implement regulations constituted good cause). *But see Kollett v. Harris*, 619 F.2d 134 (1st Cir. 1980) (holding that the good cause exception did not apply given that 14 months intervened between the passage of the amendments and their effective date and no justification was advanced for the agency's failure to follow

notice and comment within the time available); *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (3d Cir. 1979) (the fact that the EPA had more than one year to implement the plans weighed against a good cause determination because the EPA could have complied with the notice and comment requirements); *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 213 (5th Cir. 1979) (six-month Congressional deadline did not excuse agency failure to comply with prior notice and comment procedure).  Here, the FNS had 18 months from enactment of the statute to the date of its implementation.

Although the time line available to the FNS was not severely constrained, the agency has demonstrated that it worked diligently to complete the interim rule while also attending to other demanding obligations.  The Court accepts defendant's proffer that it would have been difficult for the FNS to have set aside a period of time to undertake notice and comment.  The FNS has demonstrated that it has not been dilatory in promulgating the interim rule during the period of June 2004 to November 2005.[6]  Clearly, a notice and comment period prior to December

---

[6] From July of 2004 through October of 2004, the FNS conducted congressional briefings and collected necessary data and information from state agencies relating to the vendor cost containment provision of the Reauthorization Act.  Vogel Decl. (Jan. 17, 2006) ¶ 6-11.  Between December 2004 and March 2005, the FNS had a working draft of the interim rule and conducted necessary regulatory analysis. *Id.* at ¶ 11.  Between March 2005 and July 2005, the interim rule went through the formal clearance process within the FNS and USDA. *Id.* at ¶ 13-14. In July 2005, the FNS issued a draft guidance to state agencies. *Id.* at ¶ 16. In August 2005, the interim rule was presented to the Office of Management and Budget ("OMB") for its 90 day review. *Id.* at ¶ 13. Between July 2005 and October 2005, the FNS trained state

30, 2005, would have required not only several months of receiving and reviewing public comments to the interim rule, but also, if there were any resulting changes to the interim rule, the rule would have undergone a second internal review and clearance process.

Further, the Reauthorization Act includes over 60 pages of provisions affecting the WIC Program and the National School Breakfast and Lunch Programs. Vogel Decl. (Jan. 17, 2006) ¶ 5. The FNS issued a total of approximately 70 policy memoranda and 25 regulations related to the Reauthorization Act. *Id.* For the WIC Program alone, the FNS developed six policy memoranda and four other regulations. *Id.* at ¶ 18. Five FNS staffs were available to work primarily on the implementation of the WIC-related portions of the Reauthorization Act. *Id.* ¶ 5. *See, e.g., Petry,* 737 F.2d at 1202 (noting that "while agency understaffing in a rulemaking process would not, without more, normally constitute grounds for the 'good cause' exception," when considered with other factors in the case, good cause existed to bypass notice and comment). Therefore, the Court concludes that uncontroverted record evidence indicates that it is highly doubtful that the FNS could have published its interim rule by

---

agencies in seven FNS regions. *Id.* at ¶ 16.  At the end of September 2005, the OMB responded with 90 technical questions about the interim rule to which the FNS had to respond. *Id.* at ¶ 15. On November 7, 2005, the OMB cleared the rule. *Id.*  On November 22, 2005, the interim rule was signed by the Deputy Undersecretary of FNS. *Id.*  On November 29, 2005, the interim rule was published in the Federal Register. *Id.*

December 30, 2005, if it had undergone the notice and comment rulemaking procedure.  *See* Vogel Decl. (Jan. 17, 2006).  The constrained time frame plus FNS' demonstrated diligence certainly contributes to a good cause finding.

Third, the FNS argues that there was a compelling need to have a rule in effect by December 30, 2005, because on that date the states were required by Congress to be in compliance with the Reauthorization Act, and no one would have benefitted if the states were left with no guidance on how to implement the new provisions of the WIC Program.  Although this justification standing alone would not constitute good cause, the combined effect of this and other reasons suffice.  Undoubtedly, states need to know from the agency responsible for implementing the statute how they can continue to receive federal funding. WIC is a multi-billion dollar federal program that directly affects the health and nutrition of millions of Americans.[7]  Without guidance, the statute could be applied ineffectively and inconsistently, and certainly the savings Congress had hoped to achieve by the Reauthorization Act could be lost.[8]

Fourth, the FNS argues that the interim rule is exactly what

---

[7] Congress has appropriated over $5.2 billion to fund the program for fiscal year 2006.  State agencies are expected to receive nearly $2 billion in additional funding through statutorily mandated rebates from infant formula manufacturers. Complaint ¶ 13.

[8] The FNS estimates that the Reauthorization Act will result in cost savings of approximately $75 million annually.  70 Fed. Reg. at 71709.

it says - a temporary rule that is subject to amendment by public comment.  The interim nature of a challenged rule is a "significant factor" in evaluating an agency's good cause claim. *Tenn. Gas Pipeline Co. v. Fed. Energy Regulatory Comm'n*, 969 F.2d 1141, 1144 (D.C. Cir. 1992);  *Mid-Tex Electric Coop.,* 822 F.2d at 1132.  Further, an agency's failure to engage in pre-promulgation notice and comment can be partially cured when there is an opportunity for post-promulgation comment. *Universal Health Services of McAllen, Inc. v. Sullivan*, 770 F. Supp. 704, 721 (D.D.C. 1991).  Of course, an agency must remain open at the later stage to consider the comments garnered. *Id.*

The FNS has displayed a willingness to incorporate public suggestions into its final rules in its preamble to the interim rule. *See* 70 Fed. Reg. at 71709 (the FNS "will be collecting and analyzing data from State agencies, in anticipation of issuing a final rule.").  Further, prior to publishing the interim rule in the Federal Register, the FNS issued a lengthy guidance to the states in July 2005, and it received and reviewed comments from the different state agencies, some of which were incorporated into the guidance.  Vogel Decl. (Jan. 17, 2006) ¶ 16.  The interim rule, temporally limited in scope, is necessary to assist the FNS develop better assessment and evaluation tools to ensure that the Reauthorization Act does indeed achieve its goals of cutting program costs and ensuring containment of costs among WIC-only vendors.

In conclusion, having examined the totality of circumstances in which the interim rule was promulgated, the Court finds that the FNS' invocation of the good cause exception is justified. The FNS had good cause to proceed without prior notice and public comment of the interim rule.

## VI.  REGULATORY FLEXIBILITY ACT ANALYSIS

Plaintiffs next argue that the FNS failed to conduct an adequate analysis under the Regulatory Flexibility Act ("RFA") in promulgating the interim rule.  The RFA requires agencies to consider the effect that their regulation will have on small entities, analyze effective alternatives that may minimize a regulation's impact on such entities, and make their analyses available for public comment. 5 U.S.C. §§ 601-604.  Defendant argues that because the RFA requires an analysis of the impact on directly regulated businesses, it is not applicable here.  The RFA does not require that an agency assess the impact of a rule on all small entities that may be affected by the rule, but only those directly regulated.

The RFA was enacted by Congress "to encourage administrative agencies to consider the potential impact of nascent federal regulations on small businesses." *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 111 (1st Cir. 1997).  Under the RFA, an agency describes the effect of the proposed rule on small businesses and discusses alternatives that might minimize adverse

economic consequences. *Id.*  Judicial review of agency compliance with the RFA is available. *Alenco Communications Inc., v. Fed. Communications Comm'n*, 201 F.3d 608, 625 (5th Cir. 2000). Agencies need only engage in a "reasonable" and "good faith effort" to carry out the mandate of the RFA. *Id.*  Further, the RFA is a purely procedural, as opposed to a substantive, mandate; RFA "requires nothing more than that the agency file a final regulatory flexibility analysis demonstrating a reasonable, good-faith effort to carry out the RFA's mandate." *United Cellular Corp. v. Fed. Communications Comm'n*, 254 F.3d 78, 88 (D.C. Cir. 2001).  Moreover, "failure to comply with the RFA may be, but does not have to be, grounds for overturning a rule." *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 868 (D.C. Cir. 2001).

A regulatory flexibility analysis, however, is not required if the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."  5 U.S.C. § 605(b).  The RFA "impose[es] no obligation upon an agency to conduct a small entity impact analysis of effects on entities which it does not regulate." *American Trucking Ass'n, Inc. v. EPA*, 175 F.3d 1027, 1044 (D.C. Cir. 1999).  *See also Cement Kiln*, 255 F.3d at 869 ("this court has consistently rejected the contention that the RFA applies to small businesses indirectly affected by the regulation of other entities. . . .Congress did not intend to require that every agency consider every indirect effect that any regulation might

have on small businesses in any stratum of the national economy.").

The FNS certified that an RFA analysis was unnecessary because the interim rule would "not have a significant economic impact on a substantial number of small entities."  70 Fed. Reg. at 71709.  The FNS certification satisfies the standards set out in § 605(b) of the RFA.  The FNS published its certification in the Federal Register and provided a factual basis for its certification. *Id.*  Further, as in *American Trucking*, the entities directly regulated by the interim rule are state agencies. The state agencies, not WIC-only vendors, are required to establish peer groups and competitive price criteria in order to receive federal funding.

In *American Trucking*, the Court held that the National Ambient Air Quality Standards ("NAAQS") promulgated by the Environmental Protection Agency ("EPA") do not in and of themselves impose regulations on small entities.  Rather, "states regulate small entities through the state implementation plans that they are required by the Clean Air Act to develop." 175 F.3d at 1044.  The Court went on to say that the NAAQS only indirectly regulate small entities because the standards affect the planning decisions of the states. *Id*.

The situation in *American Trucking* is directly analogous to the situation in this case.  The Reauthorization Act and the interim rule are directed toward the states and regulate state

34

agencies' actions - specifically, what state agencies need to do
in order to contain WIC program costs.  State agencies are
required by the interim rule to produce a state plan that
demonstrates to the FNS that they are in compliance with the cost
containment provisions of the Reauthorization Act. 70 Fed. Reg.
at 71721-22.  Since the retail food market conditions and WIC
participant access to vendors vary from state to state, the
Reauthorization Act and the interim rule provide state agencies
with significant discretion regarding how to establish vendor
peer groups, competitive pricing, and allowable reimbursement
levels to meet the requirements of the cost containment
provision.  70 Fed. Reg. 71708.  Depending on how vendor peer
groups are established by the states, small business entities
could be affected differently in every state.

Plaintiffs attempt to distinguish this case from *American
Trucking* by urging the Court to look at the language in *Cement
Kiln*.[9]  In that case, the Court stated that the RFA applies to
"small entities which will be subject to the proposed regulation
- that is, those small entities to which the proposed rule will

---

[9] Although the agency in *Cement Kiln* did not believe the
RFA required it to conduct a regulatory flexibility analysis on
the regulation's impact on generators of hazardous materials, the
agency did so in the "spirit" of the RFA. 255 F.3d at 868.  The
petitioner challenged the adequacy of the agency's regulatory
flexibility analysis, and the Court held that because the
generators of the hazardous materials were not subject to the
rule in question, RFA analysis was not necessary. *Id*. at 869.
Since RFA analysis was not necessary in the first place, the
Court did not address the question of whether the analysis
undertaken was adequate. *Id.*

apply." *Cement Kiln*, 255 F.3d at 869 (quoting *Mid-Tex Elec. Coop,* 773 F.2d at 342).   Contrary to plaintiffs' contentions, that language actually supports the defendant's position.   State agencies are the entities to which the interim rule applies. Small business entities such as WIC-only vendors may be "targets" of the interim rule, but the interim rule actually applies to state agencies.   *See Cement Kiln*, 255 F.3d at 869 ("application of the RFA does not turn on whether particular entities are the 'targets' of a given rule").   The Court, therefore, concludes that the FNS properly certified that the interim rule would not have a significant impact upon a substantial number of small entities.

Finally, the Court notes that the FNS plans to "collect data on the implementation of this interim final rule and the options States select in order to better assess the impact for the final rulemaking and the Final Regulatory Flexibility Analysis and publish it for comments."   70 Fed. Reg. at 71709.


For the foregoing reasons, plaintiffs' Motion for Summary Judgment is DENIED and defendant's Motion for Summary Judgment is GRANTED.   The Court's December 29, 2005 Order granting plaintiffs' Motion for a Temporary Restraining Order is VACATED. An appropriate Order accompanies this Memorandum Opinion.

```
Signed:     Emmet G. Sullivan
            United States District Judge
            February 23, 2006
```